IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Lina Dou, Tingyang Shao, Yixuan Tao,   )
Xiuqin Xing, Emmy Go, Yanming Wang,   )
Shiyang Xiao, Lihong Zhan, Geli Shi, and   )
Ying Yao, on behalf of themselves and all   )
others similarly situated,   )
  )
      Plaintiffs,   )
  )
  )
    v.   )
  )
Carillon Tower/Chicago LP;   )
Forefront EB-5 Fund (ICT) LLC;   )
Tizi LLC d/b/a Local Government   )
    Regional Center of Illinois;   )
TD Bank N.A.;   )
Symmetry Property Development II LLC;   )
Fordham Real Estate LLC; and   )
Jeffrey L. Laytin,   )
      Defendants.   )

**FILED** JG

5/25/2023

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

No.: 1:18-cv-07865

**Hon. Charles P. Kocoras**
Presiding

**Hon. Young B. Kim**
Magistrate

**FIRST AMENDED CLASS ACTION COMPLAINT**

<u>Nature of the Case</u>

This lawsuit is fallout from a failed project called "Carillon Tower," a planned 42-story tower at Superior and Wabash Streets in the Magnificent Mile, supposedly housing a 200-unit Hilton hotel, 154 apartment units, a 225-seat Gibson's Restaurant, and parking spaces for 154 vehicles. It was marketed to Chinese investors as an "EB-5" path to a green card, scheduled to begin construction in 2015 and be completed in 2017.

In reality, nothing was ever built and no shovel was ever put into the ground. The entire plan was rejected by 42nd Ward Alderman Brendan Reilly after a vocal neighborhood outcry, and plans for the project were not formally submitted to the Commissioner of Planning and Development; at most, some discussions and meetings were had which do NOT amount to a formal submission. The lack of a formal submission is clear from the fact that after 4 years there has not been any explicit approval: the Defendants are still 'at the drawing board.' As recently as March 7, 2019, Defendants were denied a permit to demolish buildings on the site which were granted preliminary landmark status, proving that this project has gone nowhere in four years, yet all the money invested is gone.

The Chinese investors who are Plaintiffs in this case placed $49.5 million ($550,000 each) into an escrow with Defendant TD Bank NA ("TD") to be released only on condition that the project was submitted for approval by the Commissioner of Planning and Development, and if this didn't happen, the money was to be refunded. The most that Defendants did was meet with the Office of Planning, but no final plan was submitted for approval or denial. Despite this condition not being satisfied, TD released the money from escrow in 2015 to entities owned or controlled by Defendant Laytin. The Plaintiff's money – in many cases their family's life savings -- has been missing for over three years while they were fed misinformation about the project to keep them from suing.

Lead Plaintiff Lina Dou ("Dou") is one of ninety Chinese investors in this ill-fated project. Along with the other class members, they seek a return of their $49.5

million dollars from TD, the Laytin affiliates who were wrongfully given the money, and from the other Defendants who structured this transaction and partnered with these Defendants,

The Chinese investors simply want their money returned with whatever interest, penalties, and fees they are entitled. They are indifferent to which particular defendant was most at fault, e.g., whether the fault lies mostly with TD for breaking the escrow, or with the developers for wrongfully instructing TD to release the escrow, or with the EB-5 regional center Tizi LLC for overseeing the transaction, or with the other developer Defendants for facilitating this massive wrongdoing. The only sure thing is that this money was wrongfully taken from them to fund a non-existent project, and now the money must be returned.

## The Parties

1.      Plaintiff Lina Dou is a Chinese national residing in China.

2.      All members of the putative Class of ninety investors are Chinese citizens. None of the putative class members are residents of the State of Illinois.

3.      Defendant Carillon Tower/Chicago LP is a New York limited partnership (the "LP").

4.      Defendant Forefront EB-5 Fund (ICT) LLC is a New York limited liability company acting as the general partner of the LP (the "GP").

5.      Defendant Tizi LLC is an Illinois limited liability company doing business under the assumed name of Local Government Regional Center of Illinois

(the "Tizi"), a regional center authorized to help developers raise money from foreigners under the EB-5 program.

6. Defendant TD Bank N.A. is a national banking association with a principal place of business in Cherry Hill, New Jersey, and the escrow agent who, under the terms of the Offering, was required to hold the investors' money until certain conditions were satisfied ("TD").

7. Defendant Symmetry Property Development II LLC is a New York limited liability company that, under the terms of the Offering, was to be the co-developer of the Project ("Symmetry").

8. Defendant Fordham Real Estate LLC is an Illinois limited liability company that, under the terms of the Offering, was to be the co-developer (with Symmetry) to develop the Project ("Fordham").

9. Defendant Jeffrey L. Laytin is the managing member of the GP and thereby had control of the GP. He is also listed in SEC filings as the manager of Symmetry, the co-developer of the Project.

## Jurisdiction and Venue

10. Jurisdiction is proper in federal court pursuant to 28 U.S.C. 1332(a)(2) because this is a civil matter, in excess of the statutory minimum, between subjects of a foreign state (The People's Republic of China) and citizens and entities of the United States.

11.    Jurisdiction is also proper in federal court pursuant to 28 U.S.C. 1331 because this action involves questions of federal law, namely whether the Defendants violated the Securities Exchange Act of 1934, 15 U.S.C. 77q(a) et seq.

12.    Venue is proper in this district pursuant to 28 U.S.C. 1391(b)(1) and (2) because two of the essential Defendants (Tizi and Fordham) are Illinois companies, and the subject property is located in downtown Chicago, in this district.

13.    The Defendants have all purposely availed themselves of this district by setting up a development Project in this district.

## Factual Allegations Common to All Counts

14.    Plaintiff Dou and other class members were solicited and marketed by Tizi and its overseas agents in China to invest in an EB-5 project that would offer the promise of an eventual green card by investment in a project that generated 10 jobs per investor.

15.    Plaintiff Dou and others were provided with brochures marked "Forefront Capital" and "Forefront EB-5 Fund" which described an EB-5 investment into a building that would supposedly be built in downtown Chicago.

16.    Plaintiff Dou and others invested pursuant to a document styled "Confidential Private Offering Memorandum dated January 15, 2015" (the "PPM"), attached as Exhibit 1.

17.    The vast majority of Plaintiffs cannot speak or read English, and those that can cannot read or write beyond the elementary school level.  As part of the Offering, a copy and the PPM, translated into their native language (Mandarin

Chinese), was never provided to any plaintiff or any putative class member before they were asked to sign the execution pages of the PPM.

18.     Although the PPM stipulates that English controls and that investors are responsible for hiring a translator, the cost of translating a document of this size and complexity is prohibitive and the investor relies mainly on the fiduciary obligation of the mangers to ensure that they will be treated fairly.

19.     The PPM is an aggregate document in pdf format that contains a number of interconnected documents: a subscription agreement in favor of the GP with instructions for the Plaintiffs to wire the $550,000 into an escrow at TD ("Subscription Agreement"); a limited partnership agreement whereby each Plaintiff agrees to be a limited partner in the LP ("LP Agreement"); and an Escrow Agreement between the LP and TD ("Escrow Agreement"). Copies of such documents are contained within Exhibit 1 and referred to herein as the "Investment Documents."

20.     Payments by the Plaintiffs of $550,000 were acknowledged in confirmations letters sent by TD to Defendant Laytin as manager of the GP and the LP, a sample of which is attached as Exhibit 2.  Upon information and belief, a similar letter was used to acknowledge the same investment by each putative class member.

21.     Page 3 of the PPM provides that Symmetry and Fordham will work together in the "acquisition, construction, and development of the real property located at the corner of Superior Street and Wabash Avenue, in Chicago, Cook

County, Illinois to be known as the Carillon Tower, a 42 story tower housing a 200-room hotel operating under the Canopy by Hilton brand, 154 luxury apartment units, a 225 seat restaurant operated by Gibson's Restaurant Group, and parking space for 154 vehicles (collectively, the "Project").

22.     The "Project" was meant to be over 40 stories, over 700 feet tall, with a Hilton Hotel, apartment units, a Gibson's Restaurant, and parking.  That is what the investors were sold.

23.     The PPM at page 8 provides that each investor agrees to place $550,000 of their own funds into an escrow account with TD.  TD was then to release $50,000 of each investor's escrow funds to the LP immediately as an "Administrative Fee" for putting the deal together, and would hold the remaining $500,000 as a "Capital Contribution" until a "Holdback Trigger" had been satisfied.

24.     The Holdback Trigger is defined as follows on page 8 of the PPM and similarly throughout the Investment Documents:

"* USCIS has approved the Form I-526 Petition of one Subscriber for a Unit in the Offering; and

* The Partnership has provided evidence that the Project plan has been formally submitted to the Chicago Commissioner of Planning and Development."

25.     The second condition of the Holdback Trigger is that the LP must provide evidence of **formally** submitting the **Project** plan to the **Chicago Commissioner**.  This condition has never been met and in all likelihood can never be

7

met as the Alderman has moved to downzone the subject property, and upon information and belief based on conversations with his staff, he has no intention of approving the Project.

26.     Furthermore, the plans called for the demolition and usage of space currently occupied by three buildings under temporary landmark status, and a permit to demolish these buildings has recently been denied to Defendant Symmetry – so there is no way to build this Project anyway.

27.     Exhibit B to the Subscription Agreement is styled "Summary of Escrow Procedures" and it provides at Section G (pg. 161) that the Holdback Trigger requires that "the Project plan has been formally submitted to the Chicago Commissioner of Planning and Development."

28.     The Escrow Agreement attached to the PPM (page 165) is a word-for-word exact copy of the document signed by TD Bank NA on May 19, 2015, and provides that TD will release the funds from escrow only upon notification from the LP that the Holdback Trigger has been satisfied.

29.     Further, the Escrow Agreement provides that if the Offering is cancelled, the Administrative Fee of $50,000 must be returned to investors, for a total refund to investors of $550,000.

30.     The trigger for the entire Project – the entire basis on which the Defendants took $550,000 from the Plaintiffs -- was that a formal plan was going to be submitted to the Commissioner of Planning and Development, which never happened.  It is not clear on which date the various Defendants realized that this

8

condition had not been satisfied, but they all acted "as if" it had been satisfied and acquiesced, stood by, and did nothing while the Plaintiff's money was wrongfully released.

31.    On information and belief, an employee and/or agent of TD was informed that the Holdback Trigger for the Project had been satisfied.

32.    On information and belief, an employee and/or agent of the LP was informed that the Holdback Trigger for the Project had been satisfied.

33.    Upon information and belief, an employee and/or agent of the GP was informed that the Holdback Trigger for the Project had been satisfied.

34.    Upon information and belief, an employee and/or agent of Tizi was informed that the Holdback Trigger for the Project had been satisfied.

35.    Upon information and belief, an employee and/or agent of Symmetry was informed that the Holdback Trigger for the Project had been satisfied.

36.    Upon information and belief, an employee and/or agent of Fordham was informed that the Holdback Trigger for the Project had been satisfied.

37.    Upon information and belief, TD has released to the LP the $50,000 Administrative Fee from each investor (totaling $4.5 million) even though there is nothing to "administer" because there is no Project, and even though the Escrow Agreement provides that if the Holdback Trigger is not satisfied, the $50,000 must be returned to each investor.

38.     On information and belief, TD has released some and/or all of the $500,000 capital funds invested by the Plaintiff and each putative class member to the LP.

39.     Upon information and belief, the GP has transferred some and/or all of the $500,000 capital funds invested by the Plaintiff and each of the putative class members from the LP fund to defendants Symmetry and/or Fordham.

40.     The Offering documents create a loop of self-dealing: Defendant Laytin, as manager of the GP, can cause the LP to notify TD that the Holdback Trigger has been met, thereby causing the release of the Capital Contributions money to Symmetry, which is also managed by Laytin.

41.     The Project plan was not submitted to the City Commissioner.

42.     By longstanding Chicago tradition, a prerequisite for submitting a Plan to the City Commissioner is that the local Alderman (in this case, the 42nd Ward Alderman Brendan Reilly) first has to provide support and approval of the Project plan on behalf of his constituency.

43.     Alderman Brendan Reilly rejected the Project plan and did not provide the necessary approval for the Holdback Trigger, based in part on strong community objections to the Project related to, amongst other things, exacerbation of traffic congestion and disruption of the pickup/drop-off for a nearby school.

44.     On information and belief, Alderman Reilly has never approved the Carillon Tower Project, or any similar structure formal submission of a plan, relating to the Project as required to satisfy the Holdback Trigger.

45. There is an alternative procedure known as building without Aldermanic approval, called construction "as of right" – but there is no indication that the Defendants have pursued this strategy legally or moved it one inch forward in four years.

46. This investment was made by Plaintiff and each of the putative class members in 2015. The PPM says at page 5 that "The construction period is expected to take 24 months and is projected to be completed in October 2017, assuming construction commences in October 2015."

47. The condition precedent for the release of capital contribution funds held in escrow by TD to the Project GP never happened.

48. "The Project" as defined under the PPM does not exist and will never exist in the form described in the PPM.

49. The refund provisions of the Investment Documents were triggered as early as 2015 and the investment funds must be returned in full to the Plaintiff and putative class members with interest, fees, and costs.

50. The PPM at page 24 (page 32 of the pdf) states that the LP is supposed to make a loan to Symmetry to fund the Project after the Holdback Trigger is met: "The first advance of the Project Loan will fund *after the Holdback Trigger is met.*" (emphasis added).

51. Pursuant to the terms of the PPM, if the Holdback Trigger was never satisfied, TD would not have the authority to release investor funds to the LP or GP.

52. Pursuant to the terms of the PPM, if the Holdback Trigger is not satisfied, the GP has no authority to fund any loan or otherwise transfer investor funds out of the LP fund.

53. Members of the Plaintiff class have attempted to obtain their $550,000 investment funds from the defendants amicably, to no avail.

54. Each putative class member investor has lost $550,000, plus accrued interest, costs, and counsel fees, as a result of the wrongful release and disbursement of the TD escrow account funds by Defendants and each of them.

## Class Action Allegations

55. Plaintiffs re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

56. This action is maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

57. **Class Definition.** The class definition shall be:

All foreign investors who paid $550,000 into the EB-5 fund relating to Carillon Tower/Chicago LP and whose money was placed in the escrow account for that Project and who have not received a full refund of their $550,000 investment.

58. All members of the Class were and are similarly affected and deceived by the failure of the unlicensed brokers to register.

59. **Numerosity.** Plaintiff's counsel believes that the number of Plaintiffs is 89, who are residents of China, making joinder impracticable. The LP and its GP have records of such persons (their contact, banking and immigration application information), such records will allow the putative class members be notified on the

pendency of this action by Court-approved dissemination methods such as US Mail, electronic mail, Internet postings, and publication and, if the plaintiffs are the prevailing parties in this action, will also facilitate the transfer of the settlement and/or judgment proceeds to the Plaintiff and putative class members.

60. **Common Questions of Law and Fact Predominate.** Common questions of law and fact exist as to all members of the class and predominate over any questions that affect only individual members of the class. These common questions of law and fact include:

    i)      Whether Plaintiffs are entitled to a return of their money under the PPM and the Investment Documents; and

    ii)     Whether Defendant's have violated any federal or state securities laws by failing to comply with the provisions of the Investment Documents; and

    iii)    Whether (and to what extent) the Defendants have committed federal or state law offenses relating to transfers of money; and

    iv)    Whether one or more Defendants has breached one or more of the Investment Documents; and

v)   Whether any of the Defendants and/or other individuals aided and abetted the commission of a fraud or the conversion of the investment funds; and

vi)   Whether any of the Defendants (or others) owed a fiduciary duty to the plaintiffs and class members; and

vii)   Whether any of the Defendants (or others) breached their fiduciary duty to plaintiffs and the class members by way of material omissions and/or misrepresentations associated with the Offering and/or the release of the Holdback Trigger.

61.   **Typicality.**   The facts surrounding the investment by Plaintiff are typical of what happened with the other investors/putative class members, as they arose from the same offering and course of conduct by the Defendants.

62.   The Defendants operated under a scheme and practice to wrongfully and/or fraudulently deprive the Plaintiff and the putative class of their investment monies.

63.   **Adequacy.**   The Plaintiff has no conflict of interest or unusual fact pattern that would render her an inadequate class representative.   Plaintiff's counsel has conducted numerous class actions in this district and other federal courts.

64. **Predominance and Superiority of Class Action.** Given the commonality of the issues affecting each investor, which easily predominate over any minor differences, the class action is a superior method of deciding this matter versus case-by-case adjudication. As the recovery requested by each investor is small, and is mostly a return of their own money, judicial efficiency favors the class action as a method.

**COUNT I**
**(against Tizi, Laytin, GP, LP, and Symmetry)**
**15 U.S.C. 78j (17 CFR. 240.10b-5) and 78t**
**Federal Securities Exchange Act Violation**

65. Plaintiffs re-allege and reincorporate, as though fully set forth herein, each and every allegation above.

66. Section 10b of the Exchange Act (15 U.S.C. 78j) provides that it shall be unlawful for any person, directly or indirectly, to use any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe for the protection of investors.

67. In furtherance of Rule 10(b), the Commission enacted Rule 10b-5 (17 CFR 240.10b-5) which makes clear that it is unlawful to (a) employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of material fact, or (c) to engage in any act, practice or course of business which operates as a fraud or deceit on any person, in connection with the purchase and sale of a security.

68. A "material fact" under Rule 10b-5 is any fact that a reasonable investor would find important in making a decision whether to invest.

69.     Tizi – as the regional center structuring the deal - and the LP (through the GP) caused the PPM and Investor Documents to be drafted and disseminated to the Plaintiffs, and caused the Escrow Agreement to be entered into between the LP and TD, meaning that the release of money from escrow consummated a sale of securities.

70.     The Investment Documents worked a fraud and deceit on the Plaintiffs because it violated the Investment Documents since their money was moved out of escrow despite the Investment Documents stating that if the Holdback Trigger is not satisfied, the money will come back in full to the investors.

71.     Therefore, the Investment documents contained a misrepresentation that the money would not be moved out of escrow until the Holdback Trigger was exercised, and this misrepresentation worked a fraud on the Plaintiffs.

72.     This is a material misrepresentation in  the Investment Documents.

73.     The Plaintiffs relied upon the Investment Documents in making their investment.

74.     The promises made in the Investment Documents were untrue and made with intent to induce reliance by the Plaintiffs, causing specific and quantifiable harm to the Plaintiffs, and the Defendants are jointly and severally liable for damages caused.

75.     The LP and its GP had a duty to inform the Plaintiffs that the Holdback Trigger had not been met and that the schedule set forth in the PPM had

16

become stale and misleading. Their failure to make this disclosure is an omission to state a material fact in connection with a security.

76.     The Defendants acted with scienter, in full knowledge of the fact that no formal Project plan had been submitted as required.

77.     The Defendants had a duty to prominently disclose potentially outcome determinative risks and material facts to the success or failure of the Project.

78.     Defendants omitted to state a material fact, amounting to misrepresentation, in failing to disclose the fact that, based on long standing policy and procedure for all development in the City of Chicago, and the Defendants knowledge of such policy and procedure, the Project required Alderman/Ward approval prior to the submission of a Project plan to the City Commissioner of Development and Planning, and that the submission of any Project plan to the City Commissioner without such Alderman/Ward approval would result in rejection by the Commissioner and failure of the Project.

79.     The loss causation here is easily quantifiable: each investor has lost $550,000 plus interest, and has incurred translation fees, costs, and attorney fees to obtain recovery. The discovery of this violation of the Securities Exchange Act was not made until Plaintiffs retained counsel to determine the status of their investment, in Fall of 2018.

80.     Defendant Tizi has derivative liability because they acted at all times as a control person within the meaning of Section 20(a) and (b) of the 1934 Securities Exchange Act, since it was under their authority that the PPM was

17

issued and they had a duty to inform investors of the truth about the Project not being approved and being a failure.

WHEREFORE, the Plaintiffs demand a full refund of all money subscribed to the LP and to any Defendant, with an award of interest, costs and attorney fees.

**COUNT II**
**(against Laytin, GP, LP, and Symmetry)**
**815 ILCS 5/8 et seq.**
**Illinois Securities Act Violation**

78.     Plaintiffs re-allege and reincorporate, as though fully set forth herein, each and every allegation above.

79.     Section 2.4 of the Illinois Securities Act defines "Controlling Person" as follows: "In case of unincorporated issuers, "controlling person" means any person offering or selling a security, or group of persons acting in concert in the offer or sale of a security, who directly or indirectly controls the activities of the issuer.

80.     Under this definition, all of the Defendants listed in this Count are Controlling Persons of the LP which issued the securities.

81.     Sections 12F and 12G of the Illinois Securities Act track the Federal Rule 10b-5 and creates liability for any persons who make any misstatements of material fact or omissions of material fact.  815 ILCS 5/12.

82.     Section 13 of the Illinois Securities Act requires payment by Controlling Persons of the amount lost plus 10% per annum in interest for violation of the anti-fraud provision.

83.     The securities in this case are the LP interests offered in collaboration by the Defendants, the investment by the Plaintiff constitutes a sale of securities by the Defendants, occasioned by reliance on the misrepresentations and omissions of material fact by the Defendants.

84.     The securities were issued pursuant to arrangements by Tizi, an Illinois company, with respect to a project in Illinois, to be built by a co-developer in Illinois.  There is a strong nexus with Illinois.

85.     If the Illinois Securities Act does not apply because the GP and LP are based in New York, then the applicable law will be the New York Martin Act.

WHEREFORE, the Plaintiffs demand a full refund of all money subscribed to the LP and to any Defendant, with an award of 10% annual interest, costs and attorney fees.


### Count III
### (against Laytin, GP and LP)
### Breach of Contract of LP Agreement

86.     Plaintiffs re-allege and reincorporate, as though fully set forth herein, each and every allegation above.

87.     The LP Agreement defines "Project" as Carillon Tower, which never came to exist.

19

88.     Appendix 1 of the LP Agreement stipulates that the LP shall request funds to be released by TD as escrow agent only if the Holdback Trigger has been satisfied.

89.     The Holdback Trigger was not satisfied.

90.     TD was holding onto $49.5 million of investor funds ($550,000 times 90 investors) as evidenced by the acknowledgement as Exhibit 2, given for each investor.

91.     The LP, acting through the GP and Laytin, breached the LP Agreement by wrongfully – with scienter and full knowledge of falsity – informing TD that the Holdback Trigger had been satisfied.

92.     This wrongful action by the LP, in violation of the LP Agreement and the Investment Documents, caused quantifiable detriment to the Plaintiffs by having their funds dispersed to an idle Project.

93.     As a result of this breach, Plaintiffs' funds were unlawfully converted by the GP and LP.

WHEREFORE, the Plaintiffs demand a full refund of all money subscribed to the LP and to any Defendant, with an award of costs and attorney fees.

## Count IV
### (against TD)
### Breach of Contract of Escrow Agreement

94.     Plaintiffs re-allege and reincorporate, as though fully set forth herein, each and every allegation above.

95.     The LP was party to that certain Escrow Agreement with TD included

20

in the Investment Documents, a word for word copy of which was signed by TD on May 19, 2015.

96.     The purpose of the Escrow Agreement was specifically to hold the funds of the Plaintiffs, making them a third-party beneficiary of the Escrow Agreement.

97.     The Escrow Agreement – though nominally between TD and the LP – was only possible because the Plaintiffs (as limited partners of the LP) put their money into escrow with TD in the first place.

98.     The Escrow Agreement has a section called "Action Upon Achievement of Holdback Trigger" which stipulates that TD will release the investor Capital Contributions (aggregate of $45 million) only upon notification from the LP that the Holdback Trigger has been satisfied.

99.     Further, the Escrow Agreement has a section called "Action Upon Termination or Cancellation of the Offering" which provides that if the Offering is cancelled, the Administrative Fee of $50,000 must be returned to investors.

100.    In compliance with the Escrow Agreement, Plaintiff Dou and other investors sent $550,000 to TD, as evidenced by the letter attached as Exhibit 2.

101.    The Escrow Agreement and the LP Agreement stipulates that the LP may request funds to be released by TD as escrow agent only if the Holdback Trigger has been satisfied.

102.    The Holdback Trigger was not satisfied.

103.    TD was holding onto $49.5 million of investor funds ($550,000 times 90

investors) as evidenced by the acknowledgement as Exhibit 2, given for each investor.

104.   TD breached the Escrow Agreement by wrongfully releasing the Plaintiffs' funds even though the condition specified for such release had not been satisfied.

105.   TD had a duty prior to release of the investors' funds to demand adequate documentation showing that a Project plan had been formally submitted to the Commissioner of Planning and Development for the City of Chicago.

106.   TD negligently released the funds from escrow without reviewing the requisite documents and without doing proper due diligence, falling short of its contractual obligations and a basic standard of care.

107.   TD's failure to observe a basic standard of care in its duty to investors caused damage to the investors both immediately and proximately, in the quantifiable amount of $49 million.

108.   The Plaintiffs were a direct participant in the TD-LP contract because the Subscription Agreement required them to submit investment funds subject to the TD-LP Agreement, making them a third party beneficiary of such contract, and certainly within the zone of persons to whom TD owed a duty of professional conduct, which they breached.

109.   As a result of TD's negligent breach, Plaintiffs' funds were unlawfully converted.

WHEREFORE, the Plaintiffs demand a full refund of all money subscribed to the LP and to any Defendant, with an award of costs and attorney fees.

## Count V
### (against TD)
### Tortious Conversion

110. Plaintiffs re-allege and reincorporate, as though fully set forth herein, each and every allegation above.

111. TD received $49.5 million from the Plaintiffs for this Project and sent notices to Laytin and the LP that it had received this money, see Exhibit 2.

112. TD knew, or should have known, and could reasonably have discovered, that the Plaintiffs invested in the escrow pursuant to the PPM, which obligated TD to hold them money and not release it until the Holdback Condition was satisfied.

113. By taking Plaintiffs' money and giving it to a third party in violation of the terms under which the money was given, TD wrongfully converted the Plaintiff's funds.

114. Without a contract directly with investors, TD had no title, right, or interest in the Plaintiff's money, and should have returned it immediately. Their failure to return the funds constitutes wrongful conversion.

115. As a result of this wrongful conversion, the Plaintiffs have suffered damages.

WHEREFORE, the Plaintiffs demand a full refund of all money subscribed to the LP and to any Defendant, with an award of costs and attorney fees.

## Count VI
### (against TD)
### Tortious Interference with Contract

116.   Plaintiffs re-allege and reincorporate, as though fully set forth herein, each and every allegation above.

117.   Plaintiffs have a valid contract with the LP based on the Limited Partnership Agreement and the Investment Documents.

118.   TD knew that Plaintiffs had a contractual relationship with the LP and with various parties associated with Defendant Laytin.

119.   TD knew that the escrow arrangement was for the benefit of the contract between the Plaintiffs and the LP, under which no funds were supposed to be released from escrow until the Holdback Trigger was satisfied.

120.   TD knew that release of the Plaintiff's funds the violated the contract between Plaintiffs and the LP.

121.   TD negligently, recklessly, and knowingly interfered with the contract between Plaintiffs and the LP.

122.   By virtue of TD's tortious interference in the contractual relationship, the Plaintiffs have suffered damages.

WHEREFORE, the Plaintiffs demand a full refund of all money subscribed to the LP and to any Defendant, with an award of costs and attorney fees.

## Count VII
### (against all Defendants)

## Fraud

123.    Plaintiffs re-allege and reincorporate, as though fully set forth herein, each and every allegation above.

124.    The Defendants marketed the through Kaisheng Emigration Company (English name "Cansine" and their web site which is in Chinese is at www.cansine.com)

125.    The web site claims the Project (referred to in English as the Hilton) is "100% safe." See Exhibit 4. (last visited November 22, 2018).

126.    The web site implies that the Project is active, alive, and ongoing. It omits any statement about the failure to submit a Project plan to the City of Chicago Commissioner of Planning and Development.

127.    The web site says that each investor has full third party insurance to obtain a return of their money if they are not eligible for a green card due to events beyond their control.

128.    The web site is a public proclamation that benefits each of the Defendants.

129.    It contains the material misstatement that the Project is 100% safe, which is impossible for any investment, and which would disqualify the Project for EB-5 since the program requires that investors place capital "at risk."

130.    The web site fails to disclose material facts about the Project being slowed and dead.

131.    The Plaintiff and others relied on the web page since they speak Chinese and the web page is in Chinese.

132.    This reliance caused them to believe that the Project was still active. This caused damage for failure to take action to obtain recovery.

132.    The failure to inform investors of the truth was a ploy to drain their assets and to get more time to slap something together at the last minute as an excuse for not returning the money.

133.    The benefit of this fraud inured to all defendants: it gave them money and time, and violated the fiduciary duties owed to the investors.

134.    Defendants are jointly and severally liable for this fraud on the investors.

WHEREFORE, the Plaintiffs demand a full refund of all money subscribed to the LP and to any Defendant, with an award of interest, costs and attorney fees.


## Count VIII
### (against Laytin, the GP and LP)
### Breach of Fiduciary Duty

135.    Plaintiffs re-allege and reincorporate, as though fully set forth herein, each and every allegation above.

136.    The GP has a fiduciary duty to keep the limited partners fully informed of all material developments in the Project.

137.    This duty is separate and distinct from their contractual duty to limited partners.

26

138.   The GP and Laytin (as controlling person of the GP) knew as early 2015 that the Project plan had not been formally submitted to the Commissioner of Planning and Development, and they knew as early as April 2017 that the Project had been denied in whatever form it was informally – through a mere meeting – shown to the City.

139.   This created a duty to inform limited partners and to make clear their remedy to obtain a return of investment due to failure of condition precedent for the project.

140.   The duties violated include the duty of care, the duty of loyalty (no self-dealing) and the duty of good faith and fair dealing.

141.   Plaintiff Dou and investors have suffered for the failure of the GP, the LP, and Laytin to comply with their fiduciary duties.

WHEREFORE, the Plaintiffs demand a full refund of all money subscribed to the LP and to any Defendant, with an award of interest, costs and attorney fees.

## Count IX
### (against all Defendants)
### Appointment of Third-Party Administrator

142.   Plaintiffs re-allege and reincorporate, as though fully set forth herein, each and every allegation above.

143.   The practical question remains how the money in this case will be rightfully returned to the Chinese investors in full, accounting for interest, fees, costs, and other expenses.

27

144. The Chicago Convention Center Eb-5 lawsuit heard in this Court by Justice St. Eve is instructive.

145. That case involved a massive fraud whereby investors put their money into a project that did not actually exist – it was a fake, no shovel was ever put into the ground. The SEC brought suit under Rule 10b-5 and they won disgorgement of the investment back to the Chinese investors. The practical question for the Court became how to get the money back to the investors.

146. As a remedy, Justice St. Eve appointed a neutral third party to conduct an accounting, receive the disgorged funds and the fines, to make deductions for fees and costs, and to make sure that each investor got his or her proportional share. See "Order to Appoint a Distribution Agent," *SEC v. A Chicago Convention Center LLC*, 13-cv-00982 (January 31, 2018).

147. The same process can be used in this case.

148. At present, the Plaintiffs do not have any idea where their money is located. They are in need of an accounting from the LP, and a disgorgement or fine that can be placed with a neutral third party for accounting.

149. The remedy of constructive trust is recognized in this Court and in Illinois for situations where one party wrongfully holds the property of another.

WHEREFORE, the Plaintiffs demand a (i) full refund of all money subscribed to the LP and to any Defendant, with an award of interest, costs and attorney fees, and (ii) the Court appointment of an administrator / trustee / distribution agent to

collect all refunded money (by way of disgorgement or damages) and to perform a complete accounting of the escrow fund.


Dated:          March 19, 2018


                                        Respectfully Submitted,

                                        /s/ Glen J. Dunn, Jr.


Glen J. Dunn, Jr.                       Douglas Litowitz
Glen J. Dunn & Associates, Ltd.         Attorney at Law
221 N. LaSalle Street                   413 Locust Place
Suite 1414                              Deerfield, IL 60015
Chicago, Illinois 60601                 (312) 622-2848
(312) 880-1010                          Litowitz@gmail.com
gdunn@gjdlaw.com

BY FOREFRONG EB-5 FUND

# CARILLON TOWER/CHICAGO, L.P.

# CARILLON TOWER/CHICAGO, L.P.

**CONFIDENTIAL PRIVATE OFFERING MEMORANDUM**

January 15, 2015

**ACCREDITED INVESTORS ONLY**

**MINIMUM CAPITAL INVESTMENT US$500,000**

**(Excluding Administrative Fee of US$50,000)**

**NOT TO BE REPRODUCED OR DISTRIBUTED**

GENERAL PARTNER:

**FOREFRONT EB-5 FUND (ICT), LLC**

**7 Times Square, 37th Floor, New York, NY 10036**

Offering Price: US$500,000 per Unit

Administrative Fee: US$50,000 per Unit

This document contains confidential and proprietary information belonging exclusively to: Carillon Tower/Chicago, L.P.

These Units have not been registered under the Securities Act of 1933 (the "Securities Act") or under applicable state securities laws. These Units are being sold in reliance on exemptions from such registration requirements and may not be transferred or resold except as permitted under such laws.

Neither the Securities and Exchange Commission nor any state securities regulatory authority has approved or disapproved the offer and sale of these Units or determined if this Memorandum is accurate or complete. Any representation to the contrary is a criminal offense.

The Units involve a high degree of risk and substantial restrictions on transferability. You should not invest in the Units unless you can bear the complete loss of your investment. (See "Risk Factors," beginning on page 43 below.)

Subscriptions for Units are not revocable and we will accept them on a rolling basis with no minimum. Each subscriber's investment will be released to us on satisfaction of the EB-5 release conditions described under "Summary of Escrow Procedures. Potential investors should be aware that there is no assurance that any monies besides their own will be invested in the Partnership. If this Offering yields less than projected proceeds we will modify our business plan, which may increase risks to investors. See "Risk Factors – Risks Related to 'Best Efforts' Offering "on page 43.

**Name**_____

**Copy Number**_____

## IMPORTANT NOTICES TO INVESTORS

This Memorandum is being provided to each prospective investor ("**Prospective Investor**") in connection with such prospective investor's interest in purchasing one or more Units. The purpose of this Memorandum is to furnish prospective investors with certain information regarding a prospective investment in the Units and the Partnership and certain of the risks attendant thereto. All of the information contained in this Memorandum is based on information available to the General Partner and the Partnership as of the date hereof and believed by them to be accurate. No warranty can be made as to the accuracy of such information or that circumstances have not changed since the date such information was supplied. Capitalized terms used in this Memorandum but not defined herein shall have the meanings set forth in the subscription agreement or the Partnership agreement attached hereto as exhibit c and exhibit b, respectively.

The Units offered hereby are speculative and an investment in the Units involves a high degree of risk. Prospective investors should carefully consider the information set forth herein under "risk factors." Prospective investors must be prepared to bear the economic risk of their investment for an indefinite period and be able to withstand a total loss of their investment.

The Units are restricted securities under the Securities Act and applicable state securities laws. Accordingly, the interests may not be sold, transferred or hypothecated in the absence of an effective registration statement under the Securities Act and applicable state securities laws or an opinion of counsel acceptable to the Partnership and its counsel that such registration is not required. Additionally, the transfer of Units will be restricted under the Partnership agreement. Accordingly, investors will be required to hold the Units indefinitely.

Neither the delivery of this Memorandum nor any sale made hereunder shall under any circumstances create an implication that there have been no changes in the affairs of the Partnership or in the project or applicable law since the date hereof or that the information herein is correct as of any time subsequent to the date of this Memorandum. This Memorandum supersedes and replaces any and all information delivered or made available by or on behalf of the Partnership to the recipients of this Memorandum prior to the date hereof.

With respect to the Units or this Memorandum, only the Partnership has been authorized to make any representations or give any information other than those contained herein; and, if given by the Partnership, such representations and information are not to be relied upon unless contained in this Memorandum. No offering literature or advertising in any form should be relied upon in connection with this Offering except for this Memorandum, and any other information furnished by the Partnership in response to a prospective investor's request shall only be used to verify the accuracy of any assumptions, representations, or information set forth in this Memorandum, which supersedes all prior correspondence and information. No broker, dealer, salesman or other person has been authorized to give any information or to make any representation (whether oral or written) not contained in this Memorandum (whether oral or written), and, if given or made, such information or representation must not be relied upon as having been authorized by the Partnership.

The Partnership, upon written request, will make available to a prospective investor and/or his or her advisors all documents relating to this Offering and any additional information regarding the Partnership and this Offering to the extent the Partnership possesses such information or can acquire it without unreasonable effort or expense; provided, however that such documents and information shall only be used to verify the accuracy of any assumptions, representations, or information set forth in this Memorandum, which supersedes all prior correspondence and information. Requests for such documents or information should be made

in writing to the Partnership, c/o Forefront EB-5 Fund (ICT), LLC, 7 Times Square, 37th Floor, New York, NY 10036, attention: Peter Shirk, telephone: (212) 607-8150, investment@forefronteb5fund.com.

Prospective investors are not to construe the contents of this Memorandum or any prior or subsequent communication from the Partnership or professionals associated with this Offering as legal, immigration or tax advice. Each prospective investor should consult with his or her own personal attorney, accountant and other advisors, at his or her own expense, as to the legal, tax, economic, and other consequences of an investment in the interests and the investment's suitability for him or her.

This Memorandum contains summaries of certain provisions of the documents relating to this investment and various provisions of relevant statutes and applicable regulations thereunder; however, said summaries do not purport to be complete and are qualified in their entirety by reference to the text of the original documents, statutes and regulations.

Each prospective investor who subscribes to invest in the Partnership will be required to represent and warrant to the Partnership in his or her subscription agreement that among other things he or she: (1) is buying the Units for his or her own account and not with any view to their distribution or resale in the foreseeable future; (2) possesses such knowledge and experience in financial and business matters that he or she is capable of evaluating the merits and risks of an investment in the Units; (3) is able to bear the economic risks of such an investment; (4) could afford a complete loss of such an investment; and (5) understands the terms, rights, duties, obligations, and restrictions contained in this Memorandum, the Partnership agreement and the subscription agreement. A subscription may be void, at the option of the Partnership, if any representations made by the prospective investor in his or her subscription agreement or which are delivered to the Partnership are or believed to be untrue.

This Offering of the Partnership interests is limited only to individual persons (not any legal entities) who are "accredited investors," as such term is defined in rule 501(a) of regulation d under the Securities Act. The offering will not be made to any U.S. Person, no offer to sell or sale will be made in the united states and no buy order will be accepted if it is originated from within the united states.

The General Partner and the Partnership retain the right, in their sole discretion, to accept or reject, in whole or in part, any subscription and to sell fractional Units.

This Memorandum does not constitute an offer or solicitation to any person residing in a jurisdiction where such offer or solicitation is not authorized or in which the person making the offer or solicitation is not qualified to do so.

All references in this Memorandum to "dollars," "U.S. dollars," and "US$" are to the currency of the United States of America.

Inquiries regarding this Memorandum should be directed to the Partnership at the address of the General Partner listed above. The Partnership will make available to any prospective qualified investor, prior to the closing, the opportunity to ask questions of and receive answers from the Partnership or persons acting on behalf of the Partnership concerning the terms and conditions of the Offering and the business and operations of the Partnership, and to obtain any additional information to the extent the Partnership possesses such information.

This Memorandum contains summaries, believed by the Partnership to be accurate, of certain agreements and other documents which are attached as exhibits hereto. All such summaries are qualified in their entirety by reference to such agreements or documents. This

Memorandum does not purport to be all-inclusive or contain all of the information which a prospective investor may desire. The delivery of this Memorandum at any time does not imply that information herein is correct as of any time subsequent to its date.

The offeree, by accepting delivery of this Memorandum, agrees to return it and all related documents to the Partnership if the offeree decides not to subscribe for Units or at any time if the Partnership requests the return of this Memorandum and such other documents.

This Memorandum is subject to modification or withdrawal at any time.

TABLE OF CONTENTS

Page

IMPORTANT NOTICES TO INVESTORS ................................................................................. ii
CONFIDENTIALITY AND UNDERTAKINGS ........................................................................ 1
FORWARD-LOOKING STATEMENTS – ............................................................................... 2
IMPORTANT FACTORS AND ASSOCIATED RISKS ......................................................... 2
I.     THE PARTNERSHIP ................................................................................................ 13
II.    CARILLON TOWER PROJECT ............................................................................. 13
       A.   Overview ............................................................................................................ 13
       B.   Funding Structure for the Project ...................................................................... 15
       C.   Partnership Investment in the Project ................................................................ 15
       D.   Marketing Strategy ............................................................................................. 16
       E.   Competition ........................................................................................................ 17
       F.   Financial Summary ............................................................................................. 20
III.   MANAGEMENT AND DEVELOPMENT PROFESSIONALS ............................ 20
       A.   The General Partner ........................................................................................... 20
       B.   Project Management And Development Team .................................................... 21
IV.    REGIONAL CENTER ............................................................................................... 24
V.     LOAN TERMS AND CONDITIONS ...................................................................... 24
VI.    THE OFFERING ....................................................................................................... 25
       A.   General ............................................................................................................... 25
       B.   The EB-5 Process ............................................................................................... 26
       C.   The Subscription Procedure ............................................................................... 27
       D.   Escrow Accounts ................................................................................................ 27
       E.   Closings .............................................................................................................. 27
       F.   Risk Factors ........................................................................................................ 27
       G.   Leverage and Loan Terms .................................................................................. 27
       H.   Return on Investment – Net Distributable Cash from Operations and Distributions of
            Project Loan Repayment Proceeds ..................................................................... 28
       I.   Compliance with EB-5 Restrictions ................................................................... 29
       J.   Payment of Expenses ......................................................................................... 29
       K.   Formation ........................................................................................................... 29
       L.   Regional Center Responsibilities ....................................................................... 30
       M.   Suitability Standards .......................................................................................... 30
       N.   How to Subscribe ............................................................................................... 31

O.   Miscellaneous .................................................................................................31
P.   Conflicts of Interest .......................................................................................31
VII.   FEES AND EXPENSES ..........................................................................................33
A.   Certain Administrative Expenses of the Partnership .................................33
B.   Other Expenses of the Partnership ..............................................................33
C.   Management Fee ............................................................................................34
VIII.   WITHDRAWALS ...................................................................................................34
IX.   SUITABILITY .......................................................................................................34
A.   Investor Suitability Standards ......................................................................34
X.   IMMIGRATION MATTERS ...................................................................................35
A.   Overview .........................................................................................................35
C.   Counting Jobs Created ..................................................................................36
D.   The I-526 Petition Process ............................................................................38
E.   I-526 Petition Approval Not Guaranteed .....................................................39
F.   Consular Processing or Adjustment of Status ............................................39
G.   Consular Processing .......................................................................................39
H.   Visa Issuance Not Guaranteed .....................................................................40
I.   Admission After Immigrant Visa Issued Not Guaranteed ...........................40
J.   Adjustment of Status .....................................................................................40
K.   Travel During Adjustment of Status Processing ..........................................41
L.   Employment During the Adjustment of Status Processing ..........................41
M.   Adjustment of Status Cannot Be Guaranteed .............................................42
N.   Grounds for exclusion. ...................................................................................42
O.   Removal of Conditions ...................................................................................43
P.   Removal of Conditions Not Guaranteed .......................................................44
XI.   RISK FACTORS .....................................................................................................44
A.   Risks Related to "Best Efforts" Offering. ....................................................45
B.   General Risks Related To The Partnership's Proposed Business ...............45
C.   Special Risks Associated With The Project ..................................................48
D.   Risks Related To The Offering ......................................................................53
E.   Tax Risks [to be reviewed by tax advisor] ...................................................55
F.   Immigration Risk Factors [to be reviewed by immigration counsel] ...........56
G.   Escrow Agreement Risk Factors ...................................................................60
H.   Risks Related To The Project Loan ...............................................................60
XII.   SUMMARY OF THE PARTNERSHIP AGREEMENT ...............................................62
XIII.   SUMMARY OF SUBSCRIPTION AGREEMENT .....................................................66

| XIV. | SUMMARY OF ESCROW PROCEDURES | 70 |
|---|---|---|
| XV. | FEDERAL TAX CONSIDERATIONS | 71 |
| | A. United States Tax Status | 72 |
| | B. Certain Considerations for U.S. Investors | 72 |
| | C. Taxation of Partnership Income, Gain and Loss | 72 |
| | D. Imputed Interest and OID | 73 |
| | E. Investment Interest and Passive Activity Limitations | 73 |
| | F. Deductibility of Partnership Investment Expenditures and Certain Other Expenditures | 73 |
| | G. Application of Basis and "At Risk" Limitations on Deductions | 74 |
| | H. Certain U.S. Tax Considerations for Foreign Investors | 74 |
| | I. Withholding | 74 |
| | J. Backup Withholding | 75 |
| | K. Estate Tax | 75 |
| | L. State and Local Taxes | 75 |
| | M. Disposition of the Units | 76 |
| | N. Possible IRS Challenges; Tax Audits. | 76 |
| | O. Possible Legislative or Other Action Affecting Tax Aspects | 76 |
| XVI. | MISCELLANEOUS | 76 |
| | A. Limitation of Liability; Indemnification | 76 |
| | B. Confidentiality and Non-Disclosure | 77 |
| XVII. | LEGAL MATTERS | 78 |
| XVIII. | ACCESS TO INFORMATION | 78 |
| | A. Additional Information | 78 |
| | B. Reports | 78 |
| 1. | INDEX OF DEFINED TERMS | 79 |

EXHIBITS

| Exhibit A | Financial Projections |
|---|---|
| Exhibit B | Partnership Agreement |
| Exhibit C | Form of Subscription Agreement |
| Exhibit D | Form of Escrow Agreement |
| Exhibit E | Business Plan |
| Exhibit F | TEA Letter |
| Exhibit G | Regional Center Designation Approval Letter |
| Exhibit H | LOI from Gibson's Restaurant Group |

This Memorandum contains all of the representations by the Partnership concerning the Offering, and no person shall make different or broader statements than those contained herein. Investors are cautioned not to rely upon any information not expressly set forth in this Memorandum.

## CONFIDENTIALITY AND UNDERTAKINGS

The information contained in this Memorandum is confidential and proprietary to the Partnership. By accepting delivery of this Memorandum, the Subscriber is deemed to have acknowledged and agreed to the following:

- The information contained in this Memorandum will be used by the Subscriber solely for the purpose of deciding whether to proceed with a further investigation of the Partnership;

- This Memorandum or information derived from this Memorandum will be kept in strict confidence by the Subscriber and will not, whether in whole or in part, be released or discussed by the Subscriber for any purpose other than an analysis of the merits of an eventual investment in the Partnership by the Subscriber, nor will recipient make any reproductions of such information; and

- If the Subscriber does not subscribe for Units or upon the written request of the Partnership, this Memorandum, and any other documents or information furnished to the Subscriber and any and all reproductions thereof and notes relating thereto will be promptly returned to the Partnership.

## FORWARD-LOOKING STATEMENTS

## IMPORTANT FACTORS AND ASSOCIATED RISKS

The statements contained in this memorandum that are not historical facts are forward-looking statements within the meaning of the federal securities laws. These forward-looking statements include the plans and objectives of management for future operations, including plans and objectives relating to the future economic performance of the Project Owner (as defined below). The forward-looking statements and associated risks set forth in this Memorandum include or relate to the successful implementation and operation of the Project Owner's investment strategies and business plan.

The forward-looking statements included herein are based on current expectations that involve a number of risks and uncertainties. These forward-looking statements are based on various assumptions regarding the Partnership and its proposed operations. Such assumptions involve judgments with respect to, among other things, future economic, competitive and market conditions and future business decisions, all of which are difficult or impossible to predict accurately and many of which are beyond the control of the Partnership, the General Partner, and the Project Owner.

Although the Partnership believes that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate and, therefore, there can be no assurance that the results contemplated in forward-looking information will be realized. In addition, as disclosed elsewhere and under "Risk Factors," the business and operations of the Project Owner is subject to substantial risks, which increase the uncertainty inherent in such forward-looking statements. In light of the significant uncertainties inherent in the forward-looking statements included herein, the inclusion of such information should not be regarded as a representation by the Partnership, the General Partner, the Regional Center, the Project Owner, the Developer, the Co-Developer or any other person that the objectives or plans of the Partnership will be achieved.

The words "estimate," "plan," "intend," "expect," "proposed," "project," "may," "will," and similar expressions are intended to identify forward-looking statements. These forward-looking statements involve and are subject to known and unknown risks, uncertainties and other factors which could cause the actual results, performance (financial or operating) of the Partnership or achievements to differ materially from the outcomes, expressed or implied, by such forward-looking statements or the projections set forth herein. Prospective investors are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date hereof. The Regional Center and the Partnership specifically disclaim any obligation to release any revisions to these forward-looking statements to reflect events of circumstances after the date hereof, to reflect the occurrence of unanticipated events, or for any other reasons.

# EB-5 INVESTMENT OPPORTUNITY

This Preliminary Confidential Private Offering Memorandum (this "Memorandum") describes an offering of up to ninety (90) limited partnership Units (the "Units") of Carillon Tower/Chicago, L.P., a New York limited partnership[1] (the "Partnership") at a purchase price of $500,000 per Unit (the "Offering"). The Units offered hereby will be sold subject to the provisions of a subscription agreement (the "Subscription Agreement") containing certain representations, warranties, terms and conditions of an investment in the Partnership, and the Partnership Agreement of the Partnership (the "Partnership Agreement"). Prospective investors who seek to become limited partners of the Partnership ("Limited Partners") should carefully read and retain this Memorandum, the Subscription Agreement, and the Partnership Agreement.

The Partnership has been organized to provide financing (the "Project Loan") to Symmetry Tower/Chicago Project Owner, LLC, a New York limited liability company (the "Project Owner"),[2] which will work in conjunction with Fordham Real Estate, LLC, an Illinois limited liability company (the "Developer") and Symmetry Property Development II, LLC, a New York limited liability company (the "Co-Developer") in the acquisition, construction and development of the real property located at the corner of Superior Street and Wabash Avenue, in Chicago, Cook County, Illinois (the "Property") to be known as the Carillon Tower, a 42 story tower housing a 200-room hotel operating under the Canopy by Hilton brand, 154 luxury apartment units, a 225 seat restaurant operated by Gibson's Restaurant Group and parking space for 154 vehicles (collectively, the "Project").

The General Partner of the Partnership will be Forefront EB-5 Fund (ICT), LLC (the "General Partner"), a New York limited liability company.[3]

This Offering includes up to ninety (90) Units with each Unit constituting a limited partnership interest in the Partnership ("Partnership Interest"). The maximum aggregate amount of the Offering may be increased by the General Partner in its sole discretion, provided that in no event shall it exceed one hundred and twenty (120) Units. The Partnership will make the Project Loan to the Project Owner to fund a portion of the Project as described below.

| | | |
|---|---|---|
| Offering Price:[4] | $ | 500,000 per Unit ("**Capital Contribution**") |
| Maximum Offering Amount:[4, 5] | $ | 45,000,000 (**90 Units**) |
| Minimum Purchase: | $ | 500,000 (**1 Unit**) |
| Administrative Fee: | $ | 50,000 per Unit ("**Administrative Fee**") |

The Offering Price and Administrative Fee are payable in cash upon subscription.

The specific Units herein are being offered for the purpose of acquiring and developing the Property for the Project, and are being offered solely to "Accredited Investors," as such term is defined in Rule 501(a) of Regulation D under the Securities Act, as amended (the "Securities Act"), who are also applying for an I-526 Immigrant Petition for Entrepreneur (the "I-526 Petition") with the United States Immigration and Customs Service ("USCIS").

The Partnership is offering for purchase to a limited number of individual investors who are not "U.S. persons," as such term is defined in Rule 902(k) of Regulation S under Regulation S under the Securities Act, on a limited and private basis, and a maximum of $45,000,000, subject to increases as set

---

[1] Entity in formation.

[2] Entity in formation.

[3] Entity in formation.

[4] The Offering Price and Maximum Offering Amount exclude the Administrative Fee of $50,000 per Unit of Offering costs, immigration services and marketing fees, as more fully described below.

[5] Subject to proportionate reduction of the Maximum Offering Amount in the event that the Project is confirmed to create fewer than 900 jobs.

forth above ("Maximum Offering Amount").

**No party other than the Partnership is responsible for the contents of this Memorandum, and no other party except authorized sales agents will be involved in the offering of Units under this Memorandum or the acceptance of Subscriptions from Subscribers.**

The aggregate funds to be raised for this Project are estimated to be $150,457,500, from the following sources: (1) $51,000,000 of equity from the Project Owner, (2) $45,000,000 from the Investors in this Offering (the "Investors") in exchange for Partnership Units, to be provided to the Project Owner in the form of the Project Loan, and (3) $54,457,500 from the funding of a secured construction loan that is currently being sought on reasonably competitive market terms (the "Construction Loan").

## SUMMARY OF TERMS

*This summary highlights important information about the Partnership and this Offering. Because it is a summary, it does not include all of the information you should consider before investing in the Partnership. Please review this Memorandum, including the Exhibits and such other information regarding the Partnership as you may deem appropriate, before you decide to invest.*

| | |
|---|---|
| **The Partnership** | The Partnership is a New York limited partnership named Carillon Tower/Chicago, L.P. |
| **The Offering** | The Partnership is currently offering up to 90 Units to eligible investors through private placement at purchase price of $500,000 each. The maximum aggregate amount of the offering may be increased by the General Partner in its sole discretion, provided that in no event shall it exceed 120 Units. Investors in the Partnership become limited partners ("Limited Partners" and each individually, a "Limited Partner") of the Partnership. All Units are of the same class and no Unit will have any priority over any other Unit. |
| **The General Partner** | The Partnership's general partner, Forefront EB-5 Fund (ICT), LLC, a New York limited liability company, will exercise ultimate authority over the Partnership and oversee the day-to-day activities of the Partnership. |
| **The Regional Center** | Tizi, LLC, an Illinois limited liability company doing business as "The Local Government Regional Center of Illinois, LLC," is the regional center which previously received approval to establish, and now operates, the "Local Government Regional Center of Illinois" (the "Regional Center"). The Regional Center is authorized by the USCIS under the "EB-5 Immigrant Investor Pilot Program" to establish and solicit investment from foreign investors under the EB-5 Pilot Program. The Project is believed to be a qualifying investment under the EB-5 Pilot Program. The geographic scope of the Regional Center encompasses Cook County in Illinois, which is the location of the Project. (See the Regional Center Designation Letter attached hereto as Exhibit G.) |
| **The Project Owner** | Symmetry Tower/Chicago Project Owner, LLC, a New York limited liability company, will enter into a contract with the Developer and/or the Co-Developer, and will work with the Developer and Co-Developer on the Project. |

| | |
|---|---|
| **The Project** | The Carillon Tower project is a mixed-use real estate development in Chicago, Cook County, Illinois that is intended to include hospitality, conference, parking, and residential uses. |

The Developer will develop the Property and brand it as the Carillon Tower, a premier luxury residential apartment rental, upscale hotel and restaurant complex, which will occupy approximately 363,000 square feet of building area and will be appointed with a full range of first class facilities, features and amenities, currently envisioned as follows: (i) approximately 166,000 square feet of luxury residential apartment space consisting of 154 Units, with an outdoor deck, pool and fitness center, social room, media room, and hotel à-la-carte services; (ii) 110,000 square feet with 200 guest rooms, a dining room and bar, room service, a pool and fitness center, and meeting rooms; (iii) a 12,000 square foot restaurant with a seating capacity of 225, operated by Gibson's Restaurant Group pursuant to a lease, a copy of which is provided as Exhibit H;  and (iv) 75,000 square feet of parking space available for approximately 154 vehicles.

The Project Owner expects to commence construction in October, 2015, using up to $45,000,000 of bridge loan financing (the "Bridge Financing"). If available, EB-5 financing would replace any Bridge Financing, in whole or in part, depending on the amount raised in this Offering and the timing of its availability. If secured, the Bridge Financing is expected to provide market terms and pricing for such type of financing. The construction period is expected to take 24 months and is projected to be completed in October 2017, assuming construction commences in October 2015.

**The Investment Opportunity**

Investors will have the opportunity to purchase limited partnership Units in the Partnership, which is a special purpose entity established by the General Partner, which will in turn provide a loan to the Project Owner to fund a portion of the construction costs and operating capital for the Project. The Partnership will raise up to $45,000,000 of EB-5 capital, allowing for up to 90 Units at an investment of $500,000 each (the "Capital Contribution").

**Closing Date**

The Project Loan will close on the first date on which all of the Project Loan Documents (as hereinafter defined), in form satisfactory to General Partner, are executed and delivered by the Project Owner and the Partnership, and all other applicable conditions precedent are satisfied or waived, which date shall not be later than December 20, 2015 (the "Closing Date"), unless otherwise extended by the General Partner.

**Use of Proceeds**

The Project Loan will be used to fund (a) the costs and expenses of the construction and development of the Property, (b) the costs and expenses of servicing the anticipated Construction Loan, (c) repayment of existing bridge indebtedness, and (d) ongoing working capital requirements and other general corporate needs of operating and maintaining the Carillon Tower.

**TEA Designation**

The EB-5 Program generally requires investors to invest a minimum of $1,000,000, but reduces that amount to $500,000 for an investment in a Targeted Employment Area, or "TEA," which is either an area of high unemployment – equal to or exceeding 150% of the national average - or a qualifying rural area.

The State of Illinois has authorized the Illinois Department of Employment Security (IDES) to certify that an area of the state qualifies as an area of high unemployment for purposes of the EB-5 Program. IDES provided a letter to the Developer dated September 19, 2014 (the "**TEA Letter**"). The letter states that as of December 31, 2013, an area of 29 contiguous census tracts in Chicago, including the area where the Project site is located, has an unemployment rate of 11.3%, which is 153% of the national unemployment rate of 7.4% for 2013. A copy of the TEA Letter is attached to this memorandum as Exhibit F.

**Project Developers and Managers**

The Carillon Tower project includes an experienced team of real estate, legal, business, and EB-5 professionals. The Developer, Fordham Real Estate, LLC, is one of the Midwest's premier developers of high-end residences. Known for their projects' five-star amenities, the Developer's management has developed more than 16,000 residences. The Co-Developer, Symmetry Property Development II, LLC is a global development firm specializing in creating superior lifestyle communities. Its projects combine culture, entertainment, retail, residential, education and hospitality in master-planned community settings.

**Project Loan and Project Terms**

The aggregate amount of the Project Loan (hereinafter defined) and other debt financing, including the Construction Loan and any Bridge Financing or other subordinated indebtedness, shall not exceed 70% of the total cost of the Project. The balance of the Project costs, if any, is expected to be funded through Project Owner equity, unless other sources of incentive funding become available (for example, government incentives and/or tax rebate credits).

To the extent that the total Project Loan amount is less than $45,000,000, the Developer reserves the right to obtain mezzanine financing that is senior and superior in priority to the Project Loan in order to bridge the difference in total funding available, although the total anticipated indebtedness amount shall not increase.

The General Partner will negotiate a rate of interest on the Project Loan from the Partnership to the Project Owner. The rate is expected to be at a level that will, if the Project Loan is fully performed, provide the Partnership with sufficient cash flow to make distributions to the Limited Partners. See "Loan Terms and Conditions."

**Project Loan Term**

The Project Loan will mature on the fifth anniversary of funding. If the Project Loan is not repaid in full on its maturity date, the Partnership will have the rights and remedies available to it under the definitive documents for the Project Loan (subject to any intercreditor agreement with the lender of the Construction Loan and applicable law). The Project Loan may be extended for up to two additional consecutive one-year terms at the option of the Partnership.

The Project Owner may not prepay the Project Loan.

**Senior Indebtedness**

The Project Owner plans to purchase the Property, where, with the assistance of the Developer and the Co-Developer, it will develop and construct the Project for a total cost of $150,475,500 to be funded as follows:

Construction Loan : $54,457,500

Project Loan: [$45,000,000]

Equity: $51,000,000

The Partnership intends to fund the Project Loan with proceeds of the $45,000,000 investment in Units by the Limited Partners for their aggregate purchase of at least 90 Units.

In addition to the equity investments, the Project Owner expects to obtain the $54,457,500 Construction Loan, which it is currently seeking on reasonably competitive market terms. The Project Owner expects that as a condition to extending the Construction Loan the lenders will require as security a first priority lien on the Project's real property as well as a general security interest in all of the Project Owner's assets.

**Collateral**

The Project Loan will be secured by a subordinated second-position (or preferred position) lien on the Property, and buildings and equipment located on the Property. This lien will be subordinated to the lien securing the Construction Loan.

**Distributions: Preferred Returns and Return of Capital**

Whenever the Partnership makes distributions from net cash flow, the Limited Partners will have a preferential right to receive up 0.5% of their Capital Contributions per year before the Partnership can make any other distribution. These payments are referred to as "**Preferred Returns.**"

Preferred Returns begin accruing on the date we lend the proceeds of an Investor's Capital Contribution to the Project Owner. The Partnership plans to begin paying Preferred Returns in arrears on a quarterly basis beginning 4 months after that date. The Limited Partners' preferential right is cumulative; that is, if the Partnership fails to distribute the full 0.5% in any applicable period, it must pay the shortfall amount to Limited Partners along with any current Preferred Return before it can make any distribution to any party in a later period.

After the Project Loan matures the Project Owner will be required to repay the principal of the Project Loan and any accrued interest. Subject to the performance of the Project Loan, the Partnership will use the proceeds of principal repayments to make distributions of capital to Limited Partners. The Partnership expects this to occur five years after making the Project Loan, but in no case will the Partnership distribute capital to a Limited Partner before the USCIS adjudicates that Limited Partners' I-829 application. The Limited Partners will have a preferential right to receive distributions from the proceeds of repayment of the Loans up to the full amount of their Capital Contributions before the Partnership can distribute proceeds to the General Partner. The amount of capital returned is subject to the performance of the Project Loan, to the prior payment of the Partnership's other expenses and obligations, and to the discretion of the General Partner to take reasonable reserves. This distribution of capital in an amount up to the Limited Partner's Capital Contribution is referred to as the "Return of Capital." Nothing in this section shall imply a right for the Limited Partners to redeem their Units or receive a return of their Capital Contributions.

Please see IV.I. *Return on Investment – Net Distributable Cash from Operations and Distributions of Project Loan Repayment Proceeds* for a more complete discussion of distributions to Limited Partners, including the method of allocating partial payments if the Partnership distributes less than 100% of the preferential amount to investor.

Restrictions apply to our distributions to Limited Partners. To establish the Interests as qualifying investments under the EB-5 Program, the Partnership has structured them as an at-risk equity investment in the Partnership. The Interests are not notes, bonds or any other kind of debt security. The Partnership cannot guarantee that it will pay distributions. If it fails to do so, the Investors will not have a right to declare a default, seek collection or pursue other typical remedies of a bondholder or noteholder.

**Holdback Procedure and Escrow**

Each Subscriber's $500,000 Capital Contribution and $50,000 Administrative Fee will be received in an escrow account with TD Bank, N.A. (the "Escrow Agent"). A Subscriber's Administrative Fee will be released from escrow when the Partnership accepts the subscription.

Capital Contributions will be held in escrow until the following conditions (the "Holdback Trigger") have been satisfied:

- USCIS has approved the Form I-526 Petition of one Subscriber for a Unit in the Offering;
- The Partnership has provided evidence that the Project plan has been formally submitted to the Chicago Commissioner of Planning and Development.

Once the Holdback Trigger has been satisfied, the Escrow Agent will release 80% of the Capital Contribution of each Investor to the Partnership and will retain 20% of each Investor's Capital Contribution (the "Holdback Amount") in an account (the "Holdback Escrow Account") for the benefit of each Investor. Disbursements from escrow will subsequently be handled as follows:

- Whenever USCIS approves a Subscriber's I-526 Petition, the Escrow Agent will disburse that Subscriber's Holdback Amount (if it has not previously been released pursuant to the next paragraph) to the Partnership to be invested in the Partnership and complete the Subscriber's capital contribution.

- Whenever USCIS denies a Subscriber's I-526 Petition without further possibility of appeal, the Escrow Agent will return the denied Subscriber's Holdback Amount to the denied Subscriber, if such funds remain in the Holdback Escrow Account, without deduction or payment of interest, and the Partnership will repay the balance of the Capital Contribution to the denied Subscriber. The Partnership will also instruct the Escrow Agent to disburse from the Escrow Holdback Account an additional $400,000 (in the case where the denied Subscriber's Holdback Amount remained in the Holdback Escrow Account) or $500,000 (in the case where the denied Subscriber's Holdback Amount has previously been disbursed from the Holdback Escrow Account), which will be drawn from the Holdback Amounts of other Subscribers. These funds will be

disbursed directly to the Partnership and will complete the capital contributions of those other Subscribers and will allow the Partnership to continue operations without incurring a deficit by repaying the balance of the denied Subscriber's capital contribution.

**Under the foregoing repayment procedures, an Investor's Holdback Amount may be released from escrow to reimburse the Partnership for its repayment of the Capital Contribution of an investor whose I-526 petition has been denied, resulting in a completion of the Investor's Capital Contribution to the Partnership before receiving I-526 Petition approval. A prospective investor should carefully review the full escrow provisions described in the section titled "The Offering – Escrow Accounts."**

The Holdback Trigger includes a requirement that the USCIS has approved one I-526 Petition related to the Project because, based on policy statements of the USCIS, such approval generally indicates that the USCIS has accepted a project as an investment qualifying for conditional permanent residency under the EB-5 Progi526ram. The Partnership anticipates that, once it has granted a first I-526 Petition approval, the USCIS will approve the I-526 Petitions of our other Subscribers, unless the circumstances of an individual investor prevent approval or unforeseen events were to cause the USCIS to change its evaluation of the Project. After the Holdback Trigger is satisfied we would expect any I-526 rejections to be Subscriber-related rather than Project-related and, accordingly, we would expect very few, if any, of our Subscribers' I-526 Petitions to be rejected. Investors should, however, be aware that USCIS retains ultimate discretion over petition approvals and that we cannot assure USCIS approval of any petition.

**Exit Strategy**

The Project Owner expects, after the Project achieves stable operations, to sell it to a real estate investment trust (REIT) that will purchase the property subject to the Project Loan and will agree to assume all obligations of the Project Owner under the Project Loan Documents. The Partnership's consent will be required for the purchaser's assumption of the Project Loan, but the Partnership may not unreasonably withhold its consent. In general, the Partnership will be able to withhold its consent only for reasonable concerns about the purchaser's creditworthiness or its ability to perform the Project Loan or with respect to concerns and/or knowledge that such consent will violate USCIS's rules regarding the investment requirements for each of the EB-5 investors that are still pending I-829 adjudications.

Neither the Project Owner nor the Partnership can assure that the Project Owner's exit strategy will be successful. If the Project Owner cannot successfully arrange a sale to a REIT or other purchaser that is willing and able to assume the Project Loan, the Project Owner will continue to own and operate the Project. In that case, the Project Owner's ability to repay the Project Loan will depend on the sufficiency of retained earnings from the Project or the Project Owner's ability to sell or refinance the Project to raise funds to repay the principal amount of the Project Loan at maturity.

Each of the foregoing strategies will depend on the profitability of the Project and its value as an operating business. The success of the Project cannot be assured and is subject to numerous risks, including those discussed under

"Risk Factors."

| | |
|---|---|
| **Administrative Fee** | In addition to the $500,000 Capital Contribution, the Partnership will receive from each prospective investor an administrative fee of $50,000 (the "Administrative Fee") for Offering costs, immigration services and marketing fees. If an investor's I-526 Petition is denied, 100% of such investor's Capital Contribution and the Administrative Fee, subject to the terms set forth in the "Holdback Procedure and Escrow" section above, will be returned. |
| **Job Creation** | Barnhart Economic Services, LLC prepared an economic study for the Project. The report determined that 2,122 permanent new jobs will be created by the construction and operations of the Carillon Tower. Assuming the Offering is fully subscribed with 90 EB-5 investors, the 2,122 jobs will be more than twice the 900 jobs required by the EB-5 Program. |
| | Nevertheless, job creation is subject to risk and we provide no guaranty that the Project will create sufficient jobs to satisfy EB-5 Program requirements for all or any of our Investors. |
| | We will allocate the qualifying jobs created by the Project on a first-in, first-out basis, tied to the date on which the Limited Partner submitted his or her I-526 Petition to the USCIS. |
| **Subscription** | Investors may subscribe for Units by executing and delivering the documents referenced in the Section entitled "Subscription" below. Acceptance of subscriptions is not guaranteed and is subject to a number of conditions. The General Partner will have the right to accept or reject any subscription at any time prior to the subscriber's submission of his or her I-526 Petition to the USCIS. In the event that a subscription is not accepted, or in the event the conditions necessary to close the Offering are not satisfied or waived, the subscription amount shall be returned to the Subscriber. In addition, the Administrative Fee will be refunded if there is a rejection of the Subscriber's I-526 Petition by USCIS unless such rejection results from the Subscriber's misrepresentation, fraud or abandonment of an I-526 Petition, or failure to comply with a USCIS request, in which case the General Partner has the right to retain all of the Administrative Fee. No interest will be paid to the Subscriber on subscription amounts or the Administrative Fee. (See "Subscription," below.) |
| **Investor Qualification** | This Offering is made pursuant to an exemption from registration provided by Section 4(a)(2) of the Securities Act, and Regulations S promulgated thereunder, and exemptions available under applicable state securities laws and regulations. Persons desiring to invest in the Units will be required to represent and warrant to the Partnership that they are not "U.S. persons," as defined in Regulation S under the Securities Act, that they qualify as an "accredited investor," as defined in Rule 501(a) of Regulation D under the Securities Act, and to other matters described in the Subscription Agreement (see Exhibit C) to purchase Units. |
| **Transfer Restrictions; No Resale** | Units may not be transferred without the consent of the General Partner, and then only in compliance with applicable securities laws and regulations. There are other substantial restrictions on transferring Units. No market for the Units exists, and no market is expected to develop. (See "Risk Factors," |

below.)

| | |
|---|---|
| **Allocation of Profits and Losses** | Except as otherwise required by the Internal Revenue Code, profits and losses of the Partnership shall be allocated to the Limited Partners as provided in the Partnership's Partnership Agreement (see Exhibit B). Subject to applicable laws, the General Partner has broad discretion to adjust the application and allocation of the net proceeds of this Offering and of profit and losses of the Partnership. |
| **Tax Risks** | Investment in the Partnership involves substantial tax risks. The Partnership has not obtained a legal opinion or ruling from any tax authority regarding any tax aspects of the Project, the Partnership, or its business. This tax discussion is not tax advice to Investors. Each Investor is advised to consult with his or her own tax advisor regarding the tax consequences of investing in the Partnership. (See "Risk Factors" and "Tax Matters," below.) |
| **Risk Factors** | An investment in the Partnership involves substantial risks, including limited operating history, reliance on management, general market risks, limited transferability of Units, reliance on the services of third parties, and other matters. There is no guarantee that an Investor will receive either a return of his or her investment, or a return on his or her investment. (See "Immigration Risk Factors" and "Risk Factors," below, for a discussion of some of these risks.) Neither the Partnership nor the General Partner, nor the Regional Center guaranty that any Limited Partner will receive conditional residency or permanent residency in the United States as a result of his or her purchase of a Unit. Each Limited Partner must evaluate and accept the risk that he or she may not be granted residency in the United States after making his or her Capital Contribution and being admitted as a Limited Partner of the Partnership. |
| **Operating Control of Partnership** | All management and day-to-day control of the Partnership will be exercised by the General Partner. The Limited Partners shall have limited involvement in the management of the Partnership, including limited voting rights as described in the Partnership Agreement. |

## STRUCTURAL OVERVIEW



\* The Regional Center will sponsor the Project through a joint venture with the Partnership.

## I.  THE PARTNERSHIP

The Partnership is a New York limited partnership named Carillon/Tower Chicago, L.P. The Partnership is offering Units to a select group of qualified investors by private placement. The Partnership's investment objective and strategy with regard to the Units are set forth below, and investors are directed to such materials. The information in this Memorandum is qualified in its entirety by the Partnership Agreement, annexed hereto as Exhibit B and deemed a part of this Memorandum, which should be carefully reviewed before a prospective investor invests in the Partnership. This Memorandum does not set forth all the provisions and distinctions of the Partnership Agreement that may be significant to a particular prospective individual investor partner of the Partnership. Each prospective Limited Partner should examine this Memorandum, the Partnership Agreement, and the Subscription Agreement accompanying this Memorandum in order to assure himself or herself that the terms of the Partnership Agreement and the Partnership's investment program are satisfactory to him or her.

The Partnership is a commercial for-profit enterprise formed to finance the development, construction and operation of a Canopy by Hilton hotel, luxury apartment complex and parking facility in an SOM-designed 42-story tower with approximately 363,000 square feet of space. The General Partner organized the Partnership to serve as a "new commercial enterprise" under the EB-5 immigrant investor program administered by USCIS. The Partnership will invest in the Project through a loan to the Project Owner.

As of the date of this Memorandum, the Project is situated within a geographic area certified by the Illinois Department of Employment Security as a high unemployment area, qualifying it as a Targeted Employment Area ("TEA") into which the minimum qualifying investment amount for the EB-5 Program is US$500,000.

Forefront EB-5 Fund (ICT), LLC, a New York limited liability company, is the sole general partner of the Partnership and is responsible for: (i) managing all of the investments to be made by the Partnership, including making decisions in relation to the acquisition, financing, structuring, monitoring and disposition of the investments, and (ii) providing certain administrative services to the Partnership.

## II.  CARILLON TOWER PROJECT

### A.  Overview

The Carillon Tower project is a planned mixed-use real estate development in Chicago, Illinois that will include an upscale hotel, conference space, ground floor retail, parking, and rental apartments. The project site is located on a half-block parcel in downtown Chicago, in the prestigious "Magnificent Mile" neighborhood of North Michigan Avenue, bounded by Superior Street on the south, Rush Street on the east, and Wabash Avenue on the west.

The approximately 363,000 square foot project has been designed by one of the world's largest and most influential architectural design firms, Skidmore, Owings and Merrill ("SOM"), which has its headquarters in Chicago. It will rise as a distinctive 42-story tower in a neighborhood already known for its architectural landmarks. A 200-room hotel (approximately 110,000 square feet) operating under the Canopy by Hilton brand will occupy lower levels over tower, while 154 luxury apartment units (approximately 166,000 square feet) will occupy the upper floors. In addition, the tower will house approximately 12,000 square feet of retail space dedicated to a 225 seat restaurant operated by Gibson's Restaurant Group and approximately 75,000 square feet of parking space for 154 vehicles.

The hotel will operate under Hilton 's newly launched Canopy Hotel brand, and feature a pool, fitness center, meeting rooms, breakfast service, single entre dinner service and happy hour cocktails. The apartments in the new tower, to be known as the Hilton Apartments, will have exclusive amenities such as an outdoor deck, pool, fitness center, social room, media room, and a-la carte food and beverage services.  The development will be served by an on-site parking garage that will accommodate the tenants

in the new tower and will feature electric vehicle charging stations to capture the growing market of environmentally conscious consumers.

As of the date of this Memorandum, the pre-development work for the Project is in process and initial permitting and city planning work on the Project has commenced. Construction will begin on October 2015 and be completed in October 2017. The proceeds of the Offering will be used by the Partnership to finance the acquisition of the land, the development and construction stages of the Project, and operation of the Carillon Tower. Total cost of the Project is estimated at $150,457,500 and is expected to be financed in part with the proceeds of the Offering, and in part from a variety of other sources, including cash equity and the Construction Loan (currently being sought on reasonably competitive market terms), to fully fund the remaining development and related costs of the Project. For additional information regarding the financing of the Project costs, see "Funding Structure for the Project" below.

Carillon Tower's site is at the heart of Chicago's most sought after neighborhood, located at the northeast corner of Superior and Wabash Streets, one half block from Tiffany's front door. A 42–story tower will rise from the Superior/Wabash corner, with a lifestyle hotel at the base operating under the new Canopy by Hilton brand, and 154 luxury apartments above. A 154–space parking garage will occupy the lower tier of floors, underneath and inside the tower. A Gibson's Group restaurant will occupy the Wabash corner.

In the lower floors of the tower, the Project Owner will operate a 200-room hotel under the Canopy by Hilton brand, an upscale select-service hotel brand launched globally by Hilton in 2015. The hotel will have 200 guest rooms. Boutique hotels of this type have generally been successful in the Chicago market, and the Project hotel will be placed in a distinctive structure at a premier location.

- The hotel will be operated by Hilton Worldwide under the Canopy by Hilton brand, pursuant to a Franchise Agreement between the Project Owner and Hilton Franchise Holdings, LLC ("Hilton Franchisor"). The Franchise Agreement will license the Project Owner to use the Canopy brand and all related marks, and require the hotel to be operated in accordance with Hilton Franchisor's standards. Hilton Franchisor will provide for centralized services by Hilton such as booking rooms and the Hilton HHonors program. Hilton Franchisor will receive a basic fee of 4% of the Project Owner's gross rooms revenue, which Hilton Franchisor may increase to 5% at its discretion. The Project Owner will also pay the Hilton Franchisor for services and materials procured from Hilton.

The luxury apartments will feature sweeping views in all directions, including unobstructed views of Lake Michigan to the East. 154 Units are planned, with amenity spaces located on the rooftop of the adjacent portions of the building.

At the Superior/Wabash corner, Gibson's Restaurant Group, the creators and owner of Chicago's most popular steakhouse, will develop a new and exciting 11,000 square-foot, 225 seat restaurant concept. [Further Gibson's disclosure to come]

The parking garage will serve all uses, with direct internal points of entry for the apartments, hotels and restaurants.

The Project will generate revenue principally from the following sources:

- Hotel revenue from guest accommodations

- Revenue from bar and restaurant operations

- Receipts of lease payment on rental apartments

- Parking fees

The plans for the Carillon Tower project have been created by the architectural firm of Skidmore, Owin and Merrill, LLP ("SOM"), and will be developed by Fordham Real Estate, LLC (the "Developer") and Symmetry Property Development II, LLC (the "Co-Developer"). The Carillon Tower project is located in a neighborhood that the Developer knows well and did much to shape. The Developer created the adjacent Fordham and Pinnacle Towers, which feature a high level of finish and amenities. The Developer seeks to extend its upscale concept the Project's new multiuse tower, in collaboration with a very strong team of partners: the Co-Developer, Forefront Capital, Walsh Construction, and Carillon Holdings, LLC – each of which the Developer believes combines great marketing and investment strength, and Gibson's Restaurant Group, owners of Chicago's Gibson's Bar & Steakhouse, Quartino Ristorante, LUXBAR, and The Montgomery Club, as well as successful restaurants throughout the U.S.

### B. Funding Structure for the Project

The Project Owner intends to fund the Project from a variety of sources, including the Project Owner's cash equity of $51,000,000, the $54,457,500 Construction Loan (currently being sought on reasonably competitive market terms), and EB-5 immigrant investment in the form of the Project Loan in the amount of $45,000,000. The Project Owner expects that the lenders of the Construction Loan financing (the "Construction Lenders") will require first lien on the Project's real and personal property and on the assets of the Project Owner as collateral for the Construction Loan.

Accordingly, the following estimated sources and uses of funds for the acquisition of equipment and real estate, and construction of the facility are shown below:

#### Sources and Uses of Funds

| Sources | %age | Apartments | Hotel | Parking | Retail | Totals |
|---|---|---|---|---|---|---|
| Construction Loan | 36% | $ 25,187,845 | $19,159,148 | $ 5,660,124 | $ 4,164,054 | $ 54,457,500 |
| EB-5 Debt | 30% | $ 20,989,871 | $15,965,956 | $ 4,716,770 | $ 3,470,045 | $ 45,000,000 |
| Equity | 34% | $ 23,788,521 | $18,094,750 | $ 5,345,673 | $ 3,932,718 | $ 51,000,000 |
| **Total Sources** | **100%** | **$ 69,966,237** | **$53,219,854** | **$15,722,568** | **$ 11,566,817** | **$150,475,500** |
| Uses | | | | | | |
| Land | | $ 9,988,000 | $ 7,737,000 | $ 2,429,968 | $ 1,845,032 | $ 22,000,000 |
| Hard Costs* | | $ 40,097,701 | $24,742,679 | $10,209,169 | $ 5,676,342 | $ 80,725,891 |
| Soft Costs | | $ 17,120,536 | $18,490,175 | $ 2,633,431 | $ 3,632,943 | $ 41,877,086 |
| Development Fee | | $ 2,760,000 | $ 2,250,000 | $ 450,000 | $ 412,500 | $ 5,872,500 |
| **Total Uses** | | **$ 69,966,237** | **$53,219,854** | **$15,722,568** | **$ 11,566,817** | **$150,475,500** |

*Hard Costs include all construction cost line items in the Budget Summary

### C. Partnership Investment in the Project

Investors will have the opportunity to purchase Units representing limited partnership interests in the Partnership, which is a new commercial enterprise established by the General Partner to raise funds to lend to the Project Owner to fund a portion of the construction costs and operating capital for the Project. The Partnership intends to raise up to $45,000,000 of EB-5 capital, allowing for 90 Units at an investment of $500,000 each (the "Capital Contribution").

The $45,000,000 Project Loan will bear interest at a rate to be negotiated between the Partnership and the Project Owner. The Project Loan will mature on the fifth anniversary of funding. The Project Loan may be extended for up to two additional consecutive one-year terms at the option of the Partnership. The Borrower may not prepay the Loan.

After the Project achieves stable operations, the Project Owner expects to sell it to a real estate investment trust (REIT) or other buyer that will purchase the property subject to the Project Loan and will agree to assume all obligations of the Project Owner under the Project Loan Documents. The Partnership's consent will be required for the purchaser's assumption of the Project Loan, but the

Partnership may not unreasonably withhold its consent. In general, the Partnership will be able to withhold its consent only for reasonable concerns about the purchaser's creditworthiness or its ability to perform the Project Loan, including the covenants intended to preserve the Loan's eligibility as qualifying investment under the EB-5 Program. It is anticipated that the purchaser of the Project will repay the Project Loan at maturity, subject to the same rights of the Partnership to extend the term of the Project Loan.

If the Project Owner is unable to make such a sale, or chooses not to, it will continue to own and operate the Project and will repay the principal on the Project Loan with retained earnings from the Project, proceeds of a refinancing of the Project, or a sale of some or all of the Project. Each of these strategies for repayment of the Loan Principal depends on the Project's success in generating profits and its market value as an operating business, which cannot be assured.

Neither the Project Owner nor the Partnership can assure that the Project Owner's exit strategy will be successful. If the Project Owner cannot successfully arrange a sale to a REIT or other purchaser that is willing and able to assume the Project Loan, the Project Owner will continue to own and operate the Project. In that case, the Project Owner's ability to repay the Project Loan will depend on the sufficiency of retained earnings from the Project or the Project Owner's ability to sell or refinance the Project to raise funds to repay the principal amount of the Project Loan at maturity.

Each of the foregoing strategies will depend on the profitability of the Project and its value as an operating business. The success of the Project cannot be assured and is subject to numerous risks, including those discussed under "Risk Factors."

**D.** **Marketing Strategy**

The Co-Developer, Symmetry Property Development II, has developed the marketing strategy for the Project, which will have separate components for each of the Project's primary uses. To market the rental apartments, the Project Owner has engaged Conlon Real Estate, which is part of the affiliate network of Christie's International Real Estate. To market the hotel, the Project Owner has engaged CBRE Hotels, a hotel management consulting unit of CBRE Group, Inc.

*Marketing Budget*

The project budget includes the cost of the following marketing activities and materials: sales office aids, sales office operations, printing, advertising production, media, mailers, web and social media, promotions, signage, broker commissions, marketing consultants, marketing related furniture fixture and equipment, and operating supplies and equipment.

| Marketing Budget | |
|---|---|
| Initial Lease-Up Concession Allowance ................. | $ 770,000 |
| Marketing and Sales .............................................. | $ 460,000 |
| Preopening Expense/Lease-Up Expense Reserve .. | $ 1,125,32 |
| Working Capital ..................................................... | $ 324,000 |
| **Total Marketing Budget** ...................................... | **$2,679,320** |

*Apartment Marketing*

With over 200 professionals, Conlon Real Estate is one of the Chicago area's fastest growing realtors, and through its Conlon Luxury division it is considered a leading boutique realtor Conlon's affiliation with Christie's International Real Estate (CIRE) gives Conlon a global reach and strong partner in servicing the Chicago luxury market.

*Hotel Marketing*

CBRE Hotels will be responsible for developing and implementing a marketing plan for the hotel. CBRE Hotels is part of CBRE Group, Inc., the world's largest commercial real estate services firm, with 425 offices in more than 70 countries. CBRE Hotels has extensive experience in marketing hotels and can link its clients to a global network of capital and best practices.

*Brand Marketing*

The hotel will also market through Hilton International's sales organization, Hilton Worldwide Sales. This will provide access to the services of more than 700 sales professionals in 34 offices around the world, and the combined benefits of scale, access, competence, and experience from Hilton Worldwide Sales. Hilton Worldwide Sales provides a differentiated selling platform for each of the brands in Hilton's portfolio. Sales efforts for Canopy by Hilton are expected coordinate with Canopy's newly established identity as a Hilton's global "lifestyle hotel" brand.

Through Hilton's guest loyalty program, Hilton HHonors, the Project hotel's guests will be able to use points and airline miles earned through stays at other properties in the Hilton family of brands, and can accumulate points at the Project hotel for use at Hilton properties on their other travels. The Hilton HHonors program is one of the largest programs of its type, with over 40 million members worldwide. The program has partnerships with most major airlines where guests can "double dip" and accumulate both points and airlines miles simultaneously with their hotel stay. Similar to frequent flyer programs, Hilton HHonors provides different tiers of membership that guests can reach, depending on the amount of stays and points accumulated annually. As points increase, benefits such as free internet access and concierge services escalate, encouraging program members to seek out Hilton branded hotels for their travels in preference to others. The Project Owner believes that the Project hotel's location, amenities, Canopy lifestyle image and distinctive design will make it an attractive choice for Hilton HHonors members traveling to Chicago.

The program has seen significant growth in China, which alone saw a 79 percent increase in Hilton HHonors membership in 2011. This was attributed in part to the refining of the brand identity in China, including the addition of a Chinese name and a Chinese website for customers to sign up and redeem their points.

**E.    Competition**

*Apartments*

Section 5.4.1 of the Business Plan provides a complete overview of the multi-family market overview in the Chicago Metro Area.

*Hotel*

Section 5.4.6 of the Business Plan provides extensive data on recent performance of hotels in downtown Chicago and information on the Project hotel's expected competitors.

The following table identifies potential competitors to the Project hotel, including performance data on a cross-section of higher and lower priced hotels. It also provides data on hotels under development in the Project area and expected to open soon. The Canopy by Hilton, regarded as a "limited service" or "selected service hotel," occupies a niche between higher and lower priced hotels. Limited service hotels lack most of the amenities found in higher priced hotels, like multiple restaurants and bars, conference facilities and banquet halls. Select service hotels have some of the services and amenities of higher priced full-service hotels, and the Canopy brand in particular will seek to provide a more upscale experience than traditional limited-service hotels.

## Chicago Market Profile

Total Room Supply: 108,706

### Chicago Top Brands

| Upper-Priced Brands | Properties | Rooms | % Market | Lower-Priced Brands | Properties | Rooms | % Market |
|---|---|---|---|---|---|---|---|
| Hilton | 12 | 6,754 | 6.2% | Holiday Inn | 22 | 4,574 | 4.2% |
| Hyatt | 9 | 6,140 | 5.6% | Extended Stay America | 27 | 3,254 | 3.0% |
| Marriott | 14 | 5,165 | 4.8% | Holiday Inn Express | 21 | 2,457 | 2.3% |
| DoubleTree | 11 | 3,191 | 2.9% | Super 8 | 27 | 1,835 | 1.7% |
| Courtyard | 19 | 3,105 | 2.9% | Motel 6 | 13 | 1,532 | 1.4% |

Source: Smith Travel Research

### Chicago Supply Pipeline

| Phase | Upper-Priced | | | Lower-Priced | | | Unclassified / Independent | | |
|---|---|---|---|---|---|---|---|---|---|
| | Properties | Rooms | % Market | Properties | Rooms | % Market | Properties | Rooms | % Market |
| Pre-Planning | 5 | 2,056 | 1.9% | 1 | 90 | 0.1% | 7 | 2,402 | 2.2% |
| Planning | 6 | 1,356 | 1.2% | 3 | 300 | 0.3% | 4 | 1,416 | 1.3% |
| Final Planning | 2 | 261 | 0.2% | 3 | 416 | 0.4% | 3 | 327 | 0.3% |
| In Construction | 2 | 572 | 0.5% | 0 | 0 | 0.0% | 2 | 471 | 0.4% |
| Total | 15 | 4,245 | 3.9% | 7 | 806 | 0.7% | 16 | 4,616 | 4.2% |

Source: Dodge / TWR / STR / PKF-HR

### Pipeline Status Definitions

| Phase | Definition |
|---|---|
| Pre-Planning | No architect has been selected |
| Planning | An architect or engineer has been selected for the project and plans are underway. Initial approvals have usually been granted. |
| Final Planning | The project will go out for bids, or construction will start within 4 months. |
| In Construction | Ground has been broken or the owner is finalizing bids on the prime (general) contract. |

Source: Dodge / TWR / STR

### Market Study and Feasibility

Section 5.4.1 of the Business Plan includes extensive information about the market for multifamily rental housing in the Chicago area, as well as the demand for hotel rooms, which has been prepared by CBRE.

*Apartments*

According to CBRE, rents in the Class A downtown Chicago market are currently at $2.63 per square foot, up 5.2% from a year ago. Rent for luxury prosperities currently averages $2.85 per square foot, up 4.78% from a year ago, partly influenced by the introduction of new buildings to the data set. Class B net effective rents are up 6.91% from a year ago, due primarily to the extensive renovation that occurred in this data set. The spread between Class A and B narrowed to 13.8% (down from 15.2% last year) while Class B building rents grew at a faster rate, catching up with the growth in Class A product.

Concessions for Class A buildings have reduced from 1.5 to 2 months or more for buildings offering a concession to .5 to 1 month free. Concessions are far less prevalent for Class B buildings. Most buildings have transitioned to a revenue management system which is part of the reason for fewer concessions. As indicated in the marketing budget, the Project Owner expect to offer concessions in order to secure initial tenants.

Based on the foregoing trends, the projected rental rate for the Project is an average of $3.27 per square foot, which is 2.8% higher than current rental rates in the neighborhood. The Project Owner believes that the newness of the building, its attractive location and design, and its level of finishes and amenities, will enable it to charge monthly rates that are slightly above the average for luxury apartments in the neighborhood. The Company is seeking to position rents at a level where lease-up will take approximately 12 months from certificate of occupancy.

Projected financial results are forecasts based on numerous assumptions, not predictions. Bad conditions in the general or local economy could occur, or an unexpected number of competitor could

enter the market, either of which could make it necessary to offer the apartments at lower than expected rates, or extend the amount of time needed for lease-up.

*Hotel*

Based on data from the report *PKF Hospitality Research, LLC, "Hotel Horizons Economic Forecasts of U.S. Lodging Markets" September – November 2013 Edition*, the Project Owner estimates that REVpar (Revenue per available room) for hotels in the Chicago area grew 8.3% in 2014. This is better than the rate of growth in 2013. Prospects for RevPAR growth in the upper-priced segment (positive 8.3%) are better than in the lower-priced segment (positive 7.0%). Chicago market occupancy levels are expected to range from 66.8% to 69.2% during the 5-year forecast period.

The following table shows both historical and forecast data with respect to hotel occupancy rates,

| Year | Occ | Δ Occ | ADR | Δ ADR | RevPAR | Δ RevPAR |
|------|------|-------|--------|--------|--------|----------|
| 2008 | 63.0% | -6.5% | $132.16 | 1.9% | $83.29 | -4.7% |
| 2009 | 56.2% | -10.8% | $113.50 | -14.1% | $63.79 | -23.4% |
| 2010 | 61.7% | 9.8% | $112.86 | -0.6% | $69.63 | 9.1% |
| 2011 | 64.1% | 4.0% | $118.16 | 4.7% | $75.79 | 8.9% |
| 2012 | 66.7% | 4.0% | $125.08 | 5.9% | $83.44 | 10.1% |
| 2013F | 66.8% | 0.1% | $131.27 | 5.0% | $87.67 | 5.1% |
| 2014F | 67.9% | 1.6% | $139.82 | 6.5% | $94.91 | 8.3% |
| 2015F | 69.0% | 1.6% | $149.60 | 7.0% | $103.21 | 8.7% |
| 2016F | 69.2% | 0.4% | $158.46 | 5.9% | $109.71 | 6.3% |
| 2017F | 68.2% | -1.5% | $165.37 | 4.4% | $112.82 | 2.8% |
| **Long Run Averages – 1988 to 2012** | | | | | | |
| Occupancy: 64.7% | | | Δ ADR: 2.6% | | Δ RevPAR: 2.9% | |

Source: PKF Hospitality Research, LLC, Smith Travel Research

average daily revenue and RevPAR.

[Projected revenues for the hotel are based on the foregoing information. Revenues from hotel operations, like other travel-related sectors, is sensitive to general economic conditions. If poor economic conditions or other factors reduce demand for hotel rooms, the Project Owner will not earn revenues at expected levels, which could damage the business and cause investors to lose some or all of their investments.]

*Parking*

The Project Owner plans to engage a parking operator to manage and operate the Project's parking garage and market its parking. It is currently in discussions with nationally recognized parking operators, but has not yet entered into any agreement.

### F. Financial Summary

The following projections for the Project, which include five-year income projections, have been provided by the Project Owner, which prepared them based what it believes to be reasonable assumptions concerning its probable future operations. Because actual conditions may differ significantly from those assumptions, the Partnership can give no assurance that these projections will prove to be accurate and cautions Investors against placing excessive reliance on the projections in deciding whether to invest in the Partnership.

### Pro Forma Financial Information

**Project Totals, Annual**

| | TOTALS | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|
| **SOURCES** | | | | | | |
| EQUITY | $ 51,162,000 | $ 22,319,360 | $ 28,842,640 | $ - | $ - | $ - |
| PRE-DEVELOPMENT LOAN | $ 15,000,000 | $ 15,000,000 | $ - | $ - | $ - | $ - |
| EB-5 | $ 45,143,000 | $ 17,803,919 | $ 27,339,081 | $ - | $ - | $ - |
| CONSTRUCTION LOAN | $ 53,716,546 | $ - | $ 8,895,473 | $ 44,821,073 | $ - | $ - |
| SENIOR LOAN | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | |
| NET APARTMENT PROCEEDS | $ 103,565,960 | $ - | $ - | $ - | $ 103,565,960 | $ - |
| NET HOTEL PROCEEDS | $ 85,388,156 | $ - | $ - | $ - | $ - | $ 85,388,156 |
| NET RETAIL PROCEEDS | $ 16,252,500 | $ - | $ - | $ - | $ 16,252,500 | $ - |
| NOI COMBINED | $ 23,103,366 | $ - | $ - | $ 7,080,405 | $ 10,241,947 | $ 5,781,014 |
| **TOTAL SOURCES** | $ 393,331,527 | $ 55,123,279 | $ 65,077,194 | $ 51,901,478 | $ 130,060,407 | $ 91,169,170 |
| | | | | | | |
| **USES** | | | | | | |
| LAND | $ 22,000,000 | $ 22,000,000 | $ - | $ - | $ - | $ - |
| HARD COSTS (Includes Contingency) | $ 89,885,859 | $ 5,515,434 | $ 51,852,657 | $ 32,517,768 | $ - | $ - |
| SOFT COSTS (Includes Development Fee) | $ 35,564,617 | $ 12,607,844 | $ 13,220,455 | $ 9,736,317 | $ - | $ - |
| INTEREST CARRY (Development) | $ 2,571,070 | $ - | $ 4,082 | $ 2,566,988 | $ - | $ - |
| INTEREST CARRY (Post Development) | $ 3,498,344 | $ - | $ - | $ - | $ 3,498,344 | $ - |
| INTEREST CONTINGENCY | $ - | $ - | $ - | $ - | $ - | $ - |
| SENIOR MORTGAGE | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | |
| **TOTAL COSTS** | $ 153,519,889 | $ 40,123,279 | $ 65,077,194 | $ 44,821,073 | $ 3,498,344 | $ - |
| **TOTAL DEVELOPMENT COSTS \*** | $ 150,021,546 | | | | | |
| **NET CASH FLOW BEFORE DEBT REDUCTION** | $ 239,811,638 | $ 15,000,000 | $ - | $ 7,080,405 | $ 126,562,063 | $ 91,169,170 |
| | | | | | | |
| **DEBT REDUCTION** | $ 68,716,546 | $ 15,000,000 | $ - | $ - | $ 53,716,546 | $ - |
| | | | | | | |
| **NET CASH FLOW BEFORE EB-5 & EQUITY** | $ 171,095,092 | $ 0 | $ - | $ 7,080,405 | $ 72,845,517 | $ 91,169,170 |
| | | | | | | |
| **IRR ON EQUITY INVESTMENT** | 42.88% | | | | | |

\* Total Development Costs do not include Interest Carry (Post Development)

A more detailed summary of the projections and assumptions is included in <u>Exhibit B</u>.

As outlined in <u>Exhibit B</u>, the base case five-year financial plan reflects a substantial increase in sales while maintaining the current profit margins. These calculations assume that ninety (90) Units are sold pursuant to the Offering.

## III. MANAGEMENT AND DEVELOPMENT PROFESSIONALS

### A. The General Partner

The sole general partner of the Partnership is Forefront EB-5 Fund (ICT), LLC, a New York limited liability company.

The General Partner exercises ultimate authority for overall management of the Partnership and is responsible for its day-to-day operations, although the Limited Partners will engage in policymaking activities and will have the rights, powers, and duties normally granted to limited partners under the New York Revised Uniform Limited Partnership Act. The General Partner has the right to delegate its responsibilities under the Limited Partnership Agreement, including the responsibility of providing certain management, development, administrative and auditing services, to suitable parties who may be reasonably compensated by the Partnership. The General Partner may also retain such suitable parties, including, without limitation, the Regional Center, to provide services to the Partnership or the Project Owner, including, without limitation, legal, consulting, marketing, administration, and accounting services. Furthermore, the General Partner may enter into agreements with such parties, including, without limitation, the Regional Center, on behalf of the Partnership or the Project Owner, which agreements may include provisions for the indemnification and exculpation of such parties by the Partnership or the Project Owner. The Partnership Agreement provides for the indemnification of the General Partner in connection with the performance of its duties on behalf of the Partnership, provided that such actions do not constitute gross negligence or willful misconduct.

The General Partner will devote as much time to the activities of the Partnership as it determines necessary for the efficient conduct of the Partnership. The General Partner may engage or participate in other business activities or ventures, even if they would compete with the Partnership. The Partnership and the Limited Partners will have no interest in these other activities or ventures. The General Partner and its affiliates may invest other real estate developments, however neither the General Partner nor its affiliates may buy securities from, or sell securities to, the Partnership. As a result of its other activities the General Partner may have conflicts of interest in allocating time, services and functions among the Partnership and other business ventures. See "Conflicts of Interest" below.

## B. Project Management And Development Team

### 1. Jeffrey Laytin, Member and Manager of the General Partner

A partner in The Law Offices of Jeffrey L. Laytin PLLC, Mr. Laytin specializes in domestic and global intellectual property law, and focuses on trademarks, copyrights, licensing issues and rights of publicity. For the Chinese government, and U.S. and Chinese investors, Mr. Laytin helps those who want to do business in one or both countries. He provides advice and assistance on a wide range of issues faced by companies doing business in, or seeking to enter, the competitive and complex Asian market. During the last several years, Mr. Laytin has developed a significant network of personal relationships with business and government leaders in the People's Republic of China. His legal expertise and experience in navigating governmental channels in China's economic centers, such as Beijing and Shanghai and in Guangdong, enable clients to achieve their goals where other firms have failed.

Mr. Laytin is experienced in the fields of real estate development, entertainment, retail luxury goods, and the registration, protection and enforcement of intellectual property rights. His groundbreaking work for the New York City Police Foundation/NYPD establishes his credentials as the leading practitioner in the field of municipal licensing.

Mr. Laytin has a J.D. from University of North Carolina in Chapel Hill and B.S. in Management/Economics from New York University where he graduated as a University Honors Scholar.

### 2. Brad Reifler, Member of the General Partner

Brad Reifler has a proven executive management track record and over 30 years of experience in leadership, deriving maximum growth potentials and streamlining businesses' operational performance. He led Reifler Trading Corp to become one of the largest independent futures brokerage houses in the U.S., selling it in 2000 to Refco. In 2001, Mr. Reifler co-founded Pali Capital, a broker dealer providing value-added services to the hedge fund community. Between 2001 and 2008, Pali's revenues were in

excess of $1 billion and the revenue to trader ratio was the highest [reported among similar funds]. In 2009, Mr. Reifler became the CEO of Forefront Capital, a global financial services firm.

His board membership includes European American Bank, Millbrook School; Elon College Parents Council, Root Markets, and Majestic Research. His philanthropic endeavors include the Barton Center for Diabetes Education, children with brain tumors, the Crohn's and Colitis Foundation of America; and the Michael J. Fox Foundation for Parkinson's Research. [Education?]

### 3. Peter Shirk, Member of the General Partner

Peter Shirk graduated from the University of Notre Dame with a BBA in Management, after which he served in the United States Marine Corps in Vietnam, as a Platoon and Company Commander, attaining the rank of Captain. After release from active duty in the USMC, he earned his J.D. from the University of Notre Dame, and began a legal career with Winston & Strawn in Chicago, where he was a securities and acquisition/merger specialist, including a concentration in commodities law.

Mr. Shirk's familiarity with the commodities business and association with numerous commodity related clients led to a career at the Chicago Mercantile Exchange as a commodities broker and trader. He eventually became President and COO of Eurospread Associates, a firm specializing in trading and brokering Eurodollar spreads and options. Mr. Shirk's work at the Chicago Mercantile Exchange included active involvement with the Chicago Mercantile Exchange's partnership with Singaporean officials to launch the SIMEX, Singapore International Monetary Exchange.

Additionally, Mr. Shirk initiated a successful development business in Nantucket, Massachusetts, developing property and building homes with an associate. Mr. Shirk continues to be involved with Marine Corps, Veteran, and other social development activities.

### 4. Project Owner: Symmetry Tower/Chicago Project Owner, LLC

Symmetry Tower/Chicago Project Owner, LLC, a New York Limited Liability Company founded on February 24, 2014 (the "Project Owner"), is the owner of the Project and is the job-creating entity for purposes of the EB-5 Program. The Partnership will lend the proceeds of the Offering to the Project Owner, which will also be borrower under the Construction Loan and will contract with the Developer, the Co-Developer and the other companies involved in developing and construction the Project. The Project Owner is owned by the Developer and the Co-Developer, and is managed by Jeffrey Laytin.

### 5. Hilton Worldwide – Hotel Franchisor

Hilton Worldwide is one of the largest and fastest growing hospitality companies in the world, with more than 4,200 hotels, resorts and timeshare properties encompassing more than 690,000 rooms in 93 countries and territories. In the nearly 100 years since its founding, Hilton has been leader in the hospitality industry and established a portfolio of 12 world-class brands, including its flagship full-service Hilton Hotels & Resorts brand, which is the most recognized hotel brand in the world. The company's premier brand portfolio also includes luxury and lifestyle hotel brands, Waldorf Astoria Hotels & Resorts, Conrad Hotels & Resorts and Canopy by Hilton, its full-service hotel brands, Curio – A Collection by Hilton, DoubleTree by Hilton and Embassy Suites Hotels, its focused–service hotel brands, Hilton Garden Inn, Hampton Inn, Homewood Suites by Hilton and Home2 Suites by Hilton, and its timeshare brand, Hilton Grand Vacations (HGV). More than 300,000 team members proudly serve in Hilton properties and Hilton corporate offices around the world. Hilton Hotels has approximately 40 million members in its award–winning customer loyalty program, Hilton HHonors.

### 6. The Developer: Fordham Real Estate, LLC

Fordham Real Estate, LLC will serve as the primary developer of the Project. Fordham Real Estate, LLC was founded in 1988 by Christopher T. Carley and has grown into one of the premier residential development companies in Chicago. Fordham Real Estate, LLC developments are known for both their luxurious details and for fitting seamlessly into their environment. The combined experience of

the principles of Fordham Real Estate, LLC covers more than 16,000 residential Units, as well as involvement in various land developments, office, retail, hospitality and mixed-use properties. This development history, strong financial backing, and market knowledge allow Fordham Real Estate, LLC to gain approvals, secure financing and construct complex and high-quality developments.

### 7. The Co-Developer: Symmetry Property Development, LLC

Symmetry Property Development II, LLC will serve as a co-developer of the Project. The Co-Developer is a global development firm specializing in creating superior lifestyle communities. Its projects combine culture, entertainment, retail, residential, education and hospitality in master-planned community settings. It not only benefits from long-standing relationships with major financial institutions around the world; the Co-Developer's founding partners have a wide range of international financial and legal experience and expertise, which allow for it to engage in a variety of complex international development projects from start to completion.

### 8. Construction: The Walsh Group

The Walsh Group has practiced general building construction since its foundation in 1898 by Matthew Myles Walsh. Currently in its fourth generation of leadership, the firm has been a family held business since that time. Walsh Construction was incorporated in the State of Illinois in 1949; in order to facilitate national expansion efforts, The Walsh Group and additional subsidiary Archer Western were founded in 1983. Each company has experience with a wide variety of building, civil, and transportation sectors including wastewater and water treatment plants, rapid transit, highway and bridgework, educational facilities, warehouse/distribution facilities, athletic facilities, correctional facilities, office, design-build, and more.

### 9. Architect: Skidmore, Owings and Merrill

Skidmore, Owings and Merrill LLP (SOM) is one of the world's largest and most influential architectural and design firms. Founded in Chicago in 1936, SOM has designed some of the most iconic buildings of the post-war era, including New York's Lever House and Time-Warner Center and Chicago's John Hancock Center and Willis Tower (formerly Sears Tower). Notable recent buildings include the Burj Khalif Dubai, the AIG Tower in Hong Kong, the Jianianhua Centre in Chongqing and New York's One World Trade Center. SOM has 4,000 professionals networked across 46 locations.

### 10. Barnhart Economic Services, LLC

Barnhart Economic Services, LLC, founded in 2008, is an economic consulting firm specializing in economic impact analysis, EB-5 job creation analysis, business plan preparation services and EB-5 project consultation. The group has conducted economic studies for a variety of industries, including basic infrastructure development, construction, manufacturing, agriculture, sports stadiums, deep water container ports, chain as well as luxury resort hotels, office buildings, restaurants, health care facilities and hospitals, assisted living facilities, real estate development, education, entertainment, mining, retail stores and shopping malls. In addition, the group provides job creation feasibility studies as well as full economic reports for EB-5 Regional Center projects.

The group has experience with the USCIS EB-5 approval process including new Regional Center establishment, hypothetical and exemplar project submissions, actual Regional Center projects, Targeted Employment Area (TEA) determination, and responding to agency Requests for Evidence (RFE).

### 11. Hotel Marketing Consultants - CBRE Group, Inc.

Headquartered in Los Angeles, California, CBRE is the world's premier, full-service real estate services company. Operating globally, the firm holds a leadership position in virtually all of the world's key business centers. Whether it's a local, regional, national or global assignment, CBRE applies insight, experience, intelligence and resources to help clients make informed business decisions. We empower

our people, and our clients, with the information they need to anticipate market opportunities, seize competitive advantages and execute the best possible real estate strategies.

**Peter S. Greene, First Vice President for CBRE Hotels**, specializes in development and brokerage services.  A veteran of the hospitality industry, Mr. Greene has over 40 years of hotel experience as an owner, financier, developer, operator and broker of hotels. He has participated in over $1 billion of hotel real estate activity in his career including acquisition work, financing, management, renovations consulting and brokerage.  Prior to CBRE Hotels, Mr. Greene served as Managing Director with Insignia/ESG Hotel Partners, where he was responsible for developing the expansion of real estate services offered by Hotel Partners after its merger with CBRE.  Mr. Greene has headed up his own consulting practice, a leading advisory firm to the hospitality industry as well as a hotel development, management and syndication firm.  He also served as vice president for a multi-million dollar diversified real estate investment company.  Mr. Greene began his career in operations where he managed single and multiple hotel properties.

### Apartment Consultant/Residential Marketing – Conlon:  A Real Estate Company

Conlon, founded to address the needs of today's ever changing real estate market, is a specialized boutique brokerage that brings together a team of the top performing brokers in Chicago.  Conlon brokers, on average have over 10 years of experience in the industry and combined they are responsible for over $2 billion worth of homes purchased in the Chicago area.

## IV. REGIONAL CENTER

Tizi, LLC, an Illinois limited liability company doing business as "The Local Government Regional Center of Illinois, LLC," is the regional center that previously received approval to establish, and now operates, the "Local Government Regional Center of Illinois" (the "Regional Center"). The Regional Center is authorized by USCIS under the "EB-5 Immigrant Investor Pilot Program" to establish and solicit investment from foreign investors under the EB-5 Pilot Program. The Project is believed to be a qualifying investment under the EB-5 Pilot Program. See the designation approval letter attached as Exhibit G hereto.

The Regional Center focuses on the following industries: full-service restaurants, mobile food services, drinking places, supermarkets and other grocery stores, and other community housing services. While the Regional Center is not specifically pre-approved to finance hotel and multi-use projects, as of the issuance on May 30th, 2013 of a binding USCIS policy memorandum, regional centers may expand their designation to sponsor projects in additional industries through the I-526 submission process without the need to formally amend their designation. As a result, the Regional Center believes it will be qualified to sponsor the Project. Creation of jobs required under the EB-5 Program will be established using the job calculation methodology approved by USCIS with the regional center proposal.

The geographic area of the Regional Center includes Cook County, Illinois.

## V. LOAN TERMS AND CONDITIONS

Prior to the closing of the first Unit offered hereunder, the Partnership will enter into a Loan Agreement and other related documents (together, the "Project Loan Documents") with the Project Owner. The following is an outline of the material terms and conditions of the Project Loan from the Partnership to the Project Owner.

| | |
|---|---|
| **Borrower** | Symmetry Tower/Chicago Project Owner, LLC |
| **Project Loan** | The Project Loan is for a maximum aggregate principal amount of $45,000,000.  The first advance of the Project Loan will fund after the Holdback Trigger is met, and will be in the full amount of the 80% of Investors' Capital Contributions that will be released at that time. The maximum amount of the Project Loan principal will be $45,000,000, |

unless the maximum aggregate amount of the offering is increased by the General Partner in its sole discretion. In no event will the Offering exceed 120 Units or the Loan principal exceed $60,000,000.

The Project Loan will be subject to the terms and conditions of an intercreditor agreement that will provide for the subordination of the Project Loan to the Construction Loan.

**Collateral**

The Project Loan will be secured by a subordinated second-position (or preferred position) lien on the Project's real property and equipment located on the Property. The lien will be subordinate to the first priority lien securing the Construction Loan.

**Project Loan Term**

The Project Loan will mature on the fifth anniversary of funding. If the Project Loan is not repaid in full on its maturity date, the Partnership will have the rights and remedies available to it under the definitive documents for the Project Loan (subject to any intercreditor agreement with the lender of the Construction Loan and applicable law). The Project Loan may be extended for up to two additional consecutive one-year terms at the option of the Partnership.

The Project Owner may not prepay the Project Loan.

**Closing Date**

The Project Owner and the Partnership must execute and deliver the Project Loan Documents, and all other conditions to closing the Project Loan must be satisfied or waived, no later than December 20, 2015 (the "Closing Date"), unless both agree on a later date.

**Use of Proceeds**

The Project Loan will be used to (i) fund the costs and expenses of the Project, including the costs and expenses in connection with the opening and initial operations of the Project; (ii) fund the costs and expenses and ongoing working capital requirements and other general corporate needs of operating and maintaining the Project; and (iii) repay bridge indebtedness incurred for expenditures related to the Project.

**Interest Rate; Interest Payments**

The General Partner will negotiate a rate of interest on the Project Loan from the Partnership to the Project Owner that is expected to yield sufficient revenue for the Partnership, after paying its expenses and obligations, to distribute Preferred Returns to Limited Partners.

**Certain Fees to the Regional Center**

On the Closing Date of the Offering, the Regional Center shall receive a one-time service fee of a customary amount for comparable transactions, to be paid by the General Partner out of the Administrative Fee.

## VI. THE OFFERING

### A. General

The Partnership is offering for purchase (the "Offering") to a limited number of individual investors who are not "U.S. persons," as such term is defined in Rule 902(k) of Regulation S under the Securities Act of 1933, as amended, on a limited and private basis, with a maximum of $45,000,000 of Partnership Interests in the Partnership. The maximum aggregate amount of the offering may be increased by the General Partner in its sole discretion, provided that in no event shall it exceed one hundred and twenty (120) Units. Partnership Interests are described in the Partnership Agreement to be entered into by and among the Partnership and each of the Subscribers for Partnership Interests whose subscriptions are

accepted by the Partnership pursuant to the Subscription Agreement between each Subscriber and the Partnership. The Partnership Agreement and Subscription Agreement are attached to this Memorandum as Exhibits B and C The following discussion is qualified in its entirety by reference to the full text of those documents.

This Offering of the Partnership Interests is limited to individual persons only (not any legal entities) who are "Accredited Investors," as such term is defined in Rule 501(a) of Regulation D under the Securities Act. The Offering will not be made to any U.S. Person, no offer to sell or sale will be made in the United States and no buy order will be accepted if it is originated from within the United States. (See "The Offering," "Subscription" and the Subscription Agreement attached hereto as Exhibit C.) Subscribers for Partnership Interests, in the aggregate, will own 100% of the Limited Partners' Interest in the Partnership. Each Subscriber is to be issued a Partnership Interest that represents a percentage ownership based upon the Capital Contribution to the Partnership made by the Subscriber in proportion to the Capital Contributions made by all the Subscribers, as more fully described in the Partnership Agreement.

In general, in order to purchase a Partnership Interest, each potential investor must represent to the Partnership that he or she is not resident in the United States at the time of the offer of the Partnership Interest, will not be resident in the United States at the time of the sale of the Partnership Interest and is not acquiring the Partnership Interest for the benefit of a U.S. Person.

### B. The EB-5 Process

The Offering has been structured with the intent that each Subscriber, by becoming a Limited Partner in the Partnership, will have made an investment that qualifies as the investment component required for an EB-5 Visa. If the Subscriber otherwise satisfies the non-investment criteria for an EB-5 Visa, it will enable the Subscriber to seek permanent United States residency and, ultimately, to apply for U.S. citizenship, subject to the risk factors set forth in this Offering. However, the granting of an I-526 Petition does not guarantee the issuance of an EB-5 Visa or final permanent residency status upon the filing of an I-829 Petition ("I-829 Petition"). The USCIS's decision to remove conditions to permanent residency will depend, among other things, on the Project Owner's expenditure of funds in accordance with the Business Plan and the actual job creation activities of the Project. The Project, which will be located in the Regional Center Territory, is expected to be designated by USCIS as a qualifying investment for the EB-5 program. However, Subscribers must be aware that there are numerous other factors that will lead to the grant or denial of the EB-5 Visa based upon the personal facts and circumstances of each Subscriber. (See "Immigration Matters" and "Risk Factors - Immigration Risk Factors.")

The General Partner or the Regional Center may arrange for licensed and bonded migration firms to represent a Subscriber and, on such Subscriber's behalf, assist in the filing of the I-526 Immigration Petition by Alien Entrepreneur for an EB-5 Visa on behalf of each Subscriber at such Subscriber's expense, which will be filed promptly following acceptance of the subscription and admission of the Subscriber and presentation of documentation of the Limited Partner's lawful source of funds and of the path of funds from the Limited Partner to the escrow account. The General Partner has been advised that USCIS reports it is taking approximately 14.3 months to approve or deny an I-526 Petition.

Because potential investors are outside the U.S., they may be offered securities by migration agents or other intermediaries who do not register under U.S. law. These intermediaries may be subject to the laws and regulations of your home country, but the duties that U.S. securities laws and regulations impose on brokers, dealers and investment advisors, including the duty to consider the suitability of an investment for a particular investor, do not necessarily apply to them. Therefore you should conduct your own independent analysis and rely only on independent sources of expert advice retained by you to determine that an investment in the Partnership is suitable for you.

## C.     The Subscription Procedure

The period for the Offering will commence on February 20, 2015 and will end on December 20, 2015 at 5:00 p.m. EST, unless extended by the Partnership until June 20, 2016 (the "Offering Period"). The Partnership may accept subscriptions in the aggregate not to exceed the Maximum Offering Amount, until the end of the Offering Period. Upon delivery of the subscription payment and the executed Subscription Agreement, the Subscriber shall no longer have the right to revoke his or her subscription, and may not request a refund of his or her payments unless the Offering is canceled or USCIS denies the Subscriber's I-526 Petition

In addition to executing the Subscription Agreement and remitting the amount for the Partnership Interests to the Escrow Agent as described herein, the Subscriber will also need to execute the Partnership Agreement, and deliver the executed Partnership Agreement to the Partnership in order to complete his or her subscription. The Partnership Agreement is attached as Exhibit B.

## D.     Escrow Accounts

All subscription proceeds from this Offering, including the Administrative Fee, will be held in escrow by the Escrow Agent pursuant to the terms of the Escrow Agreement[6] between the Partnership and the Escrow Agent (the "Escrow Agreement"). A form of the Escrow Agreement is attached hereto as Exhibit D. The Escrow Agent is TD Bank, N.A. Subscribers will earn no interest on escrowed funds.

## E.     Closings

The General Partner will notify each Subscriber as soon as practicable of the acceptance or rejection in whole or part of his or her subscription. The Partnership will promptly execute a Partnership Agreement and deliver it to each Subscriber whose subscription is accepted, and will admit the Subscriber as a Limited Partner in the Partnership.

## F.     Risk Factors

An investment in the Units involves substantial risks and significant restrictions on transferability. An investment in the Partnership should be viewed as highly speculative and is designed only for non-U.S. persons who are "accredited investors" (as more fully described below) and who maintain their investment over a significant period of time and who can afford the loss of their investment. (See "Risk Factors.")

## G.     Leverage and Loan Terms

The Partnership will invest the proceeds of this Offering in the Project by lending them to the Project Owner via the Project Loan. The Project Loan will be subordinate in interest to the expected Construction Loan in a principal amount of $54,457,500.

1.     Terms and Rates Subject to Change.  All Construction Loan terms, conditions and rates as described herein may be subject to negotiations and revisions as a result of changes in the market and other various underwriting factors.

2.     Debt/Equity Ratio. The Project Owner is currently seeking to obtain the $54,457,500 Construction Loan on the terms outlined in this Memorandum, and may obtain additional financing (to the extent the Maximum Offering Amount is not raised) which, together with the proceeds from the Offering, will be used primarily for the construction of the Project. The Project Owner's target debt to total cost ratio is expected not to exceed approximately 70%. The Project Loan amount is intended to be based upon the Project Owner equity funding to cover approximately 30% to 35% or more of the total Project cost if the highest Maximum Offering Amount is raised. If the Maximum Offering Amount or

---

[6] Subject to final approval from the Escrow Agent.

other additional financing is not raised, the percentage of the Project Loan proceeds may proportionately decrease as the amount of the Project Owner equity is increased. At currently projected levels assuming $45,000,000 of Project Loan proceeds, the Project Loan comprises approximately 30% of the total Project cost. However, until construction is complete the fair market value of the Property will be less than the amount of the Project Owner's Project-related indebtedness.

3.   <u>Repayment of Project Loan</u>. The funds raised in this Offering (the Limited Partners' Capital Contributions) will be used by the Partnership to make the Project Loan. The Partnership's sole source of revenue, and its sole source of cash for making distributions to Limited Partners, will be the Project Owner's payment of interest and (at maturity) principal Project Loan the Project Owners. The Project Owner expects to repay the principal of the Project Loan with retained earnings from the Project, proceeds of a refinancing of the Project, or a sale of some or all of the Project.

4.   The Project Loan will mature on the fifth anniversary of funding. If the Project Loan is not repaid in full on its maturity date, the Partnership will have the rights and remedies available to it under the definitive documents for the Project Loan (subject to any intercreditor agreement with the lender of the Construction Loan and applicable law). The Project Loan may be extended for up to two additional consecutive one-year terms at the option of the Partnership.

The Project Owner may not prepay the Project Loan.

<u>Project Owner Equity</u>: The Project Owner has funded or will fund total equity of approximately $51,000,000.

5.   <u>Security</u>: The Project Loan will be secured by a subordinated second-position (or preferred position) lien on the Project real estate, subordinate to the senior debt financing related to the Project, which, combined with the Project Loan and bridge financing, if any, shall not exceed approximately 70% of the total cost of the Project. However, until construction is complete the fair market value of the Property will be less than the amount of the Project Owner's Project-related indebtedness.

**H.   Return on Investment – Net Distributable Cash from Operations and Distributions of Project Loan Repayment Proceeds.**

The Partnership will not generate any revenue from the Project until it begins receiving the interest payments from the Project Owner with respect to the Project Loan, and principal payments on the Project Loan when applicable and allowable. Interest payments are anticipated to commence on the Closing Date after the Partnership's first disbursement of funds in the Project Loan. Accordingly, distributions to Limited Partners from Project Loan proceeds could not begin until at least 90 days from the date the first funding of the Project Loan. Thereafter, the Partnership intends to pay distributions on a quarterly basis up to the amount of the Preferred Return, to the extent funds are available.

1.   <u>Distributions of Cash from Operations</u>. To the extent the Partnership generates revenue from net distributable cash from operations, including receiving interest payments on the Project loan, the Partnership may, at the discretion of the General Partner after setting aside reasonable reserves, distribute such net distributable cash, first, 100% to the Limited Partners, pro rata based upon their respective percentage interest in the Partnership, in proportion to, and to the extent of, the Limited Partners' unpaid preferred return; and second, the balance of the net distributable cash, if any, shall be distributed to the General Partner.

The General Partner has sole discretion over the decision whether to make distributions, including but not limited to distributions from interest payments earned on account of the Project Loan. If the General Partner decides to distribute Project Loan proceeds from interest payments, it will distribute the proceeds pro rata among the Limited Partners, in proportion to, and up to the amount of, each Limited Partners' unpaid Preferred Return; and second, will distribute the balance of the proceeds, if any, to the General Partner. In general, the Limited Partners' preferred return is one half percent (1/2%) per year.

2.    Net Distributable Cash from Capital Events.  When the Project Owner repays principal on the Project Loan, the General Partner will distribute the proceeds of that repayment pro rata among the Limited Partners whose subscription proceeds were included in the tranche corresponding to the portion of the principal that has been repaid.  The General Partner will first distribute 100% of these proceeds to the Limited Partners, in proportion to, and up to the amount of, each Limited Partners' unpaid preferred return; second, will distribute proceeds to the Limited Partners, pro rata, until each such Limited Partner has received an amount equal to such Limited Partner's aggregate unrecovered Capital Contribution; and third, will distribute the balance of the proceeds, if any, to the General Partner.

In the event of (a) the sale, transfer, or other disposition of all or any portion of the Project Loan, (b) the incurrence of any indebtedness by the Partnership which is secured by, or otherwise allocated in good faith by the General Partner to, the Project Loan, (c) the refinancing of any indebtedness allocated to the Project Loan, or (d) any similar transaction with respect to the Project Loan, proceeds from such capital event will be distributed 100% to the Limited Partners, pro rata based upon their respective percentage interests in the Partnership, in proportion to, and to the extent of, each Limited Partner's unpaid preferred return and, second, to the Limited Partners' unrecovered Capital Contributions.  Finally, the balance of the proceeds, if any, will be distributed to the General Partner.  Please see Article 5 of the Partnership Agreement for exceptions and further details.

Timing of Return on Investment.  No portion of a Limited Partner's original Capital Contribution may be repaid to the Limited Partner (if any portion is repaid at all) until after the later to occur of (i) the fifth anniversary of the initial loan of Offering proceeds to the Project Owner, and (ii) final adjudication of the Limited Partner's I 829 Petition for removal of conditions on permanent residence related to the Partnership.  Proceeds derived from any refinancing or sale of the Project, or any portion thereof (which the Partnership will use commercially reasonable efforts to avoid so long as any Investor's I 829 application for removal of conditions on permanent residence related to the Partnership remains to be filed by the applicable Investor or has not yet been be adjudicated), would be distributable following consummation of the event.  Notwithstanding the foregoing, the Partnership Agreement and applicable laws may delay or prohibit distributions both of net cash flow, and net cash proceeds from sales or refinancing by the Project Owner or the Project, or any portion thereof.

## I.    Compliance with EB-5 Restrictions

The Project Owner, working with the Developer and Co-Developer, will operate its business in a manner that is designed to comply with, and to enable EB-5 investors and the Regional Center to comply with, legal and policy requirements of the Immigrant Investor Program, as advised by the Regional Center. With respect to any bridge financing, the Project Owner will agree to track, maintain, and share data and records with the provider or providers of ridge financing and the Regional Center concerning the Project, including the expenditure of funds, employment of workers, completion of construction and operation of facilities and enterprises, to provide that job creation under the bridge financing may be credited to the Limited Partners.

## J.    Payment of Expenses

The General Partner will pay out of the Administrative Fees, and not Capital Contributions, all ordinary administrative and operating expenses of the Partnership incurred in connection with the Offering and maintaining and operating the Partnership for EB-5 compliance purposes, including, any costs, fees or expenses due and payable to the Regional Center. The Partnership will bear (subject to reimbursement by the Project Owner as agreed between the Project Owner and the General Partner) all other expenses, including legal, accounting, banking, travel, consulting, insurance and similar expenses.

## K.    Formation

1.    Formation and Purpose. The Partnership is a limited partnership organized under the New York Revised Uniform Limited Partnership Act.

2. <u>Administrative Office</u>. The General Partner will oversee the administration of the Partnership. The General Partner's Office and contact will be as follows:

> FOREFRONT EB-5 FUND (ICT), LLC
> 7 Times Square, 37th Floor,
> New York, NY 10036
> Tel: (212) 607-8150
> investment@forefronteb5fund.com

3. <u>Limited Partners</u>. The Limited Partners are those investors who purchase Units in the Partnership in this Offering and those persons who subsequently are admitted as substitute Limited Partners in the event of a permitted transfer of Units.

## L. **Regional Center Responsibilities**

The Regional Center shall oversee all administrative matters involving the maintenance and compliance of the Partnership under USCIS guidelines and shall assist Limited Partners in providing information needed for their petitions for conditional permanent residency on Form I-526 and for removal of conductions on Form I-829. In particular, the Regional Center will provide necessary information with respect to job creation and confirmation of expenditure of funds.

## M. **Suitability Standards**

The Units are speculative investments and involve a high degree of risk. In addition to the suitability standards set forth above, an investment in the Partnership is suitable only for persons of adequate financial means who have no need for liquidity with respect to this investment and can afford a total loss of their investment. Consequently, an investment in the Units offered hereby is not a suitable investment for all potential investors and the sale of the Units hereunder will be made on a selected private basis to a limited number of investors who meet the suitability standards set forth below.

The suitability standards set forth below represent minimum suitability standards for investors. The satisfaction of such suitability standards by an investor does not necessarily mean that an investment in the Units is suitable for the Investor. Potential investors are encouraged to consult their personal legal, tax, and other professional advisors to determine whether an investment in the Units is appropriate for them. The General Partner and/or the Partnership may reject subscriptions, in whole or in part, in their sole discretion.

There is no established market for the Units. Because there are only a limited number of investors and restrictions on the transferability of the Units and the non-transferability of immigration benefits, no market in the Units is ever expected to develop. The Units cannot be resold unless: (i) subsequently registered under the Securities Act and applicable state securities laws or (ii) an exemption from such registration is available.

Units are being offered and will be sold only individuals applying for an I-526 Petition with USCIS who are also "accredited investors," as defined in Rule 501 under the Securities Act, which include the following persons: (a) any natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000; or (b) any natural person whose individual income exceeded $200,000, or whose joint income with that person's spouse exceeded $300,000, in each of the two most recent years and who has a reasonable expectation of reaching that income level in the current year.[7]

---

[7] For purposes of this paragraph, "net worth" means the excess of (a) total assets at fair market value, including personal property but excluding the undersigned's primary residence, over (b) total liabilities, including (i) any mortgage debt which exceeds the value of the undersigned's primary residence and (ii) any mortgage debt as of

Each prospective Investor will be required to represent and to establish to the satisfaction of the Partnership that such investor meets one or more of the criteria for accredited investors. The Partnership reserves the right to refuse a subscription for Units in its sole discretion for any reason, including concern that the prospective Investor may not meet the requirements for accredited investors, the Units are in the Partnership's judgment are otherwise an unsuitable investment for the prospective Investor or the Partnership. Each prospective Investor must also meet the further suitability criteria and make the representations and warranties set forth in the Subscription Agreement.

### N. How to Subscribe

Any potential investor who wishes to subscribe for Units must deliver by Certified U.S. Mail or other nationally recognized tracking delivery services (federal express, ups, etc.) the following items to:

CARILLON TOWER/CHICAGO, L.P.
c/o FOREFRONT EB-5 FUND (ICT), LLC
7 Times Square, 37th Floor,
New York, NY 10036
investment@forefronteb5fund.com

(i) two executed copies of the Subscription Agreement and the Acknowledgment Agreement attached thereto (attached hereto as Exhibit C);

(ii) an executed investor questionnaire (attached as an exhibit to the Subscription Agreement);

(iii) two executed copies of the counterpart signature page to the Partnership Agreement (attached hereto as exhibit b); and

(iv) evidence of a wire transfers in an amount equal to $550,000, payable to the Escrow Agent.

### O. Miscellaneous

1. <u>Reports to Limited Partners</u>. Limited Partners will receive annual internally prepared financial statements and will also receive necessary information for tax reporting, together with other regular operating and/or financial reports as determined by the Partnership.

2. <u>Certain Regulatory Matters</u>. The Partnership has not registered as an investment company and does not intend to do so. Therefore, the Partnership is not expected to be required to adhere to the investment policies required by the Investment Company Act of 1940, as amended.

3. <u>Tax Considerations</u>. The Partnership intends to operate as a partnership for U.S. Federal income tax purposes that is not a publicly traded partnership taxable as a corporation. Accordingly, the Partnership should not be subject to U.S. Federal income tax, and each Limited Partner will be required to report on his or her own annual tax return such Limited Partner's distributive share of the Partnership's taxable income or loss.

4. <u>Foreign Limited Partners</u>. Foreign investors should consult their tax advisors with respect to the U.S. federal and state and the foreign tax consequences of an investment in the Partnership, including the requirements with respect to withholding relative to amounts distributed to such Limited Partners.

### P. Conflicts of Interest

Because of a pre-existing relationship, any transaction between the Partnership and (a) the General Partner, (b) the Project Owner, to which the Partnership (under the control of the General

---

the date hereof in excess of the amount outstanding 60 days prior, other than as a result of the acquisition of the primary residence.

Partner) shall loan the proceeds of the Offering, as described above, (c) the Developer, (d) the Co-Developer, and (e) the owners, managers, directors, officers, or employees of the foregoing, may be entered into without the benefit of "arms-length" bargaining, and may involve actual or potential conflicts of interest—including, without limitation, the loan of Offering proceeds for furtherance of the Project. As a result, the Partnership Agreement and the Project Loan Agreement may have terms less favorable to the Limited Partners or the Partnership than the terms of a commercial agreement negotiated at arm's length. Except and to the extent that specific limitations on self-dealing may be set forth in the Partnership Agreement, the Limited Partners will be relying on the general fiduciary standards, as may be modified by the terms of the Partnership Agreement, which apply to a general partner of a limited partnership under law to prevent overreaching by the General Partner in any transaction with or involving the Partnership. (See Paragraph 4, "Fiduciary Responsibility of the General Partner," below). The following constitutes a summary of important areas in which the interests of the General Partner or its members, managers, or officers may conflict with those of the Partnership, as well as certain conflicts of interest between the Limited Partners and the Regional Center.

1.   <u>Lack of Independent Representation</u>. The Partnership has not been represented by independent counsel. The attorneys that provide services relating to the Partnership perform their services for the General Partner and at its direction. There is no attorney-client relationship or legal representation of the Partnership.

2.   <u>Control of the Partnership</u>. Subject to significantly limited oversight by the Limited Partners as members of the Partnership, the General Partner will be solely responsible for making all decisions of the Partnership pertaining to the lending of the Offering proceeds and the results therefrom. Additionally, the General Partner is generally responsible by the terms of the Partnership Agreement for the operations of the Partnership, including carrying out the specific authorization to lend the Offering proceeds on behalf of the Partnership to the Project Owner. The General Partner's management of the Partnership may otherwise be affected as described herein.

3.   <u>Partnership Opportunities</u>. The General Partner and its members, managers, and officers and their representative affiliates have previously had presented to it and/or to them opportunities to launch, and have launched, and will in the future launch, other investment funds or vehicles for the pursuit of other investment or funding opportunities, both under the EB-5 Pilot Program, and otherwise. Additionally, it the Project is successful, the resulting "track record" may cause others to offer business opportunities to the General Partner or its members, managers, and officers they might otherwise not have received. Each Investor should recognize that the General Partner (or another legal entity formed by the General Partner and/or its members directly) intends to investigate such opportunities, and may pursue them, and that under the Partnership Agreement the Limited Partners have no interest in those other enterprises.  Neither the General Partner nor any member, manager of officer has any obligation to present business opportunities to the Partnership before pursuing it for its own account, even if the opportunity is of a type that the Partnership could pursue.

4.   <u>Fiduciary Responsibility of the General Partner</u>. The General Partner has a fiduciary responsibility to conduct the affairs of the Partnership in the best interests of the Partnership (duty of loyalty), and must exercise good faith and reasonable prudence in managing the Partnership's business (duty of care). The New York Revised Uniform Limited Partnership Act provides that a limited partner may institute legal action on behalf of the Partnership (a "derivative action") to enforce a right of a limited partnership, which would include a breach by a general partner of the general partner's fiduciary duty. As set forth in the Partnership Agreement, the General Partner may not be liable to the Partnership or the Limited Partners for errors in judgment or other acts or omissions so long as performed or omitted in good faith. Therefore, Limited Partners may have a more limited right of action than they would have absent these limitations in the Partnership Agreement. In addition, the burden of proving a breach of fiduciary duty by a general partner, and all or any portion of the expense of such lawsuit, would have to

be borne by the Limited Partner(s) bringing such action, unless a derivative action is successfully prosecuted.

5. <u>Commissions</u>. The Regional Center may pay commissions or other fees to one or more licensed and bonded immigration consultants, brokers, investment advisors, or other parties in connection with the sale of Units pursuant to the Offering. Any such commissions or other fees paid to any party in connection with the sale of Units pursuant to the Offering shall not be paid out of the proceeds of the Capital Contributions of Investors, but from the Administrative Fees and other fees paid by the General Partner to the Regional Center.

6. <u>Other Activities; Competition</u>. The General Partner does not have any duty to account to the Partnership for profits derived from activities other than Partnership activities, and is under no duty, other than the duty as a fiduciary, to engage in such activities in a manner which does not affect the Partnership's investments. In addition, the General Partner is required to devote to the Partnership's affairs only as much time as the General Partner deems necessary. As such, it is possible that the General Partner may have potential conflicts of interest with the Partnership.

7. <u>Compensation</u>. The General Partner may receive a substantial economic benefit from participating in the Project and from the Partnership. To compensate the General Partner for its efforts associated with setting up the Partnership, conducting the Offering, and making the Loan to the Project Owner, the General Partner shall receive certain fees and have the ability to retain the unexpended portions of the Administrative Fee as a fee. The General Partner may also receive distributions of cash from the Partnership's operations after it has paid all of its expenses and obligations and paid the Preferred Returns to the Limited Partners.

## VII.  FEES AND EXPENSES

### A.  Certain Administrative Expenses of the Partnership

The General Partner will pay or cause the Partnership to pay all reasonable administrative expenses of the Partnership, which will consist of out-of-pocket expenses reasonably incurred by or on behalf of the Partnership that are directly related to the organization of the Partnership and the marketing and sale of Units, including, but not limited to, legal fees and expenses, sales, marketing and referral expenses, escrow expenses, filing fees, reasonable travel and entertainment expenses, and fees and expenses relating to the production of marketing materials (collectively, "<u>Administrative Expenses</u>"). Administrative Expenses will be paid from the US$50,000 Administrative Fee paid by each Limited Partner.  The General Partner will not be reimbursed for Administrative Expenses in excess of the Administrative Fee. In the event, however, that the aggregate Administrative Expenses are less than the Administrative fee, such difference shall be paid by the Partnership to the General Partner. No part of the Limited Partners' capital contributions will be use to pay organizational or administrative expenses.

### B.  Other Expenses of the Partnership

The Partnership will bear its own ongoing expenses relating to the operations and activities of the Partnership, including, without limitation, management fees, costs of legal, tax, accounting, and other professional advice and the advice of other consultants and experts, out-of-pocket expenses related to the sourcing, due diligence and potential acquisition of Partnership investments, regardless of whether such acquisition is actually consummated, expenses associated with the holding and sale of Partnership investments, and any other expenses relating to the Partnership (including, without limitation, insurance and the costs of any litigation involving the Partnership) (collectively, the "<u>Partnership Expenses</u>"). The Partnership Expenses will be payable from then current interest income, to the extent available, and the General Partner shall advance all Partnership Expenses in excess of the then current interest income. The Partnership will reimburse the General Partner for any advanced Partnership Expenses plus 1.0% annual interest incurred thereon from the Partnership's future interest income and any other Partnership income,

to the extent and as soon as available. Expenses of the Partnership shall be paid from the cash flow of the Partnership and will in no event be deducted from Limited Partners' capital contributions.

### C. **Management Fee**

The General Partner shall not receive any management fee as compensation from the Limited Partnership for serving as General Partner, but may receive distributions of cash from Partnership operations after it has paid all of its expenses and obligations and paid the Preferred Returns to the Limited Partners.

## VIII. **WITHDRAWALS**

No Partner shall have the right to withdraw any amount or receive any distribution from the Partnership, except as expressly provided in the Partnership Agreement. A Limited Partner may not sell, assign, pledge or transfer his or her Unit without the prior written consent of the General Partner, which the General Partner may grant or withhold in its sole and absolute discretion. It is currently anticipated that the Partnership will not repurchase Units from Limited Partners, or make significant cash distributions to Limited Partners, for at least five years from the date of the first closing in which the Partnership receives and accepts subscriptions. Any Units acquired in reliance upon Regulation S may not be offered or sold to a U.S. person or for the account or benefit of a U.S. person prior to the expiration of a one-year period from the final closing in this Offering.

In the event a Limited Partner's I-526 Petition is approved by USCIS and the Limited Partner, acting in good faith (as determined in the sole and absolute judgment of the General Partner), fails the consular interview process or the USCIS adjustment of status process, the General Partner shall offer such Limited Partner an opportunity to voluntarily retire or withdraw from the Partnership; provided, however, that such a retirement or withdrawal will only be permitted if, in the General Partner's reasonable judgment, there would no material adverse effect on the Partnership or the Partnership's investments or if the Partnership is able to secure alternative financing to replace the amounts to be returned to the retiring or withdrawing Limited Partner. Simultaneously with the permitted retirement or withdrawal of a Limited Partner, (i) the Unit of such retiring or withdrawing Limited Partner will be cancelled; (ii) such Limited Partner's entire equity interest in the Partnership, including any right of such Limited Partner to receive allocations or distributions of income, losses, profits or capital (the "Partnership Interest") of such retiring or withdrawing Limited Partner in the Partnership will thereafter be canceled and terminated, and the Partnership Interests of the remaining Limited Partners will be adjusted pro rata to reflect such cancellation and termination; (iii) such retiring or withdrawing Limited Partner will sell his or her Partnership Interest to the Partnership for an amount equal to $500,000 minus any reasonable expenses incurred by the Partnership; and (iv) such retiring or withdrawing Limited Partner will not be entitled to receive any other amount or payment from the Partnership for the value of his or her Partnership Interest or his or her capital account in the Partnership.

The Partnership Agreement contains additional rights, terms, conditions and requirements regarding withdrawals, and the summary contained in this Memorandum is qualified in its entirety by reference to the Partnership Agreement.

## IX. **SUITABILITY**

### A. **Investor Suitability Standards**

Each purchaser of a Unit must bear the economic risk of its investment for an indefinite period of time because the Units have not been registered under the Securities Act of 1933, as amended (the "Securities Act" or the "1933 Act") and, therefore, cannot be sold unless they are subsequently registered under the Securities Act or an exemption from such registration is available. It is not contemplated that any such registration will ever be effected, or that certain exemptions provided by rules promulgated under the Securities Act (such as Rule 144) will be available. There is no public market for the Units now,

nor is one expected to develop in the future. The Units are being offered in reliance upon the exemption provided in Section 4(a)(2) of the Securities Act and Regulation D or Regulation S thereunder. The Units have not been registered under the securities laws of any state or other jurisdiction and will not be offered in any state of the U.S. except pursuant to an exemption from registration. In addition, the Partnership is not registered under the Investment Company Act of 1940, as amended (the "Investment Company Act"). The Partnership Agreement provides that a Limited Partner may not assign his or her Unit (except by operation of law), nor substitute another person for himself or herself as a Limited Partner, without the prior consent of the General Partner, which may be withheld for any reason or no reason. The foregoing restrictions on transferability should be regarded as substantial, and will be clearly reflected in the Partnership's records.

Each purchaser of a Unit is required to represent that the Unit is being acquired for his or her own account, for investment, and not with a view to resale or distribution. The Units are suitable investments only for sophisticated investors for whom an investment in the Partnership does not constitute a complete investment program and who fully understand, are willing to assume, and have the financial resources necessary to withstand the risks involved in the Partnership's specialized investment program and to bear the potential loss of their entire investment in the Partnership.

Each potential investor must qualify as an "accredited investor" within the meaning of Rule 501(c) of Regulation D under the Securities Act.

For purposes of this Offering, an **accredited investor** is one of the following:

1.     Any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase, exceeds US$1,000,000;[8] or

2.     Any natural person who had an individual income in excess of US$200,000 in each of the two most recent years or joint income with that person's spouse in excess of US$300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year.

The foregoing suitability standards represent the minimum suitability requirement for prospective investors in the Partnership and satisfaction of these standards does not necessarily mean that an investment in the Partnership is a suitable investment for a prospective investor. In all cases, the General Partner shall have the right, in its sole discretion, to refuse a subscription for Units for any reason or no reason, including, but not limited to, its belief that the prospective investor does not meet the applicable suitability requirements or that such an investment is otherwise unsuitable for that investor.

Each prospective purchaser is urged to consult with his or her own legal, tax, immigration and other professional advisors to determine the suitability of an investment in the Units, and the relationship of such an investment to the purchaser's overall investment program and financial and tax position. Each purchaser of a Unit is required to further represent that, after all necessary advice and analysis, his or her investment in a Unit is suitable and appropriate, in light of the foregoing considerations.

The method of subscription is described in the subscription documents annexed hereto as Exhibit C.

## X.     IMMIGRATION MATTERS

### A.     Overview

---

[8] For purposes of this item, "net worth" means the excess of (a) total assets at fair market value, including personal property but excluding the undersigned's primary residence, over (b) total liabilities, including (i) any mortgage debt which exceeds the value of the undersigned's primary residence and (ii) any mortgage debt as of the date hereof in excess of the amount outstanding 60 days prior, other than as a result of the acquisition of the primary residence.

The EB-5 immigrant visa preference category is intended to encourage the flow of capital into the United States economy and to promote employment of workers in the United States. To accomplish these goals and so that foreign investors may obtain immigration benefits for having made an investment, the program mandates the minimum capital that foreign investors must contribute and it mandates that ten (10) full-time jobs must be created on account of each investor. In addition to the return that investors hope to achieve on their investment, foreign investors and their qualifying family members are offered the prospect, but not the guarantee, of conditional lawful permanent residence in the United States. Investors are responsible for applying for the lifting of their conditional status by filing an I-829 Petition during the ninety days immediately before the second anniversary of receiving conditional permanent resident status; neither the Partnership nor the General Partner is responsible to file this petition on behalf of any individual investor. However, the Regional Center is responsible for preparing the documentation to accompany the petition. The following information is intended to be summary only; Investors should obtain independent counsel on immigration matters from their own legal counsel.

The Offering has been structured so that investors may meet the investment requirements of the EB-5 program (8 U.S.C. § 1153 (b)(5)(A) - (D); INA § 203(b)(5)(A) - (D) of the Immigration & Nationality Act) (the "INA Act") and qualify under this program to become eligible for admission to the United States of America as lawful permanent residents with their spouses and unmarried, minor children.

The Offering relies on the provisions of the INA Act concerning regional centers and upon the fact that the Project is being sponsored by the Regional Center, which has been authorized by the INA Act to establish and solicit investment from foreign investors under the EB-5 Pilot Program.

## B. Amount of Investment

As a general rule, the EB-5 program calls for a minimum investment of U.S. $1,000,000 per investor, with exceptions for high unemployment or low permanent population areas, where the minimum investment has been reduced to $500,000 per investor. The Project Owner has been advised by its economist, Barnhart Economic Services, LLC, that the Project should qualify for the lower minimum investment amount based upon the letter of certification received from the Illinois Department of Employment Security, certifying that the Project site is in an area of high unemployment for purposes of the EB-5 Program. (See the TEA Letter attached hereto as Exhibit F.)

## C. Counting Jobs Created

To qualify as an EB-5 investor, each investor must demonstrate that 10 full-time, year-round jobs will be created on account of such investor's investment. These jobs must be for U.S. citizens, lawful permanent residents and those lawfully admitted to the United States, such as asylees, refugees, conditional residents and some others. Non-immigrant (temporary) workers are not included in the count. Also excluded are the Investor, the Investor's spouse and the Investor's children.

A full-time job means one that requires at least 35 hours each week to fulfill. Job sharing is permitted for a full-time position so long as the total weekly-hours requirement is met. The EB-5 program does not permit the combination of part-time jobs to create a full-time position.

Normally, under the EB-5 regime, a job is deemed created when the employee provides services or labor to the new commercial enterprise and is remunerated directly by the new enterprise. Independent contractors are excluded from the job creation count. However, payment or other remuneration does not have to come directly from the new enterprise if it is located within a regional center.

In further support of the EB-5 Visa preference program the U.S. Congress created the Pilot Program, which provided for the authorization of regional centers by the U.S. Department of Justice, Immigration and Naturalization Service (now, USCIS). Enterprises sponsored by a regional center are not required to directly employ 10 full-time workers for each EB-5 qualifying investment. Rather, they may satisfy the requirement if the Investor demonstrates that at least 10 qualifying jobs will be created directly

or indirectly, or induced, as a result of the investment. Tizi, LLC, an Illinois limited liability company doing business as "The Local Government Regional Center of Illinois, LLC," previously received USCIS approval to establish the "Local Government Regional Center of Illinois" as a regional center, and now operates it. . An investment in a commercial enterprise sponsored by the Regional Center will be able to meet job-creation requirements through jobs indirectly created and induced by the Project.

An independent economist conducted an economic and statistical analysis to determine the number of jobs expected to be created as a result of foreign investors each contributing $500,000 (assuming $500,000 funding to the Partnership per Investor) to the Partnership to enable it to complete the Project. This analysis was conducted using the Impact Analysis for Planning (IMPLAN) input-output analysis and social accounting software and associated 2010 county data ("IMPLAN").

IMPLAN is one of several widely-accepted regional economic modeling systems based on the BEA I-O accounts, and is approved by the USCIS as a method of measuring job creation. Input-output analysis is a standard technique for estimating the broad economic impacts resulting from changes in specific economic activities in a regional economy. These economic models account for the transactions between industries, governments, employees, and households. The secondary economic effects of given changes in output or employment are estimated by economic multipliers that represent the activity generated from intermediate purchases through the industry supply chain (indirect effects) and activity generated from employee household spending (induced effects).

The IMPLAN model provides detailed estimates of impacts on the regional economy from changes in final demand or purchases for final use, changes in earnings or changes in employment. It is a static equilibrium model, implying that the estimated changes in output, earnings or employment have no real time dimensions; however, it is usually assumed that the forecasted changes are annual changes as the data used in the model are annual. The model measures the direct, indirect and induced effects of these changes in final demand to the local economy.

The analysis conducted using IMPLAN demonstrated that new jobs are anticipated from expenditure of the proceeds of this Offering in excess of the 900 jobs required under EB-5 law and regulations if all 90 Units marketed in this Offering are sold pursuant to the Offering. Such analysis predicts that 2,122 total permanent jobs will result from the Project.

The following table summarizes the principal findings of the Economic Study with respect to job creation resulting from the Carillon Tower project:

| | | Employment (Jobs) | Labor Income | Value Added | Industry Output |
|---|---|---|---|---|---|
| **Activity** | **Impact Type** | | | | |
| Construction, 2015-17 | Direct Effect | 547 | $40,155,610 | $48,191,659 | $90,385,432$ |
| | Indirect Effect | 177 | $13,604,059 | $20,116,534 | 34,295,423 |
| | Induced Effect | 1,011 | $60,309,920 | $95,829,976 | $147,206,330 |
| | **Total Effect** | **1,734** | **$114,069,589** | **$164,138,170** | **$271,887,185** |
| Operations, 2017-18 | Direct Effect | 120 | $4,435,413 | $12,427,271$ | $18,530,332 |
| | Indirect Effect | 36 | $2,365,318 | 3,816,878 | $6,134,511 |
| | Induced Effect | 216 | $13,140,204 | $20,321,812 | $30,965,236 |
| | **Total Effect** | **372** | **$19,940,935** | **$36,575,961** | **$55,630,079** |
| Property Sales Commissions (2019) | Direct Effect | 7 | $179,555 | $1,194,154 | $1,425,877 |
| | Indirect Effect | 1 | $63,701 | $121,098$1,4 | $181,976 |
| | Induced Effect | 15 | $933,953 | 28,832 | $2,181,912 |
| | **Total Effect** | **23** | **$1,177,209** | **$2,744,085** | **$3,789,765** |
| | Total applicable | 16 | | | |
| **Total Construction, Operations and Asset Sales** | | **2,122** | **$135,187,733** | **$203,458,216** | **$331,307,029** |
| Number EB-5 investors supported | | 212 | | | |
| Potential EB-5 capital | | $106,000,000 | | | |

Summary of Impacts

Values expressed in 2015 dollars. Potential investment capital assumes $500,000 per investor with TEA status. Source: *IMPLAN* software (v.3) and regional economic data for study area counties (Implan Group LLC).

### D.   The I-526 Petition Process

For investors seeking lawful permanent residence, the first step in the process is to file an I-526 Immigrant Petition for Entrepreneur, referred to in this Memorandum as the I-526 Petition, together with accompanying evidence in support of the program's requirements. USCIS adjudicates I-526 Petitions by reviewing these criteria, among others:

1.   New Commercial Enterprise. There must be evidence that shows that the Project Owner is new and is authorized to transact business.

2.   Investment Capital. The petition must be supported by evidence that the petitioner has invested the minimum required capital. USCIS expects these funds to be "at risk," connoting an irrevocable commitment to the enterprise. The funds must be used by the enterprise exclusively to create employment. Funds used to pay administrative costs or other obligations undertaken to promote the investment in the enterprise are not deemed "at risk."

3.   Source of Capital. Evidence must support the legal acquisition of capital. Investors must be able and willing to provide all financial records that USCIS may require to demonstrate that invested funds have been lawfully acquired. Funds earned or obtained in the United States while the Investor was in unlawful immigration status are not deemed to be lawfully acquired. If funds are not lawfully acquired, they may not be deemed "at risk."

4.   Managerial Role. Limited Partners will have the rights, powers, and duties normally granted to limited partners under the Uniform Limited Partnership Act, which include limited involvement in management of the Partnership and limited voting rights as described in our Partnership Agreement. The General Partner believes that this provides a sufficient level of participation in the management of the new enterprise to satisfy the requirements of the EB-5 Program.

5.   Amount of the Investment. The petition must be supported by evidence that the required minimum sum has been invested.

6.   Employment Creation. There must be evidence that 10 full-time jobs will be created on account of each EB-5 investment. See the earlier discussion about qualifying jobs and investment in a

project sponsored by a regional center, which may permit counting of jobs indirectly created and induced by the Project, in addition to those directly created.

### E.   I-526 Petition Approval Not Guaranteed

The I-526 Immigrant Petition for Entrepreneur will be approved only if USCIS is satisfied that the foregoing criteria have been met. The determination of whether these criteria have been established is within the discretion of USCIS. It is also within the power, if not the discretionary authority, of USCIS to seek information about other aspects of the investment and the relationship of the Investor to the enterprise. USCIS frequently reinterprets the meaning of qualifying criteria. There can be no certainty that compliance with the foregoing criteria, supported by appropriate documentation, will lead to the I-526 Petition approval.

In the event that USCIS denies the I-526 Petition, the Investor may not proceed with the next step in the immigration process, consular processing or adjustment of status. Instead, the Investor must decide whether to appeal the denial of the I-526 Petition at his or her own cost and expense with consent of the Partnership or abandon the prospect of investing in the Partnership and obtaining lawful permanent resident status thereby.

### F.   Consular Processing or Adjustment of Status

Approval of the I-526 Petition means that the alien and the alien's spouse and children under the age of twenty-one (21) years may apply for admission as conditional lawful permanent residents ("CLPR"). Approval of the I-526 Petition does not mean that the Investor has been granted admission to the United States as a lawful permanent resident. Approval means that the investment documented by the I-526 Petition has qualified the Investor as an alien entrepreneur.

The application for admission is a separate and subsequent process that concerns issues common to all aliens who wish to live in the United States permanently. Admission as a CLPR may be sought using one of two methods: consular processing or adjustment of status.

### G.   Consular Processing

Consular processing is designed for aliens who are living outside of the United States, who prefer to process at a consulate for strategic reasons or as a matter of convenience or are ineligible to adjust status. Typically, the consular post, which is chosen at the time the I-526 Petition is filed, is in the country of last residence, i.e., the last principal actual dwelling place. In very limited instances, usually involving a recognized hardship, a different consular post may process an application for lawful permanent residence.

Before issuing an immigrant visa, the consular post must determine if each alien is admissible to the United States. Receipt of I-526 Petition approval does not by itself establish admissibility. To be admissible an alien must prove that no grounds of inadmissibility exist and the alien has proper travel documents. (See "Immigration Risk Factors," below, for a list of the grounds of inadmissibility). Waivers are available for certain of the many grounds of inadmissibility, but the grant of a waiver is in the discretion of the government and aliens seeking waivers experience lengthy delays in adjudication of waiver applications. Investors should consult with independent immigration counsel to determine if any grounds of inadmissibility may affect the Investor's admission or the admission of the Investor's spouse or children to the United States.

If the consular post finds that the Investor is admissible, it will issue an immigrant visa to the Investor. The consular post will also determine if the spouse and the qualifying children of the Investor are admissible. A determination of admissibility must be made as to each visa applicant. There is no guarantee that all members of the Investor's family will be granted an immigrant visa. If the Investor is denied an immigrant visa, applications by the spouse and children of the Investor for such a visa will be denied.

Notably, consular posts are administered by the U.S. Department of State ("DOS"), an agency unrelated to the Department of Homeland Security ("DHS") and its sub-agency, USCIS. Consular processing subjects both the visa applicant and the I-526 Petition to the scrutiny of a second government agency whose decisions are not appealable. If the consular officer, based upon information not available to USCIS in its adjudication process, suspects fraud or misrepresentation in the I-526 Petition process or if the consul doubts the eligibility for lawful permanent resident status, the consul may return the case to USCIS for re-adjudication of the I-526 Petition. If USCIS reaffirms its approval, the consul is expected to issue an immigrant visa, assuming there are no other grounds of inadmissibility.

Consular processing begins when USCIS transmits the I-526 Petition approval to the National Visa Center ("NVC"). At appropriate intervals, the NVC issues instructions and appointment packages and requests required documents and information. In time, the alien will be instructed to obtain fingerprints and a physical examination and to report to a consular interview. Immigrant visas usually are issued shortly after the interview unless the consul detects problems in the visa application, the underlying I-526 Petition or during the interview process. Visa applicants should allow about twelve months to complete consular processing, although times for processing vary greatly among consular posts.

## H. Visa Issuance Not Guaranteed

Decisions by consuls are discretionary and unreviewable. USCIS and DOS report recent efforts to communicate more efficiently regarding their respective roles in determining the eligibility of EB-5 investors for immigrant visas. There cannot be any assurance that improved communications will occur generally or with respect to a particular investor or the Investor's spouse or minor children. Neither may it be assured that improved communications will result in the issuance of a visa. Other factors that a consul may, with unreviewable discretion, elect to consider could result in the denial of a visa.

Visa applicants should not change any living, employment, schooling or other lifestyle arrangements in their country of residence before they are issued an immigrant visa based upon an approved I-526 Petition.

## I. Admission After Immigrant Visa Issued Not Guaranteed

After issuance, immigrant visas remain valid for six months. During this period, the holder of the visa must use it to apply for admission to the United States at a designated port of entry. The port of entry is frequently in an international airport. When the alien arrives at the port of entry, he or she will present the immigrant visa to a Customs and Border Protection officer who has the authority to admit the Investor to the United States as a CLPR. This process is known as inspection. Generally, possession of a valid immigrant visa will result in an admission unless the inspecting officer suspect's fraud, the alien's travel documents are not in order or the alien has become inadmissible in the time between the date of visa issuance and the date admission is sought. Possession of an immigrant visa does not guarantee admission to the United States.

## J. Adjustment of Status

The Adjustment of Status ("AOS") procedure is designed to permit aliens who have been admitted to the United States as non-immigrants or who have been paroled into the country to apply for admission as permanent residents without leaving the country. These non-immigrants must establish that they are admissible permanently, meeting the same standards as aliens who use consular processing to obtain a permanent resident visa. (See the discussion, above, on Consular Processing, and see "Immigration Risk Factors," below).

Aliens seeking AOS must also comply with requirements peculiar to the AOS process. Aliens who do not meet these additional requirements will be required to use consular processing to obtain an immigrant visa, which will necessitate a departure from the United States. Aliens who have entered the U.S. under some specific non-immigrant statuses may encounter more difficulties than others in adjusting

status (and may not be successful). Investors should consult with immigration counsel regarding these issues before the I-526 Petition is filed.

An alien investor or the investor's spouse or children who are eligible for CLPR status may not be eligible for AOS if they: (1) were employed in the U.S. without authorization; (2) were not in lawful status on the date their AOS application was filed or if they failed to maintain lawful status thereafter; (3) were ever out of status during earlier admissions to the U.S.; (4) are admitted in certain non-immigrant statuses, such as "A", "G" or "J" (unless the two-year foreign residency requirement does not apply or a waiver of the requirement has been obtained); (5) have been removed from the U.S. in the ten years prior to seeking AOS; (6) were admitted under the visa waiver program at the time AOS is sought; or, (7) obtained CLPR as the spouse of a U.S. citizen or as the son or daughter of a spouse of a U.S. citizen and have not abandoned this CLPR prior to seeking AOS. There may be additional reasons why an alien may not adjust status, which is a benefit granted at the discretion of USCIS.

There may be additional reasons why an alien may not adjust status, which is a benefit granted at the discretion of USCIS. There is no appeal from a denial of AOS; the only relief available is renewing the AOS before an immigration judge in a removal proceeding. Investors should consult with immigration counsel to determine if they, their spouse and their children are eligible for AOS.

During AOS processing, the applicant will be required to submit a medical examination and will receive instructions from USCIS regarding biometric data collection. In rare cases, an interview may be required. The interview may be waived by USCIS, but the waiver should not be expected. USCIS uses profiling information to determine who will be interviewed and it also interviews some AOS applicants to maintain the integrity of its screening process. There is no formal process to request the waiver of an interview. If the Investor is interviewed, the spouse and children of the Investor will be required to attend the interview.

### K.     Travel During Adjustment of Status Processing

An alien investor who leaves the United States without advance permission while an AOS application is pending is deemed to have abandoned that application unless the applicant has been admitted in and continues to hold valid H or L non-immigrant status pending adjudication of the AOS application.

Advance permission to depart the U.S. is issued routinely if the alien articulates a bona fide need to travel. It is not necessary to demonstrate an emergent need to travel; any purpose not contrary to law is usually deemed sufficient. Advance permission, known as Advance Parole, is usually granted for multiple entries during the time required to complete the AOS process, but not longer than one year. It may be necessary to re-apply for Advance Parole if the AOS process is not completed within a year.

Advance Parole is not available to aliens who are outside the U.S. It is important for AOS applicants who wish for travel to make application for Advance Parole while they are in the U.S. They must remain in the U.S. until Advance Parole is granted to avoid abandonment of the AOS application. Advance Parole applications may take about 60 to 90 days to be granted. Processing times may be longer if an applicant is subjected to extended background checking. In demonstrated emergent circumstances, an AOS applicant may receive expedited Advance Parole.

Alien investors admitted to the United States in any non-immigrant status who have obtained Advance Parole during the AOS process should consult with immigration counsel before traveling. Re-admission to the U.S. using the Advance Parole document may jeopardize the non-immigrant status of the alien's family members who did not travel. The consequences, if any, of this situation should be examined prior to travel.

### L.     Employment During the Adjustment of Status Processing

Applicants for AOS who wish to work in the United States must obtain employment authorization unless they have been admitted to the U.S. in a non-immigrant status that confers employment authorization that does not end before AOS is granted. Self-employment requires employment authorization.

Employment authorization applications currently take 60 to 90 days to be adjudicated. Processing times may be longer if an applicant is subjected to extended background checking. Employment authorization is usually granted during the time required to complete the AOS process, but not longer than one year. It may be necessary to re-apply for employment authorization if the AOS process is not completed within a year. To avoid a lapse in employment authorization re-applications should be made sufficiently in advance of the expiration of existing authorization. Employment without authorization at any time in the U.S. is a violation of immigration status and may jeopardize the right to adjust status.

### M.    Adjustment of Status Cannot Be Guaranteed

AOS is granted in the discretion of USCIS. Its decision is unreviewable. An alien whose AOS application has been denied may request that the case be re-opened or re-considered by the same office that denied AOS. If the request to re-open or re-consider the case is denied, or, if, after such a review, the alien fails to convince USCIS to reverse its original decision, the alien may renew the AOS before an immigration judge if he or she is placed into removal proceedings.

Aliens admitted in unexpired non-immigrant status who are denied AOS to CLPR are usually entitled to remain in the U.S. in that status and may seek an extension of that nonimmigrant status or seek a change to a different non-immigrant status for which they are qualified. At such time as the alien's non-immigrant status expires, the alien is expected to depart the U.S. If at the time of the denial of AOS, the alien's non-immigrant status was expired, the alien is expected to depart the U.S. Failure to depart timely is a violation of U.S., immigration law and regulation which may affect the ability of the alien to qualify for future immigration benefits.

If an alien investor is admitted to the U.S., in a non-immigrant status (pending AOS), the spouse and children of the alien investor are frequently admitted for a time coincident with the authorization of the Investor to remain in the U.S. If AOS is not granted to the alien investor and the Investor's non-immigrant status expires, the status of the spouse and children will be deemed to have expired at the same time. They, too, will be expected to depart the U.S. at that time.

AOS applicants should not make any permanent connections to the United States or change any permanent living, employment, schooling or other lifestyle arrangements in their country of residence before they are issued AOS based upon an approved I-526 Petition.

### N.    Grounds for exclusion.

Persons applying for lawful permanent residence must overcome the statutory presumption of inadmissibility. Applicants must demonstrate, affirmatively, that they are admissible to the United States. There are many grounds of inadmissibility that the government may cite as a basis to deny admission for lawful permanent residence. Various statutes, including for example Sections 212, 237 & 241 of the Act, the Antiterrorism & Effective Death Penalty Act of 1996 (AEDPA) and the Illegal Immigration Reform & Immigrant Responsibility Act of 1996 (IIRAIRA) set forth grounds of inadmissibility, which may prevent an otherwise eligible applicant from receiving an immigrant visa, entering the United States or adjusting to lawful permanent residence.

Examples of aliens precluded from entering the United States include:

a)    persons who are determined to have a communicable disease of public health significance;

b)    persons who are found to have, or have had, a physical or mental disorder and behavior associated with the disorder which poses or may pose, a threat to the property, safety, or

welfare of the alien or of others, or have had a physical or mental disorder and a history of behavior associated with the disorder, which behavior has posed a threat to the property, safety, or welfare of the immigrant alien or others, and which behavior is likely to recur or to lead to other harmful behavior;

c) persons who have been convicted of a crime involving moral turpitude (other than a purely political offense), or persons who admit having committed the essential elements of such a crime;

d) persons who have been convicted of any law or regulation relating to a controlled substance, admitted to having committed or admits committing acts which constitute the essential elements of same;

e) persons who are convicted of multiple crimes (other than purely political offenses) regardless of whether the conviction was in a single trial or whether the offenses arose from a single scheme of misconduct and regardless of whether such offenses involved moral turpitude;

f) persons who are known, or for whom there is reason to believe, are, or have been, traffickers in controlled substances;

g) persons engaged in prostitution or commercialized vice;

h) persons who have committed in the United States certain serious criminal offenses, regardless of whether such offense was not prosecuted as a result of diplomatic immunity;

i) persons excludable on grounds related to national security, related grounds, or terrorist activities;

j) persons determined to be excludable by the Secretary of State of the United States on grounds related to foreign policy;

k) persons who are or have been a member of a totalitarian party, or persons who have participated in Nazi persecutions or genocide;

l) persons who are likely to become a public charge at any time after entry;

m) persons who were previously deported or excluded and deported from the United States;

n) persons who by fraud or willfully misrepresenting a material fact, seek to procure or have procured) a visa, other documentation or entry into the United States or other benefit under the Immigration Act;

o) persons who have at any time assisted or aided any other alien to enter or try to enter the United States in violation of law;

p) certain aliens who have departed the United States to avoid or evade U.S. Military service or training;

q) persons who are practicing polygamists; and

r) persons who were unlawfully present in the United States for continuous or cumulative periods in excess of 180 days.

**O. Removal of Conditions**

Approval of an AOS application or the grant of an I-526 Petition followed by entry into the U.S. using an immigrant visa means that the Investor and the spouse and qualified children of the Investor have been granted CLPR for two years. The "conditions" must be removed so that the aliens may reside

in the U.S. indefinitely. Failure to remove the conditions results in the termination of CLPR status and will likely result in the commencement of removal proceedings.

Removal of conditions is sought by the filing of an I-829 Petition in the 90-day period immediately preceding the second anniversary of the grant of CLPR status. In support of the petition, the alien investor must demonstrate full investment in the enterprise and compliance with the requirement that 10 jobs have been created as a result of the investment. The investor must also demonstrate maintenance of the investment continuously since becoming a CLPR. The Project Owner will provide documentation, upon request by a Limited Partner, as reasonably necessary and available in support of such Partner's application for removal of conditions.

During the pendency of the petition, aliens admitted in CLPR status remain in valid status even if the petition is not decided before the expiration of the two-year period of admission. CLPR status is extended in one year increments or until the petition to remove conditions is adjudicated. Unfortunately, some USCIS offices have been reluctant to extend CLPR status, presumably in ignorance of the law. Aliens have also experienced difficulty obtaining advance permission to travel during this period. This difficulty is not experienced in all instances and it may abate as local USCIS offices become more familiar with the law. Delays and improper denials of documents evidencing extended CLPR status and Advance Parole cannot be ruled out. Denial of such documents does not end the lawful status granted by statute.

### P. Removal of Conditions Not Guaranteed

In the history of the EB-5 program, INS (now USCIS) modified the requirements for removal of conditions after the time that some investors were granted CLPR status. As a result of this action, some of those investors were unable to comply with the new requirements, creating the possibility that they would be removed from the United States. Some of these investors contested the change in rules after their investments were made.

Their position was supported in litigation that resulted in INS being ordered to reconsider their applications to remove conditions by applying the original rules. There cannot be any assurance that USCIS will not change the requirements for removal of conditions after investors are granted CLPR status through investment in the Project. There cannot be any assurance that an investor will be able to demonstrate to the satisfaction of USCIS that the Project is operating within its business plan, that it has created the requisite jobs at the time required by USCIS or that any other requirements for the removal of conditions have been met.

## XI. RISK FACTORS

**The purchase of Units involves a high degree of risk and is suitable only for persons of substantial means who can bear the risk of loss of their entire investment and who have no need for liquidity in their investment. In addition to all other information set forth elsewhere in this Memorandum, including the exhibits hereto, a prospective investor should carefully consider the following risks, and should consult his own legal, tax, real estate and financial advisors with respect thereto, before making a decision to purchase Units. The order in which the following risks are presented does not necessarily correlate to the magnitude of the risks described. The fact that the following risk factors are enumerated in no way implies that these are the only risk factors associated with this investment and are merely illustrative of the types of risks involved in this type of investment.**

**Any of the risks enumerated in this section of this Memorandum could have material and adverse effects on the Project Owner's cash flow, financial condition or ability to repay the Project Loan. If the developer is unable to repay the Project Loan, in whole or in part, Investors could see a substantial, if not total, loss of their investments.**

In addition to the risks described below, businesses are often subject to risks not foreseen or fully appreciated. In reviewing this Memorandum, potential investors should keep in mind other possible risks that could be important.

This Memorandum contains forward-looking statements. The risk factors we describe below are among the factors that can cause our performance to differ materially from the results anticipated or implied by our forward-looking statements. Please read the section entitled "Forward-Looking Statements – Important Factors and Associated Risks."

A.   **Risks Related to "Best Efforts" Offering.**

If This Offering Does Not Yield Projected Proceeds We Must Obtain Other Financing or Modify Our Business Plan. We are conducting this offering on a "best efforts" basis with no underwriter, no advance agreement that any number of Interests will be purchased, and no minimum amount of subscriptions required to close. Subscriptions are not revocable and we will accept them on a rolling basis. Capital contributions will be received in escrow and released to us once the conditions for release have been satisfied, irrespective of the total amount of investment. Potential Investors should be aware that there is no assurance that any monies besides their own will be invested in the Partnership.

We have based our business plan on a projection of $45 million in funds from this offering. If we fail to raise that amount, the Project Owner will require additional financing from other sources. We cannot assure you that funds in addition to your investment will be available on acceptable terms or available at all. Such financing may result in subordination of Investors' interests to other investors or lenders, increasing the risk that you may have no return of or on your investment. If the Project Owner does not obtain needed additional capital, or the cost of such capital is excessively high, the risk that our business will fail or that it will not employ the requisite number of employees to satisfy the requirements of the EB-5 Program will increase significantly.

B.   **General Risks Related To The Partnership's Proposed Business**

The following represent risk factors relating to the Partnership's business in general.

1.   The Partnership and the Project Owner Have No Operating History.  The Partnership has been formed for the specific purpose making a loan to the Project Owner.  The Project Owner has been formed for the specific purposed of acquiring, designing, developing, constructing, owning and operating the Project.  Accordingly, neither the Partnership nor the Project Owner has any operating history.  The Partnership has described certain aspects and projections for this Project in this Memorandum which are based primarily on its own knowledge and its experience, which are limited, and have not been verified.  The Project Owner has been formed to acquire the Property and to develop, construct and operate the Project.  While the individuals and entities that own and control the Project Owner have experience in developing similar projects, each real property project is unique and their past performance does not necessarily indicate that the Project will be successful.

2.   The Financial Projections Are Not Based Upon Actual Operations.  Because the Partnership has no operating history and was recently formed, it cannot provide a balance sheet or income statement based on actual operations of the Partnership.  The pro forma financial projections attached to this Memorandum have been provided by the Project Owner, which prepared them based what it believes to be reasonable assumptions concerning its probable future operations.  Because actual conditions may differ significantly from those assumptions, the Partnership can give no assurance that these projections will prove to be accurate and cautions Investors against placing excessive reliance on the projections in deciding whether to invest in the Partnership.  For example, hotel room rates and occupancy levels have fluctuated greatly in recent years, as have costs of construction and labor. An increase in costs or decrease in Project revenues could cause a partial or total loss of Investors' investments.

3.     Dependence upon the Project. The success of an investment in the Partnership depends entirely on the Project Owner's ability to service the Project Loan and repay it at maturity, which, in turn, depends on the success of the Project's business operations and its value as an operating business. Operating revenue of the Project Owner will provide its sole source of revenue to pay interest on the Project Loan and to pay its other obligations. The Project Owner's may also need to refinance or sell all or part of the Project to repay the principal on the Project Loan, which will only yield sufficient funds if the Project has achieved significant market value through successful operations. There are no assurances that the Project can operate profitably. Its failure to do so could result in a loss of some or all the Investors' investments.

4.     Limited Partners will bear a significant financial risk. Purchasers of Units will be providing a significant portion of the risk capital to the Project Owner pursuant to the Project Loan and will be investing at a time when the success of the Project remains uncertain. Accordingly, Limited Partners will incur a significant portion of the capital risk related to Project.

5.     The Project Owner, the Developer, the Co-Developer, the Principals and their affiliates will be subject to conflicts of interest. Developer, Co-Developer and/or Project Owner and the principals in the Developer, Co-Developer and/or Project Owner and its members (the "Principals") and their affiliates have total control over the operation of the Project and the potential repayment of the Loan. This could result in one or more conflicts of interest between the interests of the Limited Partners and the Principals. The potential conflicts of interest include, but are not limited to, the following:

   a.     The principals of the Project Owner may acquire or invest in other properties that compete for the same tenants and customers as the Project. The principals may acquire and operate those other projects for their own accounts.

   b.     Because the General Partner shares common ownership with the Project Owner the General Partner will face a conflict in its duties to the Partnership if it has to enforce the terms of the Project Loan, especially in the enforcing remedies in the event of a default by the Project Owner.

   c.     The Developer and/or Project Owner, the Principals and their other affiliates will not be required to disgorge any profits or fees or other compensation they may receive from any other business they own separate from the Project, and Limited Partners will not be entitled to receive or share in any of the profits, return, fees or compensation from any other business owned and operated by the Developer, the Co-Developer and/or Project Owner, the Principals and their other affiliates for their own benefit.

   d.     The Developer and/or Project Owner, the Principals and their other affiliates are not required to devote all of their time and efforts to the affairs of the Project and this could result in a conflict of interest for the time and attention of the Developer, the Co-Developer and/or Project Owner, the Principals and their other affiliates.

   e.     The Project, the Developer, the Co-Developer and/or Project Owner, the Partnership and the Limited Partners have not been represented by separate counsel in connection with the drafting of the Partnership Agreement or the Subscription documents, or this Offering.

6.     The Partnership's liability will be limited. Pursuant to the Partnership Agreement, the General Partner, its agents, and their other affiliates will not be liable to the Partnership or any Partner for any damages, losses, liabilities or expenses (including reasonable legal fees, expenses and related charges and cost of investigation) so long as those parties acted in good faith. Thus, Partners will have limited recourse against those parties. The Partnership Agreement also provides that the Partnership will indemnify, hold harmless and waive any claim against the General Partner, its agents, and its other affiliates, for any and all losses, damages, liability claims, causes of action, omissions, demands and

expenses or any other act or failure to act arising from or out of the performance of their duties to the Partnership under the Partnership Agreement or as a result of any action which the General Partner and/or their designated agents acted or failed to act in performance of their duties to the Partnership unless such loss has arisen as a result of their gross negligence or willful misconduct.

7.     <u>The Project will have no diversification of its investment</u>. The Partnership will invest its capital in the Project through the Project Loan, placing all of its fund in a single business sector at a single location. This exposes the Investor to more risk than investment in a diversified business or portfolio where losses in one region or business sector may leave other parts of the investment unaffected.

8.     <u>The Partnership's success is dependent upon the successful implementation of the Project Owner's business plan</u>. The success of the Partnership will largely depend upon the Project Owner's success in implementing its business plan related to the Project. Because many of the factors necessary for success are beyond the control of the Project Owner, there can be no assurance that the Project Owner will be able to successfully implement the business plan, or carry out that business plan as circumstances require.

9.     <u>The Project will be subject to uninsured risks and catastrophic and force majeure events</u>. The Project may be subject to catastrophic events and other force majeure events, such as fires, earthquakes, adverse weather conditions, changes in law, eminent domain, war, riots, terrorist attacks and similar risks. These events could result in the partial or total loss of investment or significant down time resulting in lost revenues, among other potentially detrimental effects. While the Partnership does and will seek to maintain insurance and other risk management products (to the extent available on commercially reasonable terms) to mitigate the potential loss resulting from catastrophic events and other risks customarily covered by insurance, such products may not be practicable or feasible. Moreover, it will not be possible to insure against all such risks, and such insurance proceeds as may be derived in a timely manner from covered risks may be inadequate to completely or even partially cover a loss of revenues, an increase in operating and maintenance expenses and/or a replacement or rehabilitation. In addition, certain losses of a catastrophic nature, such as those caused by wars, earthquakes, terrorist attacks or other similar events, may be either uninsurable or insurable at such high rates as to adversely impact the Partnership's profitability. If a major uninsured loss were to occur with respect to the Project, the Partnership could lose the capital indirectly invested in the Project.

10.     <u>Distributions by the Partnership are not guaranteed</u>. The investment in the Partnership is not expected to generate current income for some time, and at least not until after the Project's commercial operation date. Therefore, the return of capital and the realization of gains, if any, from the investment will be deferred until such time. Payment of distributions and the amounts thereof will be dependent upon returns received by the Partnership on the Project Loan. No assurances can be given that the Partnership will be repaid the Project Loan or be able to declare and pay any distributions to the Limited Partners, or that Limited Partners will earn a positive return on their investment or receive a return of any or all of their investment.

11.     <u>Significant indebtedness will be incurred, including indebtedness senior to the Partnership's Loan</u>. The Project Owner will incur a material amount of indebtedness to finance the costs of developing the Project, to pay closing costs, and to establish reserves.

12.     <u>Leveraging and other factors relating to financing may increase the risk of loss to the Investors.</u> Under subscription of the Offering or unforeseen costs could make additional borrowing by the Project Owner necessary and change the Partnership's position as a lender to the Project. The use of secured indebtedness to finance a portion of development costs and/or working capital is referred to as "leveraging". Leveraging increases the risk of loss of the Partnership's investment if and to the extent that the Project declines in value. In addition, to the extent cash flow from a leveraged investment is not sufficient to pay debt service, cash from other sources would be required. Unless the Project generates such cash, the Project Owner might be required to raise additional equity investment funds or to borrow

additional funds for such purpose, and there can be no assurance that such equity investment, or such loans, will be available on favorable terms, if at all. Similarly, even if the Project generates such cash, the Project Owner may nevertheless elect to raise or borrow additional funds. In such event, the Project Owner may be required to sell the Project on disadvantageous terms, or security agreements or guarantees securing any of the Project Owner's debt may be foreclosed and the Property sold by priority lenders to repay the debts owing them. This would have a materially adverse effect on the Partnership and its Investors.

### C. Special Risks Associated With The Project

The following represents a description of specific risk factors related to the development and operation of the Project.

1. <u>The Project has no operating history</u>. Because the Project has not yet been developed, it has no operating history, and involves risks of failure to maintain or obtain or substantial delays in obtaining: (i) regulatory, environmental or other approvals or permits related to operations; (ii) financing; and (iii) refinancing. As with any new business venture of this size and nature, operation of the Project could be affected by many factors, including, but not limited to, those which follow. The occurrence of these events could significantly reduce or eliminate revenues and profits from the Project or significantly increase the expenses of the Project. As a result, the Project Owner may be unable to pay back a portion or all of the Loan, and Investors may experience a partial or total loss of their investments.

2. <u>The Hotel Brand is New.</u> Hotels have just begun operating under the Canopy by Hilton brand in 2015. While Hilton has a long history in the hospitality industry, the Canopy business model, target market, look and feel and package of amenities are untested and have unknown marketing appeal. If the Canopy brand is unsuccessful, Project performance may be poor and, if it becomes necessary, re-branding the hotel could be expensive and time-consuming and result in significant disruption to the business, affecting the rental units as well as the hotel.

3. <u>Additional zoning approvals may need to be obtained; dependency on permits</u>. Although the Partnership has been advised that it is a fair assumption that the Project, subject to approval under the planned development process, will be approved on the Property, there are no assurances that the business plan may not have to be modified and accordingly, additional or modified zoning, building, platting and/or development approvals may need to be obtained.

Prior to securing final approval for the Project, the Project Owner or Developer must obtain or extend certain building and safety, handicapped, and other. Additionally, public health, fire and safety, and other licenses may also need to be obtained. While the Partnership, the General Partner, the Project Owner, the Developer and the Co-Developer believe that there should be no impediments to obtaining any necessary permits and licenses or obtaining any consents or approvals, no assurance can be made that they will be obtained.

4. <u>Marketing and operating efforts may not be successful</u>. Although the Project is unique in its location and design, there are no assurances that the Project Owner and its agents will be able to successfully manage the various business elements of the Project and market its concept to the general public in a manner that achieves the projected rates, volume and profit as set forth in the financial projections contained in the Project Business Plan attached hereto as Exhibit E. In particular, each component of the Project, namely the hotel operations, the residential operations, and the food and beverage operations each have their own unique operating and marketing attributes and will be dependent upon numerous factors, including consumer and commercial demand for the products to be delivered in the specific areas that comprise the Project. There are no assurances that marketing and operating efforts will be successful.

5. <u>Significant construction risks may jeopardize the Project</u>. The Project development involves significant construction activity. The construction contract may need to be renewed, potentially

at increased cost, if construction does not commence by a certain date and such contract covers only a certain percentage of the work provided for by the remaining construction budget; the Developer is contracting directly for a significant amount of work not covered by the existing construction contract. Commercial development typically requires substantial capital outlay during the construction period, and several years could pass before positive cash flows can be generated, if ever. The time and costs required to complete the construction and development of the Project may be substantially increased by many factors, including shortages of materials, equipment, technical skills and labor, adverse weather conditions, natural disasters, labor disputes, disputes with contractors, accidents, changes in government priorities and policies, delays in obtaining the requisite licenses, permits, and approvals from the relevant authorities, and other unforeseeable problems and circumstances, including a delay in the consummation of the transactions contemplated by this Memorandum. These problems may delay construction, which in turn would delay the Developer's and/or Co-Developer's ability to generate cash flow, and increase costs, which can significantly reduce projected rates of return and the ability to service debt costs. Obtaining building permits is a time-consuming process, and it is virtually impossible to predict how long it may take to receive final building permits. This uncertainty could result in construction delays and increased costs associated with the Project, although the Project has already received most of the construction permits it requires. The costs of construction materials and labor may change to the detriment of the Developer or Co-Developer during the course of construction. Unanticipated cost increases may require the Developer or Co-Developer to raise or borrow additional capital that may or may not be available, to complete construction of the Project. In addition, failure to complete the Project according to the Project's original specifications or schedule, if at all, may give rise to potential liabilities and, as a result, a Limited Partner's return on investment in the Interests may be different than originally expected.

6. <u>The Project may be subject to technical risks and technology risks</u>. The Project may be subject to technical risks, including design errors, defects in construction and materials, mechanical breakdown, failure to perform according to design specifications and other unanticipated events, which adversely affect operations, health, safety and other equipment and/or plant facilities. While the Project will be insured and it is expected that third parties will bear much of this risk, there can be no assurance that any or all such risk can be mitigated or that such parties, if present, will perform their obligations.

7. <u>Success of the Project will, in part, depend on the local, United States' and global economies</u>. The Project's intended business is dependent upon many factors, including the state of the local, national and global economies and the status of consumer spending, especially discretionary spending, and business in general. During periods of economic contraction such as recently experienced, revenues may decrease while some costs remain fixed or even increase, resulting in decreased earnings. Furthermore, other uncertainties, including national and global economic conditions, terrorist attacks, infectious disease outbreaks, military conflicts or other global or regional events, could adversely affect consumer travel and spending and adversely affect the Project's operations.

8. <u>The hospitality business is subject to unique risks</u>. Hospitality projects have certain unique risk factors, including the following:

    a. The Project Owner will depend on its relationship with Hilton International, and any deterioration in such relationship, could materially and adversely affect the development and operations of the Project.

    b. Results of operations are subject to risks inherent in the hospitality industry, such as the demand for hospitality services in the general vicinity of the Project, which could materially and adversely affect the Project.

    c. Competition from other hospitality properties, located in close proximity the Project may reduce demand for rooms at the Carillon Tower, which could materially and adversely affect the Project.

d. The success of the Project depends on key personnel whose continued service is not guaranteed, and their departure could materially and adversely affect the Project.

e. Adverse economic conditions and dislocation in the credit markets have had a material and adverse effect on the Project's competitors and may, in the future, continue to materially and adversely affect the Project.

f. Uncertainty of cash flow to meet fixed obligations; adverse changes in general or local economic conditions; excessive hotel openings resulting in an over-supply; relative appeal of particular types of facilities to patrons, customers, and vendors; reduction in the cost of operating competing businesses; decreases in employment, reducing the demand for hospitality; the possible need for unanticipated renovations; adverse changes in interest rates and availability of funds and other changes in operating expenses; changes in governmental rules and fiscal policies; acts of God, including earthquakes, which may cause uninsured losses; the financial condition of patrons and customers of the Project; increases in energy costs and other expenses of travel resulting in less tourism and travel to the Project area; environmental risks; loss to or condemnation of the Property on which the Project is located; and other factors which are beyond the control of the Partnership, the General Partner, the Project Owner, the Developer and the Co-Developer. Because hotel rooms are rented for relatively short periods of time compared to most commercial properties, hotels are highly impacted much more quickly by adverse economic conditions and competition than other commercial properties that are rented for longer periods of time. Decreases in actual Project income from anticipated amounts, or increases in operating expenses, among other factors, could result in the Partnership's inability to meet all its cash obligations. Furthermore, any material and adverse effects on the cash flow and financial condition of the Developer and/or Co-Developer or the Project Owner could result in the Project Owner's failure to repay the Partnership's Loan. If the Project Owner fails to repay the Loan made by the Partnership, Limited Partners could see a substantial, if not total, loss of their investment.

9.  <u>The Project will be subject to seasonality fluctuations of revenue</u>. The hospitality industry as a whole is seasonal in nature. Generally, hotel revenues are greater in the second and third calendar quarters than in the first and fourth calendar quarters. This seasonality can be expected to cause quarterly fluctuations in the Project's revenues.

10.  <u>The Project will be subject to general risks of restaurant ownership</u>. The Partnership's investment in the Project will be subject to the risks generally incident to the operation of restaurant and bar facilities, including, without limitation, the following: uncertainty of cash flow to meet fixed obligations; adverse changes in general or local economic conditions; excessive restaurant and bar openings in the area causing an over-supply; relative appeal of particular types of facilities to patrons, customers, and vendors; reduction in the cost of operating competing businesses; decreases in employment, reducing the demand for entertainment and dining in the area; the possible need for unanticipated renovations; adverse changes in interest rates and availability of funds and other changes in operating expenses; changes in governmental rules and fiscal policies; the financial condition of patrons and customers of the Project; environmental risks; epidemics of infectious disease and food borne pathogens, and the fear of contracting illness in restaurants or other public spaces; condemnation of the Property on which the Project is located; and other factors which are beyond the control of the Partnership, the General Partner, the Project Owner, the Developer and the Co-Developer. Decreases in actual Project income from anticipated amounts, or increases in operating expenses, among other factors, could result in the Partnership's inability to meet all its cash obligations. Furthermore, any material and adverse effects on the cash flow and financial condition of the Developer and/or Co-Developer could result in the Developer's failure to repay the Partnership's Loan. If the Developer fails to repay the Loan made by the Partnership, Limited Partners could see a substantial, if not total, loss of their investment.

11.  <u>The Project will be dependent upon market risks specific to Chicago</u>. The Project will be based solely in Chicago, and therefore will be subject to a greater degree of risk than a hotel, restaurant, or apartment complex operating in more markets. For example, the cost and availability of air services and the impact of any events that disrupt air travel to and from Chicago will adversely affect the business of the Carillon Tower. Reductions in flights by major airlines as a result of higher fuel prices or lower demand can impact the number of visitors to the Project.

12.  <u>Changes in public health concerns may affect the operations of the restaurants and bars within the Carillon Tower</u>. Changes in public health concerns may affect consumer preferences regarding the type of food and beverages that will be sold in the restaurants within the Carillon Tower. For example, public health concerns regarding food ingredients, fat, and calories have resulted in governmental regulations that may adversely affect the operations of restaurants. Further, growing movements to change laws relating to alcohol may result in a decline in alcohol consumption at the restaurants or bars in the Project or increase the number of dram shop liability claims made against the restaurants in the Project, either of which may negatively impact operations or result in the loss of liquor licenses. Any material and adverse effects on the operations of the restaurants or nightclubs in the Project could result in the Developer's failure to repay the Loan made by the Partnership. If the Developer fails to repay the Loan made by the Partnership, Limited Partners could see a substantial, if not total, loss of their investment.

13.  <u>Problems obtaining a liquor license may affect the results of the Project</u>. Operations of the restaurants and nightclubs in the Project, and as the same will be governed by the final Certificates of Occupancy, involve serving beer, wine, and hard liquor, which therefore will require any hotel to maintain a liquor license. Any problems that the hotel may encounter in obtaining such a liquor license, including but not limited to the imposition of non-standard restrictions or conditions on the liquor licenses, could materially adversely affect the proposed operation of the restaurants and bars in the Project, and hence the results realized by the Partnership.

14.  <u>Unions and union organization activities may adversely affect the operations of the Project</u>. Employees of Carillon Tower may be union members. Furthermore, non-union employee staffs in various areas may be subject to union organization activities. While the Project has taken collective bargaining costs into account for the operation and construction of the Project, there can be no assurance that the unions will abide by the terms of any collective bargaining agreement if any union deems certain aspects of such agreement unfair, and furthermore. Employees who are not covered by collective bargaining may be subject to labor union organizing efforts. The Project could suffer work stoppages or "slow-downs" as a result. In such event, it is likely that the employee costs of the Project will be higher than presently projected for the continuation of the Project, because union workers would have compensation and benefits that are generally higher than non-union workers in the same hotel, restaurant and residential industry jobs. None of the Project Owner, the Developer, the Co-Developer, the General Partner or the Partnership will have control over whether one or more unions determine to target the Developer's or Co-Developer's operations for union organization activities.

15.  <u>The Partnership's investment in the Project will be illiquid and the repayment of the Project Loan will be subject to the ultimate value of the Project</u>. The Limited Partners will be dependent on the Partnership receiving payment of interest on the Project Loan and repayment of the Project Loan from the Project Owner. The ability of the Project Owner to pay interest on the Project Loan and to repay the Project Loan will, in large part, be dependent on its ability to generate cash flow from operations and/or to sell or refinance the Project. If operations of the Project deviate in any material adverse respect from those projected, the Project may not generate sufficient cash flow to service the required indebtedness due on the Project Loan. Additionally, the Project Owner may not be able to easily liquidate or refinance the Project. No assurance can be given that the Project Loan will be repaid or when it will be repaid.

16.    Rising interest rates may impact the Project Owner's ability to fund debt service. Interest rates for the financing of real estate are at historically low levels, and any increase in rates may have an adverse effect on the Project Owner's ability to pay debt service associated with any loans, including the Project Loan. In addition, increases in interest rates may have an adverse effect on the operation and/or sale of the Project and may have an adverse effect on the ability of the Project Owner to refinance the Project and, thus, its ability to pay the Project Loan.

17.    The Project will be subject to various environmental and health and safety laws, regulations and permit requirements. Investing in businesses operated on real property involves risks relating to hazardous and toxic contamination of such property or its adjacent property, including subsurface and underground water contamination. The Project is subject to changing and increasingly stringent environmental and health and safety laws, regulations and permit requirements, and there can be no guarantee that all costs and risks regarding compliance with environmental laws and regulations can be identified. New and more stringent environmental and health and safety laws, regulations and permit requirements or stricter interpretations of current laws or regulations could impose substantial additional costs on the Project.

Compliance with such current or future environmental requirements does not ensure that the operations of the Project will not cause injury to the environment or to people under all circumstances or that the Project will not be required to incur additional unforeseen environmental expenditures, which may be significant and could result in substantial penalties. Moreover, failure to comply with any such requirements could have a material adverse effect on the Project, and there can be no assurance that the Project will at all times comply with all applicable environmental laws, regulations and permit requirements.

18.    The Project will be subject to general risks of the hospitality, residential and food service industries. The Partnership's investment in the Project will be subject to the risks generally incident to the operation of hospitality, residential and food service space within the Project, including, without limitation, the following: uncertainty of cash flow to meet fixed obligations; adverse changes in general or local economic conditions; excessive restaurant or hotel openings resulting in an over-supply; relative appeal of particular types of facilities to patrons, customers, and vendors; reduction in the cost of operating competing businesses; decreases in employment, reducing the demand for certain types of goods; the possible need for unanticipated renovations; adverse changes in interest rates and availability of funds and other changes in operating expenses; changes in governmental rules and fiscal policies; acts of God, including earthquakes, which may cause uninsured losses; the financial condition of customers; and other retail risk factors which are beyond the control of the Partnership, the General Partner, the Project Owner, the Developer and the Co-Developer.

19.    The Project may be subject to unfavorable publicity.  Hotels, restaurants and residential communities can be harmed by negative publicity resulting from complaints, litigation, or general bad word-of-mouth regarding the quality of the facility, experience, or service, prices, personal injury, sanitation, or other concerns of consumers.  Negative publicity from traditional media or on-line social networking may result from actual or alleged incidents or events taking place on the Project's premises. Regardless of whether the allegations or complaints are valid, unfavorable publicity relating to the Project could adversely affect the public's perception of the Project as a whole.  Adverse publicity and its effect on overall consumer perceptions, or the Project's failure to respond effectively to adverse publicity, could have a material adverse effect on the business of the Project Owner and the Partnership.  Any material adverse effect on the business of the Project could result in the Project Owner's failure to repay the Project Loan.  If the Project Owner fails to repay the Project Loan, Investors could see a substantial, if not total, loss of their investment.

20.    Legal proceedings could materially impact Partnership results. Hotels, restaurants and apartment communities are often subject to litigation. From time to time, the Project Owner or the

Partnership may be party to legal proceedings including matters involving personnel and employment issues, personal injury on the premises, intellectual property and other proceedings arising in the ordinary course of business. While insurance often covers much of the legal costs and liability resulting from litigation, such insurance often has significant deductibles and may not cover some litigation losses. Although the Partnership and the Project Owner do not currently anticipate any material litigation, their financial results could be materially impacted by the decisions and expenses related to future legal proceedings.

21. <u>The Partnership's Ability to Foreclose on Project Assets Could Be Restricted and the Collateral May Not Retain its Value</u>**.** If the Project Owner fails to make regular payments on the Project Loan or to repay the Project Loan on maturity, the Partnership may choose to foreclose on the assets of the defaulting Project Owner. It may or may not succeed in doing so. The Partnership's lien on Project assets will be subordinate to the lien securing the Construction Loan, and the intercreditor agreement with respect to the Project Loan and the Construction Loan may prevent the Partnership from foreclosing or exercising some of its other remedies while the Construction Loan is in place. In any liquidation of the Project Owner, its assets will first be applied to repaying principal and interest (as well as any penalties) owed to the Construction Lender. As a result, foreclosure may not give the Partnership recourse to sufficient assets and the proceeds of selling the available assets could fall materially short of the Limited Partners' invested funds.

In practice, laws governing borrowers and creditors may interfere with the Partnership's ability to exercise its rights and remedies if the Project Owner defaults on the Project Loan. For example, some laws may require creditors to foreclose against property in a prescribed manner. Other laws may re-classify the Loan as equity in the Project Owner instead of a loan to it, thereby transforming the Partnership from a creditor into an equity holder. If it were to declare bankruptcy, the Project Owner would have the protection of the bankruptcy courts, which may charge an appointed trustee with protecting the interests of all creditors and give the trustee the power to override the directions of our General Partner. Collateral for a loan can lose significant value and may prove difficult to foreclose upon and liquidate. All of the foregoing, plus other unspecified risks, may delay the Partnership's ability to exercise its rights in the case of default, and could result in a total loss of Investor's investments.

### D. <u>Risks Related To The Offering</u>

1. <u>Determination of the Offering Price and other terms of the Units have been arbitrarily determined</u>. The Offering Price for the Units, the returns proposed to be paid to Limited Partners and other terms of the Units may not bear an exact correlation to assets acquired or to be acquired or the value of the Project or any other established criteria or quantifiable indicia for valuing a business. No representation is being made by the Partnership, the General Partner or the Project Owner that the Units have or will have a market value equal to their Offering Price or could be resold (if at all) at their original Offering Price. The Offering Price for the Units should not be considered an indication of the actual value of the Units or the price at which the Units could be transferred following the consummation of this Offering.

2. <u>There will be no public market for the Units, and the Units are subject to significant restrictions on transferability</u>. There is no public market for the Units and no such market is expected to develop in the future. The sale of the Units is being made without registration under the Securities Act and applicable state securities laws in reliance upon various exemptions under the Securities Act, including the "private offering" exemption of Section 4(a)(2) and Regulation D and Regulation S promulgated under the Securities Act and available exemptions under applicable state securities laws. Such Federal and state securities laws severely restrict the transferability of the Units offered hereby. Accordingly, an investment in the Units will be highly illiquid. The Units are considered "restricted securities" under the Securities Act and applicable state securities laws and cannot be resold or otherwise transferred unless they are registered under the Securities Act and any applicable state securities laws or

are transferred in a transaction exempt from such registration requirements. Consequently, a holder of the Units may not be able to liquidate his or her investment and each Limited Partner's ability to control the timing of the liquidation of his or her investment in the Partnership will be restricted. Limited Partners should be prepared to hold their Units indefinitely. In addition, a Limited Partner should be able to withstand a total loss of his or her investment in the Partnership.

3. <u>Foreign governmental action may adversely affect the Offering</u>. The government of the People's Republic of China, the expected home country source of many Investors, as well as other foreign governments (each, a "Sovereignty"), may restrict or suspend entirely participation by its nationals in the EB 5 Program as violative of (a) the Sovereignty's Securities Laws, (b) the Sovereignty's foreign exchange controls, and/or (c) the current prohibition on such Sovereignty's nationals investing overseas in an individual capacity, rather than through enterprises. Moreover, a Sovereignty may promulgate new laws or regulations in the future that restrict or prohibit participation in the EB 5 Program. Finally, no Sovereignty has declined to approve this private placement; although in the past it has been assumed that a lack of action on particular offerings by a Sovereignty is tantamount to its tacit approval, it cannot be assured that in the future, a Sovereignty will not restrict or prohibit foreign private placements in general, or the Offering in particular

4. <u>The Partnership Agreement limits transferability of the Units</u>. Pursuant to the Partnership Agreement, the Units are not readily transferable and no transfer of Units may be made unless, among other things, the transferor delivers to the Partnership an opinion of counsel satisfactory to the Partnership and Partnership that the transfer will not create adverse tax consequences and would not violate federal or state securities laws. Obtaining such an opinion on securities laws would generally require for its basis that the Units be registered under such laws or that an exemption from registration exists, and there can be no assurance that an exemption will be available.

5. <u>The Partnership Agreement has not been negotiated at arm's length</u>. The General Partner has generally established the terms of the Partnership Agreement, which were not negotiated on an arm's-length basis. In addition, legal counsel for the Partnership and the General Partner have not acted as counsel for or represented the interests of the prospective Investors. Prospective Investors should consult with their own legal counsel with respect to an investment in the Partnership.

6. <u>We do not expect to register as an investment company</u>. The Partnership intends to avoid becoming subject to the Investment Company Act of 1940, as amended (the "<u>1940 Act</u>"). However, the Partnership cannot assure prospective Investors that, under certain conditions, changing circumstances or changes in the law, the Partnership may not become subject to the 1940 Act in the future as a result of the determination that the Partnership is an "investment company" within the meaning of the 1940 Act which does not qualify for an exemption as set forth below. Becoming subject to the 1940 Act could have a material adverse effect on the Partnership. Additionally, the Partnership could be terminated and liquidated due to the cost of registration under the 1940 Act.

7. <u>Subscriptions are irrevocable</u>. The execution and delivery of the Subscription documents by a Subscriber constitutes a binding offer to purchase Partnership Interests. Once a prospective Investor subscribes for Partnership Interests, the Limited Partner will not be able to revoke his/her Subscription. If this Offering is not closed pursuant to the terms hereof, or if a prospective Investor's subscription is rejected, the Partnership will cause the Subscription Agreement and all of the subscribed amounts to be promptly returned to Subscribers without interest and without any offset or deduction, and thereafter the Subscribers will have no further obligation thereunder.

8. <u>Subscription may be rejected</u>. The Partnership reserves the right to refuse a subscription for Units in its sole discretion for any reason, including concern that the prospective Investor may not meet the requirements for accredited investors, the Units are otherwise an unsuitable investment for the prospective Investor or the Partnership and/or General Partner believes that the Limited Partner may subject the Project Owner to a loss of any of its operating licenses.

### E. Tax Risks

**Pursuant to Internal Revenue Service circular No. 230, be advised that any federal tax advice in this communication, including any attachments or enclosures, was not intended or written to be used, and it cannot be used by any person or entity taxpayer, for the purpose of avoiding any internal revenue code penalties that may be imposed on such person or entity. Such advice was written to support the promotion or marketing of the transaction(s) or matter(s) addressed by the written advice. Each person or entity should seek advice based on the particular circumstances from an independent tax advisor.**

**Prospective Investors should consult their own tax advisors with respect to the tax consequences (including U.S. Federal, state and local tax consequences and non-U.S. tax consequences) of an investment in the Partnership. Unless waived by the General Partner in its sole discretion, Units in the Partnership are only being sold to accredited investors who have represented that they are relying, if at all, solely upon the advice of their own advisors with respect to legal, immigration, tax, business, financial and other aspects of an investment in the Partnership.**

There are various federal income tax risks associated with an investment in the Units. Some, but not all, of the various risks associated with the federal income tax aspects of the Offering of which Investors should be aware are set forth below and as more fully described in Section hereof. The effect of certain tax consequences on an Investor will depend, in part, on his or her own tax return. No attempt is made herein to discuss or evaluate the state or local tax effects on any Investor. Each Investor is urged to consult the Investor's own tax advisor concerning the effects of federal, state and local income tax laws on an investment in the Units and on the Investor's individual tax situation. The following discussion is not tax advice. Neither the Partnership nor its affiliates nor counsel for the Partnership has provided any tax (or other legal) advice to any holder of Units or any Limited Partner. This summary does not discuss the impact of various proposals to amend the Internal Revenue Code (the "Code") which could change certain of the tax consequences of an investment in the Partnership.

1.     <u>There are risks related to the status of the Partnership for Federal income tax purposes</u>. The Partnership has been organized as a limited partnership under the laws of the State of New York. The Partnership will file its tax returns as a partnership for federal and state income tax purposes. The discussion herein assumes that the Partnership will at all times be treated as a partnership for federal tax purposes. The continued treatment of the Partnership as a partnership is dependent on present law and regulations, which are subject to change although there is no current legislation in existence or presently contemplated that is expected to otherwise affect the Partnership's classification as a partnership for United States income tax purposes.

2.     <u>Investors may have possible federal income tax liability in excess of cash distributions</u>. Each Investor will be taxed on the Investor's allocable share of the Partnership's taxable income, regardless of whether the Partnership distributes cash to Investors. Investors should be aware that although the Partnership will use its best efforts to make distributions in an amount necessary to pay income tax at the highest effective individual income tax rate on the Partnership's taxable income, the federal income tax on an Investor's allocable share of the Partnership's taxable income may exceed distributions to such Investor. An Investor's allocable share of the Partnership's cash distributions is subject to federal income taxation only to the extent the amount of such distribution exceeds an Investor's tax basis in its Partnership Interest at the time of the distribution. Additionally, distributions, which exceed the amount for which an Investor is considered "at-risk" with respect to the activity, could cause a recapture of previous losses, if any. There is a risk that an Investor may not have sufficient basis or amounts "at-risk" to prevent allocated amounts from being taxable. The deductibility of various Partnership expenses allocable to certain Limited Partners may be subject to various limits for U.S. federal income tax purposes. It is possible that losses of the Partnership or of a particular activity of the Partnership could exceed income in a given year. Any such losses may be passive losses, which may

{01933141;1}NY55/404292.1

subject Limited Partners to limits on deductions for losses. Additionally, the deductibility of capital losses are also subject to limitations. Limited Partners should consult their own tax advisers regarding potential limitations on the deductibility of their allocable share of items of losses and expenses of the Partnership. Each Limited Partner will be required to report on his or her own U.S. federal income tax return his or her share of the Partnership's income, gains, losses, deductions and credits for the taxable year of the Limited Partner, whether or not cash or other property is distributed to that Limited Partner.

      3.    <u>Information reporting to Limited Partners by the Partnership</u>. The Partnership will file an information return on IRS Form 1065 and will provide information on Schedule K-1 to each Limited Partner following the close of the Partnership's taxable year. Delivery of this information by the Partnership will be subject to delay in the event of the late receipt of any necessary tax information from an entity in which the Partnership holds an interest It is therefore possible that, in any taxable year, Limited Partners will need to apply for extensions of time to file their tax returns.

      4.    <u>Tax auditing procedures will be under control of the Partnership</u>. Any audit of items of income, gain, loss or credits of the Partnership will be administered at the Partnership level. The decisions made by the Partnership with respect to such matters will be made in good faith consistent with the Partnership's fiduciary duties to both the Partnership and to the Investors, but may have an adverse affect upon the tax liabilities of the Investors.

      5.    <u>Changes in Federal and state income tax laws and policies may adversely affect Investors</u>. There can be no assurance that U.S. federal and state income tax laws and IRS administrative policies respecting the income tax consequences described in this Memorandum will not be changed in a manner which adversely affects the interests of Investors.

      **In view of the foregoing, it is absolutely necessary that each and every prospective Investor consult with the prospective Investor's own attorneys, accountants and other professional advisors as to the legal, tax, accounting and other consequences of an investment in the Units.**

      F.    **<u>Immigration Risk Factors</u>**

      A Subscriber should consult with legal counsel familiar with United States immigration laws and practice. Purchase of a Unit does not guarantee lawful permanent residence in the United States. The Units described in this Memorandum involve a significant degree of risk relating to immigration matters. Among the immigration risk factors that a prospective investor should consider carefully are the following; however, this list is not exhaustive and does not purport to summarize all risks associated with the purchase of a Unit in the Partnership. See "general risk factors" for certain additional risks associated with a purchase of a partnership interest.

      1.    <u>General</u>. While best efforts have been made to structure this offering so that Limited Partners may meet EB-5 immigrant visa requirements under 8 U.S.C. § 1153 B)(5)(A) - (D); INA Act § 203 (B)(5)(A) - (D) and qualify as "alien entrepreneurs," a preliminary step to becoming eligible for admission to the United States with the Limited Partner, his or her spouse and qualifying children as lawful permanent residents, no representations can be made and no guarantees can be given with respect to the ability of this investment to guarantee or otherwise assure that the Limited Partners will be approved as an alien entrepreneur" and will be granted conditional or unconditional lawful permanent resident status.

      2.    <u>The USCIS may not accept the Project as a qualifying investment</u>. The Regional Center did not request that USCIS review and approve the Project as part of its Regional Center designation application. Therefore, the approval of the Project will be addressed when a Subscriber's individual I-526 Petition is filed. Even after such approval, however, in adjudicating a Petition on Form I-526 that must be filed with USCIS by Limited Partners to determine the suitability of the investment offered herein for immigration purposes under 8 U.S.C. § 1153 (B)(5)(A) - (D); INA 203 (B)(5)(A) - (D), USCIS may re-determine issues associated with the Project's qualification, may review unfavorably the Limited

Partner's proof of the source of capital invested, and may deny the I-526 Petition for reasons other than the acceptability of the Project.

    3.    <u>Some Investors may not be eligible for admission to the U.S.</u> Despite the approval of a Limited Partner's I-526 Petition, there cannot be any guarantee that the Limited Partner, his or her spouse or any of their minor, unmarried children will be granted lawful permanent residence. The grant of such immigration status is dependent, among other things, upon the personal and financial history of each applicant. Any one of the several government agencies may determine in its discretion, sometimes without the possibility of appeal, that an applicant for lawful permanent residence is excludable from the United States. In limited instances, a waiver on the ground of exclusion may be available under the law, but adjudications of waiver applications are themselves made in the unreviewable discretion of the government.

    4.    <u>We may not return funds to an Investor whose visa or Adjustment of Status is denied after I-526 approval.</u> Following I-526 Petition approval, the investing Partner, his/her spouse and their qualifying children must timely apply for an immigrant visa or adjustment to permanent resident status. As part of this process, the applicants will undergo medical, police, security and immigration history checks to determine whether the applicants are inadmissible to the United States for any of the reasons mentioned above or for any other reason. The visa or adjustment of status may be denied notwithstanding I-526 Petition approval. If, following closing and disbursement of the Escrow Account, the Limited Partner, his/her spouse or their qualifying children are denied an immigrant visa or denied adjustment of status to conditional lawful permanent residence, such action will not entitle the Limited Partner to the return of any funds paid to the Partnership or its affiliates, although the Partnership will use reasonable efforts to replace the Limited Partner's investment with another qualifying Investor's investment.

    5.    <u>USCIS may not remove conditions to an Investor's lawful permanent residence.</u> Lawful permanent residence status granted initially to the Limited Partner, his or her spouse and their qualifying children is "conditional;" the Limited Partner, his/her spouse and their qualifying children must seek removal of conditions before the second anniversary of lawful permanent admission to the United States. There cannot be any assurance that USCIS will consent to the removal of conditions as to the Limited Partner, his/her spouse and their qualifying children. If Limited Partner fails to have conditions removed, the Limited Partner, his/her spouse and their qualifying children will be required to leave the United States and may be placed in removal proceedings. Even if the Limited Partner succeeds in having conditions removed, the Limited Partner, his/her spouse and each of their qualifying children, each must separately have conditions removed. Failure to have conditions removed as to any of these members of family may require some members to depart from the United States, and such family members may be placed in removal proceedings. Examples of possible reasons for denial of the Limited Partner's petition to remove conditions from permanent residence include:

- failure to maintain investment for the required two years, such as through some kind of distribution or return of the Limited Partner's capital before the time for removal of conditions on the Limited Partner's residence, even if 10 jobs were created;

- failure of the project to use all of the Limited Partner's invested capital in job creating activity at risk to the Limited Partner, according to technical requirements of USCIS (some of which are not clearly articulated and which could change over time), even if 10 jobs were created;

- failure of the project to show that the Limited Partner's investment has created 10 new jobs for U.S. workers that can be allocated to such Limited Partner (which may result from failure to meet the project's economic milestones that were used as assumptions in projection of the indirect jobs that would be created by the Limited Partner's investment); and

- even if the required 10 jobs were created, the project's material departure from the business plan presented to USCIS in obtaining the Limited Partners initial I-526 Petition approval.

6. <u>Regulations regarding removal of conditions to permanent residency lack clarity</u>. USCIS regulations governing lawful permanent residence for investors do not state specifically the criteria which USCIS must apply to determine eligibility for the removal of conditions to lawful permanent resident status. Courts have determined some standards to be followed by USCIS in some, but not all, circumstances. The Partnership may make certain management decisions in the absence of these specific eligibility criteria. The Partnership will seek as much information as possible from USCIS in an effort to assist the Limited Partners to qualify for the removal of conditions, where good business practices permit. This notwithstanding, Limited Partners should become educated about the standards that will determine eligibility of a Limited Partner, his/her spouse and their qualifying children to achieve unconditional lawful permanent residence in the United States pursuant to this program, which currently is in a state of evolution.

7. <u>Numerical quotas</u>. Currently, 10,000 EB-5 immigrant visas are allocated annually to alien investors and the spouse and qualifying children of the Investor of which 3,000 are currently restricted to regional centers. EB-5 status is available on a first-come, first-served basis. If more statuses are sought than are available, a delay in the availability of EB-5 lawful permanent resident status will result. There is no reliable means to predict if such a delay will occur, or if it occurs, how long an investor or the spouse and qualifying children of the Investor will wait before visa status for them becomes available. Also, the availability of current EB-5 immigrant visas may end, the number of EB-5 immigrant visas may decrease or increase, or the time it takes to acquire EB-5 status may increase significantly. Other changes in the administration of the visa preference system may affect and even preclude the ability to obtain a visa for lawful permanent residence or to adjust to lawful permanent residence.

8. <u>Expiration of the Regional Center Pilot Program</u>. The regional center pilot program was first created in 1992. Since then it has been extended, most recently through September 30, 2015. The Project relies on the regional center pilot program so that employment created indirectly by investments in the Project may be counted towards the minimum number of jobs needed to qualify a Limited Partner, his/her spouse and their qualifying children to have conditions removed. It is reported that I-526 Petitions are increasing in regional centers. There is no reliable means to know if the regional center program will be extended or made permanent.

9. <u>Active participation in the Partnership's business</u>. The EB-5 program requires that an applicant is actively involved in the business affairs of the Partnership. Failure to be actively involved may jeopardize the Limited Partner's I-526 Petition approval or result in the denial of lawful permanent residence status for the Limited Partner, his/her spouse and their qualifying children. The Partnership Agreement, reflecting the EB-5 regulations governing what level of participation is acceptable to meet the EB-5 criteria, mandates that each Limited Partner shall participate in the management of the Partnership to the extent reflected therein. The right to approve certain decisions of the Partnership as set forth in the Partnership Agreement is expected to be sufficient to meet these requirements. If not, the Partnership intends to cause the Partnership Agreement to be amended to conform with EB-5 regulations as required in the Partnership's reasonable opinion, but there can no assurance such amendment will succeed in reversing a decision of USCIS nor that USCIS will permit such change after the filing of an I-526 petition without requiring the investors to re-file their respective petitions.

10. <u>Risks attendant to the EB-5 Fifth Preference Visa Status</u>. The EB-5 program has many requirements that must be met to the satisfaction of USCIS. Such requirements are not all clearly articulated and may change over time. The failure to meet even one of these requirements to the satisfaction of USCIS may result in the denial of an I-526 Petition.

11.    An Investor Who Chooses to File a New I-526 Petition in the Case of Material Change Will Face Additional Immigration Risks. Current USCIS policy allows a conditional lawful permanent resident in the U.S. to file a new I-526 petition containing a new business plan if the investor or the regional center believes that the Project has materially changed and that the I-829 Petition would likely be denied. On approval of the new I-526 petition, the investor begins a new two-year period of conditional permanent resident status and five-year period towards naturalization. The investor would still have to proceed with the timely filing of the I-829 Petition or risk falling out of status. Any conditional lawful permanent resident children who have reached age 21 before the filing of the new I-526 Petition cannot be included in the new I-526 Petition and are removable from the U.S. If the investor and his or her spouse become divorced between the date of approval of the initial I-526 Petition and the subsequent I-526 filing the derivative spouse can no longer derive lawful permanent resident status.

12.    TEA Determination. The minimum investment amount of $500,000 in this Offering is based on a determination the Project site is within a Targeted Employment Area, or TEA. TEA status is determined at the time of the I-526 application, and status can change if, for example, employment rates improve. The USCIS has a policy of deferring to the authority of state-designated agencies to determine geographical areas or census tracts that will be aggregated to determine TEA status.  In the future the USCIS may not give deference state certification letters determining that an area is a TEA. If the USCIS were to determine that the Project was not within a TEA, the Investors would not meet the at-risk capital requirement of the EB-5 Program with a $500,000 investment, and their I-526 Petitions would be denied unless they contributed an additional $500,000. As a result, it could become difficult or impossible for the Partnership to raise the necessary funds for the Offering. There is no certainty that the USCIS will accept a TEA designation until it adjudicates an I-526 Petition based on the designation.

13.    .Delays in Project. Delays in the development of the Project could result in jobs not being created timely enough in accordance with applicable EB-5 Pilot Program guidelines.

14.    Insufficient number of Limited Partners. Regional center designations are based on the full investment of many different investors in a single project. Although some regional centers' projects are in great demand and even have waiting lists that is not the case with all regional centers. If a regional center project does not attract a sufficient number of Limited Partners, the Project may not happen or may be delayed, which could result in the original Limited Partners being unable to remove conditions. The instant offering contains a minimum subscription of 20 Limited Partners. If the Regional Center does not obtain 20 subscriptions as of the expiration of the instant offering, the Limited Partner's subscription proceeds will be returned to the Limited Partner in accordance with the Escrow Agreement.

15.    The Project Owner's failure to realize its Business Plan could prevent removal of conditions to permanent residency. The USCIS's approval of application for removal of conditions to permanent residency may be denied by USCIS if the job-creating entity does not make expenditures in accordance with the business plan, or when the business assumptions utilized in the econometric model are otherwise not realized. An I-526 Petition may be approved based upon an economist's report using a recognized econometric model to predict the number of indirect and induced jobs that will be created based upon a specific dollar expenditure in a specific project in a specific geographical area in a specific industry in a specific timeframe with a specific number of tenants and other specific foundation facts. Although USCIS should not second guess the econometric report at the I-829 stage, In particular, the Developer must expend the full amount of the funds for the uses delineated in the Business Plan and Economic Report. USCIS will want proof that the assumptions relied upon in the report have actually occurred. If they have not occurred because of economic conditions, change of plans, construction delays, etc., the Limited Partner is at risk that the condition removal petition will not be approved. An explanation of how jobs will be allocated between Limited Partners can be found in the EB-5 Job Allocation Addendum contained in Schedule 2 of the Partnership Agreement attached as Exhibit B hereto.

16. _A regional center may lose certification_. USCIS is in the process of developing standards to review regional centers. The results of any review process could lead to regional center decertification. The General Partner has no affiliation with or control over the Regional Center.

17. _"At Risk" investment_. In order for an I-526 Petition to be approved, the Limited Partner's investment must be "at risk." If adjudication is made that the funds are not truly at risk at either the I-526 or I-829 stage, the I-526 Petition will be denied. At a minimum, the Limited Partner's commitment is a five-year commitment. Although there can be no guaranteed right of redemption or specific return, some regional center investments are more risky than others; some have a greater chance of the Investor getting his money back after five years with some rate of return; and some are more speculative investments. While the Limited Partner is allowed to have a guaranteed right to return of the investment money if the I-526 Petition is not approved (and some regional centers place the investment money in escrow pending the I-526 Petition approval), USCIS' position is that there can be no guarantee of redemption of the investment if the I-829 Petition is not approved.

18. _Risks related to the adjudicating agency_. Even if none of the contingencies occurs, the Limited Partner is subject to the risk inherent in the nature of the adjudicating agency. The USCIS ultimately has broad discretion to grant or reject petitions. USCIS has been known to adopt restrictive positions and change those positions without notice in the EB-5 area.

**Change in Laws**

The immigration laws and the corresponding rules, regulations and skis interpretations related to the EB-5 pilot program and the corresponding applications are in a constant state of flux, and there are no assurances that new laws and/or interpretations that would otherwise modify the disclosures and information set forth in this memorandum will not result.

**G.    Escrow Agreement Risk Factors**

The Escrow Agreement provides for the disbursement of all or a portion of most of the Subscribers' $500,000 Capital Contribution amount before the Subscribers' I-526 Petition has been approved. After the Holdback Trigger has been achieved, 80% of the Subscribers' $500,000 Capital Contribution amount will be disbursed from the Escrow Agent to the Partnership to be used to fund the Loan. The 20% Holdback Amount may also be released to the Partnership before a Subscriber's I-526 Petition is decided if another Subscriber's Petition is denied and Holdback Amounts are used to reimburse the Partnership for its return of capital to the denied Subscriber. If the Subscriber's I-526 Petition is ultimately denied, there is a risk that such Subscriber may not receive a return of his or her Capital Contribution if the Holdback Amount held in escrow at such time or in the future, is not sufficient to refund such amount. In certain cases, absent a Holdback Amount being available at such time or in the future to fund a refund, the Subscriber will be dependent on the General Partner and the Partnership to locate a substitute Subscriber to take the place of the denied Subscriber and enable the refund of the denied Subscriber's funds. There are no assurances that a substitute Subscriber will be found, thus resulting in the denied Subscriber having to maintain his or her investment in the Partnership notwithstanding the loss of expected immigration benefits.

**H.    Risks Related To The Project Loan**

1. _The Project Loan documents will contain limited covenants regarding the Project Owner's activities_. The Loan Agreement is expected to conform to industry standards for a second lien, subordinated loan of a similar nature. The Project Loan Agreement will only provide certain restrictions on the activities of the Project Owner.

2. _The lack of a sinking fund or the requirement to maintain financial ratios increases the risk that the Project Owner will be unable to repay the principal and interest under the Project Loan Agreement when due_. Since there is no sinking fund for the Project Loan, the Project Owner will be

required to use available cash from operations, sell assets or refinance the anticipated Construction Loan and the Project Loan to make payments. There are no assurances that same can be accomplished, especially, if there is a fallback in the credit markets where refinancing may become unavailable to pay the principal, and accrued interest, due under the Project Loan Agreement.

3. <u>There are increased risks involved with construction lending activities</u>. Construction lending, such as the Project Loan, generally is considered to involve a higher degree of risk than other types of lending due to a variety of factors. These factors include the dependency on successful completion of a project and the difficulties in estimating construction costs. Construction loans are frequently under collateralized unless and until the improvements have been constructed.

4. <u>The bankruptcy or insolvency of the Project Owner could impair the Partnership's ability to secure repayment of the Project Loan</u>. There can be no assurance that the Project Owner will not become insolvent and, possibly, the subject of voluntary or involuntary bankruptcy proceedings under the federal bankruptcy code. Under the federal bankruptcy code, a bankruptcy court may reduce the rate of interest applicable to a bankrupt estate's debts and/or decrease or stretch out debt servicing payments. Additionally, the trustee of a bankrupt estate, or the estate itself, as debtor-in-possession, has certain special powers to avoid, subordinate or disallow debts. In certain circumstances, the creditors' claims may be subordinated to financing obtained by a debtor-in-possession subsequent to its bankruptcy.

5. <u>Repayment of the Partnership's Project Loan will be dependent upon the repayment of construction loan financing</u>. It is anticipated that the Project will be financed in part by the Construction Loan in the amount of $54,457,500. The Project Owner will be subject to an agreement (the "<u>Construction Loan Agreement</u>") with the Construction Lenders, which will govern the terms of the construction loan financing. Furthermore, the Partnership and the Construction Lenders will likely be parties to an intercreditor agreement which will provide, among other things, that the construction loan financing will be secured by a lien (the "<u>Construction Lien</u>") on all assets of the Project Owner, as will the Project Loan, and that the Partnership's lien on these assets will be junior in priority to the Construction Lien. While the Project Owner anticipates that it will be able to make appropriate payments on both the construction loan financing and the Project Loan, any unforeseen difficulty, such as the occurrence of construction delays, hardships in the general economic climate which lead to lessened consumer spending, inability to obtain additional financing necessary for the completion of the Project, or any other difficulty including but not limited to those mentioned in other risk factors herein, may cause the Project Owner to default on its payments on the construction loan financing. If the Project Owner does default, the intercreditor agreement will likely prohibit the repayment of the Project Loan until the balance of the construction loan financing is repaid and the Construction Lien is discharged.

6. <u>Refinancing of the construction financing may affect repayment of the Project Loan</u>. The Construction Loan Agreement may allow for the Construction Loan to be refinanced. For example, the maturity date of the Construction Loan may be extended, or the principal amount of the Construction Loan may be increased. Because the Project Loan will be junior to the Construction Loan, such changes may adversely affect the repayment of the Project Loan. To the extent that the maturity date of the Construction Loan will be extended, the repayment of the Project Loan may be required to be extended by a similar time period, which may delay the return of the Limited Partners' investments. To the extent that such changes to the terms of the bond financing increase the amount of indebtedness that will be senior to the Project Loan, more of the Project Owner's resources may need to be directed toward repayment of the bond financing, which may jeopardize the repayment of the Project Loan and the return of Limited Partners' investments. Any other refinancing of the anticipated bank financing may result in terms that are less favorable to the Partnership, and may adversely affect the repayment of the Project Loan and the return of the Limited Partners' investments.

7. <u>Additional debt may be required for completion of the Project or post-completion operations</u>. Although the Partnership believes that the Project Owner will successfully raise all of the

{01933141;1}NY55/404292.1

capital necessary to fund the Project and for working capital after completion of the Project, it is possible that unforeseen difficulties may cause the Project Owner to fail to raise the additional capital necessary to operate the Project, or that the proceeds from the Project Loan to the Project Owner plus the additional capital raised will be inadequate to satisfy all capital requirements, or that such financing may not be available when needed, requiring the Project Owner to obtain alternative financing in addition to the Project Loan to the Project Owner and the other anticipated sources of financing, including supplementary short-term and long-term debt financing, or equity financing. The terms of such alternative financing, if it can be procured, may be better or worse for the Project Owner than the terms of the Project Loan from the Partnership, and may result in subsequent investors in the Project Owner having superior rights to those of the Partnership. Furthermore, if the Project Owner is unable to obtain such additional financing, it may be unable to operate the Project, which may result in the inability of the Project Owner to repay the Project Loan, and could result in a substantial, or total, loss of the Limited Partners' investments.

8.    <u>Use of the Construction Loan may be subject to conditions</u>. A Construction Loan is currently being sought on reasonably competitive market terms; the funding of same may be subject to conditions including, without limitation, the requirement that the Project Owner either raise sufficient EB-5 Funding pursuant to this Offering for the Project Loan, obtain sufficient Bridge Financing for the Project. Therefore, all of the financing requirements will need to be satisfied in order to successfully fund the Project.

## XII.    SUMMARY OF THE PARTNERSHIP AGREEMENT

The Partnership is organized under the New York Revised Uniform Limited Partnership Act. The rights and obligations of the Limited Partners are governed by that act and by the Partnership Agreement, a copy of the Partnership Agreement is attached as Exhibit B to this Memorandum. Prospective Investors should review the Partnership Agreement carefully before investing in the Partnership. The following discussion of the Partnership Agreement is intended to be summary only, does not purport to be complete, and is qualified by reference to the Partnership Agreement in its entirety.

1.    <u>Responsibilities of the General Partner or Its Designated Agents</u>. The General Partner and/or its designated agents have the exclusive management and control of all aspects of the business of the Partnership, including the overseeing of the administration of the Loan. These parties will generally provide administrative services to the Partnership and the Limited Partners, including overseeing the Loan, the collection of loan payments, the disbursement of funds to Limited Partners and the filing of the Partnership's tax return.

2.    <u>Partnership Finances</u>.

*Capital Accounts*. A Limited Partner's financial interest in a limited partnership is reflected in a capital account maintained for the Limited Partner on the books of such Partnership, the value of which is calculated not less frequently than as of the end of each calendar year. The capital account is credited with a Limited Partner's Capital Contributions, as well as the amount of net income allocable to the Limited Partner, and is charged with the amount of the distributions to the Limited Partner and the amount of any net losses allocable to the Limited Partner. The net profits and losses will be allocated among the Limited Partners in a manner consistent with distributions as outlined below and elsewhere in this Memorandum. Certain special allocations may, however, be made in accordance with the provisions of the Partnership Agreement to prevent Limited Partners from having negative balances in their capital accounts.

*Distributions*. Net cash flow (in excess of reasonable reserves to pay expenses will be distributed at the sole discretion of the General Partner. The General Partner will endeavor to cause the Partnership to distribute net cash flow within ninety (90) days after the close of each calendar year.

3.    _Affiliated Transactions_. The Partnership Agreement contains a number of provisions which, consistent with the General Partner's fiduciary duties to the Limited Partners, establish certain procedures and rights in favor of the Limited Partners.

4.    _Exculpation and Indemnification of the General Partner and Its Agents_. The Partnership Agreement relieves the General Partner and its agents, and its other affiliates, to the fullest extent permitted by law, from liability for acts or omissions or errors in judgment in the performance of its duties under the Partnership Agreement if they acted in good faith. The Partnership Agreement also provides for indemnification by the Partnership of the General Partner and its Agents, and their affiliates, to the fullest extent permitted by law, for liabilities incurred in their respective capacities, except for acts of bad faith, gross negligence, fraud, or willful misconduct. As a result of such exculpation and indemnification provisions, a Limited Partner may have a more limited right of action than he or she would otherwise have in the absence of such provisions. Limited Partners will be notified if any indemnification is made and of the reasons therefore.

5.    _Term and Dissolution_. The term of the Partnership will continue until dissolution. The Partnership may be dissolved if certain contingencies occur, such as repayment of the Loan. On dissolution of the Partnership, the assets will be liquidated and the proceeds distributed to the Limited Partners in proportion to their respective Interests in the Partnership up to any unrecovered amount of their initial Capital Contributions and any applicable interest thereon. Remaining proceeds, if any, shall be paid to the General Partner. A final accounting will be made by the General Partner and furnished to all Limited Partners.

6.    _Amendments_. The Partnership Agreement may not be modified except with the written consent of the General Partner and a majority in interest of the Limited Partners (excluding, in certain cases, the interest of the Limited Partners), except that, for certain limited purposes relating to administrative matters, the General Partner may amend the Partnership Agreement without the consent of the Limited Partners. Any amendment that would have a material adverse effect on the rights or interest of any Limited Partner vis-à-vis the other Limited Partners would also require the consent of that Limited Partner.

7.    _Restrictions on Transfer_. A Limited Partner may not transfer any portion of his or her interest in the Partnership without (a) the prior written consent of the General Partner, which may be withheld in the General Partner's reasonable discretion (except on the death of an individual Limited Partner or by operation of law pursuant to the reorganization of a Limited Partner) and (b) receipt by the General Partner of an opinion of counsel, if requested, that such transfer would not result in a violation of the Securities Act or any applicable state securities laws.

8.    _Limited Partners may have liabilities with respect to the Partnership_. Assuming that a Limited Partner does not participate in the control of the Partnership within the meaning of the New York Revised Uniform Limited Partnership Act (NYRULPA), and that it otherwise acts in conformity with the provisions of our Partnership Agreement, the Limited partner's liability under NYRULPA will be limited, subject to possible exceptions, to the amount of capital the partner has contributed to the Partnership plus the Limited Partner's hare of any undistributed profits and assets and any funds wrongfully distributed to it, as described below. If it were determined, however, that the rights of limited partners as a group constituted "participation in the control" of our business for the purposes of the NYRULPA, then the Limited Partners could be held personally liable for our obligations under the laws of New York, to the same extent as our General Partner. The General Partner does not believe that the Partnership Agreement extends any rights to Limited Partners that could give rise to such a finding.

General liability would extend to persons who transact business with us who reasonably believe that a Limited Partner is a General Partner based on the Limited Partner's conduct. Neither our Partnership Agreement nor the NYRULPA specifically provides for legal recourse against our General Partner if a limited partner were to lose limited liability through any fault of our General Partner.

Although this does not mean that a limited partner could not seek legal recourse, we know of no precedent for this type of a claim.

Under the NYRULPA, a limited partnership may not make a distribution to a partner if, after the distribution, all liabilities of the limited partnership, other than liabilities to partners on account of their partnership interests and liabilities for which the recourse of creditors is limited to specific property of the limited partnership, would exceed the fair value of the assets of the limited partnership. The NYRULPA provides that a limited partner who receives a distribution and knew at the time of the distribution that the distribution was in violation of the law will be liable to the limited partnership for the amount of the distribution for three years from the date of distribution.

9.  Distributions. Reference is made to "OFFERING SUMMARY - Distribution" for a description of distributions to Limited Partners. Upon payments of interest and repayment of the Loan by the Project Owner to the Partnership, the Limited Partners, may, at the option of the General Partner, receive a distribution of all or a portion of their interest or Capital Contribution pursuant to the Partnership Agreement.

10.  Insurance Protection. The Partnership may enter into any contract of insurance which the General Partner may reasonably deem appropriate for the protection or conservation of Partnership property, or for any other purpose beneficial to the Partnership. However, the Partnership shall not seek insurance against normal business risk inherent in loaning money to a job creating enterprise who may be unable to repay the loan.

11.  Authority of the General Partner.

In addition to any other rights and powers which it may possess under law and the New York Revised Uniform Limited Partnership Act, but subject to the provisions of section 6.2 of the Partnership Agreement, the General Partner and/or its designated agents shall have such other rights and powers required for or appropriate to its management of the Partnership's business, which, by way of illustration but not limitation, shall include the following:

(1) to enter into the Subscription Agreement and any Side Letters, and to exercise and perform the Partnership's rights and obligations thereunder;

(2) to pay, in accordance with the provisions of this Agreement, all expenses, debts and obligations of the Partnership to the extent that funds are available therefor;

(3) to enter into any contract which the General Partner may reasonably deem appropriate for any purpose beneficial to the Partnership;

(4) to employ attorneys, agents, consultants, accountants and other independent contractors to perform services on behalf of the Partnership, including Affiliates of the General Partner;

(5) to bring or defend legal actions in the name of the Partnership, pay, collect, compromise, arbitrate, or otherwise adjust or settle claims or demands of or against the Partnership or its agents;

(6) to establish reasonable reserve funds from income derived from the Loan in connection with its administration, but the Partnership shall not establish reserves consisting of Capital Contributions of Limited Partners prior to repayment of the Loan by the Project Owner;

(7) to distribute funds to the Limited Partners, by way of cash or otherwise, all in accordance with the provisions of this Agreement;

(8) to perform or cause to be performed all of the Partnership's obligations under any agreement to which the Partnership is a party;

(9) to make the Loan and from time to time modify the conditions of same if reasonably necessary and approve the Disbursement Agent engaged by the Construction Lenders pursuant to a Construction Disbursement Agreement to administer the disbursement of the Loan proceeds;

(10) to engage the third parties to provide administrative services to the Partnership; and

(11) to execute, acknowledge and deliver any and all instruments necessary to effectuate any of the foregoing.

12.   EB-5 Compliance. The General Partner shall operate the Partnership in a manner that is designed to comply with legal and policy requirements of the Immigrant Investor Program ("IIP") administered by USCIS, as advised by Regional Center. In particular, the General Partner shall:

(1) deploy the $500,000 Capital Contribution by each Limited Partner who is seeking permanent residence through the IIP only in at risk job creating activity constituting the Project, directly or indirectly, and to keep such funds invested (including by loan) in job creating activity until all Limited Partners have received adjudication of removal of conditions from permanent residence;

(2) avoid agreements for redemption (including return on investment) of each Limited Partner's Capital Contribution before adjudication of the petitions for removal of conditions on their permanent residence;

(3) enforce, to the extent permitted by the provisions of the Loan Agreement in order to require the Project Owner to follow the business plan for the Project as submitted for approval to USCIS, consulting with Regional Center before implementing any changes that could be considered material;

(4) track, maintain records, and share data and records with the Regional Center concerning the Loan and the underlying Project, including the expenditure of funds, employment of workers, completion of construction, operation of facilities and enterprises; and

(5) require, to the extent permitted by the provisions of the Loan Agreement, the Project Owner to perform such tracking, documentation, and sharing with the Partnership and the Regional Center in order to enable the Regional Center to meet its obligations to USCIS and to provide information to Limited Partners needed for them to request removal of conditions from their U.S. permanent residence.

13.   Mandatory Redemption. Subject to the terms of the Escrow Agreement, if a Subscriber is admitted as a Limited Partner of the Partnership but thereafter receives a denial from USCIS of his or her I-526 Petition (without certification of the denial to the USCIS Administrative Appeals Office), such that such Limited Partner is ineligible to receive an immigrant visa or adjustment of status by reason of his or her ownership of Partnership Interests, and if the Limited Partner demands return of his or her Capital Contribution, then the Partnership shall return to such Limited Partner his or her Capital Contribution from available cash from the Partnership, including any escrow reserve maintained by the Partnership, and return the Administrative Fee, unless the rejection of the Subscriber's I-526 Petition by USCIS was due to the Limited Partner's misrepresentation, fraud, abandonment of the I-526 Petition, or failure to comply with a USCIS request, in which case the General Partner has the right to retain all of the Administrative Fee. If a Limited Partner receives a denial of its I-526 Petition and elects to appeal that denial at his or her own expense and the General Partner consents to the appeal, the cancellation of the Limited Partner's Partnership Interest will be deferred until the appeal is resolved and until either the Limited Partner receives I-526 Petition Approval, in which event no cancellation shall occur, or the denial is affirmed, in which event the redemption will proceed as provided above. If the General Partners determines that a cancellation will occur as a result of denial of an I-526 Petition, no additional documents will be necessary to effectuate the cancellation. The Limited Partner's receipt and acceptance

of a check repaying the purchase price of the cancelled Unit will constitute the full and complete redemption of all of such Limited Partner's Partnership Interest.

Notwithstanding anything to the contrary in this Section, if the General Partner determines, in its sole and absolute discretion, that the repurchase of the denied Limited Partner Unit pursuant to this Section would have an adverse effect on the business or immigration objectives of the Partnership or the ability of other Limited Partners to obtain unconditional permanent resident status in the United States pursuant to the EB-5 Pilot Program, or the Partnership is restricted from purchasing any Units under the Act or other applicable law or under the terms of any loan agreements with its lenders, or the Partnership does not have the available cash to effect such repurchase of the Units, then the Partnership's obligation to repurchase the Units shall be suspended until the General Partner determines, in its sole and absolute discretion, that the repurchase of the Units no longer causes such adverse effect on the Partnership.

14. <u>Withdrawals</u>. Except in the event of an I-526 denial, Limited Partner may not withdraw from the Partnership unless the General Partner consents to such withdrawal, which consent may be withheld in the General Partner's sole discretion. All expenses incurred by the Partnership in connection with such withdrawal shall be paid for by the withdrawing Limited Partner. If a Limited Partner withdraws any part of his or her Capital Contribution before removal of conditions on his or her permanent residence, the General Partner shall give notice to the Regional Center for prompt reporting to USCIS for possible revocation of immigration benefits arising from the Limited Partner's initial investment.

15. <u>Job Creation Allocation</u>. The allocation to specific named Investors of job creation numbers arising from fulfillment of the Partnership's business plan will be reported to the Regional Center, avoiding double counting any job. To the extent that there are insufficient jobs created for all Investors to qualify for approval at the I-829 Petition stage, the Partnership will allocate the qualifying jobs among the Investors on a first-in, first-out basis, tied to the date on which the Investor submitted his or her I-526 Petition to the USCIS.

Any Investor who is not allocated a sufficient number of jobs for I-829 Petition approval will be denied removal of conditions to permanent residency, and may lose residency and be required to leave the U.S. Because of our use of the first-in, first-out method, Investors who subscribe later will bear a greater risk of job shortfall that those who subscribed earlier.

## XIII.   **SUMMARY OF SUBSCRIPTION AGREEMENT**

1. <u>General</u>. A Subscriber will be required to deliver an executed Subscription Agreement to the Partnership. The Subscription Agreement is attached hereto as Exhibit C. By execution of the Subscription Agreement, a Subscriber irrevocably subscribes for and agrees to purchase a Partnership Interest and fund the payment or installment, and to be bound by all the terms of the Escrow Agreement between the Partnership and the Escrow Agent. The Partnership reserves the right to reject a subscription (the "<u>Subscription</u>") in its sole discretion. If the Subscription is accepted, the Partnership will notify the Subscriber of the acceptance and of the scheduled date of funding the Subscriber's subscription price, including the Administrative Fee. If the Subscription is rejected in full, all funds received from the Subscriber will be returned without interest, and thereafter the Subscription Agreement shall be of no further force or effect.

2. <u>Representations, Warranties and Covenants</u>. In the Subscription Agreement, a Subscriber makes various representations, warranties and covenants to the Partnership, including without limitation, the following:

a. that the Subscriber understands that the offer and sale of the Partnership Interests have not been registered under the Securities Act, any state securities or "blue sky" laws, or any rules or regulations promulgated thereunder (collectively, "<u>Securities Laws</u>"), pursuant to applicable exemptions. Without such registration, such Partnership Interests may not be sold, pledged,

hypothecated or otherwise transferred at any time whatsoever, and such Partnership Interests may not be offered or sold in the United States or to a U.S. Person, except upon delivery to the Regional Center of an opinion of counsel satisfactory to the General Partner and/or the Partnership's counsel that registration is not required for such transfer or the submission to the General Partner's counsel of such other evidence as may be satisfactory to the General Partner and/or the Regional Center's counsel to the effect that any such transfer will not be in violation of the Securities Laws. No hedging transactions involving the Partnership Interests may be conducted unless in compliance with the Securities Laws;

b.      that the Subscriber acknowledges that neither the Regional Center nor the Regional Center's counsel is obligated to register the Partnership Interests under the Securities Laws. Subscriber further understands that the transfer of the Partnership Interests may be substantially restricted by the Securities Laws and by the absence of a trading market therefore, and the transfer of the Partnership Interests is additionally restricted by the terms of the Partnership Agreement; that no trading market for the Partnership Interests exists and none is expected to develop, and that any sale or other disposition of the Partnership Interests may result in unfavorable tax consequences to the Subscriber. The Subscriber acknowledges that the restrictions on the transferability of the Partnership Interests are substantial and may require the Subscriber to hold the Partnership Interests indefinitely;

c.      that the Subscriber has adequate means of providing for the Subscriber's current and future needs and possible personal contingencies and has no need for liquidity of the Partnership Interests;

d.      that the Subscriber understands that because the Project has not yet been completed and opened for business, it has no operating history. If the Project Owner is unable to raise at least $45,000,000 from the Offering prior to the expiration of the Offering Period, the Partnership may be required to obtain additional financing, which may not be possible and, even if possible, may result in increased debt service obligations as a result of such leverage;

e.      that the Subscriber understands that: (i) his or her subscription for Partnership Interests is irrevocable until the Offering Period ends, without the Partnership's written consent; (ii) an investment in the Partnership Interests is a speculative investment that involves a high degree of risk, including the risk of loss of the entire investment of the Subscriber in the Partnership; (iii) no federal or state agency has passed upon the adequacy or accuracy of the information made available to the Subscriber, or made any finding or determination as to the fairness for investment, or any recommendation or endorsement of the Partnership Interests as an investment; (iv) there will be restrictions on the transferability of the Partnership Interests under the Securities Laws and the Partnership Agreement and there will be no public market for the Partnership Interests, and, accordingly, it may not be possible for the Subscriber to liquidate his or her investment in the Partnership Interests; (v) any anticipated federal and/or state income tax benefits applicable to the Partnership Interests may be lost through changes in, or adverse interpretations of, existing laws and regulations; and (vi) there is no assurance that the Partnership will ever be profitable, or that the Subscriber's investment in the Partnership Interests will ever be recoverable;

f.      that the Subscriber acknowledges that there is no assurance that his or her I-526 Petition will be approved. Neither the Regional Center, the General Partner, the Partnership, the Project Owner, nor the Subscriber's selected immigration counsel has made any effort to pre-determine Subscriber's personal qualifications and circumstances and whether Subscriber is likely or not likely to obtain favorable action on his or her I-526 Petition or EB-5 Visa;

g.      that the Subscriber has been provided with a copy of the Partnership's Offering Memorandum, including, as exhibits thereto, the Partnership Agreement, a form of the Escrow

Agreement, and a form of the Subscription Agreement, has reviewed same, has had the opportunity to ask questions of the General Partner, has received answers adequate to Subscriber with respect to same, and has no further questions regarding the Regional Center, the General Partner, the Partnership, the Project Owner, or the Project;

h.    that the Subscriber acknowledges that: (i) the risks inherent to this investment have been fully considered; (ii) the General Partner will have substantial and exclusive authority to conduct the operation of the Partnership; and (iii) an investment in the Partnership Interests has neither been approved nor disapproved by the United States Securities and Exchange Commission or the Securities Division of the Department of Banking and Finance of the State of New York or any other department or agency of any other jurisdiction, and such authorities have not passed upon the adequacy or accuracy of the disclosure provided to investors in connection with an investment in the Partnership Interests;

i.    that the Subscriber acknowledges that neither the Regional Center, the Project Owner, the Developer, the Co-Developer, the General Partner, nor any of their respective representatives or affiliates have made any representations or warranties in respect of the Partnership's, the Project Owner's or the Project's business or profitability. Without limiting the generality of the foregoing, the Subscriber acknowledges and agrees that information, including any business plan or financial projections or forecasts or other information contained in written materials provided or made available to the Subscriber, and any oral, visual or other presentations made by the General Partner or Regional Center or its representatives to the Subscriber shall not be deemed a representation or warranty in respect of the matters therein. The Subscriber acknowledges that this Memorandum contains information that the General Partner and the Project Owner believe is accurate and, as same relates to the projected revenues and expenses of the Project, data that the Project Owner believes is a reasonable forecast of the results that the Project Owner will achieve; however, as an accredited, experienced and sophisticated investor, Subscriber is aware that there are myriad foreseeable and unforeseeable events that could cause the assumptions underlying the financial projections to not materialize, and the results of same may cause material adverse consequences to the financial results of the Project Owner and the Partnership;

j.    that the Subscriber is acquiring the Partnership Interests solely for the account of the Subscriber for investment purposes only and not for distribution or resale to others. The Subscriber will not resell or offer to resell all or a portion of the Partnership Interests except in strict compliance with all applicable Securities Laws including, without limitation, Regulation S (Rules 901 through 905 and Preliminary Statement) under the Securities Act of 1933, as amended, and the Partnership Agreement;

k.    that the Subscriber's financial condition is such that it has no need for liquidity with respect to his or her investment to satisfy any existing or contemplated undertaking or indebtedness and is able to bear the economic risk of his or her investment for an indefinite period of time, including the risk of losing all of his or her investment;

l.    that the Subscriber acknowledges that the offer and sale of the Partnership Interests is not taking place within the United States, but rather in an "offshore transaction," as defined in Rule 902 of Regulation S adopted by the Securities Exchange Commission pursuant to the Securities Act of 1933, as amended. "United States" means the United States of America, its territories and possessions, any state of the United States and the District of Columbia;

m.    that the Subscriber acknowledges that the Partnership Interests have not been registered under the Securities Act and therefore cannot be offered and sold in the United States or to U.S. Persons, unless the Partnership Interests are registered under the Securities Act or an exemption from the registration requirements of the Securities Act is available. Subscriber is not a U.S. Person and is not acquiring the Partnership Interest for the account or benefit of any U.S. Person;

n.      that the Subscriber acknowledges and confirms that the Subscriber has been given complete access to all documents, records, contracts and books of or relating to the Partnership and the Partnership Interests now existing, and all other information to the extent the Partnership possesses such information or can acquire it without unreasonable effort or expense, and that the Subscriber has engaged in a complete examination of all such documents, records, contracts and books to the extent deemed necessary by the Subscriber in reaching the Subscriber's decision to invest in the Partnership. The Subscriber further acknowledges and confirms that the Subscriber has had an opportunity to ask questions of and receive answers from the General Partner concerning the Partnership Interests, the prospective contemplated business and purpose of the Partnership, the Project and any other matter the Subscriber has deemed relevant, and all such inquiries have been answered to the Subscriber's satisfaction. In addition, Subscriber acknowledges that it has had and may have, at any reasonable hour, after reasonable prior notice, access to the financial and other records of the Partnership which the General Partner can obtain without unreasonable effort or expense, and further acknowledges that Subscriber has obtained, in Subscriber's judgment, sufficient information from the General Partner to evaluate the merits and risks of an investment in the Partnership;

o.      that in making the decision to purchase the Partnership Interests, Subscriber has relied solely upon independent investigations made by Subscriber, and the Subscriber further represents and warrants that the Subscriber is not acquiring the Partnership Interests as a result of any advertisement, article, notice or other communication published in any newspaper, magazine or similar media distributed in the United States, any seminar in the United States or any solicitation by a person in the United States not previously known to the Subscriber, and that Subscriber is not aware of any general solicitation within the United States or general advertising within the United States regarding the purchase or sale of the Partnership Interests. The Subscriber acknowledges and confirms that it is not relying upon any statement, representation or warranty made by the Regional Center or its respective representatives in making a decision to subscribe for the Partnership Interests. Subscriber must rely solely on the terms of the Partnership Agreement for the terms of Subscriber's participation in the Partnership and the rights and responsibilities of owning his or her Partnership Interests;

p.      that the Subscriber is a bona fide resident of the country set forth in his or her address in the Subscription Agreement, and agrees that if his or her principal residence changes prior to his or her purchase of the Partnership Interests, he or she will promptly notify the General Partner. The Subscriber represents and warrants that the Subscriber is not a U.S. Person, is not a citizen or resident alien of the United States, and did not receive an offer to purchase the Partnership Interests or this Memorandum in the United States and did not execute the Subscription Agreement and pay the installment from within the United States. The Subscriber further agrees to execute and deliver to the General Partner an appropriate IRS Form W-8 certifying that he or she is a Non-Resident Alien;

q.      that the Subscriber understands that the General Partner and the Partnership will be relying on the accuracy and completeness of all matters set forth in the Subscription Agreement, and the Subscriber represents and warrants to the Regional Center, the General Partner, the Project Owner, the Developer, the Co-Developer and the Partnership, and to each of their affiliates, that the information, representations, warranties, acknowledgments and all other matters set forth in the Subscription Agreement with respect to the Subscriber are complete, true and correct and does not fail to include any material fact necessary to make the facts stated, in light of the circumstances in which they are made, not misleading, and may be relied upon by them in determining whether the offer and sale of the Partnership Interests to the Subscriber is exempt from registration under the Securities Laws, and the Subscriber will notify them immediately of

any change in any statements made in the Subscription Agreement that occurs prior to the consummation of the purchase of the Partnership Interests; and

r.      that the Subscriber is an "accredited investor" and has accurately completed the Accredited Investor Status section of the signature page to the Subscription Agreement in order to evidence same. The Subscriber will represent and warrant that it is also a "sophisticated person" in that Subscriber has such knowledge and experience in financial and business matters that individually and/or with the aid of advisers, it is capable of evaluating the merits and risks of an investment in the Partnership by making an informed investment decision with respect thereto.

## XIV.    **SUMMARY OF ESCROW PROCEDURES**

The Partnership intends to enter into an Escrow Agreement[9] which, in conjunction with the Partnership Agreement; provides for the following treatment of Investors' funds:

A.  Each Subscriber's $500,000 Capital Contribution and $50,000 Administrative Fee will be received in an escrow account with TD Bank, N.A. (the "Escrow Agent"). A Subscriber's Administrative Fee will be released from escrow when the Partnership accepts the subscription.

B.  By subscribing for Units, each Subscriber recognizes and agrees that the Partnership will commence operations and has a need for the Capital Contributions of Subscribers before Subscribers' I-526 Petitions are approved by USCIS. **Therefore, under the circumstances discussed below, a portion or all of a Subscriber's Capital Contribution will be released from escrow prior to I-526 Petition approval as set forth below. A Subscriber's Administrative fee will be released from escrow when the Partnership accepts the subscription.**

C.  Capital Contributions will be held in escrow until the following conditions (the "Holdback Trigger") have been satisfied:

- USCIS has approved the Form I-526 Petition of one Subscriber for a Unit in the Offering;

- The Partnership has provided evidence that the Project plan has been formally submitted to the Chicago Commissioner of Planning and Development.

Once the Holdback Trigger has been satisfied, the Escrow Agent will release 80% of the Capital Contribution of each Investor to the Partnership and will retain 20% of the Capital Contribution (the "Holdback Amount") in an account (the "Holdback Escrow Account") for the benefit of each Subscriber.

The Holdback Trigger includes a requirement that the USCIS has approved one I-526 Petition related to the Project because, based on policy statements of the USCIS, such approval generally indicates that USCIS has accepted a project as an investment qualifying for conditional permanent residency under the EB-5 Program. The Partnership anticipates that, once it has granted a first I-526 Petition approval, the USCIS will approve the I-526 Petitions of our other Subscribers, unless the circumstances of an individual investor prevent approval or unforeseen events were to cause the USCIS to change its evaluation of the Project. After the Holdback Trigger is satisfied we would expect any I-526 rejections to be Subscriber-related rather than Project-related and, accordingly, we would expect very few, if any, of our Subscribers' I-526 Petitions to be rejected. Investors should, however, be aware that USCIS retains ultimate discretion over petition approvals and that we cannot assure USCIS approval of any petition.

---

[9] Subject to final approval from the Escrow Agent.

After the Holdback Trigger has been satisfied, disbursements from escrow will be handled as follows:

- Whenever USCIS approves a Subscriber's Form I-526 Petition, the Escrow Agent will disburse that Subscriber's Holdback Amount (if it has not previously been released pursuant to the next paragraph) to the Partnership to be invested in the Partnership and complete the Subscriber's capital contribution.

- Whenever USCIS denies a Subscriber's I-526 Petition without further possibility of appeal, the Escrow Agent will return the denied Subscriber's Holdback Amount to the denied Subscriber, if such funds remain in the Holdback Escrow Account, without deduction or payment of interest, and the Partnership will repay the balance of the Capital Contribution to the denied Subscriber. The Partnership will also instruct the Escrow Agent to disburse from the Escrow Holdback Account an additional $400,000 (in the case where the denied Subscriber's Holdback Amount remained in the Holdback Escrow Account) or $500,000 (in the case where the denied Subscriber's Holdback Amount has previously been disbursed from the Holdback Escrow Account), which will be drawn from the Holdback Amounts of other Subscribers. These funds will complete the capital contributions of those other Subscribers and will allow the Partnership to continue operations without incurring a deficit by repaying the balance of the denied Subscriber's capital contribution.

D. **Under the foregoing repayment procedures, an Investor's Holdback Amount may be released from escrow to allow the Partnership to avoid a deficit when it repays the Capital Contribution of an Investor whose I-526 petition has been denied. A prospective investor should carefully read and understand the Escrow Agreement.**

The Partnership is not obligated to refund a denied Subscriber's Capital Contribution or Administrative Fee if (i) the Subscriber fails to actively proceed to obtain I-526 Petition approval once the I-526 Petition has been filed; or (ii) the Subscriber withdraws the I-526 Petition once the I-526 Petition has been filed.

## XV. <u>FEDERAL TAX CONSIDERATIONS</u>

**Pursuant to Internal Revenue Service Circular No. 230, be advised that any federal tax advice in this communication, including any attachments or enclosures, was not intended or written to be used, and it cannot be used by any person or entity taxpayer, for the purpose of avoiding any Internal Revenue Code penalties that may be imposed on such person or entity. Such advice was written to support the promotion or marketing of the transaction(s) or matter(s) addressed by the written advice. Each person or entity should seek advice based on the particular circumstances from an independent tax advisor.**

**Prior to investment, an investor that is not a U.S. Person should consult with his or her non-U.S. And U.S. Tax advisors with regard to the tax consequences of becoming a lawful permanent resident of the united states, and, further, of investing in, owning and disposing of the limited partner interests described in this memorandum, and all other tax consequences in connection with the company.**

**The following discussion is not tax advice. Prospective investors in the Partnership are strongly urged to consult their own tax advisors with respect to the tax consequences of an investment in the Partnership.**

No federal income tax ruling will be requested from the IRS with respect to any of the income tax consequences or federal estate tax consequences related to the Partnership's activities or an Investor's ownership of a Unit. Therefore, a material risk exists that, upon audit, certain items of deduction may be disallowed, in whole or in part, or required to be capitalized by the Partnership. It is presently intended that the Partnership's tax filings will be prepared based upon interpretations of tax law deemed to be most

favorable to the majority of Investors. However, it will be the responsibility of each Investor to prepare and file all appropriate tax returns that he or she may be required to file as a result of his or her participation in the Partnership. Each Investor is strongly urged to consult with his or her own tax advisor and counsel with respect to all tax aspects of the acquisition and ownership of a unit.

### A. United States Tax Status

The Partnership will be classified for U.S. federal income tax purposes as a partnership under currently applicable tax laws. This summary does not discuss all of the tax consequences that may be relevant to a particular Investor or to certain Investors subject to special treatment under the federal income tax laws, including financial institutions, insurance companies, tax-exempt investors or non-U.S. Investors. Moreover, this summary does not address the U.S. federal estate and gift tax or alternative minimum tax consequences of the acquisition, ownership, disposition or withdrawal of an investment in the Partnership.

### B. Certain Considerations for U.S. Investors

The following discussion summarizes certain significant U.S. federal income tax consequences to an Investor who: (a) owns, directly or indirectly through a partnership or other flow-through entity, an interest as an Investor; (b) is, with respect to the United States, a citizen or resident individual, a domestic corporation, an estate, the income of which is subject to U.S. federal income taxation regardless of its source, or a trust for which a court in the United States is able to exercise primary supervision over its administration and one or more United States persons have the authority to control all substantial decisions, as such terms are defined for U.S. federal income tax purposes; and (c) is not tax-exempt.

### C. Taxation of Partnership Income, Gain and Loss

The Partnership will not pay U.S. federal income taxes, but each Investor will be required to report his or her allocable share of the income, gains, losses, deductions and credits of the Partnership. It is possible that the Investors could incur income tax liabilities without receiving from the Partnership sufficient cash distributions to defray such tax liabilities. Each Investor is required to take into account in computing his or her federal income tax liability, and to report separately on his or her own federal income tax return, his or her distributive share of the Partnership's income, gain, loss, deductibility and credit for any taxable year of the Partnership ending within or with the taxable year of such Investor.

Pursuant to the Partnership Agreement, items of the Partnership's taxable income, gain, loss, deduction and credit are allocated so as to take into account the varying interests of the Investors over the term of the Partnership. The Partnership Agreement will contain provisions intended to comply substantially with IRS regulations describing partnership allocations that will be treated as having "substantial economic effect," and hence be respected, for tax purposes. However, those regulations are extremely complex, and there can be no assurance that the allocations of income, deduction, loss and gain for tax purposes made pursuant to the Partnership Agreement will be respected by the IRS, if reviewed. It is possible that the IRS could challenge the Partnership's allocations as not being in compliance with such Treasury regulations. Any resulting reallocation of tax items may have adverse tax and financial consequences to an Investor.

The Partnership, the General Partner, and the Project Owner intend to treat the Loan made by the Partnership to the Project Owner as indebtedness for U.S. federal income tax purposes. However, no assurances can be given that the IRS will not treat the Loan as an equity investment in the Project Owner. Investors are urged to consult their own tax advisors regarding the consequences of the Loan being characterized as equity in the Project Owner for U.S. federal income tax purposes. The remainder of this discussion assumes that the Loan is properly treated as debt for U.S. federal income tax purposes.

The Partnership's taxable year will be the calendar year, or such other year as required by the

Code. Tax information will be distributed to each Investor as soon as reasonably practicable after the end of the year.

### D. Imputed Interest and OID

The Partnership will recognize interest income from the Loan that may be includible in the taxable income of Investor in each year that the Partnership owns the Loan. In the event that the stated interest on the Loan is below the applicable federal rate, then interest must be imputed and income tax on the imputed interest will apply whether or not cash distributions are made. If the IRS determines that the Loan includes "original issue discount," then each Investor will be required to include in his or her income the portion of the original issue discount that accrues during any tax year. Original Issue Discount is the excess of the Loan's stated redemption price at maturity (in general, the stated principal amount of the Loan) over the issue price (in general, the amount invested) of the Loan. If any portion of the interest paid is "Qualified Stated Interest," then such Qualified Stated Interest will not be included in determining the amount of original issue discount. Qualified Stated Interest is stated interest unconditionally payable at least annually at a single fixed rate. A U.S. Investor will realize ordinary income tax arising from original issue discount. A U.S. Investor must pay tax on the ordinary issue discount whether or not cash is received by such Investor.

### E. Investment Interest and Passive Activity Limitations

There are limits on the deduction of "investment interest," (i.e., "interest for indebtedness properly allocable to property held for investment"). In general, investment interest will be deductible only to the extent of the taxpayer's "net investment income." For this purpose "net investment income" will generally include net income from the Partnership and other income from property held for investment (other than income treated as passive business income). However, long-term capital gain is excluded from the definition of net investment income unless the taxpayer makes a special election to treat such gain as ordinary income rather than long-term capital gain. Interest which is not deductible in the year incurred because of the investment interest limitation may be carried forward and deducted in a future year in which the taxpayer has sufficient investment income. The Partnership will report separately to each Investor his or her distributive share of the investment interest expense of the Partnership, and each Investor must determine separately the extent to which such expense is deductible on the Investor's tax return.

Non-corporate investors (and certain closely held, personal service and S corporations) are subject to limitations on using losses from passive business activities to offset active business income, compensation income, and portfolio income (e.g., interest, dividends, capital gains from portfolio investment, royalties, etc.). The Partnership's distributive share of income or losses generally may be treated as passive activity income or losses. Accordingly, an Investor will be subject to the passive activity loss limitations on the use of any allowable Partnership losses and allocable Partnership expenses.

### F. Deductibility of Partnership Investment Expenditures and Certain Other Expenditures

Investment expenses of an individual, trust or estate are deductible only to the extent they exceed 2% of the taxpayer's adjusted gross income for the particular taxable year. In addition, the Code further restricts the ability of individuals with an adjusted gross income in excess of a specified amount to deduct such investment expenses. Moreover, such investment expenses are miscellaneous itemized deductions which are not deductible by a noncorporate taxpayer in calculating such taxpayer's alternative minimum tax liability.

These limitations on deductibility may apply to a Limited Partner's share of the trade or business expenses of the Partnership. The Partnership may make an allocation of its expenses among its various activities. There can be no assurance that any of its expenses will be considered trade or business expenses nor can there be any assurance that the IRS will agree with any allocation made by the

Partnership.

An Investor will not be allowed to deduct syndication expenses attributable to the acquisition of Units paid by such Investor or the Partnership. Any such amounts will be included in the Investor's adjusted tax basis for his or her Units.

The consequences of these limitations will vary depending upon the particular tax situation of each taxpayer. Accordingly, Investors should consult their own tax advisors with respect to the application of these limitations and on the deductibility of their share of items of loss and expense of the Partnership.

### G. Application of Basis and "At Risk" Limitations on Deductions

The amount of any loss of the Partnership that an Investor is entitled to deduct on such Investor's income tax return is limited to such Investor's adjusted tax basis in his or her Units as of the end of the Partnership's taxable year in which such loss is incurred. Generally, an Investor's adjusted tax basis for such Investor's Units is equal to the amount paid for such Units, increased by the sum of (i) such Investor's share of the Partnership's liabilities, as determined for federal income tax purposes, and (ii) such Investor's distributive share of the Partnership's realized income and gains, and decreased (but not below zero) by the sum of (a) distributions (including decreases in such Investor's share of Partnership liabilities) made by the Partnership to such Investor and (b) such Investor's distributive share of the Partnership's losses and expenses.

An Investor that is subject to the "at risk" limitations (generally, non-corporate taxpayers and closely held corporations) may not deduct losses of the Partnership to the extent that they exceed the amount such Investor has "at risk" with respect to such Investor's Units at the end of the year. The amount that a Investor has "at risk" will generally be the same as such Investor's adjusted basis as described above, except that it will generally not include any amount attributable to liabilities of the Partnership (other than certain loans secured by real property) or any amount borrowed by the Investor on a non- recourse basis.

Losses denied under the basis or "at risk" limitations are suspended and may be carried forward in subsequent taxable years, subject to these and other applicable limitations.

### H. Certain U.S. Tax Considerations for Foreign Investors

The U.S. federal income tax treatment of a non-resident alien investing as an Investor in the Partnership is complex and will vary depending on the circumstances and activities of such Investor and the Partnership. Each non-U.S. Investor is urged to consult with his or her own tax advisor regarding the U.S. federal, state, local and foreign income, estate and other tax consequences of an investment in the Partnership. The following discussion assumes that a non- U.S. Investor is not subject to U.S. federal income taxes as a result of the Investor's presence or activities in the United States other than as an Investor in the Partnership.

### I. Withholding

A non-U.S. Investor will generally be subject to U.S. federal withholding taxes at the rate of 30% (or such lower rate provided by an applicable tax treaty) on his or her share of Partnership income from dividends interest (other than interest which constitutes portfolio interest within the meaning of the Code) and certain other income. Unless a non-U.S. Investor meets certain exception requirements, then the non-U.S. Investors will also be subject to withholding on imputed interest and Original Issue Discount, determined as discussed above. Once a person receives his or her green card, he or she is no longer a non-U.S. Investor for U.S. tax purposes.

The Partnership may be deemed to be engaged in a U.S. trade or business. In such event, a non-U.S. Investor's share of Partnership income and gains will be deemed "effectively connected" with such a U.S. trade or business of the Partnership (including operating income from Partnership) and will be subject to tax at normal graduated U.S. federal income tax rates. A non-U.S. Investor generally will be

required to file a U.S. federal income tax return with respect to the non-U.S. Investor's share of effectively connected income. If the Partnership is deemed to be engaged in a U.S. trade or business, then the Partnership will be required to withhold U.S. federal income tax with respect to the non-U.S. Investor's share of Partnership income that is effectively connected income.

### J. Backup Withholding

Backup withholding of U.S. tax, currently at a rate of 28%, may apply to distributions or portions thereof by the Partnership to Investors who fail to provide the Partnership with certain identifying information, such as an Investor's taxpayer identification number. A U.S. Investor may comply with these identification procedures by providing the Partnership with a duly executed IRS Form W-9, Request for Taxpayer Identification Number and Certification. Non- U.S. Investors may comply by providing the Partnership with a duly executed IRS Form W-8BEN or other appropriate IRS Form W-8.

### K. Estate Tax

Additionally, each non-U.S. Investor is subject to U.S. estate tax on his or her interest in the Partnership. If at the time death, the non-U.S. Investor remains a non-U.S. resident, under the Internal Revenue Code, a non- U.S. Investor may pass, free of U.S. estate tax, the first $60,000 of U.S. situs assets. The value in excess of this $60,000 exemption will be subject to federal estate tax at a 35% rate. Treaties and various exemptions may reduce or eliminate the estate tax, but no assurance can be made that a treaty or exemption will apply.

The United States charges income and estate tax on all U.S. citizens and permanent residents based on worldwide income. Treaties and various exemptions eliminate some but not all of the risk of double taxation. Each state in the United States has its own separate income tax system. All but four states raise revenue through state income tax. Investors should consider the tax effects of becoming a U.S. resident before investing. Foreign persons (non-U.S. persons) that become permanent residents of the United States generally are subject to U.S. federal income tax on their worldwide income in the same manner as a U.S. citizen. Prior to making an investment in the Partnership, an Investor that is not a U.S. person should consult with his or her non-U.S. tax advisors with regard to the consequences of becoming a lawful permanent resident of the United States.

This Memorandum does not address all of the U.S. federal income tax consequences to the Investor of an investment in the Partnership, and does not address any of the state or local tax consequences of such an investment to any Investor, or all of the United States or foreign tax consequences of such an investment to any Investor that is not a United States person or entity. Each Investor is advised to consult his or her own tax counsel as to the U.S. federal income tax consequences of an investment in the Partnership and as to applicable state, local and foreign taxes. Special considerations may apply to Investors who are not United States persons or entities and such investors are advised to consult his or her own tax advisors with regard to the United States, state, local and foreign tax consequences of an investment in the Partnership.

It is anticipated that upon the acceptance of an Investors I-526 Petition and the issuance of a temporary resident visa, such Investor will automatically become a United States taxpayer and not be subject to the tax treatment afforded non-resident persons unless such Investor's tax status would change in the future.

### L. State and Local Taxes

Investors should consider the potential state and local tax consequences of an investment in the Partnership. In addition to being taxed in its own state or locality of residence, an Investor may be subject to tax return filing obligations and income, franchise and other taxes in jurisdictions in which the Partnership operates. Investors should consult their tax advisers regarding the state and local tax consequences of an investment in the Partnership.

### M. Disposition of the Units

There are limitations on the transfer, assignment or disposition of the Units. Generally, a U.S. Investor will recognize capital gain or loss on the sale, redemption, exchange or other taxable disposition of an interest in the Partnership, excluding amounts attributable to interest (which will be recognized as ordinary interest income) to the extent the U.S. Investor has not previously included the accrued interest income. The deductibility of capital losses may be subject to limitation. The consequences of the limitations will vary depending on the tax situation of each taxpayer. Accordingly, each Investor should consult their own tax advisors with respect to these limitations.

Any gain from the sale or disposition of the Units by a non-U.S. Investor will generally be treated as gain or loss effectively connected with a trade or business in the United States and would be subject to federal net income tax. Accordingly, each non-U.S. Investor should consult their own tax advisors prior to the sale or disposition of an interest in the Partnership.

### N. Possible IRS Challenges; Tax Audits.

Investors should be aware that the IRS may challenge the Partnership's treatment of items of income, gain loss, deduction and credit, or its characterization of the Partnership's transactions, and that any such challenge, if successful, could result in the imposition of additional taxes, penalties and interest charges. The General Partner decides how to report the items on the Partnership's tax returns. In the event the income tax returns of the Partnership are audited by the IRS, the tax treatment of the Partnership's income and deductions generally is determined at the partnership level in a single proceeding rather than by individual audits of the Investors. If the IRS audits the Partnership's tax returns, however, an audit of the Investor's own tax returns may result. The General Partner, designated as the "Tax Matters Partner," has considerable authority to make decisions affecting the tax treatment and procedural rights of all Investors. In addition, the Tax Matters Partner has the authority to bind certain Investors to settlement agreements and the right on behalf of all Investors to extend the statute of limitations relating to the Investors' tax liabilities with respect to Partnership items. The legal and accounting costs incurred in connection with any audit of the Partnership's tax returns will be paid off by the Partnership, but each Investor will bear the cost of audits of his or her own return.

### O. Possible Legislative or Other Action Affecting Tax Aspects

The foregoing discussion is only a summary and is based upon existing U.S. federal income tax law. Investors should recognize that the U.S. federal income tax treatment of an investment in Units may be modified at any time by legislative, judicial or administrative action. Any such changes may have retroactive effect with respect to existing transactions and investments and may modify the statements made above. The rules dealing with U.S. federal income taxation are constantly under review by persons involved in the legislative process and by the IRS and the Treasury Department, resulting in revisions of the Treasury regulations and revised interpretations of established concepts as well as statutory changes. Revisions in U.S. federal tax laws and interpretations thereof could adversely affect the tax aspects of an investment in the Partnership. There can be no assurance that legislation will not be enacted that has an unfavorable effect on an Investor's investment in the Partnership.

**The summary of federal tax considerations set forth above is not intended to be a complete summary of the tax consequences of an investment in the Partnership. Each prospective member is advised to consult with his or her own tax advisor concerning the tax considerations of an investment in the Partnership.**

## XVI. MISCELLANEOUS

### A. Limitation of Liability; Indemnification

The Partnership Agreement limits the liability of the General Partner, its affiliates and their respective directors, officers, employees, shareholders and agents (each an "<u>Indemnified Party</u>") to the

Partnership and the Partners. The Partnership Agreement also provides for the Partnership to indemnify the Indemnified Parties from and against certain liabilities relating to the Partnership and its affiliates. Certain limitation of liability and indemnification provisions contained in the Partnership Agreement are summarized below. However, reference is made to the terms of the Partnership Agreement for the complete details of the limitation of liability and indemnification provisions summarized below.

To the fullest extent permitted by law, no Indemnified Party will be liable to the Partnership or to any Limited Partner for any liabilities arising in connection with acts or omissions performed in good faith for the Partnership. Such limitation of liability will not apply, however, where the Indemnified Party is guilty of gross negligence or willful misconduct. To the extent that the General Partner has duties to the Partnership or to any other Partner under applicable law, the General Partner, to the fullest extent permitted by law, will not be liable to the Partnership or to any other Partner for its good faith reliance on the provisions of the Partnership Agreement. The provisions of the Partnership Agreement, to the extent that they expand or restrict the otherwise existing duties and liabilities of the General Partner, are agreed by the Partners to modify to that extent such other duties and liabilities.

The General Partner may consult with legal counsel and accountants selected by it, and the General Partner will be fully protected and held harmless for any act or omission taken or suffered by it on behalf of the Partnership in reliance upon and in accordance with the advice of such counsel or accountants, provided that such counsel or accountants were selected with reasonable care.

The Partnership Agreement provides that the Partnership will indemnify, hold harmless and waive any claim against the General Partner, its agents, and its other affiliates, for any and all losses, damages, liability claims, causes of action, omissions, demands and expenses or any other act or failure to act arising from or out of the performance of their duties to the Partnership under the Partnership Agreement or as a result of any action which the General Partner and/or their designated agents acted or failed to act in performance of their duties to the Partnership unless such loss has arisen as a result of their gross negligence or willful misconduct

The Partnership has agreed to indemnify and hold harmless each of the Indemnified Parties, to the fullest extent permitted by law, from and against any and all claims, liabilities, damages, losses, costs and expenses (including amounts paid in satisfaction of judgments, in settlements, as interest, fines and penalties and for the legal and other costs and expenses of investigating or defending against any claim or alleged claim) that are incurred by any Indemnified Party and arise out of or in connection with the affairs of the Partnership or any of its affiliates, including any mistake in judgment, any act performed or omission made by an Indemnified Party, losses incurred due to mistake, action, inaction, gross negligence or bad faith of any broker or other agent (assuming that such broker or other agent was selected with reasonable care), or the performance by such Indemnified Party of any of the General Partner's responsibilities under the Partnership Agreement; provided that an Indemnified Party shall be entitled to indemnification only to the extent that such Indemnified Party acted in good faith and such Indemnified Party's conduct did not constitute gross negligence or willful misconduct. The satisfaction of any such indemnification and holding harmless shall be from and limited to Partnership assets, and no Limited Partner shall have any personal liability on account thereof beyond the amount of its capital commitment to the Partnership. An Indemnified Party must obtain the written consent of the General Partner (which consent may not be unreasonably withheld) prior to entering into any settlement which would result in an obligation of the Partnership to indemnify such Indemnified Party.

### B.  Confidentiality and Non-Disclosure

The General Partner has the right not to disclose to any Limited Partner any information the disclosure of which would, in the reasonable determination of the General Partner, not be in the best interest of the Partnership. If requested to do so by a Limited Partner, the General Partner may in its discretion disclose to such Limited Partner information relating to a Partnership investment. The Limited Partner agrees to treat any information about the Project entities or the other parties as confidential and

proprietary, and shall not disclose such information to any person, except as required by any regulatory authority, law or regulation or by legal process.

## XVII.  LEGAL MATTERS

The Partnership does not have counsel separate from the legal advisors to the General Partner. Should a future dispute arise between the Partnership and the General Partner, separate counsel may be retained as circumstances then dictate. In addition, counsel to the Partnership and the General Partner may serve as counsel to other investment funds sponsored or managed by the General Partner or its affiliates. No independent counsel has been retained to represent the Limited Partners.

## XVIII.  ACCESS TO INFORMATION

### A.    Additional Information

Prior to the consummation of the Offering, the Partnership will provide to each prospective Investor and such prospective Investor's representatives and advisors, if any, the opportunity to ask questions and receive answers concerning the terms and conditions of this offering and to obtain any additional information which the Partnership may possess or can obtain without unreasonable effort or expense that is necessary to verify the accuracy of the information furnished to such prospective Investor. Any such questions should be directed to the Partnership as follows:

CARILLON TOWER/CHICAGO, L.P.
c/o FOREFRONT EB-5 FUND (ICT), LLC
**7 Times Square, 37th Floor,**
**New York, NY 10036**
Attention: Peter Shirk
Tel: (212) 607-8150
investment@forefronteb5fund.com

No other persons have been authorized to give information or to make any representations concerning this Offering, and if given or made, such other information or representations must not be relied upon as having been authorized by the Partnership.

### B.    Reports

The General Partner will furnish all Limited Partners with annual reports and may, in its discretion, issue quarterly and such other reports as the General Partner deems fit. Each annual report will summarize the status of the activities of the Partnership at the end of the fiscal year and will include a balance sheet as of the end of such fiscal year as well as unaudited statements of income, each Limited Partner's capital account balance, gains and losses and a cash flow statement for such fiscal year, all of which shall be prepared by the Partnership's accountants in accordance with generally acceptable accounting practices as in effect from time to time in the United States. In addition, the General Partner will distribute information to enable the Partners to prepare their respective income tax returns, including, without limitation, a Form K-1 or other appropriate information, although the preparation of the Partners' individual tax returns is the sole responsibility of each Partner.

1. <u>INDEX OF DEFINED TERMS</u>

| | | | |
|---|---|---|---|
| 1933 Act | 42 | IMPLAN | 44 |
| 1940 Act | 62 | INA Act | 43 |
| Administrative Expenses | 40 | Indemnified Party | 85 |
| AOS | 48 | Investment Company Act | 42 |
| Capital Contribution | 22 | NVC | 48 |
| Closing Date | 32 | Offering | 33 |
| CLPR | 47 | Offering Period | 34 |
| Code | 63 | Partnership Expenses | 41 |
| Construction Lenders | 22 | Partnership Interest | 41 |
| Construction Lien | 69 | Principals | 54 |
| Construction Loan | 11 | Project Loan Documents | 31 |
| Construction Loan Agreement | 69 | Regional Center | 31 |
| DHS | 48 | Securities Act | 42 |
| DOS | 48 | Securities Laws | 75 |
| Escrow Agreement | 34 | Subscription | 74 |
| I-829 Petition | 33 | TEA | 20 |
| IIP | 73 | | |

EXHIBIT A

# FINANCIAL PROJECTIONS

## Project Expenses & Cost

The estimated construction cost of this project is 130 million USD, and the estimated total income of the project is around 217 million USD.

| Project | Amount （USD） |
|---|---|
| **Project Development Cost** | |
| Layer Equity | 25,000,000 |
| Infrastructure and construction costs | 74,485,172 |
| Design/furniture/equipment | 45,057,304 |
| Management Fee and other expenses | 5,915,000 |
| **The total cost of the project** | **150,475,500** |
| | |
| **Project Income** | |
| Apartments | 111,871,428 |
| Hotel | 78,296,881 |
| Parking | 8,913,194 |
| Restaurants | 18,908,126 |
| **The total income of the project** | **217,989,629** |

## Project Capital Sources

The sources of the capital are from:
Bank loans, EB-5 mezzanine debt investments, and equity investments

| Capital Sources | Amount （USD） |
|---|---|
| Bank loans | 54,457,500 |
| EB-5 Limited Partners | 45,000,000 |
| Equity Total Amount | 51,000,000 (First stage land 25,000,000+ Second stage development 26,000,000) |
| **Total** | **150,457,500** |

EXHIBIT B

# PARTNERSHIP AGREEMENT

LIMITED PARTNERSHIP AGREEMENT

OF

CARILLON TOWER/CHICAGO, LP
a New York Limited Partnership

Dated as of March 6, 2014

## TABLE OF CONTENTS

Page

IMPORTANT NOTICES TO INVESTORS.................................................................................ii

CONFIDENTIALITY AND UNDERTAKINGS ........................................................................1

FORWARD-LOOKING STATEMENTS.....................................................................................2

IMPORTANT FACTORS AND ASSOCIATED RISKS............................................................2

I.      THE PARTNERSHIP ....................................................................................................13

II.     CARILLON TOWER PROJECT ................................................................................13

    A.  Overview ..................................................................................................................13

    B.  Funding Structure for the Project ........................................................................15

    C.  Partnership Investment in the Project .................................................................15

    D.  Marketing Strategy ...............................................................................................16

    E.  Competition ............................................................................................................17

    F.  Financial Summary ...............................................................................................20

III.    MANAGEMENT AND DEVELOPMENT PROFESSIONALS................................20

    A.  The General Partner ..............................................................................................20

    B.  Project Management And Development Team .....................................................21

IV.     REGIONAL CENTER ..................................................................................................24

V.      LOAN TERMS AND CONDITIONS ..........................................................................24

VI.     THE OFFERING ...........................................................................................................25

    A.  General ....................................................................................................................25

    B.  The EB-5 Process ...................................................................................................26

    C.  The Subscription Procedure .................................................................................27

    D.  Escrow Accounts ...................................................................................................27

    E.  Closings ...................................................................................................................27

    F.  Risk Factors ...........................................................................................................27

    G.  Leverage and Loan Terms ....................................................................................27

    H.  Return on Investment – Net Distributable Cash from Operations and Distributions of Project Loan Repayment Proceeds. ...................................................................28

    I.  Compliance with EB-5 Restrictions.....................................................................29

    J.  Payment of Expenses ............................................................................................29

    K.  Formation ...............................................................................................................29

    L.  Regional Center Responsibilities .........................................................................30

    M.  Suitability Standards .............................................................................................30

    N.  How to Subscribe ...................................................................................................31

    O.  Miscellaneous .........................................................................................................31

    P.  Conflicts of Interest ...............................................................................................31

VII.    FEES AND EXPENSES ................................................................................................33

    A.  Certain Administrative Expenses of the Partnership ........................................33

<u>TABLE OF CONTENTS</u>
(continued)

<u>Page</u>

|  | B. | Other Expenses of the Partnership | 33 |
|  | C. | Management Fee | 34 |
| VIII. | | WITHDRAWALS | 34 |
| IX. | | SUITABILITY | 34 |
|  | A. | Investor Suitability Standards | 34 |
| X. | | IMMIGRATION MATTERS | 35 |
|  | A. | Overview | 35 |
|  | C. | Counting Jobs Created | 36 |
|  | D. | The I-526 Petition Process | 38 |
|  | E. | I-526 Petition Approval Not Guaranteed | 39 |
|  | F. | Consular Processing or Adjustment of Status | 39 |
|  | G. | Consular Processing | 39 |
|  | H. | Visa Issuance Not Guaranteed | 40 |
|  | I. | Admission After Immigrant Visa Issued Not Guaranteed | 40 |
|  | J. | Adjustment of Status | 40 |
|  | K. | Travel During Adjustment of Status Processing | 41 |
|  | L. | Employment During the Adjustment of Status Processing | 41 |
|  | M. | Adjustment of Status Cannot Be Guaranteed | 42 |
|  | N. | Grounds for exclusion | 42 |
|  | O. | Removal of Conditions | 43 |
|  | P. | Removal of Conditions Not Guaranteed | 44 |
| XI. | | RISK FACTORS | 44 |
|  | A. | Risks Related to "Best Efforts" Offering | 45 |
|  | B. | General Risks Related To The Partnership's Proposed Business | 45 |
|  | C. | Special Risks Associated With The Project | 48 |
|  | D. | Risks Related To The Offering | 53 |
|  | E. | Tax Risks | 55 |
|  | F. | Immigration Risk Factors | 56 |
|  | G. | Escrow Agreement Risk Factors | 60 |
|  | H. | Risks Related To The Project Loan | 60 |
| XII. | | SUMMARY OF THE PARTNERSHIP AGREEMENT | 62 |
| XIII. | | SUMMARY OF SUBSCRIPTION AGREEMENT | 66 |
| XIV. | | SUMMARY OF ESCROW PROCEDURES | 70 |
| XV. | | FEDERAL TAX CONSIDERATIONS | 71 |
|  | A. | United States Tax Status | 72 |
|  | B. | Certain Considerations for U.S. Investors | 72 |

<u>TABLE OF CONTENTS</u>
(continued)

<u>Page</u>

**C.** **Taxation of Partnership Income, Gain and Loss**................................................72

**D.** **Imputed Interest and OID**.....................................................................................73

**E.** **Investment Interest and Passive Activity Limitations** ......................................73

**F.** **Deductibility of Partnership Investment Expenditures and Certain Other Expenditures**.....73

**G.** **Application of Basis and "At Risk" Limitations on Deductions** .......................74

**H.** **Certain U.S. Tax Considerations for Foreign Investors**....................................74

**I.** **Withholding** ............................................................................................................74

**J.** **Backup Withholding** ..............................................................................................75

**K.** **Estate Tax** ...............................................................................................................75

**L.** **State and Local Taxes** ............................................................................................75

**M.** **Disposition of the Units** .........................................................................................76

**N.** **Possible IRS Challenges; Tax Audits.** ..................................................................76

**O.** **Possible Legislative or Other Action Affecting Tax Aspects** .............................76

**XVI.** **MISCELLANEOUS** ......................................................................................................76

**A.** **Limitation of Liability; Indemnification** .............................................................76

**B.** **Confidentiality and Non-Disclosure** ....................................................................77

**XVII.** **LEGAL MATTERS** .....................................................................................................78

**XVIII.** **ACCESS TO INFORMATION** ...................................................................................78

**A.** **Additional Information.** .........................................................................................78

**B.** **Reports** ....................................................................................................................78

**1.** **INDEX OF DEFINED TERMS** ...................................................................................79

**THE PARTNERSHIP** ...................................................................................................................1

**Formation; Continuation.** ......................................................................................1

**Name.** .......................................................................................................................1

**Principal Place of Business.** ...................................................................................2

**Purposes and Powers.** .............................................................................................2

**Registered Office and Agent.** .................................................................................2

**Fiscal and Taxable Year.** ........................................................................................2

**Term.** .......................................................................................................................2

**Filings.** .....................................................................................................................2

**DEFINITIONS** ..............................................................................................................................2

**CAPITAL CONTRIBUTIONS; JOB ALLOCATION** .........................................................10

**Closings; Acceptance of Subscriptions.** ..............................................................10

**Capital Contributions.** .........................................................................................11

**No Right to Redemption of Units or Return of Capital Contributions.**..........11

**General Partner's Option for Redemption of Units or Return of Capital Contributions.**...........11

<u>TABLE OF CONTENTS</u>
(continued)

Mandatory Redemption. ........................................................................................... 11

Uncertificated Units. .............................................................................................. 12

Limitation on Liability of Limited Partners .......................................................... 12

Interest. .................................................................................................................. 12

Negative Capital Accounts. ................................................................................... 13

Job Allocation. ...................................................................................................... 13

ALLOCATIONS OF PROFITS AND LOSSES .......................................................... 13

Losses. ................................................................................................................... 13

Profits. ................................................................................................................... 13

Special Allocations. .............................................................................................. 14

DISTRIBUTIONS ....................................................................................................... 17

Distributions. ........................................................................................................ 17

Administrative Fee. ............................................................................................... 18

Amounts Withheld. ............................................................................................... 18

Form I-829 Exception. .......................................................................................... 19

Pro Rata Calculation. ............................................................................................ 19

MANAGEMENT .......................................................................................................... 19

Management; Authority of the General Partner. ................................................... 19

Participation by Limited Partners. ........................................................................ 22

Filing of Schedules, Reports, Etc. ........................................................................ 22

Business with Affiliates. ....................................................................................... 22

Removal of General Partner. ................................................................................. 22

EXPENSES AND FEES .............................................................................................. 22

Operating Expenses. .............................................................................................. 22

Organizational Expenses. ...................................................................................... 23

EXCULPATION AND INDEMNIFICATION ............................................................. 23

Exculpation and Indemnification. ......................................................................... 23

Exclusive Jurisdiction. .......................................................................................... 25

BOOKS AND RECORDS ............................................................................................ 25

Books and Accounts. ............................................................................................. 25

Reports to Partners. ............................................................................................... 25

TRANSFERABILITY OF A PARTNER'S INTEREST ............................................... 26

Restrictions on Transfer. ....................................................................................... 26

Expenses of Transfer; Indemnification. ................................................................ 26

Recognition of Transfer. ....................................................................................... 27

Effect of Transfer. ................................................................................................. 27

## TABLE OF CONTENTS
(continued)

Page

**DISSOLUTION** ........................................................................................................ 28

    Events of Dissolution. ........................................................................................... 28

    Cancellation of Certificate. ................................................................................. 28

    Compliance With Timing Requirements of Regulations. .................................. 29

    Termination. ......................................................................................................... 29

**NOTICES; AUTHORIZATION BY LIMITED PARTNERS** ............................... 29

    Method of Notice. ................................................................................................ 29

    Routine Communications; Wire Transfers. ...................................................... 30

    Power of Attorney. .............................................................................................. 30

**GENERAL PROVISIONS** ...................................................................................... 31

    Entire Agreement. ............................................................................................... 31

    Amendment. ......................................................................................................... 31

    Approvals. ............................................................................................................ 31

    Side Letters. ......................................................................................................... 32

    Governing Law. ................................................................................................... 32

    English Language. ............................................................................................... 32

    Captions. .............................................................................................................. 32

    Successors. ........................................................................................................... 32

    Severability. ......................................................................................................... 32

    Gender and Number. ........................................................................................... 32

    Third-Party Rights. ............................................................................................. 33

    Counterparts. ....................................................................................................... 33

    Duties. .................................................................................................................. 33

    Confidentiality. .................................................................................................... 33

    Jurisdiction and Service of Process. ................................................................... 34

    Trial. .................................................................................................................... 35

**Calculation of Employment Impacts Using Regional Multipliers in Verifiable Detail** ........................ 4

LIMITED PARTNERSHIP AGREEMENT
OF
CARILLON TOWER/CHICAGO, LP

This LIMITED PARTNERSHIP AGREEMENT (this "Agreement") of Carillon Tower/Chicago, LP, a New York limited partnership (the "Partnership"), is dated as of March 6, 2014, by and among Forefront EB-5 Fund (ICT), LLC, as the general partner of the Partnership (the "General Partner"), Jeffrey L. Laytin, a natural person, as the original limited partner of the Partnership (the "Original Limited Partner"), and each Person (as defined herein) admitted to the Partnership as a limited partner from time to time pursuant to this Agreement who (a) executes and delivers a counterpart signature page of this Agreement which counterpart signature page is accepted by the Partnership and (b) is identified in the records of the Partnership as a limited partner of the Partnership (each such Person, a "Limited Partner").  The General Partner and the Limited Partners are hereinafter sometimes referred to collectively as the "Partners" and each of them individually as a "Partner".

THE PARTNERSHIP

Formation; Continuation.  The Partnership was formed upon the filing and acceptance of a Certificate of Limited Partnership (the "Certificate") with the Secretary of State of the State of New York on March 6, 2014.  Each party hereto acknowledges and agrees that upon a Person's execution of a counterpart signature page of this Agreement in the form attached hereto as Exhibit A, which counterpart signature page is accepted by the Partnership, and (Subject to Section 3.1(b)) upon receipt of any portion of such Person's Minimum Capital Contribution by the Partnership (with any balance received into escrow), such party will be admitted to the Partnership as a Limited Partner of the Partnership and will be shown as a Limited Partner on the books and records of the Partnership as of the effective date of such acceptance.  The General Partner hereby continues as the general partner of the Partnership.  The parties hereto hereby agree to continue the Partnership as a limited partnership under and pursuant to the provisions of the Act and agree that the rights and duties and liabilities of the Partners shall be as provided in the Act, except as otherwise provided herein.  Upon the admission of a Limited Partner, the Original Limited Partner shall be deemed to have withdrawn from the Partnership as a limited partner of the Partnership, and upon such withdrawal, the Original Limited Partner shall have the Original Limited Partner's capital contribution to the Partnership, if any, returned to the Original Limited Partner without any interest or deduction and the Original Limited Partner shall thereafter have no further interest in the Partnership.  Promptly after the execution of this Agreement, the Partners shall execute documents, and the General Partner shall file and record with the proper offices in the State of New York such certificates, and shall cause to be made such publications, as shall be required by the Act.

Name.  The name of the Partnership shall be "Carillon Tower/Chicago, LP."  All business of the Partnership shall continue to be conducted under such name and such name shall continue to be used at all times in connection with the Partnership's business and affairs.

Principal Place of Business. The principal place of business of the Partnership shall be 7 Times Square, 37th Floor, New York, NY 10036, or such place or places as the General Partner may, from time to time, designate.

Purposes and Powers. The business of the Partnership shall be make an investment in the Project by lending money to the Project Owner for the acquisition, development, construction and operation of the Project (the "Investment"), to do all other acts which may be necessary, incidental, or convenient to the foregoing, and to engage in any and all other lawful activities for which a limited partnership may be organized under the Act.

Registered Office and Agent. The registered office of the Partnership in the State of New York shall be 7 Times Square, 37th Floor, New York, NY 10036, or such other address within the United States as may be designated from time to time by the General Partner. The name and address of the agent for service of process on the Partnership in the State of New York shall be c/o Jeffrey Laytin, Two Old Hollow Lane, East Hampton, New York 11937, or such other agent and address as may be designated from time to time by the General Partner.

Fiscal and Taxable Year. The fiscal year and taxable year of the Partnership shall be the calendar year (the "Partnership Year"), unless another taxable year is required by Section 706 of the Code.

Term. The term of the Partnership commenced upon the filing of the Certificate and shall continue until the date that the Partnership is terminated in accordance with the provisions of Article XI hereof.

Filings. Upon the execution of this Agreement by the parties hereto, the General Partner shall do, and continue to do, all things as may be required or advisable to continue and maintain the Partnership as a limited partnership, qualified to do business in such jurisdictions as may be required, and to protect the limited liability of the Limited Partners in any jurisdiction in which the Partnership shall transact business.


## DEFINITIONS

The following defined terms used in this Agreement shall have the respective meanings specified below.

"Act" shall mean the New York Revised Limited Partnership Act, as set forth in Article 8-A, Sections 121-101 through 121-1300 of the New York Partnership Code, as amended from time to time.

"Adjusted Capital Account Deficit" shall mean, with respect to any Partner, the deficit balance, if any, in such Partner's Capital Account as of the end of the relevant Partnership Year, after giving effect to the following adjustments:

(a)     credit to such Capital Account any amounts that such Partner is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and (i)(5) of the Regulations; and

(b)     debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Regulations.

The foregoing definition of "Adjusted Capital Account Deficit" is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith. Notwithstanding the provisions of this definition, no Limited Partner shall be paid any amount(s) to reduce that Partner's equity investment in the Limited Partnership from the time of the approval of the Investor's EB-5 investor visa Form I-526 until the final disposition, approval or denial, of the removal of condition application, Form I-829. These and other forms are utilized and filed with US Citizenship and Immigration Service (USCIS) and the US Department of State (DOS) to permit, upon approval, the conditional and subsequent full US permanent residence status (Green Card) to the Investor and if applicable to Investor's family, under the program known as EB-5, Employment Creation Visas.

"Administrative Fee" shall mean, the monies contributed by each Limited Partner as an administrative fee pursuant to the applicable Subscription Agreement.

"Affiliate" shall mean, with respect to any Person, any Person Controlling, Controlled by, or under common Control with, such Person.

"Agreement" shall mean this Limited Partnership Agreement of the Partnership, including Exhibits A and B hereto, as the same may be amended from time to time.

"Bankruptcy" shall mean, with respect to any Person, (a) the filing by such Person of a voluntary petition seeking liquidation, reorganization, arrangement or readjustment, in any form, of its debts under Title 11 of the United States Code or any other federal, state or foreign insolvency law, or such Person's filing an answer consenting to or acquiescing in any such petition, (b) the making by such Person of any assignment for the benefit of its creditors, (c) the expiration of sixty (60) days after the filing of an involuntary petition under Title 11 of the United States Code, an application for the appointment of a receiver for a material portion of the assets of such Person, or an involuntary petition seeking liquidation, reorganization, arrangement or readjustment of its debts under any other federal, state or foreign insolvency law, provided that the same shall not have been vacated, set aside or stayed within such sixty-day period or (d) the entry against it of a final and nonappealable order for relief under any bankruptcy, insolvency or similar law now or hereafter in effect. The term "Bankruptcy" as defined in this Agreement and used herein is intended, and shall be deemed to, supersede and replace the events of withdrawal described in Section 121-402 of the Act.

"Business Day" shall mean any day except a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized by law to be closed.

"Capital Account" shall mean, with respect to any Partner, the Capital Account maintained for such Partner in accordance with the following provisions:

(a)     To each Partner's Capital Account there shall be credited the aggregate amount of such Partner's Capital Contributions, such Partner's distributive share of Profits and any items in the nature of income or gain which are specially allocated pursuant to <u>Article IV</u> hereof, and the amount of any Partnership liabilities assumed by such Partner or which are secured by any Partnership property distributed to such Partner.

(b)     To each Partner's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Partnership property distributed to such Partner pursuant to any provision of this Agreement, such Partner's distributive share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to <u>Article IV</u> hereof, and the amount of any liabilities of such Partner assumed by the Partnership or which are secured by any property contributed by such Partner to the Partnership.

(c)     If any Unit is Transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Unit.

(d)     In determining the amount of any liability for purposes of determining Capital Account balances hereof, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Regulations, and shall be interpreted and applied in a manner consistent with such Regulations. If the General Partner shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with such Regulations, the General Partner may make such modification if, and only if, it is not likely to have an adverse effect on the amounts distributable to any Partner pursuant to <u>Article XI</u> hereof upon the dissolution of the Partnership.

Notwithstanding the provisions of this definition, no Limited Partner shall be paid any amount(s) to reduce that Partner's initial equity investment in the Limited Partnership from the time of the approval of the Investor's EB-5 investor visa Form I-526 until the final disposition, approval or denial, of the removal of condition application Form I-829.

"<u>Capital Contribution</u>" shall have the meaning set forth in <u>Section 3.2</u> hereof.

"<u>Capital Event</u>" shall mean, with respect to the Investment, (a) any repayment of principal on the Loan or other return of capital to the Partnership in connection with the Investment; (b) the sale, transfer, exchange, pledge, hypothecation, or other disposition of all or any portion of the Investment or interests in any entity which directly or indirectly held the Investment, (b) the incurrence of any indebtedness by the Partnership or by any entity which directly or indirectly holds the Investment and which is secured by, or otherwise allocated in good faith by the General Partner to, the Investment, other than any incurrence of Indebtedness the proceeds of which are used to acquire the Investment, (c) the refinancing of any Indebtedness allocated to the Investment and (d) any similar transaction with respect to the Investment.

"<u>Certificate</u>" shall have the meaning set forth in <u>Section 1.1</u> hereto.

"Closing" shall mean the Initial Closing and each Subsequent Closing.

"Closing Date" shall have the meaning set forth in Section 3.1(a) hereof.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

"Co-Developer" means Symmetry Property Development II, LLC, a New York limited liability company.

"Construction Disbursement Agreement" means the agreement among the Partnership, the Project Owner, the Developer, the Co-Developer, the Construction Lender and the Disbursement Agent to provide services related to the disbursement of the Loan.

"Construction Lender" means one or more holders of liens on the Project that are senior in interest to that lien held by the Partnership to secure the Loan.

"Control" shall mean, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of another Person without the consent or approval of any other Person.

"Covered Persons" shall have the meaning set forth in Section 8.1(a) hereof.

"Damages" shall have the meaning set forth in Section 8.1(a) hereof.

"Depreciation" shall mean, for each Partnership Year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the adjusted tax basis of such property is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the General Partner.

"Developer" means Fordham Real Estate, LLC, an Illinois limited liability company.

"Disbursement Agent" means the agent designated by the Construction Lender as the person who will provide the supervisory services related to the Loan.

"EB-5 Immigrant Investor Program" means the government program established pursuant to 8 U.S.C. § 1153 (b)(5)(A) - (D); INA § 203(b)(5)(A) - (D) of the Immigration & Nationality Act.

"Final Closing Date" shall have the meaning set forth in Section 3.1(a) hereof.

"Fractions Rule" shall have the meaning set forth in Section 4.3(l) hereof.

"General Partner" shall have the meaning set forth in the introductory paragraph of this Agreement.

"Gross Asset Value" shall mean, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)    the initial Gross Asset Value of any asset contributed by a Partner to the Partnership shall be the gross fair market value of such asset at the time of such contribution, as agreed between the General Partner and such Partner;

(b)    the Gross Asset Values of all Partnership assets may, in the sole discretion of the General Partner, be adjusted to equal their respective gross fair market values, as determined by the General Partner, as of the following times:  (i) the acquisition of an additional Unit by any new or existing Partner in exchange for more than a *de minimis* Capital Contribution; (ii) the distribution by the Partnership to a Partner of more than a *de minimis* amount of Partnership property as consideration for an Unit; and (iii) the liquidation of the Partnership within the meaning of Regulations Section 1.704-l(b)(2)(ii)(g);

(c)    the Gross Asset Value of any Partnership asset distributed to any Partner shall be the gross fair market value of such asset on the date of distribution, as determined by the General Partner; and

(d)    the Gross Asset Values of Partnership assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Section 1.704-l(b)(2)(iv)(m) of the Regulations and Article IV hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this clause (d) to the extent the General Partner determines that an adjustment pursuant to clause (b) above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (d).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to clause (a), (b) or (d) above, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"Indebtedness" shall mean any indebtedness incurred by the Partnership, including, but not limited to, any guarantees by the Partnership and any repurchase obligations of the Partnership.

"Initial Closing" shall mean the first closing at which Persons other than the Original Limited Partner are admitted to the Partnership as Limited Partners.

"Unit" shall mean, with respect to any Partner, the interest of such Partner as a partner in the Partnership at any particular time, including the partner interest of such Partner, and the rights and obligations of such Partner as provided in this Agreement and the Act.

"Investment" shall have the meaning set forth in Section 1.4 hereof.

"Investment Contribution" for each Limited Partner, shall mean that portion of the Loan made with such Limited Partner's Capital Contribution, in the General Partner's sole discretion, if any.

"Investment Company Act" shall mean the Investment Company Act of 1940, as amended from time to time (or any corresponding provisions of succeeding law).

"Limited Partner" shall have the meaning set forth in the introductory paragraph of this Agreement.

"Loan" means the loan of up to $45 million (or such greater amount of proceeds received by the Partnership in its offering pursuant to the EB-5 Immigrant Investor Program) made by the Partnership to the Project Owner in support of the Investment.

"LP Authorized Representative" shall have the meaning set forth in Section 13.15 hereof.

"Minimum Contribution Amount" shall have the meaning set forth in Section 3.1(b) hereof.

"Net Distributable Cash" shall mean Net Distributable Cash From Operations, Net Distributable Cash From Capital Events, and other distributions described in Section 5.1.

"Net Distributable Cash From Capital Events" shall mean all cash receipts from Capital Events with respect to the Investment, reduced by the portion thereof used to, in the discretion of the General Partner, (a) pay principal or interest on any Indebtedness of the Partnership, (b) establish Reserves, (c) pay Operating Expenses and Organizational Expenses and (d) pay other expenses of the Partnership.  Net Distributable Cash From Capital Events shall not be reduced by depreciation, amortization, cost recovery deductions or similar non-cash allowances and expenses.

"Net Distributable Cash From Operations" shall mean, all cash receipts from operations of the Partnership (including, without limitation, amounts released from Reserves), reduced by the portion thereof used to, in the discretion of the General Partner, (a) pay principal or interest on any Indebtedness of the Partnership, (b) establish Reserves, (c) pay Operating Expenses and Organizational Expenses and (d) pay other expenses of the Partnership.  Net Distributable Cash From Operations shall not be reduced by depreciation, amortization, cost recovery deductions or similar non-cash allowances and expenses.

"Nonrecourse Deductions" shall have the meaning set forth in Section 1.704-2(b)(1) of the Regulations.

 "Operating Expenses" shall have the meaning set forth in Section 7.1 hereof.

"Organizational Expenses" shall have the meaning set forth in Section 7.2 hereof.

"Original Limited Partner" shall have the meaning set forth in the introductory paragraph of this Agreement.

"Participating Limited Partner" means, with respect the repayment of any portion of the principal of the Loan, (a) a Limited Partner whose Investment Contribution was originally used to disburse that portion of the principal, or (b) a Limited Partner against whose Investment Contribution that portion of the principal was applied, in the General Partner's determination and sole discretion.

"Partner Nonrecourse Debt" shall have the meaning set forth in Section 1.704-2(b)(4) of the Regulations.

"Partner Nonrecourse Debt Minimum Gain" shall have the meaning set forth in Section 1.704-2(i)(2) of the Regulations.

"Partner Nonrecourse Deductions" shall have the meaning set forth in Section 1.704-2(i)(2) of the Regulations.

"Partner" shall have the meaning set forth in the introductory paragraph of this Agreement.

"Partnership" shall have the meaning set forth in the introductory paragraph of this Agreement.

"Partnership Minimum Gain" shall have the meaning set forth in Section 1.704-2(b)(2) of the Regulations.

"Partnership Year" shall have the meaning set forth in Section 1.6 hereof.

"Percentage Interest" shall mean the interest in the Partnership represented by a Partner's Unit or Units, expressed as a percentage of all Partners' Interests and based on relative Capital Contributions. The Partnership shall keep an up-to-date Schedule of Partners which shall include a statement of each Partner's Percentage Interest.

"Person" shall mean any individual, partnership, joint venture, corporation, limited liability company, trust or other entity.

"Preferred Rate" shall mean a rate of return calculated in the same manner as interest at a non-compounding annual rate of one half of one percent (0.5%).

"Preferred Return" shall mean, with respect to any Limited Partner, a cumulative amount that is calculated in the same manner as interest at the Preferred Rate on such Limited Partner's Capital Contributions from the date that such Limited Partner participated in the Investment through its Investment Contribution.

"Profits" and "Losses" shall mean, for each Partnership Year or other period, an amount equal to the Partnership's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)     any income of the Partnership that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses shall be added to such taxable income or loss;

(b)     any expenditures of the Partnership described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Regulations, and not otherwise taken into account in computing Profits or Losses shall be subtracted from such taxable income or loss;

(c)     if the Gross Asset Value of any Partnership asset is adjusted pursuant to clause (b) or clause (d) of the definition of Gross Asset Value herein, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(d)     gain or loss resulting from any disposition of Partnership property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(e)     in lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Partnership Year or other period, computed in accordance with the definition of Depreciation herein; and

(f)     notwithstanding any other provisions hereof, any items which are specially allocated pursuant to Article IV hereof shall not be taken into account in computing Profit or Losses.

"Project" means the acquisition, construction and development of the Property to be the known as Carillon Tower, which will include luxury apartments, a select service hotel, and a Gibson's Restaurant Group restaurant located at the corner of Superior Street and Wabash Avenue, in Chicago, Cook County, Illinois.

"Project Owner" shall mean Symmetry Tower/Chicago Project Owner, LLC, a New York limited liability company.

"Regulations" shall mean the final, temporary and proposed Income Tax Regulations promulgated under the Code, as the same may be amended from time to time (including corresponding provisions of succeeding regulations).

"Regulatory Allocations" shall have the meaning set forth in Section 4.3(e) hereof.

"Reserves" shall mean reasonable reserves established by the Partnership, in the discretion of the General Partner, for all expenses, debt payments, capital improvements, replacements and contingencies, including, but not limited to, loss and liquidity reserves, of the Partnership.

"Restricted Distribution" shall have the meaning set forth in Section 5.5 hereof.

"Schedule of Partners" shall mean the Schedule of Partners of the Partnership, a copy of which is attached hereto as Exhibit B, as the same may be amended from time to time.

"Side Letter" shall have the meaning set forth in Section 13.4 hereof.

"Subscription Agreement" shall mean each Subscription Agreement between the Partnership and a Limited Partner, as the same may be amended, supplemented or replaced from time to time.

"Subsequent Closing" shall mean a closing, subsequent to the Initial Closing, at which the Partnership accepts a subscription or subscriptions from one or more Limited Partners.

"Transfer" shall mean, as applicable, a sale, exchange, transfer, assignment, pledge, hypothecation or other disposition of all or any portion of an Unit.  When used as a verb, the terms "Transfer" and "Transferred" shall have correlative meanings.

"Treasury Regulations" shall mean the federal tax regulations that provide the official interpretation of the Code by the U.S. Department of Treasury, as amended from time to time.

"Uniform Limited Partnership Act" means the Uniform Limited Partnership Act as drafted by the National Conference of Commissioners on Uniform State Laws and published by them in 2001.

"Unit" shall mean a single Unit of a limited partner interest in the Partnership representing a $500,000 Capital Contribution, the acquisition of which shall entitle the holder thereof to the rights and benefits specified in this Agreement.

"Unrecovered Capital Contribution" means an amount, if any, equal to the Capital Contribution made by a Limited Partner (or that Limited Partner's predecessor in interest), less the aggregate amount of previous distributions under Section 5.1(c)(ii) (including through Section 11.1(b)) and Section 5.1(e)(ii) received by that Limited Partner (or that Limited Partner's predecessor in interest), determined as of the date required under this Agreement.

"USCIS" shall mean the United States Citizenship and Immigration Services.


CAPITAL CONTRIBUTIONS; JOB ALLOCATION

Closings; Acceptance of Subscriptions.

Persons shall be permitted to subscribe for Units at the Initial Closing and at one or more Subsequent Closings that may be held, in the discretion of the General Partner until such time as the Units are fully subscribed in any offering conducted by the Partnership or any such offering is closed by the General Partner (the "Final Closing Date").  Subject to the foregoing, each Closing shall be held on such date as may be determined by the General Partner (each a "Closing Date"); provided, however, that the Partnership shall only hold the Initial Closing if,

after giving effect to such Closing, the aggregate amount of Capital Contributions is Five Hundred Thousand Dollars ($500,000) or more.

Except with respect to the Original Limited Partner or as otherwise provided herein, no Limited Partner shall be admitted to the Partnership as a Limited Partner unless such Person has made a minimum Capital Contribution to the Partnership of at least Five Hundred Thousand Dollars ($500,000) (the "Minimum Contribution Amount"), and has deposited the Minimum Contribution Amount into an escrow account that is irrevocable by the depositor and from which funds will be disbursed to the Partnership or refunded to the depositor in accordance with escrow instructions accepted by the General Partner in its sole discretion.

Promptly following the admission of any additional Person to the Partnership as a Limited Partner or permitted withdrawal of a Limited Partner pursuant to the terms of this Agreement, the General Partner shall update the Schedule of Partners, which update is hereby expressly consented to by the Limited Partners.

Capital Contributions.  Pursuant to their respective Subscription Agreements, each Limited Partner has agreed to make capital contributions in the aggregate amount set forth on the signature page to such Limited Partner's Subscription Agreement (such Limited Partner's "Capital Contribution").  The Capital Contributions shall be made in United States Dollars by check or wire transfer in immediately available funds to an account or accounts of the Partnership specified by the General Partner.  Notwithstanding any other provision of this Agreement or the Subscription Agreements to the contrary, except as otherwise required by the Act or other applicable law, in no event shall any Limited Partner be required to make additional capital contributions.

No Right to Redemption of Units or Return of Capital Contributions.  Except in the case where a Limited Partner's Form I-526 Immigrant Petition by Alien Entrepreneur (including adjustment of status or consular interview processing) has been denied by USCIS, no Partner shall have the right to withdraw from the Partnership or require that the Partnership purchase all or any portion of such Partner's Unit.  No Partner shall have a right to receive a return of its Capital Contributions or a dividend in respect of such Partner's Unit from any specific assets of the Partnership.  Each Partner waives any right which it may have to cause a partition of all or any part of the Partnership's assets.

General Partner's Option for Redemption of Units or Return of Capital Contributions.
Notwithstanding anything to the contrary in Section 3.3, during the following periods, the General Partner *may*, but is not guaranteed to, cause a Limited Partner's withdrawal from the Partnership by paying to such Limited Partner its (i) unpaid Preferred Return through the date of withdrawal and (ii) Unrecovered Capital Contribution:

Prior to such Limited Partner's filing of its Form I-526 Immigration Petition; or

At any time after final adjudication of such Limited Partner's Form I-829 application for removal of conditions on permanent residence, if applicable and subject to the Partnership's access to sufficient funds and its compliance with EB-5 regulations.

Mandatory Redemption.

If a Limited Partner, subsequent to his or her investment in the Partnership, thereafter receives a denial from USCIS of his or her I-526 Petition (without certification of the denial to the USCIS Administrative Appeals Office), such that such Limited Partner is ineligible to receive an immigrant visa or adjustment of status by reason of his or her Partnership Unit, and if the Limited Partner demands return of his or her Capital Contribution, then the Partnership shall repay to such Limited Partner his or her Capital Contribution from available cash from the Partnership (or from escrow, if any portion of the Capital Contribution is held in escrow), and shall repay the Administrative Fee. If a Limited Partner receives a denial of its I-526 Petition and elects to appeal that denial at his or her own expense and the General Partner consents to such appeal, the cancellation of such Limited Partner's Unit shall be deferred until the appeal is resolved and such Limited Partner receives I-526 Petition approval, in which event no cancellation shall occur, or until the denial is affirmed, in which event the redemption shall proceed as provided above. If determined by the General Partner, no additional documents shall be necessary to effect such cancellation; it being agreed by the Limited Partners that the Partnership's delivery of a check for such amount to a denied Limited Partner, and such Limited Partner's acceptance or deposit of such amount by such Limited Partner, shall constitute the full and complete redemption of all of such Limited Partner's Units in the Partnership. The General Partner shall unilaterally amend Exhibit B to reflect the deletion of any Limited Partners so cancelled.

Notwithstanding anything to the contrary in this Agreement, if the General Partner determines, in its sole and absolute discretion, that the repurchase of a denied Limited Partner's Unit pursuant to this Section would have an adverse effect on the business or immigration objectives of the Partnership or the ability of other Limited Partners to obtain unconditional permanent resident status in the United States pursuant to the EB-5 Immigrant Investor Program, or determined that the Partnership is restricted from purchasing any Units under the Act or other applicable law or under the terms of any loan agreements with its lenders, or the Partnership does not have the available cash to effect such repurchase of the Unit, then the Partnership's obligation to repurchase the Unit shall be suspended until the General Partner determines, in its sole and absolute discretion, that the repurchase of the Unit no longer causes such adverse effect.

Uncertificated Units. Units shall be recorded in book-entry form and no Partner shall have the right to demand that the Partnership produce and/or deliver certificates representing such Units. Without limiting the foregoing, the General Partner may produce and deliver certificates representing Units if the General Partner, in its sole and absolute discretion, determines that such production and delivery would be in the best interests of the Partnership.

Limitation on Liability of Limited Partners. Except as otherwise required by this Agreement, the Act or other applicable law, the liability of the Limited Partners, in their capacity as such, shall be limited to the aggregate amount of each such Limited Partner's Capital Contribution. Each Limited Partner, to the fullest extent permitted by applicable law, shall not have any fiduciary or other duty to the Partnership or any other Partner, other than the duty to act in accordance with the contractual covenant of good faith and fair dealing.

Interest. No Partner shall receive any interest on its Capital Contributions.

Negative Capital Accounts.   At no time during the term of the Partnership or upon dissolution and liquidation thereof shall a Limited Partner with a negative balance in his Capital Account have any obligation to the Partnership or the other Partners to eliminate or restore such negative balance.

Job Allocation.   Each Limited Partner acknowledges and agrees that qualifying jobs under the EB-5 Immigrant Investor Program shall be allocated to the Limited Partners on a first-in, first-out basis tied to the date on which the Limited Partner submitted his or her petition on Form I-526 to the USCIS.  Accordingly, the first ten qualifying jobs that are created by the Investment, including jobs created indirectly or induced, will be attributed to the first Limited Partner who satisfies the requirements of this section, the second ten qualifying jobs that are created by the Investment, including jobs created indirectly or induced, will be attributed to the second Limited Partner who satisfies the requirements of this section, and so on until all qualifying jobs that are created by the Investment, including jobs created indirectly or induced, have been allocated on a first-in, first-out basis to each Limited Partner who satisfies the requirements of  this section.


## ALLOCATIONS OF PROFITS AND LOSSES

Losses.  Except as otherwise provided in this Article IV, Losses of the Partnership for each Partnership Year shall be allocated to the Partners as follows:

First, to the General Partner, until the General Partner has been allocated Losses equal to the amount of Profits allocated to the General Partner pursuant to Section 4.2(e) (to the extent any such allocation of Profits has been offset pursuant to this Section 4.1(a), such Profits shall be disregarded for the purpose of computing subsequent allocations pursuant to this Section 4.1(a));

Second, to the General Partner, until the General Partner's Capital Account balances has been reduced to zero;

Third, to the Limited Partners in proportion to their respective positive Capital Account balances, until each of their Capital Account balances has been reduced to zero; and

Thereafter, to the General Partner.

Profits.  Except as otherwise provided in this Article IV, Profits of the Partnership for each Partnership Year shall be allocated to the Partners as follows:

First, to the General Partner, until the General Partner has been allocated Profits equal to the amount of Losses allocated to the General Partner pursuant to Section 4.1(d) (to the extent any such allocation of Profits has been offset pursuant to this Section 4.2(a), such Profits shall be disregarded for the purpose of computing subsequent allocations pursuant to this Section 4.2(a));

Second, to the Limited Partners in proportion to their respective allocations of Losses previously allocated to such Limited Partners pursuant to Section 4.1(c), until each

Limited Partner has been allocated Profits in an amount equal to the Losses allocated to such Limited Partner pursuant to Section 4.1(c) (to the extent any such allocation of Losses has been offset pursuant to this Section 4.2(b), such Losses shall be disregarded for the purpose of computing subsequent allocations pursuant to this Section 4.2(b));

Third, to the General Partner, until the General Partner has been allocated Profits equal to the amount of Losses allocated to the General Partner pursuant to Section 4.1(b) (to the extent any such allocation of Profits has been offset pursuant to this Section 4.2(c), such Profits shall be disregarded for the purpose of computing subsequent allocations pursuant to this Section 4.2(c));

Fourth, to the Limited Partners in proportion to amounts distributed to them pursuant to Sections 5.1(b)(i) and 5.1(c)(i), until each Limited Partner has been allocated Profits in an amount equal to the aggregate amounts distributed to such Limited Partner pursuant to Sections 5.1(b)(i) and 5.1(c)(i) (to the extent any such distribution has received a corresponding allocation of Profits pursuant to this Section 4.2(d), such distributions shall be disregarded for the purpose of computing subsequent allocations pursuant to this Section 4.2(d)); and

Thereafter, to the General Partner.

Special Allocations.

Partnership Minimum Gain Chargeback. Notwithstanding anything contained in this Article to the contrary, if there is a net decrease in Partnership Minimum Gain during any Partnership Year, except as otherwise permitted by Sections 1.704-2(f)(2), (3), (4) and (5) of the Regulations, items of Partnership income and gain for such taxable year (and subsequent years, if necessary) in the order provided in Section 1.704-2(j)(2)(i) of the Regulations shall be allocated among all Partners whose shares of Partnership Minimum Gain decreased during that year in proportion to and to the extent of such Partner's share of the net decrease in Partnership Minimum Gain during such year. The allocation contained in this Section 4.3(a) is intended to be a minimum gain chargeback within the meaning of Section 1.704-2 of the Regulations, and shall be interpreted consistently therewith.

Partner Nonrecourse Debt Minimum Gain. Notwithstanding anything contained in this Article to the contrary, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain, except as provided in Section 1.704-2(i) of the Regulations, items of Partnership income and gain for such taxable year (and subsequent years, if necessary) in the order provided in Section 1.704-2(j)(2)(ii) of the Regulations shall be allocated among all Partners whose share of Partner Nonrecourse Debt Minimum Gain decreased during that year in proportion to and to the extent of such Partner's share of the net decrease in Partner Nonrecourse Debt Minimum Gain during such year. This Section 4.3(b) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2 of the Regulations and shall be interpreted consistently therewith.

Qualified Income Offset. Notwithstanding any provisions of this Article to the contrary, in the event any Partner unexpectedly receives any adjustments, allocations, or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Partnership income and gain (including gross

income) shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Partner as quickly as possible; provided that an allocation pursuant to this <u>Section 4.3(c)</u> shall be made only if and to the extent that such Partner would have an Adjusted Capital Account Deficit. The allocation contained in this <u>Section 4.3(c)</u> is intended to be a "qualified income offset" within the meaning of Section 1.704-1(b)(2)(ii)(d) of the Regulations, and shall be subject thereto.

<u>Ordering</u>. <u>Sections 4.3(a), (b)</u> and <u>(c)</u> hereof shall be applied in the order provided in Section 1.704-2 of the Regulations.

<u>Curative Allocations</u>. The allocations set forth in <u>Sections 4.3(a), (b)</u> and <u>(c)</u> hereof (the "<u>Regulatory Allocations</u>") are intended to comply with certain requirements of Sections 1.704-1(b) and 1.704-2 of the Regulations. Notwithstanding any other provisions of this <u>Section 4.3</u> (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating other Profits, Losses, and items of income, gain, loss and deduction among the Partners so that to the extent possible, the net amount of such allocations of other Profits, Losses and other items and the Regulatory Allocations to each Partner shall be equal to the net amount that would have been allocated to each such Partner if the Regulatory Allocations had not occurred.

<u>Section 754 Election Adjustments</u>. To the extent that the General Partner elects, in its sole discretion, to cause the Partnership to make an adjustment to the adjusted tax basis of any Partnership asset pursuant to Code Section 734(b) or 743(b) that is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(m) to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such section of the Regulations.

<u>Nonrecourse Deductions</u>. Nonrecourse Deductions for any Partnership Year or other period shall be allocated in accordance with <u>Section 4.1</u> hereof.

<u>Partner Nonrecourse Deductions</u>. In accordance with Section 1.704-2(i)(1) of the Regulations, any item of Partnership loss or deduction which is attributable to Partner Nonrecourse Debt for which a Partner bears the economic risk of loss (such as a non-recourse loan made by a Partner to the Partnership or an otherwise non-recourse loan to the Partnership that has been guaranteed by a Partner) shall be allocated to that Partner to the extent of its economic risk of loss.

<u>Tax Allocations</u>. In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account to the fullest extent possible of any variation between the adjusted basis of such property to the Partnership for federal income tax purposes and its initial Gross Asset Value. If the Gross Asset Value of any Partnership asset is adjusted pursuant to clause (b) or (d) of the

definition thereof, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder. Any elections or other decisions relating to such allocations shall be made by the General Partner. Allocations pursuant to this <u>Section 4.3(i)</u> are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Person's Capital Account or share of Profits, Losses, other items or distributions pursuant to any provision of this Agreement.

<u>Varying Interests</u>. If a Partner sells or exchanges its Unit or otherwise is admitted as a substituted Limited Partner, Profits and Losses shall be allocated between the transferor and the transferee by taking into account their varying interests in the Partnership during the Partnership Year in accordance with Code Section 706(d), using the interim closing of the books method or the daily proration method, as determined by the General Partner in its sole discretion. Notwithstanding any other provision of this Agreement to the contrary, as soon as practical after each Closing Date, Profits, Losses and items thereof shall be allocated among the Partners so as to cause the Capital Accounts of the Partners to be in the same ratio as the ratio of the Partners' Percentage Interests.

<u>Tax Credits</u>. Tax credits and tax credit recapture shall be allocated among the Partners pursuant to Section 1.704-1(b)(4)(ii) of the Regulations.

<u>Fractions Rule</u>. Notwithstanding anything to the contrary contained in this Agreement, this Agreement is intended to comply with Code Section 514(c)(9)(E) and the Treasury Regulations thereunder (the "<u>Fractions Rule</u>") and Code Section 704(b) and the Treasury Regulations thereunder, and shall be interpreted and applied in a manner consistent with the Treasury Regulations. Relevant provisions of this Agreement are deemed modified, with effect from the date of this Agreement, to the extent necessary to comply with the Fractions Rule. Without limiting the foregoing, any allocation for a particular year pursuant to this Agreement which would violate the requirements of Sections 704(b) and 514(c)(9)(E) of the Code shall not be effective and there shall instead be made allocations for such year consistent with such requirements and deviating as little as possible from the allocations generally provided herein.

<u>Compliance with Law and Regulations</u>. It is the intent of the Partners that each Partner's allocated share of Profits and Losses be determined in accordance with this Agreement to the fullest extent permitted by Section 704(b)–(c) of the Code and the Regulations promulgated thereunder. Notwithstanding anything to the contrary contained in this Agreement, if the Partnership is advised that, as a result of the adoption of new or amended regulations under Section 704(b)–(c) of the Code, or the issuance of authorized interpretations, the allocations provided in this Agreement are unlikely to be respected for federal income tax purposes, the General Partner is hereby granted the power to amend the allocation provisions of this Agreement, on advice of accountants and legal counsel, to the minimum extent necessary to cause such allocation provisions to be respected for federal income tax purposes.

## DISTRIBUTIONS

Distributions.

Except as provided in this Article V, Net Distributable Cash shall be distributed to the Partners in accordance with the provisions of this Section 5.1.

Subject to Section 5.1(d) and (e), distributions of Net Distributable Cash From Operations shall be made at such times as determined by the General Partner in its sole discretion, but not less than quarterly, in the following manner:

First, 100% to the Limited Partners, *pro rata* based upon their respective Percentage Interests, until each Limited Partner has received the unpaid portion of its Preferred Return;

Second, the balance to the General Partner.

Subject to Section 5.1(d) and (e), distributions of Net Distributable Cash From Capital Events shall be made at such times as determined by the General Partner in its sole discretion, but not less than quarterly, in the following manner:

First, 100% to the Limited Partners, *pro rata* based upon their respective Percentage Interests, until each Limited Partner has received the unpaid portion of its Preferred Return;

Second, to the Limited Partners, *pro rata* based on their respective Percentage Interests, until each Limited Partner has received an amount equal to such Limited Partner's Unrecovered Capital Contribution; and

Third, the balance to the General Partner.

Notwithstanding anything to the contrary in Section 5.1(b) and (c), distributions of interest payments on the Loan received by the Partnership shall be distributed to the Partners at such times as determined by the General Partner in its sole discretion, but not less than quarterly, in the following manner:

First, 100% to the Limited Partners who participated in the Loan through an Investment Contribution for which that particular interest payment was paid, *pro rata* based upon their respective Investment Contributions for that particular interest payment, until each such Limited Partner has received the unpaid portion of its Preferred Return; and

Second, the balance to the General Partner.

Notwithstanding anything to the contrary in Section 5.1(b) and (c), following any repayment of principal on the Loan, the Partnership shall distribute Net Available Cash resulting

from such repayment at such time as determined by the General Partner in its sole discretion, but not less than quarterly, in the following manner:

First, a distribution to the Participating Limited Partners, *pro rata* based upon their respective Investment Contributions for that particular principal repayment, until each Participating Limited Partner has received the unpaid portion of its Preferred Return;

Second, to the Participating Limited Partners, *pro rata* based upon their respective Investment Contributions for that particular principal repayment, until each Participating Limited Partner has received an amount equal to its Unrecovered Capital Contribution;

Third, the balance to the General Partner.

If any of the distributions pursuant to subsections (i) or (ii) above is not made because of insufficient Net Available Cash, for so long as such amount remains unpaid the General Partner shall cause any shortfall amount to be paid from Net Available Cash prior to and in preference to any distribution to the General Partner (but after any other distribution provided for in Sections 5.1(b), (c) or (d)).

Any receipts or other revenues of the Partnership (excluding Capital Contributions) not included in Net Distributable Cash may be applied by the General Partner to pay or reserve for the payment of Operating Expenses, Organizational Expenses and Indebtedness, to establish Reserves, or distributed in accordance with the provisions of Section 5.1(b) hereof, in each case, in the discretion of the General Partner.

Prior to the dissolution and winding up of the Partnership, all distributions to the Partners shall be paid in cash. Upon the dissolution and winding up of the Partnership, distributions to the Partners may include distributions of the assets of the Partnership in kind.

Notwithstanding any provision of this Agreement to the contrary, neither the Partnership, nor the General Partner on behalf of the Partnership, shall make any distribution to any Partner if such distribution would violate the Act or other applicable law. Notwithstanding further, such distributions are subject to the Form I-829 exception described below.

Administrative Fee. The Administrative Fee shall be distributed to the General Partner.

Amounts Withheld. All amounts withheld pursuant to the Code or any provisions of any foreign, federal, state or local tax law with respect to any payment or distribution to the Partnership or the Partners shall be treated as amounts distributed to the Partners pursuant to this Article for all purposes under this Agreement. The General Partner may allocate any such amounts withheld with respect to the Partnership among the Partners in any manner that is in accordance with applicable law (taking into account the extent to which the amount withheld may vary among the Partners based upon the identity and tax status of each Partner). The Partners shall be required, upon request by the Partnership, to fund their share of any applicable withholding taxes with respect to the Partnership.

Form I-829 Exception. Anything in this <u>Article V</u> to the contrary notwithstanding, prior to final adjudication of a Limited Partner's Form I-829 application for removal of conditions on permanent residence, if applicable (or the final lapse of such Limited Partner's eligibility to submit Form I-829), distributions made to such Limited Partner may only be made to the extent that such distributions do not result in his/her Unrecovered Capital Contribution being less than Five Hundred Thousand Dollars ($500,000). After the final adjudication of such Limited Partner's Form I-829 application for removal of conditions on permanent residence, the foregoing distribution restriction shall no longer apply to such Limited Partner.

Pro Rata Calculation. If any pro rata distribution cannot be made to a Partner due to such Partner having reached a maximum distribution or due to restrictions (each, a "<u>Restricted Distribution</u>"), then, in the case of a Restricted Distribution that the General Partner in its sole discretion believes has a reasonable chance of becoming unrestricted prior to the dissolution of the Partnership, such Restricted Distribution amounts shall be set aside for distribution to such Partner if and when the restrictions are lifted, and otherwise, the Restricted Distribution amounts shall be re-distributed to the other Partners entitled to that particular distribution on a pro rata basis, based on the Unrecovered Capital Contributions of a particular Partner over the total Unrecovered Capital Contributions of the Partners entitled to such distribution.


## MANAGEMENT

<u>Management; Authority of the General Partner</u>.

The management, operation and control of the Partnership and its business and the formulation of its investment policy shall be vested exclusively in the General Partner, subject to the terms and provisions of this Agreement, including, without limitation, this Article. The General Partner shall, in its sole discretion, exercise all powers necessary and convenient for the purposes of the Partnership and all of the power conferred by the Act on the general partner of a limited partnership, including the power to conduct the Partnership's business as described in <u>Section 1.4</u> hereof and the power to delegate to one or more Persons the power to perform any of the acts described above but subject to the limitations and restrictions expressly set forth herein, including those enumerated in this Article. The General Partner shall have fiduciary responsibility for the safekeeping and use of all funds and assets of the Partnership, whether or not in its immediate possession or control. The General Partner shall not employ, or permit another to employ, such funds or assets in any manner except for the exclusive benefit of the Partnership. The General Partner shall take such commercially reasonable actions as may be necessary on its part to ensure that the Partnership is and continues throughout its term to be classified as a partnership for federal income tax purposes.

Notwithstanding anything to the contrary contained in this Agreement, the General Partner and any affiliate of the General Partner may conduct business ventures and activities outside of the scope of the Partnership's business as described in <u>Section 1.4</u> hereof, regardless of whether such business ventures or activities are in competition with the Partnership. Neither the Partnership nor any Limited Partner shall have any right to participate in any manner in such business ventures and activities of the General Partner or any affiliate of the General

Partner or receive any profits or income earned or derived by the General Partner or any affiliate of the General Partner from or in connection with the conduct of any such business ventures or activities.

Subject only to the limitations and restrictions expressly set forth herein, the General Partner shall perform or cause to be performed all management and operational functions relating to the day-to-day business of the Partnership. Without limiting the generality of the foregoing, the General Partner is authorized on behalf of the Partnership to cause the Partnership to do the following:

enter into the Subscription Agreements and the Side Letters, if any, and exercise and perform the Partnership's rights and obligations thereunder;

to make the Loan, from time to time to modify the terms or conditions of the Loan if reasonably necessary, and to approve the Disbursement Agent engaged by Construction Lender to administer the disbursement of the Loan proceeds;

acquire, hold, finance, manage and dispose of the Investment (or any underlying assets);

pay, in accordance with the provisions of this Agreement, all expenses, debts and obligations of the Partnership to the extent that funds of the Partnership are available therefor;

invest (including through an agent) cash reserves and other liquid assets of the Partnership prior to their use for Partnership purposes;

bring, compromise, settle and defend actions at law or in equity;

engage in any kind of activity and perform and carry out contracts of any kind necessary to, or in connection with, the accomplishment of the purposes of the Partnership;

enter into agreements and contracts with third parties in furtherance of the Partnership's business, including all documents and agreements as may be required in connection with the acquisition of the Investment (or portions thereof);

maintain, at the expense of the Partnership, adequate records and accounts of all operations and expenditures;

purchase, at the expense of the Partnership, liability, casualty, fire, and other insurance and bonds to protect the Partnership's assets, business, partners and employees;

purchase, at the expense of the Partnership, director and officer liability insurance to protect the General Partner and its respective officers and employees;

open accounts and deposit, maintain and withdraw funds in the name of the Partnership in any bank, savings and loan association, brokerage firm, or other financial institution;

establish reserves for contingencies and for any other proper Partnership purpose;

retain, and dismiss from retainer, any and all Persons providing legal, accounting, engineering, brokerage, consulting, appraisal, investment advisory, or management services to the Partnership, or such other agents as the General Partner deems necessary or desirable for the management and operation of the Partnership and the Investment (or portions thereof);

incur and pay all expenses and obligations incident to the operation and management of the Partnership, including, without limitation, the services referred to in paragraph (xiii) hereof, taxes, interest, travel, rent, insurance, supplies, and salaries and wages of the Partnership's employees and agents;

distribute funds to the Partners by way of cash or otherwise, all in accordance with the provisions of this Agreement;

prepare and cause to be prepared reports, statements and other relevant information for distribution to Partners;

prepare and file all necessary returns, reports and statements and pay all taxes, assessments and other impositions relating to the assets or operations of the Partnership;

effect a dissolution of the Partnership as provided herein;

act for and on behalf of the Partnership in all matters incidental to the foregoing; and

authorize any partner, officer, or other agent of the General Partner to act for and on behalf of the Partnership in all matters incidental to the foregoing.

By executing this Agreement, each Limited Partner shall be deemed to have consented to any exercise by the General Partner of any of the foregoing powers or other powers of the General Partner contained in this Agreement.

Any person dealing with the Partnership or the General Partner may rely upon a certificate signed by the General Partner as to:

the identity of the General Partner or any Limited Partner hereof;

the existence or non-existence of any fact or facts that constitute a condition precedent to acts by a General Partner or in any other manner germane to the affairs of the Partnership;

the Persons who are authorized to execute and deliver any instrument or document of or on behalf of the Partnership; or

any act or failure to act by the Partnership or as to any other matter whatsoever involving the Partnership or any Partner.

<u>Participation by Limited Partners</u>.  The Limited Partners shall have those rights, powers and obligations normally granted to limited partners under the Act. The Limited Partners shall engage in policy formulation activities to the full extent allowed to be performed by a Limited Partner pursuant to the Act. Except as provided otherwise herein or as specifically provided for under the non-waivable provisions of the Act or any applicable law, no Limited Partner, in its capacity as a Limited Partner, shall participate in the management of the business and affairs of the Partnership.  No Limited Partner, in his or her capacity as a Limited Partner, shall have any right or power to sign for or to bind the Partnership in any manner or for any purpose whatsoever, or have any rights or powers with respect to the Partnership except those expressly granted to such Limited Partner by the terms of this Agreement or those conferred upon such Limited Partner by non-waivable provisions of applicable law, and no prior consent or approval of the Limited Partners shall be required in respect of any act or transaction to be taken by the General Partner on behalf of the Partnership unless otherwise provided in this Agreement. The foregoing provisions provide each Limited Partner with certain rights, powers, and duties normally granted to limited partners under the Uniform Limited Partnership Act as specifically referenced in 8 Code of Federal Regulations Section 204.6(j)(5)(iii).

<u>Filing of Schedules, Reports, Etc</u>.  Each Partner agrees to reasonably cooperate with the Partnership in the filing of any schedule, report, certificate or other instrument required to be filed by the Partnership under the laws of the United States, any state or political subdivision thereof or any foreign nation or political subdivision thereof.  In connection therewith, each Partner agrees to reasonably provide the Partnership with all information required to complete such filings.

<u>Business with Affiliates</u>.  The Partnership may engage the General Partner or any of its respective Affiliates to provide underwriting, loan servicing, due diligence, property management, construction management, marketing and sales or other services to the Partnership; <u>provided</u> that the fees or other amounts earned in respect of the rendition of such services are at least as favorable to the Partnership, as the case may be, as those generally available from experienced and unaffiliated persons. Notwithstanding anything herein to the contrary, the Limited Partners acknowledge and approve the Loan made from the Limited Partnership to the Project Owner on the terms disclosed to the Limited Partners in the private placement memorandum made available to the Limited Partners prior to their purchase of the Units and the other transactions described therein.

<u>Removal of General Partner</u>.  Except as expressly permitted by the Act, the General Partner may not be removed.


EXPENSES AND FEES

<u>Operating Expenses</u>.  The General Partner shall not bear or otherwise be charged with any costs or expenses of the Partnership's activities and operations, all of which shall be borne by or otherwise charged to the Partnership, including all activities and operations prior to the date of this Agreement, and including, without limitation:  (i) all costs and expenses incurred in developing, negotiating and structuring the Investment or any other investments of the

Partnership, whether consummated or not consummated, and acquiring, financing, disposing of or otherwise dealing with the Investment or such other investments, including, without limitation, any investment banking, engineering, appraisal, environmental, travel, legal and accounting expenses, any deposits and commitment fees and other fees and out-of-pocket costs related thereto, and the costs of rendering financial assistance to or arranging for financing for any assets or businesses constituting the Investment or any other investments of the Partnership or for working capital or other Partnership purposes; (ii) all costs and expenses, if any, incurred in monitoring the Investment or any other investments of the Partnership, including, without limitation, any engineering, environmental, third-party payment processing, travel, legal and accounting expenses and other fees and out-of-pocket costs related thereto; (iii) taxes of the Partnership; (iv) costs related to litigation and threatened litigation involving the Partnership; (v) expenses associated with third party accountants, attorneys and tax advisors with respect to the Partnership and its activities, including the preparation and auditing of financial reports and statements and other similar matters, and costs associated with the distribution of financial and other reports to the Partners and costs associated with Partnership meetings; (vi) brokerage commissions and other investment costs incurred by or on behalf of the Partnership and paid to third parties; (vii) all costs and expenses associated with obtaining and maintaining insurance for the Partnership and its assets and director and officer liability insurance to protect the General Partner and its respective officers and employees; (viii) fees incurred in connection with the maintenance of bank or custodian accounts; (ix) all expenses incurred in connection with the registration (or exemption from registration) of the Partnership's securities under applicable securities laws or regulations; and (x) all expenses of the Partnership that are not normally recurring operating expenses (all such expenses, collectively, the "Operating Expenses"). To the extent that any Operating Expenses are paid by the General Partner, such Operating Expenses shall be reimbursed by the Partnership. The Operating Expenses shall be paid only with proceeds from Net Distributable Cash From Operations or the Administrative Fee, and not from Capital Contributions of the Limited Partners.

Organizational Expenses. The Partnership shall bear and be charged with all costs and expenses pertaining to the organization of the Partnership, including, without limitation, legal and accounting expenses (collectively the "Organizational Expenses"). The Organizational Expenses, including the payment of any placement agent or finder's fees in connection with the sale of the Units shall be paid only with proceeds from Net Distributable Cash From Operations or the Administrative Fee, and not from Capital Contributions of the Limited Partners.


## EXCULPATION AND INDEMNIFICATION

Exculpation and Indemnification. • To the fullest extent permitted by applicable law, none of the General Partner, the Original Limited Partner, their respective shareholders, members, partners, directors, officers, employees and other agents (collectively, the "Covered Persons") shall be liable to the Partnership or the Limited Partners for monetary damages for any losses, claims, damages or liabilities ("Damages") arising from any act or omission performed or omitted by such Covered Persons arising out of or in connection with this Agreement or the Partnership's business or affairs or any other Damage to which such Covered Person may become subject to in connection with any matter arising out of or in connection with this

Agreement or the Partnership's business affairs, except to the extent that any such Damages are established by a court order of final adjudication to be primarily attributable to the gross negligence, willful misconduct, breach of fiduciary duty of loyalty or bad faith of such Covered Person.

(i) If a Covered Person becomes involved in any capacity in any action, proceeding or investigation in connection with any matter arising out of or in connection with this Agreement or the Partnership's business or affairs, the Partnership shall reimburse such Covered Person for its reasonable legal and other expenses (including the cost of any investigation and preparation) as they are incurred in connection therewith; provided that such Covered Person shall provide the Partnership with an undertaking to promptly repay to the Partnership the amount of any such reimbursed expenses paid to it if it shall ultimately be determined by a court order of final adjudication that such Covered Person was not entitled to be indemnified by the Partnership in connection with such action, proceeding or investigation. If for any reason (other than by reason of the exclusions from indemnification set forth above) the foregoing indemnification is unavailable to such Covered Person, or insufficient to hold it harmless, then the Partnership shall, to the fullest extent permitted by law, contribute to the amount paid or payable by such Covered Person as a result of such loss, claim, damage, liability or expense in such proportion as is appropriate to reflect the relative benefits received by the Partnership on the one hand and such Covered Person on the other hand or, if such allocation is not permitted by applicable law, to reflect not only the relative benefits referred to above but also any other relevant equitable considerations.

(ii) The provisions of this Section 8.1 shall survive the termination of this Agreement or the dissolution of the Partnership for any reason.

No Limited Partner shall have any obligation to the Partnership or any other Partner to bring or join in any action against any Covered Person pursuant to Section 8.1(a) or (b) hereof. Nothing contained in this Section 8.1 shall be construed as any waiver of insurance claims or recoveries by the Partnership or any Covered Person.

Each Partner covenants for itself, its successors, assigns, heirs and personal representatives that such Person will, at any time prior to or after the dissolution of the Partnership, on demand, whether before or after such Person's withdrawal from the Partnership, pay to the Partnership or the General Partner any amount which the Partnership or the General Partner, as the case may be, pays in respect of taxes (including withholding taxes) imposed upon income of or distributions to such Partner, to the extent that such amounts have not been withheld from amounts otherwise distributable to such Partner.

Notwithstanding anything else contained in this Agreement, the obligations of the Partnership and each Partner under this Section 8.1, respectively, shall:

be in addition to any liability which the Partnership or such Partner may otherwise have; and

inure to the benefit of the Covered Persons, and any successors, assigns, heirs and personal representatives of such Covered Persons.

The General Partner may cause the Partnership to purchase, at the Partnership's expense, insurance to insure the Covered Persons against liability hereunder.

Exclusive Jurisdiction.  To the fullest extent permitted by applicable law, each of the Partners hereby agrees that any claim, action or proceeding by such Partner seeking any relief whatsoever against any Covered Person based on, arising out of, or in connection with this Agreement or the Partnership's business or affairs shall be brought only in the state or federal courts sitting in New York County, New York and not in any other court.


BOOKS AND RECORDS

Books and Accounts.  Complete and accurate books and accounts shall be kept and maintained for the Partnership at the principal place of business of the Partnership, as determined by the General Partner.  Each Partner shall at all reasonable times have access to, and may inspect and, make copies of, such books and accounts.  Funds of the Partnership shall be deposited in the name of the Partnership in such bank or other account or accounts as the General Partner may designate and withdrawals therefrom shall be made upon such signature or signatures on behalf of the Partnership as the General Partner may designate.

Reports to Partners.

All reports provided to the Partners pursuant to this Section 9.2 shall be prepared on such basis as the General Partner determines will appropriately reflect the operations and assets of the Partnership.

Within 120 days after the end of each Partnership Year, the Partnership shall prepare (or cause to be prepared) and mail to each Partner, a report setting forth as of the end of such Partnership Year:

a balance sheet of the Partnership as of the end of such Partnership Year;

an income statement of the Partnership for such Partnership Year;

a statement of each Partner's Capital Account;

a statement of cash flows of the Partnership for such Partnership Year;

a status report of the Investment and any other investments of the Partnership and activities during such Partnership Year, including summary descriptions of the Investment and any other investments made and disposed of by the Partnership during such Partnership Year;

a Schedule K-1 to the Partnership's Form 1065 (and the Partnership shall use its reasonable best efforts to ensure the delivery of such schedule earlier if practicable); and

such other reports and information that are required by the Act.

The General Partner shall be the "tax matters partner," as such term is defined in Section 6231(a)(7) of the Code.

## TRANSFERABILITY OF A PARTNER'S INTEREST

Restrictions on Transfer.

No Transfer of all or any portion of a Partner's Unit (including all or some of its rights or obligations hereunder) may be made without the prior written consent of the Partnership (which consent may be granted or withheld in the sole discretion of the General Partner). No Transfer of all or any portion of a Partner's Unit may be made to the extent that such Transfer would (i) result in the Partnership being subject to regulation under the Investment Company Act, (ii) result in the taxation of the Partnership at the entity level, (iii) result in the Partnership's assets being deemed "plan assets" for the purposes of Section 4975 of the Code or ERISA, (iv) have a material adverse effect for tax purposes on any other Partner (as determined by the General Partner in its reasonable discretion), unless such Transfer is consented to by such adversely-effected Partner (which consent may not be unreasonably withheld), or (v) be consummated at any time prior to the final adjudication of such Limited Partner's Form I-829 application for removal of conditions on permanent residence (or the permanent lapse of such Limited Partner's eligibility to submit Form I-829).

No Transfer shall relieve the transferor of any of its obligations under this Agreement or its Subscription Agreement without the prior written consent of the Partnership (which consent may be granted or withheld in the sole discretion of the General Partner).

Each Partner shall be liable to the other Partners if a Transfer of any of the interests in the entity or entities of which such Partner is composed, including, but not limited to, any Transfer of economic or beneficial interest resulting from any reorganization or restructuring of the entity or entities of which such Partner is composed, (i) results in the Partnership being subject to regulation under the Investment Company Act, (ii) results in the taxation of the Partnership at the entity level, (iii) results in the Partnership's assets being deemed "plan assets" for the purposes of Section 4975 of the Code or ERISA or (iii) violates any provision of this Agreement.

Expenses of Transfer; Indemnification. All expenses, including attorneys' fees and expenses, incurred by the General Partner or the Partnership in connection with any Transfer shall be fully borne, jointly and severally, by the transferring Partner and such Partner's transferee. In addition, such transferring Partner and such transferee shall indemnify the Partnership and the General Partner in a manner satisfactory to the General Partner, in its sole discretion, against any losses, claims, damages, liabilities or expenses to which the Partnership or the General Partner may become subject arising out of or based upon any false representation or warranty made by, or breach or failure to comply with any covenant or agreement of, such transferring Partner or such transferee in connection with such Transfer.

Recognition of Transfer.

The Partnership shall not recognize for any purpose any purported Transfer of any Unit (including some or all of its rights or obligations hereunder) and no Transferee of any Unit shall be admitted as a Limited Partner hereunder unless:

the applicable provisions of this Agreement shall have been complied with;

the Partnership shall have been furnished with the documents effecting such Transfer, in form and substance reasonably satisfactory to the General Partner, executed and acknowledged by both transferor and the transferee;

such Transfer shall have been made in accordance with all applicable laws and regulations and all necessary governmental consents shall have been obtained and requirements satisfied;

the books and records of the Partnership shall have been changed by the General Partner to reflect the admission of such transferee; and

such Transfer will not cause a termination of the Partnership for Federal income tax purposes.

Each transferee, as a condition to the Partnership's recognition of such Transfer, shall execute and acknowledge such instruments, in form and substance reasonably satisfactory to the General Partner, as the General Partner may deem necessary or desirable in its sole discretion to effectuate such Transfer and to confirm the agreement of such transferee to be bound by all the terms and provisions of this Agreement with respect to any rights and/or obligations represented by the Unit acquired by such transferee.  The recognition of any Transfer shall not require the approval of any other Partner.

Effect of Transfer.  Notwithstanding any other provision of this Agreement or the Act to the contrary, to the fullest extent possible pursuant to applicable law, upon the Transfer by a Partner of all of such Partner's Unit such former Partner shall have no further right as a Partner under this Agreement, including, without limitation, any right to vote on any matter regarding the Partnership and the Partnership may act without any consent, approval or vote theretofore required to be obtained from such Partner (provided, however, that the Partnership shall still be required to obtain any required consent, approval or vote from the remaining Partners).  Upon a Transfer by a Limited Partner of its entire interest in the Partnership in accordance with the provisions of this Agreement, the transferee shall be admitted as a substitute Limited Partner effective as of the time of the Transfer, upon its compliance with the applicable provisions of this Agreement.

## DISSOLUTION

Events of Dissolution.

The Partnership shall be dissolved upon the first to occur of the following events, which the General Partner will use commercially reasonable efforts to avoid as long as any Form I-829 application for removal of conditions on permanent residence related to the Partnership remains to be filed by the applicable Limited Partners or has not yet been finally adjudicated:

The determination of the General Partner, in its sole discretion, following the full discharge of the Partnership's loan responsibilities, that the continuation of the Partnership is not in the best interests of the Partners;

The determination of the General Partner with the prior written consent of a majority of the Limited Partners;

the sale or other disposition of all or substantially all of the assets of the Partnership and the collection of the proceeds therefrom;

the removal of the General Partner or the occurrence of any other event that causes the General Partner to cease to be the general partner of the Partnership under the Act, unless the Partnership is continued without dissolution in accordance with the Act;

at any time there are no limited partners of the Partnership, unless the Partnership is continued without dissolution in accordance with the Act; and

upon the entry of a decree of judicial dissolution.

Following the dissolution of the Partnership, the General Partner shall liquidate the assets of the Partnership as promptly as shall be practicable and in a commercially reasonable manner.  The proceeds of such liquidation shall be applied in the following order of priority:

first, to the satisfaction (whether by payment or the reasonable provision for payment) of debts and liabilities of the Partnership, including the establishment of any reserves that the General Partner may deem reasonably necessary to satisfy any contingent liabilities of the Partnership, and the satisfaction of the costs and expenses of the dissolution and liquidation; and

(ii) then, to the Partners in accordance with Section 5.1(c) hereof.

Cancellation of Certificate.  Upon the dissolution of the Partnership and the completion of the winding up of the Partnership, the Person acting as liquidating trustee shall cause the cancellation of the Certificate and shall take such other actions as may be necessary or appropriate to terminate the Partnership.  Except as set forth in Section 11.4 or as otherwise specifically provided for in this Agreement, upon cancellation of the Certificate in accordance with the Act, the Partnership and this Agreement shall terminate.

Compliance With Timing Requirements of Regulations. If the Partnership is "liquidated" within the meaning of Section 1.704-l(b)(2)(ii)(g) of the Regulations, distributions shall be made pursuant to this Article. In the sole discretion of the General Partner, a *pro rata* portion of the distributions that would otherwise be made to the General Partner and the Limited Partners pursuant to the preceding sentence may be:

distributed to a trust established for the benefit of the General Partner and the Limited Partners for the purposes of liquidating Partnership assets, collecting amounts owed to the Partnership, and paying any contingent liabilities or obligations of the Partnership or of the General Partner arising out of or in connection with the Partnership; provided that the assets of any such trust shall be distributed to the General Partner and the Limited Partners from time to time, in the reasonable discretion of the General Partner, in the same proportions as the amount distributed to such trust by the Partnership would otherwise have been distributed to the General Partner and the Limited Partners pursuant to this Agreement; or

withheld to provide a reasonable reserve for Partnership liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the Partnership; provided that such withheld amounts shall be distributed to the General Partner and the Limited Partners as soon as practicable.

Termination. Upon the cancellation of the Certificate of the Partnership in accordance with the Act, this Agreement shall terminate other than Sections 8 and 13.13 hereof, which shall survive the termination of this Agreement or the dissolution of the Partnership for any reason.


## NOTICES; AUTHORIZATION BY LIMITED PARTNERS

Method of Notice. All notices required to be delivered hereunder shall be in writing and must be delivered either by hand in person, by electronic mail, by facsimile transmission, by U.S. certified mail, return receipt requested or by nationally recognized overnight delivery service (receipt request) and shall be deemed given when so delivered by hand (with written confirmation of receipt), sent by facsimile transmission (with confirmation of receipt of transmission from sender's equipment), transmitted by electronic mail (in a message to the electronic mail address given to the Partnership) or, if mailed by U.S. certified mail, three days after the date of deposit in the U.S. mail, or if delivered by overnight delivery service when received by the addressee, in each case at the appropriate addresses set forth below (or to such other addresses as a party may designate for that purpose upon fifteen (15) days written notice to the other party).

If to the Partnership (c/o the General Partner) or to the General Partner at:

Forefront EB-5 Fund (ICT), LLC
7 Times Square, 37th Floor,
New York, NY 10036
Attention: Peter Shirk
E-mail: investment@forefronteb5fund.com
Fax: (212) 273-4306

with a copy to:

Homeier & Law, P.C.
150 Broadway, Suite 1920
New York, New York 10038
Attn: Clem Turner
E-mail: clemturner@homeierlaw.com
Fax: (646) 588-0333

If to a Limited Partner, to such Limited Partner at such Limited Partner's addresses/numbers set forth on the signature page set forth in the Subscription Agreement between such Limited Partner and the Partnership, or such other address as the Limited Partner has provided in writing and that the General Partner has confirmed in writing.

Routine Communications; Wire Transfers.  Notwithstanding the provisions of Section 12.1 hereof, routine communications such as distribution checks or financial statements of the Partnership may be sent by first-class mail, postage prepaid or by facsimile or electronic transmission.  The Partnership shall cause distributions to be made by means of wire transfer to any Partner who requests the same and who provides the Partnership with wire transfer instructions or by such other electronic means as are agreed to by the Partnership and such Partner.

Power of Attorney.  Without limiting the rights of the Limited Partners pursuant to Section 6.2, each Limited Partner does hereby constitute and appoint the General Partner, and any officer of the General Partner acting on its behalf from time to time, as such Limited Partner's true and lawful representative and attorney-in-fact, in its name, place and stead to make, execute, sign, deliver and file (a) any amendment to the Certificate required by the Act because of an amendment to this Agreement or in order to effectuate any change in the Partners of the Partnership, (b) any amendment to this Agreement permitted to be made by the General Partner pursuant to Section 13.2 hereof; provided, however, that if such amendment is stated in Section 13.2 hereof to be an amendment which requires the prior written consent (or other specified approval) of the affected Limited Partner, Limited Partners holding at least a majority of the Percentage Interests or all of the Limited Partners, as the case may be, such prior written consent (or such other specified approval) must be obtained, (c) any and all financing statements, continuation statements and other documents necessary or desirable to create, perfect, continue or validate any security interest granted by such Limited Partner or to exercise or enforce the Partnership's rights hereunder with respect to such security interest, and (d) all such other instruments, documents and certificates which may from time to time be required by the laws of

the United States of America, the State of New York or any other state, or any political subdivision or agency thereof, to effectuate, implement and continue the valid and subsisting existence of the Partnership and its power to carry out its purposes as set forth in this Agreement or to dissolve and terminate the Partnership in accordance with the Act. The General Partner shall deliver a copy of each document executed pursuant to this power of attorney to each Partner in whose name such document was executed. Insofar as possible pursuant to applicable law, the power of attorney granted hereby is irrevocable. This power of attorney is coupled with an interest and shall survive the subsequent incapacity, disability or dissolution of the Limited Partner granting such power.

## GENERAL PROVISIONS

Entire Agreement. This Agreement, the Subscription Agreements and the Side Letters, if any, constitute the entire agreement among the parties hereto with respect to the subject matter hereof and thereof, and supersede any prior agreement or understanding among the parties hereto with respect to the subject matter hereof or thereof.

Amendment. Except as required by law, this Agreement may be amended by the General Partner, from time to time, with the prior written consent of Limited Partners holding at least a majority of the outstanding Percentage Interests; provided, however, that amendments which do not adversely affect the Limited Partners or the Partnership, as determined by the General Partner in its sole and reasonable discretion, may be made to this Agreement and the Certificate, from time to time, by the General Partner, in its sole discretion, without the prior written consent of any of the Limited Partners, to: (a) admit any Person to the Partnership as a Limited Partner pursuant to the terms of this Agreement; (b) amend any provision of this Agreement and the Certificate which requires any action to be taken by or on behalf of the General Partner or the Partnership pursuant to requirements of New York law if the provisions of New York law are amended, modified or revoked so that the taking of such action is no longer required; (c) add to the representations, duties or obligations of the Partnership or the General Partner, or to surrender any right granted to the Partnership or the General Partner herein, for the benefit of the Limited Partners; (d) correct any clerical mistake herein or in the Certificate or correct any printing, stenographic or clerical errors, or omissions, which shall not be inconsistent with the provisions of this Agreement or the status of the Partnership as a partnership for federal income tax purposes; and (e) change the name of the Partnership or to make any other change which is for the benefit of, or not adverse to the interests of, the Limited Partners.

Approvals. Except as otherwise specifically provided herein and to the extent permitted by applicable law, each Partner agrees that the written approval of Partners holding the required Percentage Interests shall bind the Partnership and each Partner and shall have the same legal effect as the written approval of each Partner, for purposes of granting the approval of the Partners with respect to any proposed action of the Partnership, the General Partner, or any of their respective Affiliates. Each Limited Partner further agrees that for purposes of any vote sought by the General Partner pursuant to any provision of this Agreement requiring the approval of the Limited Partners (whether pursuant to an amendment or otherwise), in calculating the percentage required for such approval, the numerator and denominator will exclude the

Percentage Interest of any Limited Partner who does not indicate approval or disapproval of any matter presented for its approval within such time period as may be specified by the General Partner (which time period in any event will not be less than 10 Business Days), and such Limited Partner will be deemed for purposes of this Agreement to have not indicated any approval or disapproval of such matter.

Side Letters.  Notwithstanding any provisions of this Agreement (including Section 13.2 hereof) or of any Subscription Agreement to the contrary, it is hereby acknowledged and agreed that the Partnership, and the General Partner on its own behalf or on behalf of the Partnership, may, without the approval of any other Partner, enter into a side letter or similar agreement (each, a "Side Letter") to or with a Limited Partner which has the effect of establishing rights under, or altering or supplementing the terms of, this Agreement or of a Subscription Agreement between such Limited Partner and the Partnership.  The parties hereto agree that any terms contained in a Side Letter shall govern with respect to such Limited Partner notwithstanding the provisions of this Agreement or of any Subscription Agreement.  Except as required by law, the General Partner and the Partnership shall not be required to deliver the Side Letter or disclose the existence of any Side Letter or the terms and agreements contained therein to any Partner.

Governing Law.  This Agreement shall be construed in accordance with and governed by the laws of the State of New York, without giving effect to the provisions, policies or principles thereof relating to choice or conflict of laws.

English Language.  EACH PARTNER EITHER READS AND UNDERSTANDS ENGLISH, OR HAS HAD THIS AGREEMENT AND SUCH OTHER MATERIALS AS THE PARTNER DEEMS NECESSARY TRANSLATED BY A TRUSTED ADVISOR INTO A LANGUAGE THAT THE INVESTOR DOES UNDERSTAND.  If, in addition to the English language version of this Agreement provided for signature, any person provides a translation or summary of this Agreement in a language other than English, such translation or summary has been provided only for the convenience of the reader and shall not be enforceable by or against any party for any purpose; in the event of a conflict between such translation or summary and the English language version, the English language version shall prevail.

Captions.  The section and other headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

Successors.  Except as otherwise provided herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective legal representatives, heirs, successors and assigns.

Severability.  In case any one or more of the provisions contained in this Agreement or any application thereof shall be invalid, illegal, or unenforceable in any respect, the validity, legality, and enforceability of the remaining provisions contained herein and other application thereof shall not in any way be affected or impaired thereby.

Gender and Number.  Whenever required by the context hereof, the singular shall include the plural and the plural shall include the singular.  The masculine gender shall include the feminine and neuter genders.

Third-Party Rights.  Each Covered Person shall be deemed a third party beneficiary of the provisions of Article VIII hereof.  Subject to the foregoing, nothing in this Agreement shall be deemed to create any right in any Person not a party hereto and this Agreement shall not be construed in any respect to be a contract in whole or in part for the benefit of any third party (except as aforesaid).

Counterparts.  This Agreement may be executed in counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one instrument.

Duties.  To the fullest extent permitted by law and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of law or equity or otherwise, whenever in this Agreement a Person is permitted or required to make a decision (i) in its "sole discretion" or "discretion" or under a grant of similar authority or latitude, such Person shall be entitled to consider only such interests and factors as it desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Partnership or any other Person, or (ii) in its "good faith" or under another express standard, such Person shall act under such express standard and shall not be subject to any other or different standard.  To the extent that, at law or in equity, a Person has duties (including fiduciary or statutory duties) and liabilities relating thereto to the Partnership or to any Partner, such Person acting under this Agreement shall not be liable to the Partnership or any Partner for its good faith reliance on the provisions of this Agreement.  The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Person otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Person.

Confidentiality.

Unless otherwise approved in writing by the General Partner, each Limited Partner agrees to keep confidential, and not to make any use of (other than for purposes reasonably related to its interest in the Partnership or for purposes of filing such Limited Partner's tax returns or immigration filings or for other routine matters required by law) nor to disclose to any Person, any information or matter relating to the Partnership and its affairs and any information or matter related to the Investment or any other investments of the Partnership (other than disclosure to such Limited Partner's owners, employees, agents, advisors or representatives (each such Person being hereinafter referred to as an "LP Authorized Representative"), except that a Person who is not subject to the direction or control of such Limited Partner will not constitute an LP Authorized Representative unless such Person shall agree for the benefit of the Partnership and the General Partner to be bound by a confidentiality undertaking on substantially the same terms as set forth in this Section 13.14); provided that such Limited Partner and its LP Authorized Representatives may make such disclosure to the extent that (i) the information being disclosed is publicly known at the time of any proposed disclosure by such Limited Partner or LP Authorized Representative, (ii) the information subsequently becomes publicly known through no act or omission of such Limited Partner or LP Authorized Representative, (iii) the information otherwise is or becomes legally known to such Limited Partner other than through disclosure by the General Partner or the Partnership, (iv) such disclosure, in the opinion of legal counsel (which may be inside counsel) of such Limited Partner or LP Authorized Representative, is required by law or (v) such disclosure is in connection with

any litigation or other proceeding between any Limited Partner and the General Partner and/or the Partnership; provided, further, that each Limited Partner will be permitted, after notice to the General Partner, to correct any false or misleading information which may become public concerning such Limited Partner's relationship to the General Partner, the Partnership, or any Person in which the Partnership holds, or contemplates acquiring, an investment. Prior to making any disclosure required by law, each Limited Partner shall notify the General Partner of such disclosure and advise the General Partner as to the opinion referred to above. Prior to any disclosure to any LP Authorized Representative, each Limited Partner shall advise such LP Authorized Representative of the obligations set forth in this Section 13.13, inform such LP Authorized Representative of the confidential nature of such information and direct such LP Authorized Representative to keep all such information in the strictest confidence and to use such information only for purposes relating to such Limited Partner's Unit.

Without limiting the foregoing, each Limited Partner agrees that the following items are included within Confidential Information of, and are of independent, proprietary, economic value to, the General Partner and the Partnership, the disclosure of which would cause substantial, irreparable harm to the General Partner, the Partnership and the Project: (i) all information regarding the historical or projected pricing, cost, sales and profitability of the Project; (ii) all information pertaining to the valuation ascribed to the Property, any subsidiary thereof or to any securities of any of the foregoing by the Partnership, the General Partner, or any other Person; and (iii) all financial statements or other information concerning the historical or projected financial condition, results of operations or cash flows of any asset of the Partnership.

Jurisdiction and Service of Process. THE PARTNERSHIP AND EACH PARTNER HEREBY CONSENT TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED IN NEW YORK, NEW YORK AND IRREVOCABLY AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE APPLICABLE SUBSCRIPTION AGREEMENT(S) BETWEEN THE COMPANY AND SUCH PARTNER, ANY INVESTOR LETTER OF SUCH PARTNER REFERRED TO IN SUCH SUBSCRIPTION AGREEMENT(S), ANY SIDE LETTER BETWEEN THE PARTNERSHIP AND SUCH PARTNER AND ALL OTHER DOCUMENTS OR TRANSACTIONS AND ANY OTHER DEALINGS BETWEEN THE PARTNERSHIP AND SUCH PARTNER RELATING TO THE SUBJECT MATTER HEREOF OR THEREOF WHICH MAY BE LITIGATED MAY BE LITIGATED IN SUCH COURTS. EACH OF THE PARTNERSHIP AND EACH PARTNER ACCEPTS FOR SUCH PARTY AND IN CONNECTION WITH SUCH PARTY'S PROPERTIES, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS, WAIVES ANY DEFENSE OF FORUM NON CONVENIENS, AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION HEREWITH OR THEREWITH. EACH OF THE PARTNERSHIP AND EACH PARTNER HEREBY IRREVOCABLY CONSENTS TO THE FULLEST EXTENT PERMITTED BY LAW TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF, BY CERTIFIED MAIL (RETURN RECEIPT REQUESTED), TO SUCH PARTY AT ITS ADDRESS AS SET FORTH IN SECTION 12.1 HEREOF, SUCH SERVICE TO THE FULLEST EXTENT PERMITTED BY LAW TO BE DEEMED EFFECTIVE THIRTY (30) DAYS AFTER SUCH MAILING. NOTHING HEREIN SHALL AFFECT THE RIGHT TO

SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT OF ANY PARTY TO BRING PROCEEDINGS AGAINST ANY OTHER PARTY IN THE COURTS OF ANY OTHER JURISDICTION.

Trial.  TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTNERSHIP AND EACH PARTNER HEREBY WAIVES SUCH PARTY'S RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE APPLICABLE SUBSCRIPTION AGREEMENT(S) BETWEEN THE PARTNERSHIP AND SUCH PARTNER, ANY INVESTOR LETTER OF SUCH PARTNER REFERRED TO IN SUCH SUBSCRIPTION AGREEMENT(S), ANY SIDE LETTER BETWEEN THE PARTNERSHIP AND SUCH PARTNER AND ALL OTHER DOCUMENTS OR TRANSACTIONS AND ANY OTHER DEALINGS BETWEEN THE PARTNERSHIP AND SUCH PARTNER RELATING TO THE SUBJECT MATTER HEREOF OR THEREOF.  EACH OF THE PARTNERSHIP AND THE PARTNER ALSO WAIVES ANY BOND OR SURETY OR SECURITY UPON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH OF THE PARTNERSHIP AND EACH PARTNER ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO THE OTHER PARTY'S DECISION TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH PARTY HAS ALREADY RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT, THE APPLICABLE SUBSCRIPTION AGREEMENT(S) BETWEEN THE PARTNERSHIP AND SUCH PARTNER, ANY SIDE LETTER BETWEEN THE PARTNERSHIP AND SUCH PARTNER AND ALL OTHER DOCUMENTS OR TRANSACTIONS AND ANY OTHER DEALINGS BETWEEN THE PARTNERSHIP AND SUCH PARTNER RELATING TO THE SUBJECT MATTER HEREOF OR THEREOF AND THAT EACH PARTY WILL CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS.  EACH OF THE PARTNERSHIP AND EACH PARTNER FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH SUCH PARTY'S LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES SUCH PARTY'S JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THAT THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT, THE APPLICABLE SUBSCRIPTION AGREEMENT(S) BETWEEN THE PARTNERSHIP AND SUCH PARTNER, ANY SIDE LETTER BETWEEN THE PARTNERSHIP AND SUCH PARTNER AND ALL OTHER DOCUMENTS OR TRANSACTIONS AND ANY OTHER DEALINGS BETWEEN THE PARTNERSHIP AND SUCH PARTNER RELATING TO THE SUBJECT MATTER HEREOF OR THEREOF.  IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

**[SIGNATURE PAGES FOLLOW]**

IN WITNESS WHEREOF, the undersigned have executed this Limited Partnership Agreement as of the date first written above.

**THE GENERAL PARTNER:**

Forefront EB-5 Fund (ICT), LLC
a New York limited liability company

By: _____
    Jeffrey L. Laytin
    Managing Member

**THE ORIGINAL LIMITED PARTNER:**

_____
Jeffrey L. Laytin

**THE LIMITED PARTNERS:**

Each person who shall sign a Limited Partner Signature Page in the form attached hereto as <u>Exhibit A</u> and whose signature page hereto shall be accepted by the Partnership.

EXHIBIT A

Limited Partner Signature Page

SIGNATURE PAGE TO THE LIMITED PARTNERSHIP AGREEMENT OF
CARILLON TOWER/CHICAGO, LP
a New York Limited Partnership

Dated as of March 6, 2014

IN WITNESS WHEREOF, the undersigned has executed and delivered this Agreement on this ___ day of _____, 201__.

_____
Name of the Limited Partner (Please type or print)

_____
Name of spouse of the Limited Partner (Please type or print) (*if applicable)*

CAPITAL CONTRIBUTION AMOUNT: $500,000

CARILLON TOWER/CHICAGO, LP

By: Forefront EB-5 Fund (ICT), LLC
     a New York limited liability company
Its General Partner

        By: _____
             Name: Jeffrey L. Laytin
             Title:   Managing Member

EXHIBIT B

## **SCHEDULE OF PARTNERS**

[Attached.]

Schedule 2

**EB-5 Job Allocation Addendum**

# Conclusions: Immigrant Investors Supported

Section 203(b)(5) of the Immigration and Nationality Act requires that each immigrant investor create at least 10 permanent jobs. Total employment generated in the study area by construction spending for the proposed *Carillon Tower* project was estimated at 2,122 jobs, including all applicable jobs resulting from direct, indirect  and induced regional multiplier effects. Thus, the employment estimates for this Regional Center project imply that  it can support up to 212 individual EB-5 investors.

The area qualifies as a *Targeted Employment Area* (TEA), for which EB-5 investors are allowed to invest $500,000 individually, rather than $1 million, providing a competitive advantage for marketing of the project to foreign investors. Assuming that all 212 investors supported were to invest $500,000, a total of $106.0 million in  EB-5 investor capital can be potentially raised by the project.

**Calculation of Employment Impacts Using Regional Multipliers in Verifiable Detail**

Table A1 explicitly shows the calculation of employment impacts for the proposed project using *IMPLAN* employment final demand multipliers, deflators, and industry sales (final demand) in verifiable detail for each year and industry sector involved in the project. The employment impacts were calculated for each activity as:

Employment (jobs) = Industry Sales / 1,000,000 / Deflator x Margin x Employment Multiplier

Industry sales are expressed in millions of dollars (i.e., divided by 1,000,000) to be consistent with the denomination of the employment final demand multipliers (jobs per million dollars final demand). Industry sales are deflated using industry specific price deflators to express values in 2010 dollars, consistent with the year of the regional model data, in order to maintain the correct ratio of output per employee. The wholesale trade margin (17.2%) was applied to FFE purchases assigned to the Wholesale Trade sector. These inputs and resulting estimates of employment (job) impacts match those shown in the body of the report.

(i)     Table A1. Calculation of employment impacts using regional multipliers in verifiable detail for the *Carillon Tower* project in the Chicago metropolitan area

| Project Activity | *Implan* Industry Sector | Industry Sales | Event Year | Output Deflator | Trade Margin | Employment Multiplier | Calculated Jobs |
|---|---|---|---|---|---|---|---|
| Construction, 2015-17 | 34   Construction of new nonresidential commercial and health care structures | $5,384,963 | 2015 | 1.125 | | 21.37691 | 102 |
| | 34   Construction of new nonresidential commercial and health care structures | $46,684,203 | 2016 | 1.150 | | 21.37691 | 868 |
| | 34   Construction of new nonresidential commercial and health care structures | $29,364,507 | 2017 | 1.175 | | 21.37691 | 534 |
| | 319 Wholesale trade businesses | $1,980,742 | 2015 | 0.923 | 17.2% | 22.73683 | 8 |
| | 319 Wholesale trade businesses | $5,942,226 | 2016 | 0.909 | 17.2% | 22.73683 | 26 |
| | 319 Wholesale trade businesses | $3,961,484 | 2017 | 0.894 | 17.2% | 22.73683 | 17 |
| | 367 Legal services | $215,917 | 2015 | 1.263 | | 20.89555 | 4 |
| | 367 Legal services | $115,917 | 2016 | 1.323 | | 20.89555 | 2 |
| | 367 Legal services | $115,917 | 2017 | 1.386 | | 20.89555 | 2 |
| | 369 Architectural, engineering, and related services | $1,885,527 | 2015 | 1.188 | | 26.14463 | 41 |
| | 369 Architectural, engineering, and related services | $295,540 | 2016 | 1.230 | | 26.14463 | 6 |
| | 369 Architectural, engineering, and related services | $230,524 | 2017 | 1.273 | | 26.14463 | 5 |
| | 381 Management of companies and enterprises | $2,540,781 | 2015 | 1.188 | | 22.41368 | 48 |
| | 381 Management of companies and enterprises | $1,757,781 | 2016 | 1.229 | | 22.41368 | 32 |
| | 381 Management of companies and enterprises | $1,757,781 | 2017 | 1.272 | | 22.41368 | 31 |
| | 377 Advertising and related services | $76,667 | 2015 | 1.176 | | 21.08139 | 1 |
| | 377 Advertising and related services | $230,000 | 2016 | 1.215 | | 21.08139 | 4 |
| | 377 Advertising and related services | $153,333 | 2017 | 1.255 | | 21.08139 | 3 |
| Hotel and Rental Operations, 2017-18 | 411 Hotels and motels, including casino hotels | $11,304,913 | 2017 | 1.231 | | 25.95576 | 238 |
| | 411 Hotels and motels, including casino hotels | $1,099,391 | 2018 | 1.268 | | 25.95576 | 23 |
| | 360 Real estate establishments (rental income apartments, retail) | $3,487,063 | 2017 | 1.255 | | 18.94448 | 53 |

| Project Activity | *Implan* Industry Sector | Industry Sales | Event Year | Output Deflator | Trade Margin | Employment Multiplier | Calculated Jobs |
|---|---|---|---|---|---|---|---|
| | 360 Real estate establishments (rental income apartments, retail) | $3,972,763 | 2018 | 1.297 | | 18.94448 | 58 |
| Asset Sale (2019) | 360 Real estate establishments (property sales) | $1,603,736 | 2019 | 1.323 | | 13.38883 | 16 |
| Total All Activities | | | | | | | 2,122 |

Construction deflator adjusted for Turner Cost Index.

Appendix 1

**Terms and Conditions of Escrow Release**

1. <u>Terms and Conditions of Release of Funds from Contribution Escrow Account</u>.

   a. <u>Upon Approval of Form I–526 Petition</u>. The Partnership will submit a signed, written request for the transfer of 100% of a Limited Partner's Capital Contribution from the Contribution Escrow Account to the account of the Partnership upon the approval of such Limited Partner's I-526 Petition by the USCIS.

   b. <u>Upon Denial of Form I–526 Petition</u>.

      i. The Partnership will submit a signed, written request for the transfer of an amount equal to 100% of a Limited Partner's Capital Contribution from the Contribution Escrow Account to such Limited Partner (a "<u>Contribution Return Request</u>") upon the receipt of evidence, reasonably satisfactory to the Partnership, that the Form I–526 Petition for the Limited Partner has been subject to a final denial after all administrative remedies and appeals have been exhausted.

      ii. Notwithstanding anything to the contrary herein, in the event that (A) the Form I–526 Petition for a Limited Partner has been subject to a final denial after all administrative remedies and appeals have been exhausted and (B) the funds in the Contribution Escrow Account which are attributable to such Limited Partner's Capital Contribution are less than $500,000, the Partnership's Contribution Return Request will be satisfied out of the Capital Contributions of other Limited Partners held in the Contribution Escrow Account and/or any other amounts on deposit in the Contribution Escrow Account. Any such Capital Contributions that are not directly attributable to the denied investor will first be transferred to the Partnership. The General Partner will then, in its sole discretion, determine how best to repay the denied investor with the Partnership's funds.

   c. <u>Upon Achievement of Holdback Trigger</u>. The Partnership may submit a signed, written request for the transfer of 80% of a Limited Partner's Capital Contribution from the Contribution Escrow Account to the account of the Partnership on or after the date upon which USCIS has approved at least one Form I-526 Petition belonging to one Subscriber within the Offering (such date, the "<u>Holdback Trigger</u>"), which request shall certify that the Holdback Trigger has been satisfied.

2. <u>Terms and Conditions of Release of Funds from Expense Escrow Account</u>.

   a. <u>Upon approval of Form I–526 Petition</u>. The Partnership will submit a signed, written request for the transfer of a Limited Partner's Administrative Fee from the Expense Escrow Account to the account of the Partnership upon the approval of such Limited Partner's I-526 Petition by the USCIS.

   b. <u>Upon denial of Form I–526 Petition</u>.

     i.  The Partnership will submit a signed, written request for the transfer of 100% of a Limited Partner's Administrative Fee from the Expense Escrow Account to the Limited Partner (an "<u>Administrative Fee Return Request</u>") upon the receipt of evidence, reasonably satisfactory to the Partnership, that the Form I–526 Petition for the Investor has been subject to a final denial after all administrative remedies and appeals have been exhausted).

     ii.  Notwithstanding anything to the contrary herein, in the event that (A) the Form I–526 Petition for a Limited Partner has been subject to a final denial after all administrative remedies and appeals have been exhausted and (B) the funds in the Expense Escrow Account which are attributable to such Limited Partner's Administrative Fee are less than $50,000, the Partnership's Administrative Fee Return Request will be satisfied out of the Administrative Fee of other Limited Partners held in the Expense Escrow Account and/or any other amounts on deposit in the Expense Escrow Account. Any such Administrative Fees that are not directly attributable to the denied investor will first be transferred to the Partnership. The General Partner will then, in its sole discretion, determine how best to repay the denied investor with the Partnership's funds.

   c.  <u>Upon Achievement of Holdback Trigger</u>. The Partnership may submit a signed, written request for the transfer of 100% of a Limited Partner's Administrative Fee from the Expense Escrow Account to the account of the Partnership on or after the date on which the Holdback Trigger has been satisfied,, which request shall certify that the Holdback Trigger has been satisfied.

3.  <u>General Provisions</u>. Notwithstanding the foregoing, if there is an insufficient amount available in escrow to enable the Partnership to return the Capital Contribution and Administrative Fee amount to a denied Limited Partner (including the capital of a denied Limited Partner that was disbursed to cover a return of capital to a prior Limited Partner whose petition was denied) and continue operations with the Capital Contributions of other Limited Partners, then such refund will be made to the Limited Partner:

   a.  as of the date that adequate funds are available in escrow for the payment of the refund in the event the Partnership has not, within 30 days of such final denial, (A) made such refund or (B) replaced such denied Limited Partner with a substitute Limited Partner as set forth below; and

   b.  on a first priority basis, such that each denied Limited Partner shall be refunded his or her Capital Contribution and Administrative Fee in full in an order based on the timing of when each such Limited Partner's I-526 Petition was ultimately denied, unless such refund is otherwise made as described herein.

   c.  For purposes of clarification, the foregoing provisions are intended to ensure that each Limited Partner (A) who has all or any portion of his or her Capital Contribution or

Administrative Fee remaining in escrow and (B) who has not received approval of such Limited Partner's I-526 Petition, shall receive a capital credit for such Limited Partner's balance of any of his or her Capital Contribution or Administrative Fee released from escrow to the Partnership's general operating account.

EXHIBIT C

# SUBSCRIPTION AGREEMENT

## INSTRUCTIONS TO SUBSCRIPTION AGREEMENT

Any person desiring to become a limited partner of Carillon Tower/Chicago, L.P. (the "Partnership") should:

(a)    complete and execute one copy of the attached Subscription Agreement (the "Agreement"), subscribing for one Unit of the Partnership at the offering price of $550,000 (consisting of a $500,000 capital investment and a $50,000 processing fee) on a specified date (the "Admission Date");

(b)    execute one copy of the signature page of the Limited Partnership Agreement of the Partnership;

(c)    complete and sign one copy of the Form W-8BEN "Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding", enclosed as an exhibit to the Escrow Agreement;

send one completed and executed set of originals referred to above and any documentation required thereby to the Partnership by facsimile: (212) 868-1229 or email: investment@forefronteb5fund.com; and

send one completed and executed set of originals referred to above by overnight courier to Carillon Tower/Chicago, L.P., c/o Forefront EB-5 Fund (ICT), LLC, 7 Times Square, 37th Floor, New York, NY 10036, Attention: Peter Shirk.

The Partnership will advise each subscriber promptly of its acceptance of any offer to become a limited partner of the Partnership, but Forefront EB-5 Fund (ICT), LLC, the general partner of the Partnership (the "General Partner"), has the right in its sole discretion to refuse any subscriber's offer to become a limited partner.

Payment in United States currency by wire transfers or certified checks or bank checks, one in the amount of $500,000 for his or her capital investment and another in the amount of $50,000 for the related processing fee, must be received by the Partnership at least one business day prior to the Admission Date. Each subscriber shall transmit his or her capital investment ($500,000) and the related processing fee ($50,000) by separate wire transfers, certified checks or bank checks.

Each subscriber's capital investment of $500,000 shall be transmitted by wire transfer, certified check, or bank check to:

**Contribution Escrow Account**

| | |
|---|---|
| Credit Bank: | TD Bank, N.A. |
| ABA Number: | 011600033 |
| For the Benefit of: | Trustee Clearing Account DDA 76-8270-01-9 |
| For Further Credit to Name: | Carillon Tower/Chicago, L.P. |
| From (Investor Name): | _____ |
| Amount: | $500,000.00 |

All amounts on deposit in the Contribution Escrow Account will be held in escrow, subject to the terms and conditions of the Escrow Agreement (as defined below), until the following.

Action upon Achievement of the Holdback Trigger. Upon a written direction of the Partnership certifying that the Holdback Trigger has been satisfied, the Escrow Agent shall remit 80% of the Capital Contribution of each Investor from the Contribution Escrow Account to the Partnership and retain 20% of the Capital Contribution (the "Holdback Amount") in an account (the "Holdback Escrow Account") for the benefit of each Subscriber. The "Holdback Trigger" shall have occurred once both of the following conditions have been satisfied:

a. USCIS shall have approved the Form I-526 Petition of one Subscriber for a Limited Partnership Interest (related to an investment of Five Hundred Thousand U.S. Dollars (US$500,000);

b. The Partnership has provided evidence that the Project plan has been formally submitted to the Chicago Commissioner of Planning and Development.

Action upon Approval of Form I-526. Upon a written direction of the Limited Partnership certifying that the USCIS has approved a subscriber's Form I-526 Petition, the Escrow Agent shall promptly remit a subscriber's Holdback Amount (if not previously released pursuant to Section 4(e)) from the Holdback Escrow Account to the Limited Partnership.

Action upon Denial of Form I-526. Upon a written direction of the Limited Partnership certifying that the USCIS has denied (without appeal or after denial of any appeal) a subscriber's Form I-526 Petition, the Escrow Agent shall return the subscriber's Holdback Amount, if such funds remain in the Holdback Escrow Account, to the denied subscriber identified in such written direction, without deduction or payment of interest. The Limited Partnership shall also provide in the written direction for the Escrow Agent to disburse from the Escrow Holdback Account an additional $400,000 (in the case where the denied subscriber's Holdback Amount remained in the Holdback Escrow Account) or $500,000 (in the case where the denied subscriber's Holdback Amount has previously been disbursed from the Holdback Escrow Account) from the Holdback Amounts of subscribers to the general operating account of the Limited Partnership to fund the remainder of the capital contributions of such subscribers so the Limited Partnership can continue operations without deficit being caused by the refund of the denied subscriber's capital contribution in accordance with the terms and conditions set forth in

the Limited Partnership's Offering Memorandum. The Escrow Agent shall rely, conclusively and without further inquiry, upon the Limited Partnership to designate, in writing, the subscribers whose Holdback Amounts shall be disbursed to the Limited Partnership's general operating account for this purpose.

<u>Action on Rejection of Subscription or Cancellation or Termination of Offering</u>. If the Partnership rejects a subscription, or cancels or terminates the Offering, upon the written instruction of the Partnership, the Escrow Agent shall return the Capital Contribution to the subscriber from escrow.

Each subscriber's Administrative Fee of $50,000 shall be transmitted by wire transfer, certified check, or bank check to:

**Expense Escrow Account**
    Credit Bank:          TD Bank, N.A.
    ABA Number:      011600033
    SWIFT:             NRTHUS33XXX
    For the Benefit of:        Trustee Clearing Account DDA 76-8270-02-7
    For Further Credit to Name:    Carillon Tower/Chicago, L.P. Expense Escrow
    From (Investor Name):         _____
    Amount:            $50,000.00

Any amounts on deposit in the Expense Escrow Account will be held in escrow, subject to the terms and conditions of the Escrow Agreement (as defined below), until the achievement of the Holdback Trigger, upon which the Escrow Agent shall release 100% of the Administrative Fee to the Partnership. If the Partnership rejects a subscription, or cancels or terminates the Offering, upon the written instruction of the Partnership, the Escrow Agent shall return 100% of the Administrative Fee to the subscriber from escrow..

*      *      *

> **IMPORTANT NOTICE: Due to international banking laws, your bank MUST send a SWIFT MT 103 message and complete field 50 ("Ordering Customer") with name, number and address of the account and field 52D ("Ordering Institution") on subscription wires. Your transaction may be delayed or rejected if this information is not provided.**

The General Partner reserves the right to request any additional documentation it deems necessary to verify the identity of the investor in order to comply with applicable anti-money laundering laws or other applicable laws or regulations. Failure to provide the necessary evidence may result in applications being rejected or in the acceptance of applications being delayed. The General Partner and the Partnership and their respective members, partners, directors, officers, employees, agents and other representatives shall be held harmless by an investor against any loss arising as a result of a failure to process a subscription if any information requested by the General Partner or the Escrow Agent has not been timely provided by the subscriber.

The General Partner shall, on behalf of the Partnership, acknowledge by counter-signature all subscriptions upon approval of a subscription by the Partnership. Should a prospective limited partner not receive such an acknowledgement, it is the prospective limited partner's responsibility to contact the General Partner to ascertain the status of his or her subscription. A prospective limited partner cannot assume that his or her subscription has been approved until he or she receives the General Partner's executed counter-signature to this Agreement. If the subscription is not accepted, payment will be returned without deduction or interest.

# SUBSCRIPTION AGREEMENT

## TO BECOME A LIMITED PARTNER OF

## CARILLON TOWER/CHICAGO, L.P.

The undersigned, _____ ("New Limited Partner"), and Carillon Tower/Chicago, L.P., a New York limited partnership (the "Partnership"), hereby agree as follows:

**FIRST:**  The New Limited Partner desires to become a limited partner of the Partnership on _____ ___, 201_ (the "Admission Date"). In accordance with the terms of the Limited Partnership Agreement of the Partnership dated March 6, 2014 (the "Partnership Agreement"), the New Limited Partner subscribes for one Unit (as such term is defined in the Partnership Agreement) and in exchange will make capital contributions to the Partnership in the amount of $500,000 (the "Capital Contribution"), plus an administrative fee of $50,000 (the "Administrative Fee"), and Forefront EB-5 Fund (ICT), LLC (the "General Partner"), as general partner and on behalf of the Partnership, agrees to admit the New Limited Partner as a limited partner of the Partnership and to issue one Unit of interest in the Partnership on the Admission Date.

The Partnership is offering for purchase (the "Offering") to a limited number of individual investors who are not "U.S. persons," as such term is defined in Rule 902(k) of the Securities Act of 1933, as amended (the "Securities Act"), on a limited and private basis, a maximum of ninety (90) and a minimum of twenty (20) Units in the Partnership.

**SECOND:**  EACH NEW LIMITED PARTNER MUST COMPLETE THE APPROPRIATE REPRESENTATIONS SET FORTH BELOW:

**U.S. Person Status:**

The New Limited Partner is as of the Admission Date neither a resident nor a citizen of the United States.

**Accredited Investor Status:**

The New Limited Partner represents that he or she is an "accredited investor" within the meaning of Regulation D under the Securities Act, and has indicated below each category under which the New Limited Partner qualifies as an accredited investor.

The New Limited Partner is as of the Admission Date (check each statement that is correct):

☐ an individual who had an income in excess of $200,000 in each of the two most recent years (or joint income with his or her spouse in excess of $300,000 in each of those years) and has a reasonable expectation of reaching the same income level in the coming year;

☐ an individual who has a net worth[10] (or joint net worth with his or her spouse) in excess of $1,000,000;

☐ none of the above apply.

**THIRD:** The New Limited Partner further represents, warrants, acknowledges and agrees to the following:

a)    that the New Limited Partner is entering into this Subscription Agreement (this "Agreement") relying solely on the facts and terms set forth in this Agreement, the Confidential Private Offering Memorandum of the Partnership, as it may be amended from time to time (the "Offering Memorandum"), the Partnership Agreement attached to the Offering Memorandum as Exhibit B thereto, and the Escrow Agreement between the Partnership and the Escrow Agent, attached hereto as Exhibit B (the "Escrow Agreement"), and the New Limited Partner has received copies of all such documents, and neither the Partnership nor the General Partner has made any representations of any kind or nature to induce the New Limited Partner to enter into this Agreement except as specifically set forth in such documents;

b)    that his Capital Contribution and Administrative Fee will be transmitted to the Escrow Agent and held and released in accordance with the terms of the Escrow Agreement.

The New Limited Partner acknowledges that the Escrow Agreement:

(i)    authorizes the Partnership, without any further consent of the New Limited Partner, to direct the investment of funds held under the Escrow Agreement in the manner described in the Escrow Agreement;

(ii)    authorizes the Partnership, without any further consent of the New Limited Partner, to direct the Escrow Agent to disburse the Capital Contribution and Administrative Fee to the Partnership upon the approval of the New Limited Partner's I-526 Petition;

(iii)    authorizes the Partnership, without any further consent of the New Limited Partner, to direct the Escrow Agent to disburse the Capital Contribution and Administrative Fee to the New Limited Partner following denial of the New Limited Partner's I-526 Petition;

(iv)    authorizes the Partnership, without any further consent of the New Limited Partner, to direct the Escrow Agent to disburse the Capital

---

[10]    For purposes of this item, "net worth" means the excess of (a) total assets at fair market value, including personal property but excluding the undersigned's primary residence, over (b) total liabilities, including (i) any mortgage debt which exceeds the value of the undersigned's primary residence and (ii) any mortgage debt as of the date hereof in excess of the amount outstanding 60 days prior, other than as a result of the acquisition of the primary residence.

Contribution and Administrative Fee to the Partnership *prior to* approval or denial of the New Limited Partner's I-526 Petition, whenever the "Holdback Trigger," as defined in the Escrow Agreement, occurs;

(v)    authorizes the Partnership, without any further consent of the New Limited Partner, to disburse the Capital Contribution to the Partnership under certain circumstances when the I-526 Petition of another New Limited Partner has been denied;

(vi)   provides that no interest or other earnings on amounts held under the Escrow Agreement are payable to the New Limited Partner;

(vii)  authorizes the Partnership, without any further consent of the New Limited Partner, to provide the Escrow Agent with information about the New Limited Partner;

(viii) provides customary exclusions from liability in favor of the Escrow Agent; and

(ix)   provides for the payment of reasonable fees and expenses, which are not drawn from Capital Contributions of Limited Partners, to the Escrow Agent for its services under the Escrow Agreement.

**The foregoing summarizes only certain of the provisions of the Escrow Agreement and is qualified in its entirety by the terms of the Escrow Agreement. A New Limited Partner should carefully review and understand the Escrow Agreement attached hereto as Exhibit B, and the summary of escrow procedures set forth in the Offering Memorandum, before investing. The Escrow Agreement shall be binding upon and enforceable against the New Limited Partner;**

c)    that the New Limited Partner understands that the offer and sale of the Units have not been registered under the Securities Act, any state securities or "blue sky" laws, or any rules or regulations promulgated thereunder (collectively, "Securities Laws"), pursuant to applicable exemptions. Without such registration, the Units may not be sold, pledged, hypothecated or otherwise transferred at any time whatsoever, and the Units may not be offered or sold in the United States or to a U.S. Person, except upon delivery to the General Partner of an opinion of counsel satisfactory to the General Partner and/or the Partnership's counsel that registration is not required for such transfer, or the submission to the General Partner's counsel of such other evidence as may be satisfactory to the General Partner's counsel to the effect that any such transfer will not be in violation of the Securities Laws. No hedging transactions involving the Units may be conducted unless in compliance with the Securities Laws;

d)    that the New Limited Partner acknowledges that neither Tizi, LLC, an Illinois limited liability company doing business as "The Local Government Regional Center of Illinois, LLC" (the "Regional Center") nor the Regional Center's counsel is obligated to register

the Units under the Securities Laws. The New Limited Partner further understands that the transfer of the Units may be substantially restricted by the Securities Laws and by the absence of a trading market therefore, and the transfer of the Units is additionally restricted by the terms of the Partnership Agreement; that no trading market for the Units exists and none is expected to develop, and that any sale or other disposition of the Units may result in unfavorable tax consequences to the New Limited Partner. The New Limited Partner acknowledges that the restrictions on the transferability of the Units are substantial and may require the New Limited Partner to hold the Units indefinitely;

e)      that the New Limited Partner has consulted with his or her own tax counsel as to the U.S. federal income tax consequences of his or her investment in the Partnership and as to applicable state, local and foreign taxes;

f)      that the New Limited Partner has adequate means of providing for the New Limited Partner's current and future needs and possible personal contingencies and has no need for liquidity of the Units;

g)      that the New Limited Partner understands that because the Project has not yet been completed and opened for business, it has no operating history.

h)      That the Offering has no minimum amount, and that if the Offering does not raise at least $45,000,000 prior to the expiration of December 20, 2015 at 5:00 p.m. EST, unless extended by the Partnership until June 20, 2016 (the "Offering Period"), that Symmetry Tower/Chicago Project Owner, LLC may be required to obtain additional financing, which may not be possible and, even if possible, may result in increased debt service obligations as a result of such leverage;

i)      that the New Limited Partner has read and understood the section of the Offering Memorandum entitled *Risk Factors* and understands that: (i) his or her subscription for Units is irrevocable until the Offering Period ends, without the Partnership's written consent; (ii) an investment in the Units is a speculative investment that involves a high degree of risk, including the risk of loss of the entire investment of the New Limited Partner in the Partnership; (iv) there will be restrictions on the transferability of the Units under the Securities Laws and the Partnership Agreement, there will be no public market for the Units, and, accordingly, it may not be possible for the New Limited Partner to liquidate his or her investment in the Units; (v) any anticipated federal and/or state income tax benefits applicable to the Units may be lost through changes in, or adverse interpretations of, existing laws and regulations; and (vi) there is no assurance that the Partnership will ever be profitable, or that the New Limited Partner's investment in the Units will ever be recoverable;

j)      that the New Limited Partner acknowledges that there is no assurance that his or her I-526 Petition will be approved. Neither the Regional Center, the General Partner, the Partnership, the Developer, nor the New Limited Partner's selected immigration counsel has made any effort to pre-determine New Limited Partner's personal qualifications and circumstances and whether New Limited Partner is likely or not likely to obtain favorable action on his or her I-526 Petition or EB-5 Visa;

k)     that the New Limited Partner has been provided with a copy of the Partnership's Offering Memorandum, including, as exhibits thereto, the Partnership Agreement, the Escrow Agreement, and a form of this Agreement, has reviewed same, has had the opportunity to ask questions of the General Partner, has received answers adequate to New Limited Partner with respect to same, and has no further questions regarding the Regional Center, the General Partner, the Partnership, the Developer, or the Project;

l)     that the New Limited Partner acknowledges that: (i) the risks inherent to this investment have been fully considered; (ii) the General Partner will have substantial and exclusive authority to conduct the operation of the Partnership; and (iii) an investment in the Units has neither been approved nor disapproved by the United States Securities and Exchange Commission or the Securities Division of the Department of Banking and Finance of the State of New York or any other department or agency of any other jurisdiction, and such authorities have not passed upon the adequacy or accuracy of the disclosure provided to the New Limited Partner in connection with an investment in the Units, or made any finding or determination as to the fairness for investment, or any recommendation or endorsement of the Units as an investment;

m)    that the New Limited Partner acknowledges that neither the Regional Center, the Developer, the Co-Developer, the General Partner, nor any of their respective representatives or affiliates have made any representations or warranties in respect of the Partnership's, the Developer's, or the Co-Developer's business or profitability, or the feasibility of the acquisition, construction and development of the real property known as the known as Carillon Tower, which will include luxury apartments, a select service hotel, and a Gibson's Restaurant Group restaurant located at the corner of Superior Street and Wabash Avenue, in Chicago, Cook County, Illinois (the "Project").  Without limiting the generality of the foregoing, the New Limited Partner acknowledges and agrees that information, including any business plan or financial projections or forecasts or other information contained in written materials provided or made available to the New Limited Partner, and any oral, visual or other presentations made by the General Partner or Regional Center or its representatives to the New Limited Partner shall not be deemed a representation or warranty in respect of the matters therein. The New Limited Partner acknowledges that the Offering Memorandum contains information that the General Partner and the Developer and Co-Developer believe is accurate and, as same relates to the projected revenues and expenses of the Project, data that the Developer and Co-Developer believe is a reasonable forecast of the results that the Developer and Co-Developer will achieve; however, as an accredited, experienced and sophisticated investor, New Limited Partner is aware that there are myriad foreseeable and unforeseeable events that could cause the assumptions underlying the financial projections to not materialize, and the results of same may cause material adverse consequences to the financial results of the Developer, the Co-Developer and the Partnership;

n)     that the New Limited Partner is acquiring the Units solely for the account of the New Limited Partner for investment purposes only and not for distribution or resale to others. The New Limited Partner will not resell or offer to resell all or a portion of the Units except in strict compliance with all applicable Securities Laws including, without

limitation, Regulation S (Rules 901 through 905 and Preliminary Statement) under the Securities Act, and the Partnership Agreement;

o)    that the New Limited Partner's financial condition is such that it has no need for liquidity with respect to his or her investment to satisfy any existing or contemplated undertaking or indebtedness and is able to bear the economic risk of his or her investment for an indefinite period of time, including the risk of losing all of his or her investment;

p)    that the New Limited Partner acknowledges that the offer and sale of the Units is not taking place within the United States, but rather in an "offshore transaction," as defined in Rule 902 of Regulation S adopted by the Securities Exchange Commission pursuant to the Securities Act. "United States" means the United States of America, its territories and possessions, any state of the United States and the District of Columbia;

q)    that the New Limited Partner acknowledges that the Units have not been registered under the Securities Act and therefore cannot be offered and sold in the United States or to U.S. Persons, unless the Units are registered under the Securities Act or an exemption from the registration requirements of the Securities Act is available. New Limited Partner is not a U.S. Person and is not acquiring the Unit for the account or benefit of any U.S. Person;

r)    that the New Limited Partner acknowledges and confirms that the New Limited Partner has been given complete access to all documents, records, contracts and books of or relating to the Partnership and the Units now existing, and all other information to the extent the Partnership possesses such information or can acquire it without unreasonable effort or expense, and that the New Limited Partner has engaged in a complete examination of all such documents, records, contracts and books to the extent deemed necessary by the New Limited Partner in reaching the New Limited Partner's decision to invest in the Partnership. The New Limited Partner further acknowledges and confirms that the New Limited Partner has had an opportunity to ask questions of and receive answers from the General Partner concerning the Units, the prospective contemplated business and purpose of the Partnership, the Project and any other matter the New Limited Partner has deemed relevant, and all such inquiries have been answered to the New Limited Partner's satisfaction. In addition, New Limited Partner acknowledges that it has had and may have, at any reasonable hour, after reasonable prior notice, access to the financial and other records of the Partnership which the General Partner can obtain without unreasonable effort or expense, and further acknowledges that the New Limited Partner has obtained, in New Limited Partner's judgment, sufficient information from the General Partner to evaluate the merits and risks of an investment in the Partnership;

s)    that in making the decision to purchase the Units, New Limited Partner has relied solely upon independent investigations made by New Limited Partner, and the New Limited Partner further represents and warrants that the New Limited Partner is not acquiring the Units as a result of any advertisement, article, notice or other communication published in any newspaper, magazine or similar media distributed in the United States, any seminar in the United States or any solicitation by a person in the United States not previously known to the New Limited Partner, and that the New Limited Partner is not aware of any general solicitation within the United States or general advertising within

the United States regarding the purchase or sale of the Units. The New Limited Partner acknowledges and confirms that it is not relying upon any statement, representation or warranty made by the Regional Center or its respective representatives in making a decision to subscribe for the Units. New Limited Partner must rely solely on the terms of the Partnership Agreement for the terms of New Limited Partner's participation in the Partnership and the rights and responsibilities of owning his or her Units;

t)    that neither the Partnership, the General Partner, nor any of their respective members, partners, shareholders, agents, officers, directors or employees, nor any other person, has ever represented, guaranteed, or warranted, either directly or indirectly, any of the following to the New Limited Partner:

     1)    The percentage of profits and/or amount or type of consideration, profit or loss to be realized, if any, as a result of this investment.

     2)    The past performance or experience on the part of the Partnership's or the General Partner's personnel or that of any of their affiliates, agents or employees or any other person, that will in any way indicate the possible results of an investment in the Partnership.

u)    that the New Limited Partner is a *bona fide* resident of the country set forth in his or her address in this Agreement, and agrees that if his or her principal residence changes prior to his or her purchase of the Units, he or she will promptly notify the General Partner. The New Limited Partner represents and warrants that the New Limited Partner is not a U.S. Person, is not a citizen or resident alien of the United States, and did not receive an offer to purchase the Units or this Memorandum in the United States and did not execute this Agreement and pay the installment from within the United States. The New Limited Partner further agrees to execute and deliver to the General Partner an appropriate IRS Form W-8 certifying that he or she is a Non-Resident Alien;

v)    that the New Limited Partner understands that the General Partner and the Partnership will be relying on the accuracy and completeness of all matters set forth in this Agreement, and the New Limited Partner represents and warrants to the Regional Center, the General Partner, the Developer and the Partnership, and to each of their affiliates, that the information, representations, warranties, acknowledgments and all other statements set forth in this Agreement with respect to the New Limited Partner are complete, true and correct, and do not omit any material fact necessary to make the facts stated, in light of the circumstances in which they are made, not misleading, and the General Partner and the Partnership may rely on these statements and the covenants of the New Limited Partner in determining whether the offer and sale of the Units to the New Limited Partner is exempt from registration under the Securities Laws, and that the New Limited Partner will notify them immediately of any change in any statements made in this Agreement that occurs prior to the consummation of the purchase of the Units; and

w)    that the New Limited Partner is an "Accredited Investor" and has accurately answered the questions in Article Second of this Agreement to evidence the New Limited Partner's Accredited Investor Status. The New Limited Partner will represent and warrant that it is

also a "sophisticated person" in that the New Limited Partner has such knowledge and experience in financial and business matters that individually and/or with the aid of advisers, it is capable of evaluating the merits and risks of an investment in the Partnership by making an informed investment decision with respect thereto.

**FOURTH:**  Concurrently with the execution of this Agreement, the New Limited Partner has executed and delivered to the Partnership a counterpart of the Partnership Agreement, to be effective upon the New Limited Partner's admission as a limited partner of the Partnership.

**FIFTH:**  The Partnership and the General Partner are each hereby authorized and instructed to accept and execute any instructions in respect of the Unit to which this Agreement relates given by the New Limited Partner in written form, by facsimile or electronic means. If instructions are given by the New Limited Partner by facsimile or by email, the New Limited Partner agrees to keep each of the Partnership, the General Partner and each of their respective affiliates, principals, directors, officers, employees, agents and other representatives indemnified against any loss of any nature whatsoever arising to any of them as a result of any of them acting upon facsimile or email instructions. The New Limited Partner further understands and acknowledges that neither the Partnership nor the General Partner shall be responsible for any misdelivery or non-receipt of any facsimile or email instruction. Facsimiles or emails sent to the Partnership or the General Partner shall only be effective when actually acknowledged by the Partnership or the General Partner. The Partnership and the General Partner may rely conclusively upon and shall incur no liability in respect of any action taken upon any notice, consent, request, instructions or other instrument believed in good faith to be genuine or to be signed by properly authorized persons. Please note that messages sent via email must contain a duly signed document as an attachment. In the event that no acknowledgement is received from the General Partner within five (5) days of submission of the instruction, the New Limited Partner should contact the General Partner at 7 Times Square, 37th Floor, New York, NY 10036, Attention: Peter Shirk, to confirm receipt of the request by the General Partner.

**SIXTH:**  The New Limited Partner acknowledges that the Partnership and the General Partner may disclose to each other, to any service provider to the Partnership or to any regulatory body in any applicable jurisdiction copies of this Agreement and any information concerning the New Limited Partner provided by the New Limited Partner to the Partnership or the General Partner, and any such disclosure shall not be treated as a breach of any restriction upon the disclosure of information imposed on such person by law or otherwise.

**SEVENTH:**  **Privacy Policy of the Partnership and the General Partner.**  The New Limited Partner recognizes that non-public information concerning the New Limited Partner set forth in this Agreement or otherwise disclosed by the New Limited Partner to the Partnership, or other agents of the Partnership, such as the New Limited Partner's name, address, social security number, assets and income, and information regarding the New Limited Partner's investment in the Partnership (collectively, the "Information") (i) may be disclosed to the General Partner and its attorneys and accountants in furtherance of the Partnership's business and to other service providers such as brokers who may have a need for the information in connection with providing services to the Partnership; (ii) to third parties or financial institutions who may be providing marketing services to the Partnership, provided that such persons agree to protect the

confidentiality of the Information and use the Information only for the purposes of providing services to the Partnership; and (iii) as otherwise required or permitted by law or as requested by any regulatory or other governmental authority. The Partnership and the General Partner restrict access to the Information to their employees who need to know the Information to provide services to the Partnership, and maintain physical, electronic and procedural safeguards that comply with U.S. federal standards to guard the Information.

**EIGHTH:** The New Limited Partner hereby undertakes to: (i) diligently file and prosecute a Form I-526 petition and complete the consular interview process or the U.S. Citizenship and Immigration Services adjustment of status process, as applicable, established under 8 U.S.C. §1153 (b)(5)(A) - (D), § 203(b)(5)(A) - (D) of the Immigration and Nationality Act; (ii) promptly provide to the General Partner such information as the General Partner may at any time request confirming that the funds to be invested by the New Limited Partner were lawfully obtained, together with such other documents as the General Partner may reasonably request; and (iii) diligently file and prosecute a Form I-829 petition within 21 to 24 months after the date conditional resident status is obtained.

**NINTH:** **Confidentiality.** By executing this Agreement, the New Limited Partner specifically agrees that it will keep confidential and will not disclose to third parties (other than its tax or other financial advisors under like conditions of confidentiality) any and all information regarding the Partnership, including the Partnership's performance, provided that the confidential treatment required by this paragraph shall not apply to the tax treatment and tax structure of an investment in the Partnership or any transaction entered into by the Partnership, and the New Limited Partner may disclose to any and all persons the tax treatment and tax structure of an investment in the Partnership and all materials of any kind (including opinions or other tax analyses) that are provided to the Limited Partner relating to such tax treatment and tax structure.

**TENTH:** **Electronic Delivery of Reports and Other Communications.** At its discretion, the Partnership or the General Partner may provide to the New Limited Partner (or its designated agents) statements, reports and other communications relating to the Partnership and/or the New Limited Partner's investment in the Partnership in electronic form, such as by email. The New Limited Partner hereby consents to the sending of such statements, reports and other communications regarding the Partnership and its investment in the Partnership (including performance information, contribution and withdrawal activity, annual and other updates of the Partnership's consumer privacy policies and procedures) exclusively in electronic form without separate mailing of paper copies. The New Limited Partner acknowledges that e-mails from the Partnership or the General Partner may be accessed by recipients other than the New Limited Partner, may be interfered with, may contain computer viruses or other defects and may not be successfully replicated on other systems. Neither the Partnership nor the General Partner gives any warranties in relation to these matters. Any Limited Partner who has any doubts about the authenticity of an e-mail purportedly sent by the Partnership or the General Partner, should contact the Partnership or the General Partner immediately.

**ELEVENTH:** Indemnification.

The New Limited Partner hereby agrees to indemnify, defend and hold harmless the Partnership, the General Partner and their respective partners, officers, managers, governors, controlling persons, agents and employees, from and against any and all losses, damages or liabilities due to or arising out of a breach of any representation, warranty or covenant made by the New Limited Partner herein. Notwithstanding the foregoing, however, no representation, warranty, covenant, acknowledgment or agreement made herein by the New Limited Partner shall in any manner be deemed to constitute a waiver of any rights granted to the New Limited Partner under federal or state securities laws. All representations, warranties and covenants contained in this Agreement and the indemnification contained in this Section shall survive the acceptance of this subscription

**TWELFTH:**

The New Limited Partner hereby agrees that any representation, warranty or covenant made hereunder will be deemed to be reaffirmed by the New Limited Partner at any time he or she makes an additional capital contribution to the Partnership and the act of making such additional contribution will be evidence of such reaffirmation.  The New Limited Partner hereby agrees to promptly notify the Partnership in the event any representation or warranty made hereunder by the New Limited Partner is no longer accurate or ceases to be true.

**THIRTEENTH:** Miscellaneous.

a) This Agreement shall inure to the benefit of and be binding upon each of the parties hereto, and their heirs and legal representatives. This agreement shall be governed by the laws of the State of New York, without regard to its conflicts of law principles.

b) This Agreement and the Partnership Agreement contain the entire agreement of the parties with respect to the matters set forth herein and there are no representations, covenants or other agreements except as stated or referred to herein. In the event of a conflict between the terms, conditions or provisions of this Subscription Agreement and those of the Partnership Agreement, the terms, conditions and provisions of the Partnership Agreement shall prevail.

c) Neither this Agreement nor any provision hereof shall be amended, waived, modified, changed, discharged or terminated except by an instrument in writing signed by the party against whom any waiver, modification, change, discharge or termination is sought.

d) This Agreement is not transferable or assignable by New Limited Partner or any successor thereto.

e) This Agreement may be executed in any number of counterparts, each of which shall be considered an original.  Delivery of a copy of this Subscription Agreement bearing an original signature by facsimile transmission, by electronic mail in "portable document format" (".pdf") form, or by any other electronic means intended to preserve the original

graphic and pictorial appearance of a document, will have the same effect as physical delivery of the paper document bearing the original signature.

[*Remainder of this page intentionally left blank.*]

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement this _____ day of _____, 2015.

CARILLON TOWER/CHICAGO, LP

By:    Forefront EB-5 Fund (ICT), LLC
       Its General Partner


By: _____
       Jeffrey L. Laytin
       Managing Member


[*New Limited Partner Signature Pages to Follow*]

The undersigned is subscribing for one (1) limited partnership Unit and has wired to respective escrow accounts on behalf of "Carillon Tower/Chicago, LP" 100% of the purchase price of the Unit in the amount of $500,000, and 100% of the administrative fee in the amount of $50,000.

**New Limited Partner:**

_____

Name:

Taxpayer Identification or Social Security Number:

_____

Subscription Amount:

**$550,000.00**

*(consisting of $500,000 capital investment and $50,000 processing fee)*

Residence Address of New Limited Partner:

_____

_____

_____

Telephone: _____

Facsimile: _____

E-mail: _____

**EXHIBIT A**
**ESCROW AGREEMENT**

# EXHIBIT B
## SUMMARY OF ESCROW PROCEDURES

The Partnership intends to enter into an Escrow Agreement[11] which provides, in conjunction with the Partnership Agreement:

E.   Initially, the Capital Contribution of each subscriber ("Subscriber") will be held in an escrow account with TD Bank, N.A. (the "Escrow Agent") until the I-526 Petition of such Subscriber has been approved, subject to the provisions below.

F.   By subscribing for Units, each Subscriber recognizes and agrees that the Partnership will commence operations and has a need for the Capital Contributions of Limited Partners before Limited Partners' I-526 Petitions are approved by USCIS. **Therefore, under the circumstances discussed below, a portion or all of a Limited Partner's Capital Contribution and Administrative Fee will be released from escrow prior to I-526 Petition approval as set forth below.**

G.   The Capital Contributions and Administrative Fees of each Limited Partner will be held in the escrow account until each such Limited Partner's I-526 Petitions are approved or denied by USCIS, *provided* that once I-526 Petitions for at least one Subscriber has been approved by USCIS & the Partnership has provided evidence that the Project plan has been formally submitted to the Chicago Commissioner of Planning and Development (together considered the "Holdback Trigger"), then for each subsequent Limited Partner whose I-526 Petition has been filed, 80% of such Limited Partner's Capital Contribution and 100% of such Limited Partner's Administrative Fee may be released from escrow and funded to the Partnership's general operating account to fund a portion of such Limited Partner's Capital Contribution and full Administrative Fee so that the Partnership can commence operations, subject to the next paragraph below.

The remaining 20% ($100,000) (the "Holdback Amount") will be held by the Escrow Agent in escrow until such Limited Partner's I- 526 Petition is approved by USCIS (unless otherwise released prior to I-526 Petition approval as provided below). Upon the approval of a Limited Partner's I-526 Petition, the Holdback Amount for such Limited Partner (if not otherwise released, as described below) will be immediately released from the escrow and disbursed by the Escrow Agent to an operating account of the Partnership to fund the remaining 20% of the Limited Partner's $500,000 Capital Contribution. Accordingly, the Limited Partner will have invested a full $500,000 at the time of such Limited Partner's I-526 Petition approval (unless otherwise released prior to I-526 Petition approval to provide funds to a Limited Partner whose I-526 Petition has been denied under the circumstances described in (ii) below).

At such time as a Limited Partner's I-526 Petition is denied (without appeal or after denial of any appeal, as provided herein),

(i)       if the denied Limited Partner's Holdback Amount remains in escrow, then (A) such Holdback Amount shall be released from escrow and refunded to the Limited Partner,

and the Partnership will (1) refund the remainder of the denied Limited Partner's Capital Contribution and Administrative Fee and (2) cancel such Limited Partner's subscription; or (B) amounts held in escrow attributable to the other Limited Partners (escrow release priority based on I-526 filing date) and who have amounts remaining in escrow shall be released from escrow, transferred to the Partnership, and the General Partner will then, subject to its sole discretion, determine how best to refund the balance or entirety of the Limited Partner's Capital Contribution and Administrative Fee; and

(ii)   if the denied Limited Partner's Holdback Amount no longer remains in escrow, then (A) the Partnership will (1) refund the remainder of the denied Limited Partner's Capital Contribution and Administrative Fee and (2) cancel such Limited Partner's subscription; or (B) amounts held in escrow attributable to other Limited Partners who have amounts remaining in escrow shall be released from escrow, transferred to the Partnership, and the General Partner will then, subject to its sole discretion, determine how best to refund to the Limited Partner, it's Capital Contribution and Administrative Fee.

Notwithstanding the foregoing, if there is an insufficient amount available in escrow to enable the Partnership to return the Capital Contribution and Administrative Fee amount to a denied Limited Partner (including the capital of a denied Limited Partner that was disbursed to cover a return of capital to a prior Limited Partner whose petition was denied) and continue operations with the Capital Contributions of other Limited Partners, then such refund will be made to the Limited Partner:

(x)   as of the date that adequate funds are available in escrow, for disbursement to the Partnership, for the payment of the refund in the event the Partnership has not, within 30 days of such final denial, (A) made such refund or (B) replaced such denied Limited Partner with a substitute Limited Partner as set forth below; and

(y)   on a first priority basis, such that each denied Limited Partner shall be refunded his or her Capital Contribution and Administrative Fee in full in an order based on the timing of when each such Limited Partner's I-526 Petition was ultimately denied, unless such refund is otherwise made as set forth below.

For purposes of clarification, the foregoing provisions are intended to ensure that each Limited Partner (A) who has all or any portion of his or her Capital Contribution or Administrative Fee remaining in escrow and (B) who has not received approval of such Limited Partner's I-526 Petition, shall receive a capital credit for such Limited Partner's balance of any of his or her Capital Contribution or Administrative Fee released from escrow to the Partnership's general operating account.

The Partnership shall not be obligated to refund a denied Limited Partner's Capital Contribution or Administrative Fee if (i) the Limited Partner fails to actively proceed to obtain I-526 Petition approval filing the I-526 Petition; or (ii) the Limited Partner withdraws the I-526 Petition once the I-526 Petition has been filed.

H.   In the event the Partnership is unable to refund a denied Limited Partner's $500,000 Capital Contribution and $50,000 Administrative Fee, the Partnership shall use best efforts to substitute the denied Limited Partner with the next Subscriber that deposits his or her $500,000 Capital Contribution and $50,000 Administrative Fee with the Escrow Agent and who files his or her I-

526 Petition (the "<u>Substituting Limited Partner</u>"), as and when such Substituting Limited Partner's I-526 Petition is filed.

EXHIBIT D

# FORM OF ESCROW AGREEMENT

# ESCROW AGREEMENT

This Escrow Agreement (this "Agreement") dated as of January __, 2015 is by and between CARILLON TOWER/CHICAGO, L.P., a New York limited partnership (the "Limited Partnership"), and TD BANK, N.A., a national banking association organized and existing under the laws of the United States of America, as Escrow Agent (the "Escrow Agent").

1. **Recitals**

WHEREAS, certain persons desire to acquire limited partnership interests in the Limited Partnership (the "Interests"), as described in the Limited Partnership's Preliminary Confidential Private Offering Memorandum attached to this Agreement as Exhibit A (the "Offering Memorandum") and the Partnership Agreement (as defined in the Offering Memorandum). Unless otherwise defined in this Agreement, capitalized terms used herein have the respective meanings assigned to them in the Offering Memorandum or the Partnership Agreement, as the case may be;

WHEREAS, pursuant to the Subscription Agreement attached hereto as Exhibit B (the "Subscription Agreement"), each subscriber is required to transfer in to the Escrow Accounts the sum of U.S. Five Hundred and Fifty Thousand Dollars (US$550,000.00), representing two separate amounts:

2. U.S. Five Hundred Thousand Dollars (US$500,000.00) (the "Capital Contribution"); and

3. U.S. Fifty Thousand Dollars (US$50,000.00) (the "Administrative Fee");

WHEREAS, as described more fully in the Offering Memorandum, each subscriber irrevocably commits the Capital Contribution to investment in a high rise mixed-use real estate development at the corner of Superior Street and Wabash Street in the City of Chicago, Illinois (the "Project") upon the subscriber's delivery of the Capital Contribution, the Administrative Fee and the executed Subscription Agreement;

WHEREAS, as described more fully in the Offering Memorandum, each subscriber's Capital Contribution shall be irrevocably committed once accepted by the Partnership, subject to repayment only upon denial of the subscriber's I-526 Petition by the U.S. Citizenship and Immigration Service (the "USCIS"), and shall be immediately available and put to use in the Project for job creation purposes when released pursuant to the terms and conditions hereof, which shall be no later than the time when notice of approval of a subscriber's I-526 Petition is received from the USCIS.

WHEREAS, the Escrow Agent has no relationship, other than that of Escrow Agent, to the Limited Partnership, its affiliates or legal representatives; and

WHEREAS, the Escrow Agent will open two Escrow Accounts (the "Escrow Accounts") entitled the "Carillon Tower/Chicago, L.P. Contribution Escrow Account" (the "Contribution Escrow Account") and the "Carillon Tower/Chicago, L.P. Expense Escrow Account" (the "Expense Escrow Account"), and shall deposit the Capital Contribution in the Contribution Escrow Account and the Administrative Fee in the Expense Escrow Account and hold and disperse the funds in the Escrow Accounts in accordance with this Agreement.

NOW THEREFORE, in consideration of the premises and the mutual covenants and agreements herein set forth, the parties hereby agree as follows:

**Section 1. Engagement and Duties of the Escrow Agent**. The Limited Partnership hereby engages the Escrow Agent to serve as the escrow agent hereunder and the Escrow Agent hereby accepts such engagement and agrees to receive, hold, deliver, and deal with the Capital Contribution and Administrative Fee on the terms and conditions herein set out. The Limited Partnership agrees to pay the charges of the Escrow Agent set forth on Exhibit C to this Agreement.

**Section 2. Creation of Escrow Accounts**. The Limited Partnership hereby directs the Escrow Agent to remit (i) the Capital Contribution to the Contribution Escrow Account and (ii) the Administrative Fee to the Expense Escrow Account, as follows:

**Contribution Escrow Account**

| | |
|---|---|
| Credit Bank: | TD Bank, N.A. |
| ABA Number: | 011600033 |
| SWIFT Code: | NRTHUS33 |
| For the Benefit of: | Trustee Clearing Account DDA 76-8270-01-9 |
| For Further Credit to Name: | CARILLON TOWER/CHICAGO, L.P. |
| From (Subscriber Name): | _____ |
| Amount: | _____ |

**Expense Escrow Account**

| | |
|---|---|
| Credit Bank: | TD Bank, N.A. |
| ABA Number: | 011600033 |
| SWIFT Code: | NRTHUS33 |
| For the Benefit of: | Trustee Clearing Account DDA 76-8270-02-7 |
| For Further Credit to Name: | CARILLON TOWER/CHICAGO, L.P. |
| From (Subscriber Name): | _____ |
| Amount: | _____ |

The Escrow Agent shall provide to the Limited Partnership monthly statements of the Escrow Accounts and their activity.

While funds are held in the Escrow Accounts, the Escrow Agent, shall, at the written direction of the Limited Partnership, invest the funds in: (i) any short-term obligations which as to principal and interest constitute direct obligations of, or are guaranteed by, the United States of America; (ii) certificates of deposits of banks or trust companies with maturities of three (3) months or less, including TD Bank, N.A. or any of its affiliates, organized under the laws of the United States of America or any state thereof and insured by the Federal Deposit Insurance Corporation ("FDIC"); or (iii) the TDAM US Treasury Obligations Money Market Fund. The parties hereto are aware that the FDIC insurance applies only to a cumulative maximum amount of US Two Hundred Fifty Thousand Dollars (US$250,000.00) for all depository accounts at the same or related institutions. Further, the parties hereto understand that the Escrow Agent assumes no responsibility for, nor will the parties hereto hold the Escrow Agent liable for, any loss occurring which arises from the fact that the amount of the above account may cause the aggregate amount of any individual depositor's accounts to exceed US Two Hundred Fifty Thousand Dollars (US$250,000.00) and that the excess amount is not insured by the FDIC.

**Section 3. Funds.** From time to time upon execution of this Agreement, subscribers shall wire their respective Capital Contribution and the Administrative Fee to the Escrow Agent in accordance with the instructions in Section 2 above. The Capital Contribution and the Administrative Fee shall be held in their respective Escrow Accounts in accordance with this Agreement. Promptly upon receipt of such funds, the Escrow Agent shall provide deposit confirmation acknowledging receipt of such funds to both the relevant subscriber and the Limited Partnership.

**Section 4. Disbursement of Capital Contribution In Contribution Escrow Account.**

<u>Action Upon Rejection of Subscription</u>. The Limited Partnership may reject any subscription at any time prior to the Limited Partnership's delivery of a written direction to disburse any part of the Capital Contribution to the Limited Partnership, but not after the respective Subscriber's filing of the Form I-526 Petition. The Limited Partnership shall promptly notify the Escrow Agent with a written direction in the event of any such rejection. Upon the receipt of a written direction, the Escrow Agent shall return to the subscriber whose subscription has been rejected the Capital Contribution tendered by such Subscriber, without deduction or payment of interest.

<u>Action Upon Termination of Cancellation of the Offering</u>. Upon the receipt of a written notice from the Limited Partnership that the offering as described in the Offering Memorandum has been terminated or cancelled, all funds received from subscribers will be returned to them from the Contribution Escrow Account without deduction or payment of interest in accordance with written directions provided by the Limited Partnership. For avoidance of doubt, the Limited Partnership shall not terminate or cancel the Offering after providing written direction to disburse any part of any subscriber's Capital Contribution to the Limited Partnership.

<u>Action Upon Achievement of Holdback Trigger</u>. Upon a written direction of the Limited Partnership certifying that the Holdback Trigger has been satisfied, the Escrow Agent shall remit 80% of the Capital Contribution of each Investor from the Contribution Escrow Account to the Limited Partnership and retain 20% of the Capital Contribution (the "Holdback Amount") in an account (the "Holdback Escrow Account") for the benefit of each Subscriber. The "Holdback Trigger" shall have occurred once both of the following conditions have been satisfied:

    a. USCIS shall have approved the Form I-526 Petitions of one Subscriber for a Limited Partnership Interest (related to an investment of Five Hundred Thousand U.S. Dollars (US$500,000);

    b. The Partnership has provided evidence that the Project plan has been formally submitted to the Chicago Commissioner of Planning and Development.

<u>Action Upon Approval of Form I-526.</u> Upon a written direction of the Limited Partnership certifying that the USCIS has approved a subscriber's Form I-526 Petition, the Escrow Agent shall promptly remit a subscriber's Holdback Amount (if not previously released pursuant to Section 4(e)) from the Holdback Escrow Account to the Limited Partnership.

Action Upon Denial of Form I-526. Upon a written direction of the Limited Partnership certifying that the USCIS has denied (without appeal or after denial of any appeal) a subscriber's Form I-526 Petition, the Escrow Agent shall return the subscriber's Holdback Amount, if such funds remain in the Holdback Escrow Account, to the denied subscriber identified in such written direction, without deduction or payment of interest. The Limited Partnership shall also provide in the written direction for the Escrow Agent to disburse from the Escrow Holdback Account an additional $400,000 (in the case where the denied subscriber's Holdback Amount remained in the Holdback Escrow Account) or $500,000 (in the case where the denied subscriber's Holdback Amount has previously been disbursed from the Holdback Escrow Account) from the Holdback Amounts of subscribers to the general operating account of the Limited Partnership to fund the remainder of the capital contributions of such subscribers so the Limited Partnership can continue operations without deficit being caused by the refund of the denied subscriber's capital contribution in accordance with the terms and conditions set forth in the Limited Partnership's Offering Memorandum. The Escrow Agent shall rely, conclusively and without further inquiry, upon the Limited Partnership to designate, in writing, the subscribers whose Holdback Amounts shall be disbursed to the Limited Partnership's general operating account for this purpose.

Interest. No subscriber shall receive any interest on any funds held by the Escrow Agent or the Limited Partnership and all investment earnings shall accrue to, and be payable to, the Limited Partnership. After disbursements under Section 4(a) above, the Escrow Agent shall disperse all remaining monies in respect of the subscriber in the Contribution Escrow Account to the Limited Partnership at the same time any disbursement is made to such subscriber at the direction of the Limited Partnership in accordance with Section 8 hereof.

## Section 5. Disbursement of Administrative Fee In Expense Escrow Account.

Action Upon Rejection of Subscription. Upon the receipt of a written direction of the Limited Partnership stating that it has rejected a subscription, the Escrow Agent shall return to the subscriber whose subscription has been rejected the Administrative Fee tendered by such subscriber, without deduction or payment of interest.

Action Upon Termination of Cancellation of the Offering. Upon the receipt of a written notice from the Limited Partnership that the offering as described in the Offering Memorandum has been terminated or cancelled, Administrative Fees received from subscribers will be returned to them from the Expense Escrow Account without deduction or payment of interest in accordance with written directions provided by the Limited Partnership.

Action Upon Achievement of Holdback Trigger. Upon a written direction of the Limited Partnership certifying that the Limited Partnership has accepted a subscriber's subscription, the Escrow Agent shall remit to the Limited Partnership 100% of the Administrative Fees of such subscriber held in the Expense Escrow Account.

Interest. No subscriber shall receive any interest on any funds held by the Escrow Agent or the Limited Partnership and all investment earnings shall accrue to, and be payable to, the Limited Partnership.

**Section 6. Duties of the Limited Partnership.** The Limited Partnership shall provide the Escrow Agent with:

      (a) Evidence, reasonably satisfactory to the Escrow Agent, that this Agreement has been duly authorized, executed, and delivered on the part of the Limited Partnership.

Any information it has with respect to any subscriber available to the Limited Partnership which may reasonably be required by the Escrow Agent and may be disclosed by law.

The information listed on <u>Exhibit D</u> attached hereto.

**Section 7. Disputes.** In the event of any dispute arising as to any provisions hereof or as to the Escrow Agent's duties, the Escrow Agent shall be entitled to retain legal counsel to tender unto the registry or custody of any court of competent jurisdiction all money or property in its hands held under the terms of this Escrow Agreement, together with such legal pleading as it deems appropriate, and thereupon be discharged. The cost of such proceeding shall be paid by the Limited Partnership, provided that the Escrow Agent shall request the prior approval of the Limited Partnership respecting the retaining of counsel to the Escrow Agent, which approval will not be unreasonably withheld or delayed. All actions and proceedings arising out of or relating to this Agreement shall be heard and determined exclusively in a court of applicable jurisdiction in the State of New York, and the parties hereto hereby submit to the exclusive jurisdiction of such courts and irrevocably waive any claim or defense that it is not subject to personal jurisdiction of such courts.

**Section 8. Compensation and Expenses.** The Limited Partnership directs the Escrow Agent to disburse to the Limited Partnership all investment earnings on all the funds held in the Escrow Account remaining after disbursement of amounts to a subscriber or the Limited Partnership pursuant to Section 4 or 5 above and after the Escrow Agent has been reimbursed for reasonable fees or expenses incurred in connection with its obligations under this Agreement. In no event shall such fees reduce the aggregate amount disbursed from the Contribution Escrow Account of a subscriber to the Limited Partnership below $500,000.

**Section 9. Liability.** The Escrow Agent shall not be liable for any damage, liability or loss arising out of, or in connection with, the services rendered by the Escrow Agent pursuant to this Agreement, except for any damage, liability or loss resulting from the gross negligence, willful misconduct or breach of the Agreement by the Escrow Agent. The Limited Partnership indemnifies and holds the Escrow Agent harmless from and against any and all claims, damages, liabilities, obligations, losses, deficiencies, penalties, judgments, costs, disbursements, and expenses of any kind or nature (including, but not limited to, the reasonable fees and disbursements of counsel and amounts paid or agreed to be paid in settlement of any claim, action, suit, or proceeding or investigation) in any matter resulting from, arising out of, based upon or related and attributable to any claim of any party under this Agreement (other than with respect to any gross negligence or willful misconduct or breach as stated above). The Escrow Agent may rely on the Limited Partnership's internal anti-money laundering policies and procedures and shall have no responsibility to identify any subscriber.

**Section 10. Notices.** All notices or communications given by any party hereunder shall be delivered in person, by overnight courier service or by mail, postage prepaid, to the address of the parties as set forth under their respective signatures hereto or such other address as may be

given by notice to the other parties by a party hereto by facsimile transmission at the number given by notice to the other parties by a party hereto, or by email to the address given by notice to the other parties by a party hereto. Notices shall be deemed given on the date they are delivered in person, by facsimile transmission or by email, two (2) days after deposit with an overnight courier service or three (3) days after being deposited in the mail, postage prepaid.

**Section 11. Resignation.** Escrow Agent shall have the right to resign at any time upon thirty (30) days' prior written notice to the Limited Partnership to request that the Limited Partnership designate a substitute Escrow Agent in accordance with this Section 11. If a replacement Escrow Agent has not been appointed within such thirty (30) day period, the Escrow Agent may petition any court of competent jurisdiction for the appointment of a successor Escrow Agent and upon such appointment deliver all funds and property to such successor.

**Section 12. Execution and Counterparts.**

(a)     This Escrow Agreement may be executed in two or more counterparts, each of which shall constitute an original and all of which taken together shall constitute one and the same document and signatures by facsimile or fax shall suffice to evidence the execution and delivery of this Agreement by the parties hereto.

The Limited Partnership agrees to provide the Escrow Agent with all instruments and documents within their respective powers which the Escrow Agent requires to perform its duties hereunder.

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, heirs and assigns as permitted hereunder.

This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to such jurisdiction's principles of conflict of laws.

[Remainder of page intentionally left blank.]

IN WITNESS WHEREOF, the undersigned have caused this Escrow Agreement to be executed as of the_____ day of March, 2014.

**CARILLON TOWER/CHICAGO, L.P.**

By: Forefront EB-5 Fund (ICT), LLC, its General Partner

By: _____
    Name: Jeffrey Laytin
    Title: Managing Member

Address:  7 Times Square, 37th Floor,
          New York, NY 10036

**TD BANK, N.A.**

By: _____
    Name: Stephen Schaaf
    Title: Vice President

Address:  1006 Astoria Boulevard
          Cherry Hill, New Jersey

Exhibit A

**<u>Private Offering Memorandum</u>**

Exhibit B

### **<u>Subscription Agreement</u>**

Exhibit C

**Escrow Fees**

**SCHEDULE OF FEES (1)**

*Re:* ***Escrow Agent Services for Forefront EB-5 Fund (1)(3)(4)***

A.  Acceptance Fee:                                    $5,000.00
    One-time fee to establish the escrow account.

B.  Annual Escrow Agent Fee:                   $1,500.00   per subscriber
    Administration fee per subscriber to perform the duties outlined in the escrow agreement. In no event shall such fees reduce the aggregate amount disbursed from the Contribution Escrow Account of a subscriber to the Limited Partnership below $500,000.

C.  Out of Pocket Expenses (in arrears): (2)  At Cost

In no event shall such fees reduce the aggregate amount disbursed from the Contribution Escrow Account of a subscriber to the Limited Partnership below $500,000.
_____

(1)     All fees are due and payable upon the signing of the account agreements.

(2) Out of Pocket Expenses shall be billed at cost which may include, but is not limited to, postage, stationery, communication charges, counsel fees and expenses or other experts as may be required from time to time.

(3) TD Bank, National Association complies with Section 326 of the USA Patriot Act. This law mandates that we ask you for, verify, and record certain information about you or your organization (including you or your organization's name, street address, date of birth, Social Security or Tax Identification Number, and other information) while processing your account application.

(4) The above quoted fee schedule is contingent upon TD Bank's review and acceptance of all account documentation, including receiving a copy of the form I-526 for each subscriber and is subject to change if the details of the account should change.

Signed By: _____          Date:_____

*TD Wealth Management is a service mark of the Toronto-Dominion Bank, used with permission.*

Exhibit D

<u>Documents Required to Open Escrow Account</u>

1.) A copy of the Private Placement Memorandum/Offering Memorandum

2.) A copy AML/Know Your Customer Policy & Procedures

3.) The CIP Information for each party. This information should include:

    1.  Copy of Articles of Incorporation or Certificate of Formation for both organizations

    2.  W-9 for each organization

    3.  Corporate Resolution listing who is authorized to sign on behalf of each Company

    4.  Completed TD Bank CIP ID and Disclosure Form Entity for each organization

    5.  Listing of beneficial holders of 10% or more

    6.  For each beneficial holder and authorized signer, we will need to collect a copy of a current valid Driver's License, Completed TD Bank CIP ID and Disclosure Form Individual and a W-9

4.) A copy of each subscriber's Packet

5.) Signed TD Bank Fee Schedule

6.) Signed TD Bank Wire Transfer Agreement

7.) Signed Investment Authorization Form

8.) NCM USA Radiopharmaceutical Facility:  Please provide copy of Articles Of Incorporation or Certificate of Formation and a W-9

9.) A mutually agreed upon Escrow Agreement

aa

Form **W-8BEN**

(Rev. February 2006)

Department of the Treasury
Internal Revenue Service

## Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding

▶ Section references are to the Internal Revenue Code.  ▶ See separate instructions.
▶ Give this form to the withholding agent or payer. Do not send to the IRS.

OMB No. 1545-1621

**Do not use this form for:**

Instead, use Form:

- A U.S. citizen or other U.S. person, including a resident alien individual . . . . . . . . . . . . . . . . . . . . . W-9
- A person claiming that income is effectively connected with the conduct
  of a trade or business in the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . W-8ECI
- A foreign partnership, a foreign simple trust, or a foreign grantor trust (see instructions for exceptions) . . . . . . . W-8ECI or W-8IMY
- A foreign government, international organization, foreign central bank of issue, foreign tax-exempt organization,
  foreign private foundation, or government of a U.S. possession that received effectively connected income or that is
  claiming the applicability of section(s) 115(2), 501(c), 892, 895, or 1443(b) (see instructions) . . . . . . . . . . W-8ECI or W-8EXP

**Note:** *These entities should use Form W-8BEN if they are claiming treaty benefits or are providing the form only to claim they are a foreign person exempt from backup withholding.*

- A person acting as an intermediary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . W-8IMY

**Note:** *See instructions for additional exceptions.*

**Part I**    **Identification of Beneficial Owner** (See instructions.)

| 1 Name of individual or organization that is the beneficial owner | 2 Country of incorporation or organization |
|---|---|

3 Type of beneficial owner:  ☐ Individual   ☐ Corporation   ☐ Disregarded entity   ☐ Partnership   ☐ Simple trust

☐ Grantor trust   ☐ Complex trust   ☐ Estate   ☐ Government   ☐ International organization

☐ Central bank of issue   ☐ Tax-exempt organization   ☐ Private foundation

4 Permanent residence address (street, apt. or suite no., or rural route). **Do not use a P.O. box or in-care-of address.**

| City or town, state or province. Include postal code where appropriate. | Country (do not abbreviate) |
|---|---|

5 Mailing address (if different from above)

| City or town, state or province. Include postal code where appropriate. | Country (do not abbreviate) |
|---|---|

| 6 U.S. taxpayer identification number, if required (see instructions)  ☐ SSN or ITIN  ☐ EIN | 7 Foreign tax identifying number, if any (optional) |
|---|---|

8 Reference number(s) (see instructions)

**Part II**    **Claim of Tax Treaty Benefits** (if applicable)

9 I certify that (check all that apply):

a ☐ The beneficial owner is a resident of . . . . . . . . . . . . . . . . . . within the meaning of the income tax treaty between the United States and that country.

b ☐ If required, the U.S. taxpayer identification number is stated on line 6 (see instructions).

c ☐ The beneficial owner is not an individual, derives the item (or items) of income for which the treaty benefits are claimed, and, if applicable, meets the requirements of the treaty provision dealing with limitation on benefits (see instructions).

d ☐ The beneficial owner is not an individual, is claiming treaty benefits for dividends received from a foreign corporation or interest from a U.S. trade or business of a foreign corporation, and meets qualified resident status (see instructions).

e ☐ The beneficial owner is related to the person obligated to pay the income within the meaning of section 267(b) or 707(b), and will file Form 8833 if the amount subject to withholding received during a calendar year exceeds, in the aggregate, $500,000.

10 **Special rates and conditions** (if applicable—see instructions): The beneficial owner is claiming the provisions of Article . . . . . . . . . . . . of the treaty identified on line 9a above to claim a . . . . . . . . . . . . . % rate of withholding on (specify type of income): . . . . . . . . . . . . . . . . . . . . . . . .

Explain the reasons the beneficial owner meets the terms of the treaty article: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**Part III**    **Notional Principal Contracts**

11 ☐ I have provided or will provide a statement that identifies those notional principal contracts from which the income is **not** effectively connected with the conduct of a trade or business in the United States. I agree to update this statement as required.

**Part IV**    **Certification**

Under penalties of perjury, I declare that I have examined the information on this form and to the best of my knowledge and belief it is true, correct, and complete. I further certify under penalties of perjury that:

1 I am the beneficial owner (or am authorized to sign for the beneficial owner) of all the income to which this form relates,

2 The beneficial owner is not a U.S. person,

3 The income to which this form relates is (a) not effectively connected with the conduct of a trade or business in the United States, (b) effectively connected but is not subject to tax under an income tax treaty, or (c) the partner's share of a partnership's effectively connected income, **and**

4 For broker transactions or barter exchanges, the beneficial owner is an exempt foreign person as defined in the instructions.

Furthermore, I authorize this form to be provided to any withholding agent that has control, receipt, or custody of the income of which I am the beneficial owner or any withholding agent that can disburse or make payments of the income of which I am the beneficial owner.

**Sign Here** ▶ _____   _____   _____

Signature of beneficial owner (or individual authorized to sign for beneficial owner)   Date (MM-DD-YYYY)   Capacity in which acting

For Paperwork Reduction Act Notice, see separate instructions.    Cat. No. 25047Z    Form **W-8BEN** (Rev. 2-2006)

Printed on Recycled Paper

EXHIBIT E

# BUSINESS PLAN

（Provided Separately）

EXHIBIT F

# TEA DESIGNATION LETTER



Pat Quinn
*Governor*

Jay Rowell
*Director*

September 19, 2014

Jeffrey Laytin
Managing Partner
Symmetry Property Development LLC
One Penn Plaza, 49th Fl
New York, NY 10119

Dear Mr. Laytin:

Please be advised that the Illinois Department of Employment Security (IDES) is the designated state agency with the authority to certify that geographic areas within the State of Illinois qualify as areas of high unemployment under the Alien Entrepreneur Visa Program.

This is to confirm that the proposed project to be located on the northeast corner of the intersection of North Wabash Avenue and East Superior Street in Chicago, IL is in an area of high unemployment as defined in Section 8 CFR 204.6(i) of the Code of Federal Regulations. The proposed project area encompasses the Census Tracts in the attached table and map, all of which are located in Chicago. Federal regulations do not provide guidelines on how physical boundaries are to be evaluated, so IDES has made no judgment based on the physical boundaries of the area. IDES solely evaluates whether the geographic area meets the standards for a high unemployment area. Further, an area's final designation as a Targeted Employment Area will be made by U.S. Citizenship and Immigration Services.

The determination of eligibility is based on an analysis of the labor force data for the 12-month period ending December 2013 for the above mentioned Census Tracts and for the U.S. as a whole. The Census Tract data were developed by the Economic Information and Analysis Division of IDES using the census-share method, as described in the U.S. Bureau of Labor Statistics, Local Area Unemployment Statistics Program Manual. The average national unemployment rate for the year 2013 was 7.4 percent. We have determined that the unemployment rate for the group of Census Tracts that comprise the high unemployment area was 11.3 percent or 153 percent of the national unemployment rate.

**The State of Illinois has not investigated the proposed project, nor has it made an assessment about the quality of the project, or the potential for earnings of the project at the above address. The State of Illinois verifies that the area designated is an area of high unemployment and is contiguous but does not evaluate the geographic boundaries. Projects in a TEA are not affiliated with, or sponsored by, the State of Illinois or the Illinois Department of Employment Security.**

Sincerely,

Richard Reinhold
Manager, Local Area Unemployment Statistics
Economic Information and Analysis Division

**Source: Illinois Department of Employment Security, Economic Information and Analysis**
**2013 annual average estimates (the latest time period available) - data are subject to revision**

| County | County FIPS code | Census Tract Number | Place Name | Time Period | Labor Force | Employed | Unemployed | Unemployment Rate |
|---|---|---|---|---|---|---|---|---|
| United States (in thousands) | - | - | - | **2013-AA** | 155,389 | 143,929 | 11,460 | 7.4 |
| Cook | 031 | 814.01 | Chicago city | **2013-AA** | 1,315 | 1,076 | 239 | 18.2 |
| Cook | 031 | 815.00 | Chicago city | **2013-AA** | 2,682 | 2,583 | 99 | 3.7 |
| Cook | 031 | 816.00 | Chicago city | **2013-AA** | 2,198 | 2,021 | 177 | 8.1 |
| Cook | 031 | 817.00 | Chicago city | **2013-AA** | 2,169 | 2,093 | 76 | 3.5 |
| Cook | 031 | 2518.00 | Chicago city | **2013-AA** | 1,598 | 1,100 | 498 | 31.2 |
| Cook | 031 | 2601.00 | Chicago city | **2013-AA** | 374 | 297 | 77 | 20.6 |
| Cook | 031 | 2602.00 | Chicago city | **2013-AA** | 396 | 269 | 127 | 32.1 |
| Cook | 031 | 2603.00 | Chicago city | **2013-AA** | 462 | 348 | 114 | 24.7 |
| Cook | 031 | 2604.00 | Chicago city | **2013-AA** | 389 | 321 | 68 | 17.5 |
| Cook | 031 | 2607.00 | Chicago city | **2013-AA** | 660 | 558 | 102 | 15.5 |
| Cook | 031 | 2608.00 | Chicago city | **2013-AA** | 696 | 564 | 132 | 19.0 |
| Cook | 031 | 2705.00 | Chicago city | **2013-AA** | 370 | 247 | 123 | 33.2 |
| Cook | 031 | 2712.00 | Chicago city | **2013-AA** | 444 | 406 | 38 | 8.6 |
| Cook | 031 | 2713.00 | Chicago city | **2013-AA** | 279 | 232 | 47 | 16.8 |
| Cook | 031 | 2714.00 | Chicago city | **2013-AA** | 419 | 359 | 60 | 14.3 |
| Cook | 031 | 2804.00 | Chicago city | **2013-AA** | 358 | 290 | 68 | 19.0 |
| Cook | 031 | 2808.00 | Chicago city | **2013-AA** | 180 | 134 | 46 | 25.6 |
| Cook | 031 | 2809.00 | Chicago city | **2013-AA** | 219 | 146 | 73 | 33.3 |
| Cook | 031 | 2819.00 | Chicago city | **2013-AA** | 2,738 | 2,619 | 119 | 4.3 |
| Cook | 031 | 8331.00 | Chicago city | **2013-AA** | 4,738 | 4,519 | 219 | 4.6 |
| Cook | 031 | 8368.00 | Chicago city | **2013-AA** | 755 | 611 | 144 | 19.1 |
| Cook | 031 | 8369.00 | Chicago city | **2013-AA** | 655 | 589 | 66 | 10.1 |
| Cook | 031 | 8370.00 | Chicago city | **2013-AA** | 897 | 794 | 103 | 11.5 |
| Cook | 031 | 8371.00 | Chicago city | **2013-AA** | 732 | 623 | 109 | 14.9 |
| Cook | 031 | 8374.00 | Chicago city | **2013-AA** | 546 | 407 | 139 | 25.5 |
| Cook | 031 | 8378.00 | Chicago city | **2013-AA** | 1,395 | 1,160 | 235 | 16.8 |
| Cook | 031 | 8380.00 | Chicago city | **2013-AA** | 1,108 | 926 | 182 | 16.4 |
| Cook | 031 | 8381.00 | Chicago city | **2013-AA** | 967 | 906 | 61 | 6.3 |
| Cook | 031 | 8391.00 | Chicago city | **2013-AA** | 2,430 | 2,320 | 110 | 4.5 |
| **High unemployment area** | | | | | **32,169** | **28,518** | **3,651** | **11.3** |

**Location of proposed project**



N Wabash Ave/E Superior St Chicago TEA

1 of 1                                    09/19/2014

EXHIBIT G

# REGIONAL CENTER DESIGNATION APPROVAL LETTER



August 6, 2013

Letter of Interest for the Cathedral Tower Multi-Use Development

The Local Government Regional Center of Illinois, LLC has reviewed draft documents concerning the proposed Cathedral Tower multi-use highrise project in Chicago's Gold Coast neighborhood and believes strongly that this development will successfully fill the proposed EB5 subscription of $90M. Furthermore, based on preliminary conversations, there is every reason to believe that suitable terms will be negotiated to enable LGRCI to be the designated regional center for this project.

LGRCI received its license from the United States Citizenship and Immigration Services in October of 2011. It's co-founder and managing member is Zachary Zises, who is an EB-5 expert who consults with local developers and immigration attorneys on regional center projects as well as direct EB-5 investments.

While LGRCI is not specifically pre-approved to finance hotel and multi-use projects, as of the issuance on May 30th, 2013, of a binding USCIS policy memorandum, regional centers no longer require such a designation. As a result, LGRCI is now qualified to finance this project and will continue to be able to do so regardless of any material changes to the business plan.

Attached please find LGRCI's approval letter from USCIS granting its license as a regional center. This letter is made to Tizi, LLC, of which LGRCI is a d/b/a. Also note that while Tizi's member was originally Bryan Zises, Zachary Zises is now Tizi's sole member.

Sincerely,

Zachary Zises
President



**U.S. Department of Homeland Security**
24000 Avila Road, 2ⁿᵈ Floor
Laguna Niguel, CA 92677

**U.S. Citizenship
and Immigration
Services**

Date:  OCT 2 0 2011

Tizi, LLC
C/O Bryan Zises
30 E. Adams Street, Suite 440
Chicago, IL 60603

Application:        Request for Designation as a Regional Center
Applicant(s):       Bryan Zises

Re:                 Local Government Regional Center of Illinois
                    RCW1031910005/ID1031910005/Formerly W09001520

### **Corrected**

Pursuant to Section 610 of the Appropriations Act of 1993, on March 4, 2010, Bryan Zises submitted a proposal seeking approval and designation by U.S. Citizenship and Immigration Services (USCIS) of the Local Government Regional Center of Illinois.

USCIS hereby designates Local Government Regional Center of Illinois as a Regional Center within the Immigrant Investor Pilot Program and approves the request as described below:

## GEOGRAPHIC AREA:

The Local Government Regional Center of Illinois shall have a geographic scope to include Cook County, Illinois.

## FOCUS OF INVESTMENT ACTIVITY:

As depicted in the economic model, the general proposal, business plan and associated economic analysis, the Regional Center will engage in the following economic activities: the construction and development of infrastructures.

The Regional Center shall focus on offering EB-5 compliant capital investment opportunities into new commercial enterprises or a mix of commercial enterprises in the following target industry economic categories:

www.uscis.gov

Local Government Regional Center of Illinois/RCW1031910005/ID1031910005/Formerly W09001520
Page 2

| | | |
|---|---|---|
| 1. | NAICS 722110 | Full Service Restaurants |
| 2. | NAICS 722330 | Mobile Food Services |
| 3. | NAICS 722410 | Drinking Places |
| 4. | NAICS 445110 | Supermarkets and Other Grocery (except Convenience) Stores |
| 5. | NAICS 624229 | Other Community Housing Services |

If any investment opportunities arise that are beyond the scope of the approved industry categories, then an amendment would be required to add that category.

Aliens seeking immigrant visas through the Immigrant Investor Pilot Program may file individual petitions with USCIS for capital investments in new commercial enterprises located within and affiliated with the approved Regional Center area.

For any alien requesting the reduced threshold of $500,000 based upon an investment in a Targeted Employment area, the alien must establish at the time of filing of the I-526 petition that either the investment will be made in a TEA designated area or was in a TEA designated area at the time of the alien's initial investment into the enterprise.

## EMPLOYMENT CREATION

The econometric model is RIMS II. Immigrant investors who file petitions for capital investments in new commercial enterprises located within and affiliated with the Regional Center area must fulfill all of the requirements set forth in INA 203(b)(5), 8 CFR 204.6, and 8 CFR 216.6, except that the petition need not show that the new commercial enterprises created ten new jobs directly as a result of the immigrant investor's investment. The determination whether the alien investor has met the job creation requirements will be established by a review of the required initial evidence at 8 CFR 204.6(j) and 8 CFR 216.6(a)(4) for the Form I-526 and Form I-829 petitions, respectively. The capital investment and job creation activities outlined in the individual petitions must fall within the bounds of the final economic analysis that is contained as part of the approved Regional Center proposal and its indirect job creation model and multipliers contained within the final approved Regional Center application package. The immigrant investor must show at the time of removal of conditions that they performed the activities described in Form I-526 petition, and the activities must be based on the approved regional center methodology for demonstrating job creation.

In addition, where job creation is claimed based on multipliers rooted in revenue generated by businesses, the immigrant investor's individual I-526 petition affiliated with your Regional Center, should include as supporting evidence:

- A comprehensive detailed business plan with supporting financial, marketing and related data and analysis providing a reasonable basis for projecting creation of indirect and/or induced jobs to be achieved/realized within two years pursuant to 8 CFR 204.6(j)(4)(B) and reasonable methodologies pursuant to 8 CFR 204.6(m)(7)(ii).

An alien investor's I-829 petition to remove the conditions which was based on an I-526 petition approval that involved the creation of new indirect jobs based on multipliers tied to job creation inputs such as revenue generated by businesses, needs to be supported by evidence. Such evidence may include reasonable methodologies like multiplier tables, feasibility studies, and other economically or statistically valid forecasting devices which indicate the likelihood that the alien's investment has resulted in increased employment.

Local Government Regional Center of Illinois/RCW1031910005/ID1031910005/Formerly W09001520
Page 3

## Additional Guidelines for individual Immigrant Investors Visa Petition (I-526)

Each individual petition, in order to demonstrate that it is associated with the Regional Center, in conjunction with addressing all the requirements for an individual immigrant investor petition, shall also contain as supporting evidence relating to this Regional Center designation, the following:

1. A copy of this letter, the Regional Center approval and designation.

2. A copy of the USCIS approved Regional Center narrative proposal and business plan.

3. A copy of the job creation methodology required in 8 C.F.R. § 204.6(j)(4)(iii), as contained in the final Regional Center economic analysis which has been approved by USCIS, which reflects that investment by an individual immigrant investor will create not fewer than ten (10) full-time employment positions, either directly or indirectly, per immigrant investor. If the approval of the plan for capital investments in a given industry economic category is based upon an exemplar capital investment project, then the immigrant investor petition must also be supported by an analysis and evidence that shows that the actual capital investment in the Form I-526 petition comports to the exemplar capital investment project approved in the regional center designation and that it is otherwise EB-5 compliant.

4. A legally executed copy of the USCIS approved documents:

   a. Operating Agreement                  Draft submitted January 11, 2011
   b. Advisory Agreement                   Draft submitted January 11, 2011
   c. Private Placement Memorandum         Draft submitted January 11, 2011
   d. Escrow Agreement                     Draft submitted January 11, 2011
   e. Subscription Agreement               Draft submitted January 11, 2011

## DESIGNEE'S RESPONSIBILITIES INHERENT IN CONDUCT OF THE REGIONAL CENTER:

The law, as reflected in the regulations at 8 CFR 204.6(m)(6), requires that an approved Regional Center in order to maintain the validity of its approval and designation must continue to meet the statutory requirements of the Immigrant Investor Pilot Program by serving the purpose of promoting economic growth, including increased export sales (where applicable), improved regional productivity, job creation, and increased domestic capital investment. Therefore, in order for USCIS to determine whether your Regional Center is in compliance with the above cited regulation, and in order to continue to operate as a USCIS approved and designated Regional Center, your administration, oversight, and management of your Regional Center shall be such as to monitor all investment activities under the sponsorship of your Regional Center and to maintain records, data and information in order to provide the information required on the Form I-924A supplement. Form I-924A, Supplement to Form I-924 is available in the "Forms" section on the USCIS website at www.uscis.gov. Effective November 23, 2010, the failure to timely file a Form I-924A Supplement for each fiscal years in which the regional center has been designated for participation in the Immigrant Investor Pilot Program will result in the issuance of an intent to terminate the participation of the regional center in the Pilot Program, which may ultimately result in the termination of the approval and designation of the regional center. Note: The requirement for the filing of Form I-924A Supplement commences in fiscal year 2011. Each regional center that remains designated for participation in the pilot program as of September 30, 2011 must submit the Form I-924A Supplement with the required supporting documentation on or before December 29, 2011.

Local Government Regional Center of Illinois/RCW1031910005/ID1031910005/Formerly W09001520
Page 4

If you have any questions concerning the Regional Center approval and designation under the Immigrant
Investor Pilot Program, please contact the USCIS by Email at USCIS.ImmigrantInvestorProgram@dhs.gov.

Sincerely,

Rosemary Langley Melville
Director
California Service Center

cc: Anna H. Morzy, Esq.

EXHIBIT H

# GIBSON'S RESTAURANT GROUP LOI

**D** **Wealth Management**

TD Wealth Management, Institutional Trust
TD Bank, National Association
1006 Astoria Blvd.
Cherry Hill, NJ 08003
Phone: (856) 685-5113
Fax: (856) 533-7136
Email: stephen.schaaf@td.com

September 17, 2015

Mr. Jeffrey Laytin
Forefront EB-5 Fund LLC
One Pennsylvania Plaza, 49th Floor
New York, NY 10119

Re: Carillon Tower/Chicago, L.P. Subscription Escrow

Dear Mr. Laytin:

Please be advised that the total amount of $550,002.00 was received from Yao Ying on 09-14-15, 09-15-15, 09-16-15 and deposited as follows:

   $ 500,008.00 to the Carillon Tower/Chicago, L.P. Subscription Escrow
   $  49,994.00 to the Carillon Tower/Chicago, L.P. Subscription Expense Escrow

Sincerely,

Stephen R. Schaaf
Vice President

