UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LINA DOU, TINGYANG SHAO, YIXUAN TAO, XIUQIN XING, EMMY GO, YANMING WANG, SHIYANG XIAO, LIHONG ZHAN, GELI SHI, and YING YAO, on behalf of themselves and all others similarly situated, and LINA DOU, as limited partner of CARILLON TOWER/CHICAGO, L.P. and CARILLON TOWER/CHICAGO, L.P., <br> Plaintiffs, <br><br> -v- <br><br> TD BANK N.A., <br> Defendant. | 23-CV-4880 (JPO) <br><br> OPINION AND ORDER |

J. PAUL OETKEN, District Judge:

Plaintiffs, a group of Chinese investors, bring this action against TD Bank asserting contract, quasi-contract, and tort claims stemming from Defendant's alleged breach of an escrow agreement. Before the Court is Defendant's motion to dismiss all counts pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (ECF No. 35.)

For the reasons that follow, the motion is granted in part and denied in part, and the Court denies Plaintiffs' request for leave to file a third amended complaint.

I.    **Background**

A.    **Factual Background**

The following facts are drawn from the allegations in the Second Amended Complaint, which are presumed true for the purpose of resolving Defendant's motion to dismiss. *Fink v. Time Warner Cable*, 714 F.3d 739, 740-41 (2d Cir. 2013).

Plaintiffs bring this action on behalf of themselves and a putative class of 88 Chinese investors.[1]  (ECF No. 25 ("SAC") ¶ 20.)  Each invested $550,000 in the project, Carillon Tower/Chicago LP ("Carillon"), in hopes of obtaining an EB-5 Immigrant Investor Visa, which provides a path to permanent residence within the United States.  (SAC ¶¶ 4, 6, 12-13.)  Carillon actively courted investors hoping to participate in the EB-5 program, presenting Plaintiffs with an Offering Memorandum, stating that "Carillon was organized 'to serve as a "new commercial enterprise" under the EB-5 immigrant investor program,'" and explaining how the project qualified.  (*Id.* ¶¶ 16-17.)  Plaintiffs allege that they were "solicited and marketed" using the Offering Memorandum on January 15, 2015.  (*Id.* ¶ 28.)

As provided to Plaintiffs, the Offering Memorandum was a single PDF consisting of three "interconnected documents."  (*Id.* ¶ 29.)  First, the packet contained a "Subscription Agreement" between Carillon and prospective investors "with instructions for the [investors] to wire the $550,000 into escrow accounts at TD Bank."  (*Id.*)  Second, it contained a "Limited Partnership Agreement" between Carillon and prospective investors.  (*Id.*)  Third, it contained an "Escrow Agreement" between Carillon and TD Bank.  (*Id.*)  The Offering Memorandum divided the $550,000 into two components—a $500,000 purchase of a limited partnership unit in Carillon, and a $50,000 contribution "toward the Administrative Fees of Carillon."  (*Id.* ¶¶ 34-35.)  Those sums were to be deposited into separate escrow accounts—a "Contribution Escrow Account" and an "Expense Escrow Account."  (*Id.* ¶¶ 41-42.)

---

[1] Count I of the SAC is a derivative claim for breach of contract, made on behalf of Carillon.  (SAC ¶¶ 77-114.)  However, the parties have stipulated to dismissal of this claim with prejudice.  (ECF No. 55.)  As a result, all allegations contained under Count I of the SAC (SAC ¶¶ 77-114) are omitted from this factual summary.

In May 2015, Carillon and TD Bank executed the Escrow Agreement referenced in the Offering Memorandum.  (*Id.* ¶ 36.)  That agreement set certain "express conditions," pursuant to which "TD Bank would either release the funds to Carillon thereby consummating the Plaintiffs['] investment in Carillon or . . . would return the funds to the class Plaintiffs."  (*Id.* ¶ 44.)

The first condition was specified in a section of the Escrow Agreement titled "Action Upon Achievement of Holdback Trigger," and required TD Bank to transfer 80% of the sum in the Contribution Escrow Account "[u]pon a written direction of the Limited Partnership certifying that the Holdback Trigger has been satisfied."  (ECF No. 25-1 ("Offer Memo.") at 168; *see also id.* ¶ 46.)  This language requiring "written direction" was repeated in the Subscription Agreement between Carillon and Plaintiffs.  (Offer Memo. at 145.)  The Holdback Trigger would occur when (1) at least one investor's Form I-526 Immigration Petition was approved by the United States Citizenship and Immigration Services ("USCIS"), and (2) "[t]he Partnership has provided evidence that the Project plan has been formally submitted to the Chicago Commissioner of Planning and Development" ("CCPD").  (*Id.* at 168; *see also* SAC ¶ 47.)  This language was likewise repeated in the Subscription Agreement.  (Offer Memo. at 145.)

Following the Trigger, TD Bank would "retain the remaining 20% Capital Contributions" (the "Holdback Amount") in a separate "Holdback Escrow Account."  (SAC ¶ 46; *see also* Offer Memo. at 168.)  The Agreement specified that this 20% Holdback Amount was to be retained "for the benefit of each Subscriber."  (Offer Memo. at 168; *see also* SAC ¶ 46.)[2]  It would be

---

[2] This language is repeated in the Subscription Agreement.  (Offer Memo. at 145.)

released "[u]pon a written direction of the Limited Partnership certifying that the USCIS has approved a subscriber's Form I-526 Petition."  (Offer Memo. at 168; *see also* SAC ¶ 48).

Finally, the $50,000 in the Expense Escrow Account would be released to Carillon only "[u]pon a written direction of the Limited Partnership certifying that the Limited Partnership has accepted a subscriber's subscription."  (Offer Memo. at 169; *see also* SAC ¶ 49.)  If such an investor's subscription was not accepted, TD Bank was to return the amount in the Expense Account to that investor.  (Offer Memo. at 169.)

The Subscription Agreement between Carillon and Plaintiffs references the Escrow Agreement multiple times.  For example, it was provided alongside a copy of the Escrow Agreement, and states that all of Plaintiffs' investments "will be held in escrow, subject to the terms and conditions of the Escrow Agreement."  (SAC ¶ 52.)  The Subscription Agreement "instructs the subscribing investor to review the Escrow Agreement because '[t]he Escrow Agreement shall be binding upon and enforceable against the New Limited Partner.'"  (*Id.* ¶ 53.)

Plaintiffs allege that they deposited their funds into the escrow accounts between August 2015 and March 2016.  (*Id.* ¶ 55.)  They also allege, on information and belief, that TD Bank released both the Contribution and Expense funds "during the same months Plaintiffs made their deposits, or soon thereafter."  (*Id.* ¶ 56.)  This implies, according to Plaintiffs, that the funds must have been released before any of the relevant I-526 petitions were approved (*id.* ¶ 57), and before the project plan was submitted to the CCPD (*id.* ¶ 60).  Plaintiffs allege that TD Bank did not receive written direction from Carillon that any Plaintiff's Form I-526 Petition had been approved, that the project plan was ever submitted to CCPD, or that Carillon accepted any Plaintiff's subscription.  (*Id.* ¶¶ 61-63.)  Plaintiffs also allege that TD Bank released funds from

all of the escrow accounts to an entity other than Carillon itself (*id.* ¶¶ 64-66), namely, to a partner of Carillon called "Forefront EB-5 Fund (ICT) LLC" (*id.* ¶¶ 81-83).

Plaintiffs claim that, due to TD Bank's wrongful release of the funds from the escrow accounts, the money they invested has been missing for over eight years.  (*Id.* ¶ 10.)

### B.    Procedural History

Plaintiffs originally sued TD Bank and other defendants on November 28, 2018, in the United States District Court for the Northern District of Illinois.  *See Dou, et al. v. Carillon Tower/Chicago LP et al.*, No. 18-CV-7865 (N.D. Ill. Nov. 28, 2018), ECF No. 1.  In accordance with the forum selection clause in the Escrow Agreement, the parties agreed to sever the claims against TD Bank and transfer them to the Southern District of New York.  *Dou*, No. 18-CV-7865 (May 14, 2019), ECF No. 109.  However, the Illinois district court erroneously dismissed the claim instead of transferring it.  *Dou*, No. 18-CV-7865 (June 6, 2019), ECF No. 117.  Eventually, that court corrected the error, severed Plaintiffs' claims against TD Bank, and transferred them to this Court.  *Dou*, No. 18-CV-7865 (May 25, 2023), ECF No. 535.  At the request of Plaintiffs, the Illinois court vacated its previous dismissal to clarify that "claims against TD were not 'dismissed' but severed and transferred to the Southern District of New York."  *Dou*, No. 18-CV-7865 (Nov. 16, 2023), ECF No. 607.

Plaintiffs filed a Second Amended Complaint in the Southern District of New York on September 13, 2023.  (SAC.)  TD Bank moved to dismiss the SAC on October 20, 2023.  (ECF No. 35.)  Pursuant to a stipulation by the parties, the Court dismissed Plaintiffs' first claim, a derivative action on behalf of Carillon, with prejudice on January 2, 2024.  (ECF No. 55.)

## II.    Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must state "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This means that a complaint is properly dismissed where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief."  *Twombly*, 550 U.S. at 558.  A complaint is also properly dismissed "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct."  *Iqbal*, 556 U.S. at 679.  While "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *id.* at 678, the Court must draw "all inferences in the light most favorable to the non-moving party[.]"  *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).  Determining whether a complaint states a plausible claim is ultimately a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679.

## III.    Discussion

Plaintiffs assert five causes of action, including (1) a breach of contract claim based on the Escrow Agreement, (2) a breach of implied contract claim based on the Escrow Agreement, (3) a promissory estoppel claim based on the Escrow Agreement, (4) a breach of fiduciary duty claim, and (5) a negligence claim.

### A.    Conventional Breach of Contract

"To make out a viable claim for breach of contract a 'complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'"  *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co.*, 375 F.3d 168, 177 (2d Cir. 2004) (quoting *Harsco Corp v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)).

1.      **Actual Privity**

Plaintiffs claim to be in "actual privity" with TD Bank.  (SAC ¶ 118.)  Conversely, TD bank argues that no valid contract exists between it and Plaintiffs, as "the escrow agreement attached to the SAC expressly identifies only Carillon and TD Bank as parties."  (ECF No. 44 ("Reply") at 6.)  Per the Escrow Agreement's choice-of-law provision, the agreement is governed by New York law.  (Offer Memo. at 171.)  In New York, contract formation requires both a "'meeting of the minds' and 'a manifestation of mutual assent.'"  *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288-89 (2d Cir. 2019) (quoting *Express Indus. & Terminal Corp. v. N.Y. Dep't of Transp.*, 93 N.Y.2d 584, 589 (1999)).  That manifestation of mutual assent "must be sufficiently definite to assure that the parties are truly in agreement with respect to all material terms."  *Id*. at 289.  "Generally, courts look to the basic elements of the offer and the acceptance to determine whether there was an objective meeting of the minds sufficient to give rise to a binding and enforceable contract."  *Id*.  "Under New York law, a contract need not be signed by either or both parties in order to be enforceable."  *Asesores y Consejeros Aconsec CIA, S.A. v. Glob. Emerging Markets N. Am., Inc.*, 841 F. Supp. 2d 762, 766 (S.D.N.Y. 2012) (citing *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 572-73 (2d Cir. 1993)).  Rather, "[i]n determining whether the parties intended to enter a contract, and the nature of the contract's material terms, we look to the 'objective manifestations of the intent of the parties as gathered by their expressed words and deeds.'"  *Stonehill Cap. Mgmt., LLC v. Bank of the W.*, 28 N.Y.3d 439, 448-49 (2016).

While Plaintiffs allege that "the connection and relationship between the parties rendered Plaintiffs a party to the Escrow Agreement" (Opp. at 12), they do not explain in any more depth, nor does the Complaint allege sufficient facts for the Court to infer the nature of that connection and relationship.  Plaintiffs do allege that the Offering Memorandum attached the Escrow

Agreement, and that the Subscription Agreement stated that "'the Escrow Agreement shall be binding upon' the Plaintiffs." (SAC ¶ 127.)  However, the Offering Memorandum was provided to Plaintiffs by Carillon, and the Subscription Agreement was a bilateral contract only between Carillon and Plaintiffs—neither involved any action or objective manifestation of intent by TD Bank.  With respect to TD Bank, Plaintiffs allege only that they deposited funds into accounts maintained there, and that TD Bank "had knowledge of the names and addresses of each and every member of the class Plaintiffs who directly deposited funds."  (SAC ¶ 128.)

Plaintiffs argue that "[b]y accepting these deposits directly from the class members, TD Bank intended to . . . hold and disburse these funds in accordance with the terms of the Escrow Agreement."  (SAC ¶ 131.)  However, merely having accepted such deposits falls short of an objective manifestation of intent to enter a binding escrow contract.  *See, e.g.*, *Liu Yao-Yi v. Wilmington Tr. Co.*, 301 F. Supp. 3d 403, 427 (W.D.N.Y. 2017) (rejecting the premise that "the nature of the escrow agreement inherently imposes a duty upon the escrow agent in relationship to the investors to the account," because escrow agreements are "contract[s] like any other" and impose only "limited duties under the[ir] express terms"); *see also Palm Beach Strategic Income, LP v. Salzman*, No. 10-CV-261, 2011 WL 441778 at *6 (E.D.N.Y. Feb. 7, 2011) (denying a non-party to an escrow agreement standing to enforce that agreement).  Plaintiffs do not allege that they were part of the negotiations that led to the terms of the agreement, or that they had any direct communications with TD Bank regarding the Escrow Agreement in any way.  The Court therefore agrees with TD Bank that it did not plausibly enter into a conventional contract with Plaintiffs.

### 2.    Third-Party Beneficiaries

In the alternative, Plaintiffs argue that they can enforce the Escrow Agreement as third-party beneficiaries.  (SAC ¶ 119.)  Under New York law, a party seeking to establish status as a

third-party beneficiary must show '(1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his benefit and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost.'" *Aponte v. Diego Beekman M.H.A. HDFC*, No. 16-CV-8479, 2019 WL 316003, at *10 (S.D.N.Y. Jan. 24, 2019) (quoting *Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 336 (1983)). The existence of a valid contract between TD Bank and Carillon is not disputed, which means the key questions are whether the contract shows a clear intent to benefit Plaintiffs, and whether that benefit is sufficiently immediate.

Under New York law, a party is an intended beneficiary if "performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary" or "the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 66 N.Y.2d 38, 44 (1985) (quoting Restatement (Second) of Contracts § 302(1) (Am. L. Inst. 1981)).[3] Ordinarily, "'the parties' intent to benefit the third party must be apparent from the face of the contract,' and 'absent clear contractual language evincing such intent, New York courts have demonstrated a reluctance to interpret circumstances to construe such an intent.'" *Aponte*, 2019 WL 316003, at

---

[3] The Court notes that a contract may also be enforceable by a third party when "no one other than the third party can recover if the promisor breaches the contract." *Fourth Ocean*, 66 N.Y.2d at 45. Here, with Carillon having allegedly absconded with Plaintiffs' investments and TD Bank having suffered no injury under the contract, it is unclear to the Court who else could assert Plaintiffs' claims. This was, after all, TD Bank's top-line response to the derivative contract claim that Plaintiffs asserted but later abandoned. (*See* ECF No. 36 ("MoL") at 9 ("Carillon has pled itself out of both injury and damages; if Carillon was never entitled to the investor funds, it could not have suffered any injury or damages from failing to receive those funds").) That said, the Court is satisfied that the contract manifests an intent to benefit Plaintiffs, and Plaintiffs do not advance this argument in their briefing, so the Court needs not address it further at this time.

*10 (quoting *LaSalle Nat'l Bank v. Ernst & Young LLP*, 729 N.Y.S.2d 671, 676 (1st Dep't 2001)) (brackets omitted).  "Where performance is to be rendered directly to a third party under the terms of an agreement, that party must be considered an intended beneficiary." *Flickering v. Harold C. Brown & Co., Inc.*, 947 F.2d 595, 600 (2d Cir. 1991).

Here, Plaintiffs point to several terms in the Escrow Agreement that benefit them directly.  First, and most importantly, the plain language of the Escrow Agreement confers benefits on Plaintiffs and obligates TD Bank to provide them.  For example, the Agreement states that the holdback amount should be retained "for the benefit of each Subscriber."  (Offer Memo. at 168.)  Similarly, the Agreement states that TD Bank "shall provide deposit confirmation acknowledging receipt of such funds to *both* the relevant subscriber and the Limited Partnership."  (*Id.* (emphasis added).)  The Agreement requires TD Bank to repay to an investor all three subcomponents of their investment—the contribution ex-holdback amount, the holdback amount, and the administrative fee—if Carillon were to cancel its offer or reject an investor's subscription.  (*Id.* at 168-69.)[4]  It similarly requires TD Bank to return an investor's holdback amount if the USCIS were to deny that investor's Form I-526 petition.  (*Id.* at 169.)  As Plaintiffs observe, these commitments constitute part of an overall obligation imposed by the Escrow Agreement on TD Bank to "receive, hold, deliver and deal with the Capital Contribution and Administrative Fee on the terms and conditions herein set out."  (*Id.* at 167.)  The Court

---

[4] TD Bank argues that "the Escrow Agreement does not even give Plaintiffs a right to demand return of their funds" and "only *Carillon* can direct TD Bank to return funds to Plaintiffs."  (ECF No. 44 ("Reply") at 8.)  This conflates the right to *enforce* a contract with the nature of certain contractual obligations.  While it is true that TD Bank's contractual duty to return the funds is *triggered* by receiving written notice from Carillon, Plaintiffs could still plausibly sue to recover the funds were TD Bank to retain the funds after Carillon provided such notice.  Similarly, Plaintiffs here can sue for damages having discovered that TD Bank released their investments without complying with the conditions in the Agreement.

agrees with Plaintiffs that this language plausibly evinces an "inten[t] to benefit the class Plaintiffs by holding and safeguarding their funds in escrow where, upon satisfaction of the express conditions . . . TD Bank would either release the funds . . . or . . . return the funds to class Plaintiffs."  (SAC ¶ 121.)  The Court views this as sufficient to plausibly establish that Carillon and TD Bank intended the Agreement to benefit Plaintiffs as prospective subscribers.

In addition to this clear contractual language, other circumstances indicate an intent to benefit Plaintiffs.  For example, the Subscription Agreement between Plaintiffs and Carillon states that a new subscriber "should carefully review and understand the Escrow Agreement . . . before investing" and that "[t]he Escrow Agreement shall be binding upon and enforceable against the [subscriber]."  (Offer Memo. at 150.)  While this language was written and provided to Plaintiffs by Carillon, Carillon was one of two parties to the Escrow Agreement. Accordingly, evidence of Carillon's intent that the Escrow Agreement bind and produce benefits for Plaintiffs is relevant, even if not itself dispositive of TD Bank's intent.

TD Bank argues that such benefits are incidental rather than intended, but this is at odds with New York case law holding that an obligation to pay money is typically an immediate benefit.  *See, e.g.*, *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 248 (2d Cir. 2002) (explaining that "a third party is an intended (as opposed to incidental) beneficiary" if performance involves an obligation to pay money).  According to TD Bank, the Agreement "does not grant individual investors a right to do anything with their funds once they have been put into escrow, let alone seek return of those funds," which shows that "the contract did not intend to permit Plaintiffs to enforce it."  (MoL at 16-17.)  The Court disagrees.  The Agreement assures Plaintiffs that their money will be held by a particular party in a particular form until certain conditions are met, and then that their money will either be transmitted to Carillon or returned to Plaintiffs once those

conditions are met. If their money is not "held" and "delivered" in according these requirements, it is not implausible to read the Agreement as allowing Plaintiffs to sue to remedy the mismanagement.

TD Bank cites a case regarding escrow agreements, *Sunnyside Dev. Co., LLC v. Bank of New York*, 07-CV-8825, 2008 WL 463722, at *2 (S.D.N.Y. Feb. 19, 2008), for the proposition that non-parties to such an agreement are not third-party beneficiaries. In that case, however, the putative beneficiary was not a depositor in an escrow account, but rather a company that was acquired by the depositor. *Id.* at *1. The function of the agreement was to indemnify the purchaser for any "contingent and unidentified liabilities which might later arise." *Id.* "The 'security' ran to [the purchaser]," not the acquired company. *Id.* The acquired company was neither a payor into the escrow account, like Plaintiffs here, nor the payee from the account, like Carillon, nor did the account purport to hold any funds for its benefit. While it is true that Plaintiffs here did not sign the agreement, they clearly receive a more direct benefit from the escrow conditions than the putative beneficiary did in *Sunnyside*.

TD Bank also cites *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 431 (S.D.N.Y. 2010), for the proposition that mere custodianship of funds is not sufficient evidence of intent to benefit a third party. However, that case involved two contracts, and the court there only dismissed the plaintiffs' claims with respect to the second one. The key difference was that the first contract, unlike the second, "contain[ed] language that, when viewed in the light most favorable to Plaintiffs, indicate[d] an intent to benefit a third party." *Id.* at 429. The second contract, in contrast, contained only generic obligations to take "due care" and did not "address investors or shareholders" at all. *Id.* at 431. Here, the specific references to the Plaintiffs in the Escrow Agreement make it more akin to the first than to the second contract in *Anwar*.

TD Bank argues that the use of "third party beneficiary" in the Limited Partnership Agreement shows that Carillon and TD Bank knew how to use such language, and intentionally elected not to in the Escrow Agreement. However, TD Bank was not a party to the Limited Partnership Agreement. The Court need not look to this kind of extrinsic evidence at this time when there are sufficiently clear indicia in the Escrow Agreement that Plaintiffs were intended beneficiaries.

### 3.    Breach of the Escrow Agreement

Plaintiffs allege three distinct breaches of the Escrow Agreement, while TD Bank maintains that there was no breach at all. First, Plaintiffs allege that TD Bank released funds to Forefront rather than to Carillon, as the Agreement required. (*See, e.g.*, SAC ¶ 83.) Second, they allege that TD Bank released funds without receiving the requisite "evidence" that certain conditions, such as the submission of a project plan to the CCPD, had been met. (*See, e.g.*, *id.* ¶ 98). Third, they allege that TD Bank released funds without receiving notice *in writing* from Carillon that certain conditions had been satisfied. (*See, e.g.*, *id.* ¶¶ 95-97.)

The Court rejects Plaintiffs' first alleged breach—TD Bank argues, and Plaintiffs do not contest, that Forefront was authorized to "act on Carillon's behalf," could withdraw funds in Carillon's name, and is owned and operated by the same parties as Carillon. (MoL at 19.) Plaintiffs have, however, adequately pleaded their second and third alleged breaches.

Regarding the second alleged breach, the Escrow Agreement states that TD Bank shall release Plaintiffs' funds upon a "written direction of the Limited Partnership certifying that the Holdback Trigger has been satisfied." (*Id.*) The Agreement *also* states that "[t]he 'Holdback Trigger' shall have occurred once . . . [t]he Partnership has *provided evidence* that the Project plan has been formally submitted to the Chicago Commissioner of Planning and Development." (Offer Memo. at 168 (emphasis added).) Focusing on this second phrase, Plaintiffs claim that

"Carillon did not provide TD Bank with written evidence that the Project plan had been submitted to the Chicago Commissioner of Planning and Development."  (SAC ¶ 60.) Conversely, TD Bank attempts to erase the "evidence" requirement, arguing that "to authorize the release of funds, Carillon or its agents need only certify to TD Bank that the Holdback Trigger events had occurred."  (MoL at 20.)  TD Bank's interpretation would render the "evidence" requirement purely superfluous.  Reading the two phrases together, the Court views it as at least plausible that they constitute a joint requirement—Carillon has to certify that the Holdback Trigger has been satisfied, *and* the certification must "provid[e] evidence that the Project plan has been formally submitted."  At the very least, the Court views the language as ambiguous, which suffices to avoid dismissal at this stage.

Plaintiffs have also adequately pleaded their third alleged breach, as they clearly state that TD Bank released the funds without receiving written direction.  (SAC ¶¶ 60, 62, 63, 95-97, 99-101, 107-10, 112-13, 140-42, 145-46, 151-52.)  Plaintiffs make these allegations "upon information and belief," to which TD Bank objects.  (MoL at 21.)  While it is true that "[a] litigant cannot merely plop 'upon information and belief' in front of a conclusory allegation and thereby render it non-conclusory," the Court is inclined to allow such pleading here, as "the facts are peculiarly within the possession and control of the defendant," and "the belief is based on factual information that makes the inference of culpability plausible.'"  *Citizens United v. Schneiderman*, 882 F.3d 374, 384-85 (2d Cir. 2018).  TD Bank confusingly claims that "a record of a written certification from Carillon to TD Bank . . . would be in the possession of both Carillon and TD Bank, and Plaintiffs could have obtained any such record from Carillon."  (MoL at 21.)  But this presumes that such a record exists, and Plaintiffs' entire theory is that it does not. Clearly Plaintiffs could not obtain such a non-existent record from Carillon, even if Carillon

were cooperating with their efforts.  In addition, Plaintiffs plead certain facts that allow the Court

to infer that it is unlikely that Carillon provided written certification to TD Bank.  Namely,

Plaintiffs note that several of the conditions did not, in fact, occur.  (*See, e.g.*, SAC ¶ 7 ("No plan

was formally submitted to the CCPD.").)  Although it is plausible that Carillon would have lied

to TD Bank in writing, it is also plausible that Carillon would have preferred not to do so,

supporting Plaintiffs' allegations.  Accordingly, the Court accepts for now that TD Bank

plausibly breached the Escrow Agreement by releasing Plaintiffs' funds without receiving the

required written direction.

In its briefing, TD Bank asserts that Carillon "*did* send TD Bank a written notification—

specifically, an email certifying that the Holdback Trigger was satisfied" (Reply at 11), and that

"TD Bank produced to Plaintiffs a copy of that written Holdback Trigger notification" (*id.*).

Plaintiffs respond that Laytin, the head of Carillon, previously testified to the contrary under

oath.  (Opp. at 22.)  TD Bank does not produce a copy of this email with its briefing, and in any

event, this kind of factual dispute is a question for summary judgment rather than dismissal

under Rule 12(b)(6).  Moreover, TD Bank only claims that written notice was provided regarding

the Holdback Trigger.  This does not address the separate questions of whether written notice

was provided regarding each Plaintiff's Form I-526 Petition, or each Plaintiff's acceptance by

Carillon as a subscriber.

### B.    Breach of Implied Contract

Plaintiffs' third claim is for breach of implied contract.  For contract claims, New York

courts apply "the 'center of gravity' or 'grouping of contacts' choice of law theory."  *Fin. One*

*Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 336 (2d Cir.2005) (quoting *In re*

*Allstate Ins. Co.*, 81 N.Y.2d 219, 226 (1993)).  The Second Circuit has determined that the same

test applies to quasi-contract claims.  *See Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386,

394 (2d Cir. 2001).  The most significant contacts in this analysis are "the place of contracting, negotiation and performance; the location of the subject matter of the contract; and the domicile of the contracting parties."  *Travelers Cas. & Sur. Co. v. Dormitory Auth.-State of New York*, No. 07-CV-6915, 2008 WL 5233691, at *2 (S.D.N.Y. Dec. 16, 2008) (quoting *In re Allstate*, 81 N.Y.2d at 227).  Here, TD Bank argues that, because it is headquartered in New Jersey, New Jersey law should govern.  (MoL at 26 n.10.)  Plaintiffs do not argue to the contrary, so the Court will apply New Jersey law.

As with express contracts, "[a]n implied-in-fact contract requires every element of a contract to be proved: mutual assent, consideration, legality of object, and capacity of the parties."  *Duffy v. Charles Schwab & Co., Inc.*, 123 F. Supp. 2d 802, 818 (D.N.J. 2000); *see also In re U.S. Vision Data Breach Litig.*, No. 22-CV-06558, 2024 WL 1975542, at *3 (D.N.J. Apr. 30, 2024) ("The prima facie elements of claim for breach of an implied-in-fact contract . . . are the same as for express contracts.").  "The element of mutual assent, for example, must be inferred from the facts and circumstances of each case, including such factors as the specific conduct of the parties, industry custom, and course of dealing."  *Duffy*, 123 F. Supp. 2d at 818 (quoting *Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 377 n.5 (2d Cir. 2000)). The formal requirements for an implied contract are no less stringent than those for an express contract.  *See Baer v. Chase*, 392 F.3d 609, 616 (3d Cir. 2004) ("In other words, the terms 'express' and 'implied' do not denote different kinds of contracts, but rather reference the evidence by which the parties demonstrate their agreement.").

Here, for similar reasons that there is no evidence of the requisite mutual assent to an express contract, Plaintiffs have not pleaded adequate facts from which the Court can infer the existence of an implied contract.  There was no direct contact between Plaintiffs and TD Bank,

other than the mere act of Plaintiffs depositing their money into escrow accounts.  *See supra*

pp. 7-8; *cf. In re U.S. Vision Data Breach Litig.*, No. 22-CV-06558, 2024 WL 1975542, at *3-4

(dismissing an implied contract claim because "there are not facts pled that establish any conduct

that occurred between the . . . Defendants and Plaintiffs").[5]  Nor do Plaintiffs plead facts about

industry custom or a course of dealing that might show TD Bank's intent to assume obligations

to Plaintiffs—rather, all they say is that TD Bank "accept[ed] . . . Plaintiffs' deposits."  (SAC

¶¶ 162-63).  And, while TD Bank might have conferred benefits on Plaintiffs, that does not

necessarily create contractual obligations to them—otherwise, third-party beneficiary law would

serve no purpose.  Accordingly, the Court dismisses Plaintiffs' implied contract claims.

### C.    Promissory Estoppel

Plaintiffs also assert promissory estoppel claims.  As with their implied contract claims,

TD Bank argues that the Court should apply New Jersey law and Plaintiffs do not respond.

(MoL at 20 n. 1.)  Under New Jersey law, "[p]romissory estoppel is made up of four elements:

(1) a clear and definite promise; (2) made with the expectation that the promisee will rely on it;

---

[5] TD Bank also argues that it provided no consideration to Plaintiffs under the contract. (MoL at 19.)  Plaintiffs do allege, however, that "[p]ursuant to the Escrow Agreement, TD Bank as escrowee was to receive a fee from Plaintiffs in accordance with the fee schedule annexed to the Escrow Agreement."  (SAC ¶ 37.)  New Jersey courts typically "do not inquire into the adequacy of consideration in determining whether to enforce a contract."  *Seaview Orthopaedics ex rel. Fleming v. Nat'l Healthcare Res., Inc.*, 366 N.J. Super. 501, 508–09 (App. Div. 2004). "Plaintiffs claiming a breach of contract must meet only a low threshold for pleading consideration"—even the mere "exchange of promises" suffices.  *See Comprehensive Spine Care, P.A. v. Oxford Health Ins., Inc.*, No. 18-CV-10036, 2019 WL 928421, at *4 (D.N.J. Feb. 26, 2019) (quotation marks omitted).  It is at least ambiguous from the fee schedule appended to the Escrow Agreement whether the fees were paid by Plaintiffs or by Carillon, but the Court "must accept this allegation as true 'unless conclusory or contradicted by more specific allegations or documentary evidence,'" neither of which is the case here.  *In re Lihua Int'l, Inc. Sec. Litig.*, No. 14-CV-5037, 2016 WL 1312104, at *9 (S.D.N.Y. Mar. 31, 2016) (quoting *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 149 n.1 (2d Cir. 2012)).  The Court therefore declines TD Bank's invitation to find a lack of consideration.

(3) reasonable reliance; and (4) definite and substantial detriment." *Toll Bros., Inc. v. Bd. of Chosen Freeholders of Burlington*, 194 N.J. 223, 253 (2008).  While this statement of the elements of promissory estoppel is often cited by New Jersey courts and appears to require that "the promisee" be the one who relies on the promise, New Jersey courts also follow promissory estoppel doctrine as articulated in the Restatement (Second) of Contracts.  *See Goldfarb v. Solimine*, 245 N.J. 326, 340 (2021).  Per the Restatement, "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee *or a third person* and which does induce the action or forbearance is enforceable."  Restatement (Second) of Contracts § 139 (1981) (emphasis added).  The comments to the Restatement elaborate that "[i]f a promise is made to one party for the benefit of another, it is often foreseeable that the beneficiary will rely on the promise.  Enforcement of the promise in such cases rests on the same basis and depends on the same factors as in cases of reliance by the promisee."  *Id.* § 90 cmt. c.[6]

Accordingly, at least one New Jersey Supreme Court opinion has contemplated a promissory estoppel claim brought by a third party to the promise, rather than by the promisee.  *See Woolley v. Hoffmann-La Roche, Inc.*, 99 N.J. 284, 303 n.9 (1985).  Other courts applying New Jersey law have also cited the Restatement's "third person" promissory estoppel doctrine without qualification.  *See, e.g.*, *Onorato Const., Inc. v. Eastman Const. Co.*, 312 N.J. Super. 565, 572 (App. Div. 1998); *Mazza v. Scoleri*, 304 N.J. Super. 555, 560 (App. Div. 1997); *Meng v. Du*, No. 19-CV-18118, 2020 WL 4593273, at *3 (D.N.J. Aug. 11, 2020); *see also Ginsberg v. Bistricer*, No. A-4613-03T5, 2007 WL 987162, at *14 (N.J. Super. Ct. App. Div. Apr. 4, 2007) (rephrasing the second element of the promissory estoppel test as "expected reliance upon the

---

[6] Sections 90 and 139 of the Restatement are "complementary."  Restatement (Second) of Contracts § 139 cmt. a.

promise"); *cf. Cooley v. Lisman*, No. 16-CV-4499, 2019 WL 11288454, at *7 (D.N.J. Feb. 28, 2019) (dismissing a promissory estoppel claim where the plaintiff was not a party to the contract and failed to plead "a factual predicate [of] any reliance").

While the Court is not aware of any New Jersey cases upholding a promissory estoppel claim by a claimant other than the promisee, New Jersey law does not clearly exclude such a claim. And TD Bank cites no authority for its argument that the underlying promise must be "directed to Plaintiffs." (*Cf.* MoL at 27.) Here, there is a "clear and definite" promise in the form of the Escrow Agreement. That is enough to satisfy the first prong of the test.

Plaintiffs also adequately plead that the promise was "made with the expectation that the promisee will rely on it[.]" *Toll Bros., Inc.*, 194 N.J. at 253. The Escrow Agreement provides that TD Bank would "receive, hold, deliver, and deal" with Plaintiffs' deposits. (Offer Memo. at 167.) And, as explained above, the Agreement expressly contemplates Plaintiffs as third-party beneficiaries, stating *inter alia* that the Holdback procedures were "for the benefit of" Plaintiffs. *See supra* Section III.A.2. No provision of the Agreement requires that it be kept secret from Plaintiffs. In light of this, it was foreseeable that Plaintiffs would rely on the Agreement in deciding whether to deposit their money with TD Bank.

It was also plausibly reasonable for Plaintiffs to rely on the Agreement. They were aware of the Agreement's terms, as they were provided with a copy of the Escrow Agreement along with the Offering Memorandum. (SAC ¶¶ 52-53.) Plaintiffs allege that they were instructed to review the Agreement, told it would be binding, and that they in fact reviewed it. (*Id.* ¶¶ 52-54.) Plaintiffs also allege that they believed that TD Bank would "safeguard[]" the funds in the escrow account (SAC ¶ 121), a reasonable interpretation of TD Bank's contractual obligation to "receive, hold, deliver, and deal" with their money pursuant to the Escrow Agreement (Offer

Memo. at 167). While TD Bank is correct that Carillon provided the offering materials to Plaintiffs, the third prong of the estoppel test requires only that Plaintiffs' reliance was reasonable. TD Bank identifies no authority holding that a defendant must have been culpable for all of the conditions leading to a plaintiff's reasonable reliance.

Regarding damages, Plaintiffs allege, and TD Bank does not contest, that TD Bank's release of Plaintiffs' funds from escrow caused harm in the form of the "misappropriation, total dissipation and loss" of their funds. (SAC ¶ 187.) That is sufficient to satisfy the fourth prong of the test.

TD Bank separately argues that a promissory estoppel claim is improper where, as here, there is a valid contract covering the same or similar subject matter. Promissory estoppel is an equitable doctrine that "serves as a stop-gap where no valid contract exists to enforce a party's promise." *Kiss Elec., LLC v. Waterworld Fiberglass Pools, N.E., Inc.*, No. 14-CV-3281, 2015 WL 1346240, at *5 (D.N.J. Mar. 25, 2015). And, under New Jersey law, "liability based on quasi-contractual principles cannot be imposed if an express contract exists concerning the identical matter." (MoL at 27 (quoting *Mahanor v. Berkley Life Scis.*, No. 21-CV-18981, 2022 WL 2541773, at *14 (D.N.J. July 7, 2022).)[7] However, it is "well-established that plaintiffs who allege the existence of a valid contract may nonetheless plead the alternative theories of promissory estoppel and breach of contract when the defendant does not concede the enforceability of such contract." *Lamda Sols. Corp. v. HSBC Bank USA, N.A.*, 574 F. Supp. 3d 205, 214 (S.D.N.Y. 2021) (quotation marks and citation omitted); *see also* Fed. R. Civ. P.

---

[7] The court in *Mahanor* ultimately did not dismiss the plaintiff's quasi-contract claims, keeping them alive alongside the ordinary contract claims. *See* 2022 WL 2541773, at *20.

8(d)(2)-(3) (allowing plaintiffs to plead alternative theories of recovery even if inconsistent). The Court thus declines to dismiss Plaintiffs' promissory estoppel claim.

### D.    Tort Claims

Finally, Plaintiffs assert claims for breach of fiduciary duty and "negligence, carelessness and/or recklessness." (SAC ¶¶ 188-239.) Once again, only TD Bank addresses choice of law, but this time it claims that "the Court need not decide that issue" because the relevant law is substantially the same under in both jurisdictions. (*See* MoL at 28 n.13.) For ease of analysis, the Court applies New Jersey law based on the place of the tort.[8]

To establish a common-law breach of fiduciary duty claim in New Jersey, "a plaintiff must show that: (1) the defendant had a duty to the plaintiff, (2) the duty was breached, (3) injury to plaintiff occurred as a result of the breach, and (4) the defendant caused that injury." *Diaz v. Bank of New York*, No. 15-CV-1954, 2016 WL 111420, at *4 (D.N.J. Jan. 11, 2016) (quotation marks omitted). As an independent tort, breach of fiduciary duty requires more than non-performance under an applicable contract. *See Veyhl v. State Farm Fire & Cas. Co.*, No. 21-CV-10112, 2021 WL 6062304, at *4 (D.N.J. Dec. 22, 2021); *see also Int'l Mins. & Mining Corp. v. Citicorp N. Am., Inc.*, 736 F. Supp. 587, 597 (D.N.J. 1990).

Assuming without deciding that TD Bank had a duty to Plaintiffs beyond its contractual obligations,[9] the Court concludes that Plaintiffs have not adequately pleaded a breach of that

---

[8] Defendant argues that New Jersey is the "locus of the tort" and Plaintiffs do not disagree. (MoL at 21 n. 13.) "Lex loci delictus is the normal rule, . . . to be rejected only when it is evident that the situs of the accident is the least of the several factors or influences . . . ." *Cunningham v. McNair*, 370 N.Y.S.2d 577, 579 (1st Dep't 1975); *accord Wong v. Marriott Hotel Servs., Inc.*, No. 05-CV-04524, 2009 WL 5538644, at *3 (E.D.N.Y. Dec. 18, 2009) (explaining that, in New York choice-of-law analysis, "the traditional preference for the lex loci delictus is maintained, and a threshold is set for exceptional cases").

[9] TD Bank cites case law stating that banks do not owe duties to non-customers. (MoL at 30.) Plaintiffs do not respond. While it appears that Plaintiffs were not "customers" in the sense

duty.  Even granting Plaintiffs' point that TD Bank could be liable if it "ha[d] notice or knowledge that the escrow funds were being diverted," (Opp. at 22 (citing *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 287 (2d Cir. 2006)), Plaintiffs do not allege such notice or knowledge. Plaintiffs state that TD Bank "[k]nowingly released funds . . . when the circumstances revealed that the funds were being released for [improper] purposes," but do not plead any further details about such circumstances.  (SAC ¶ 238.)  Plaintiffs' claim that "TD Bank was aware that the Plaintiffs' funds were being chronically sapped" (SAC ¶ 171), is similarly conclusory. *Cf. Iqbal*, 556 U.S. at 678.  Plaintiffs point to no "clear evidence indicating that . . . funds [were] being mishandled." *Cf. Lerner*, 459 F.3d at 295.  The only misconduct that Plaintiffs identify is the release of funds without *written* authorization from Carillon, but the Court does not view this technical violation as sufficient to put TD Bank on notice that Carillon was committing fraud or diversion. *Compare Zamora v. JPMorgan Chase Bank, N.A.*, No. 14-CV-5344, 2015 WL 4653234 at *3 (S.D.N.Y. July 31, 2015), *aff'd sub nom. Zamora v. FIT Int'l Grp. Corp.*, 834 F. App'x 622 (2d Cir. 2020) (dismissing claim for aiding and abetting a breach of fiduciary duty because complaint failed to allege that JPMorgan had "actual knowledge" of the misconduct), *with Liu*, 301 F. Supp. 3d at 411, 429-30 (upholding breach of fiduciary duty claim where Defendant "improperly—and knowingly" misappropriated Plaintiffs' escrowed funds).  TD Bank therefore did not breach any duty of care by failing to investigate or demand additional evidence from Carillon before releasing funds.

---

that they did not own the escrow accounts, they did deposit their money, allege that they paid fees directly to TD Bank (SAC ¶ 37), and were entitled to certain "benefit[s]" under the Escrow Agreement.  (Offer Memo. at 168.)  This might elevate Plaintiffs above the status of mere creditors, even if it does not formally make them TD Bank's "customers."

For largely the same reasons, the Court dismisses Plaintiffs' negligence claims. "In order to establish a common law negligence claim under New Jersey law, a plaintiff must prove: (1) duty of care; (2) breach of that duty; (3) proximate cause; and (4) damages." *Diaz*, 2016 WL 111420 at *4 (quotation marks omitted). As with breach of fiduciary duty, negligence claims cannot be based on mere non-performance of a contract. *Int'l Mins. & Mining Corp.*, 736 F. Supp. at 597 ("It has long been the law that remedies in tort relating to a breach of contract may not be maintained in addition to those established under the contract itself in the absence of any independent duty owed by the breaching party to the plaintiff. Thus, [the plaintiff] may not recover from [the defendant] under a tort theory alleging 'malicious' or 'negligent' breach.").

Again, assuming without deciding that TD Bank had a duty to make reasonable inquiries, the Court concludes that Plaintiffs have failed to adequately allege a breach of that duty. The Second Amended Complaint points to no suspicious circumstances or other indicia of misconduct that should have alerted TD Bank to Carillon's alleged wrongdoing. Rather, all that Plaintiffs allege is that TD Bank erred in its duty to require *written* as opposed to *oral* confirmation before transferring funds, and to require evidence that the project plan was submitted as part of Carillon's certification. Plaintiffs identify no cases where these kinds of errors, even involving escrow accounts, have been found negligent.

Plaintiffs' breach of fiduciary duty and negligence claims are therefore dismissed. Because Plaintiffs have not adequately stated claims, the Court needs not address whether such claims would be time barred. (*Cf.* MoL at 28.)

### E.    Leave to Replead

Plaintiffs request leave to file a third amended complaint, in the event the Court finds the SAC deficient. (Opp. at 30-31.) "While Rule 15(a) provides that leave to amend shall be freely given when justice so requires, the Court has broad discretion in deciding whether or not to grant

such a request." *St. Clair Shores Gen. Emps. Ret. Sys. v. Eibeler,* 745 F.Supp.2d 303, 316 (S.D.N.Y. 2010) (citations and quotation marks omitted). "Factors that are relevant to the exercise of the Court's discretion include: (1) the presence of bad faith, dilatory motives, or undue delay on the part of the movant; (2) the potential for prejudice to an opposing party; and (3) whether the sought-after amendment would be futile." *Id.* (citations omitted). "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to [Rule] 12(b)(6)." *Lucente v. Int'l Bus. Machines Corp.,* 310 F .3d 243, 258 (2d Cir. 2002).

Plaintiffs' request for leave to file a third amended complaint is denied, as Plaintiffs have already amended once and because further amendments would likely be futile. Plaintiffs' request is offered "without any suggestion of what changes such amendment might effect." *In re Agnico-Eagle Mines Ltd. Sec. Litig.*, No. 11-CV-7968, 2013 WL 144041, at *22 (S.D.N.Y. Jan. 14, 2013), *aff'd sub nom. Forsta AP-Fonden v. Agnico-Eagle Mines Ltd.*, 533 F. App'x 38 (2d Cir. 2013). Given how long Plaintiffs have had to develop the facts in this case, it is unlikely that an amendment would produce additional evidence of communications between Plaintiffs and TD Bank, or evidence that TD Bank was on notice of Carillon's alleged fraud.

Plaintiffs' request for leave to amend is therefore denied.

## IV.    Conclusion

For the foregoing reasons, Defendant's motion to dismiss is GRANTED in part and DENIED and Plaintiffs' request for leave to file a third amended complaint is DENIED.

The motion to dismiss is GRANTED as to Plaintiffs' implied contract, fiduciary duty, and negligence claims. It is DENIED as to Plaintiffs' contract claims under a third-party-beneficiary theory, and Plaintiffs' promissory estoppel claims.

Defendant TD Bank shall file an answer to the remaining claims within 14 days after the date of this opinion and order.

The Clerk of Court is directed to close the motion at Docket Number 35.

SO ORDERED.

Dated:  September 20, 2024
        New York, New York

_____
            J. PAUL OETKEN
      United States District Judge