UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

LINA DOU, et al.,

                    Plaintiffs,

          v.                                    Civil Action No. 1:23-CV-04880-JPO

TD BANK, N.A.,

                    Defendant.

DEFENDANT TD BANK, N.A.'S MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

SIMPSON THACHER & BARTLETT LLP

Lynn K. Neuner
Patrick K. Barry
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
lneuner@stblaw.com
patrick.barry@stblaw.com

*Attorneys for Defendant TD Bank, N.A.*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT..................................................................................... 1

BACKGROUND ......................................................................................................... 4

    A.    The Chicago Project................................................................................ 4

    B.    Marketing the Chicago Project ............................................................... 5

    C.    Investors Invest in the Chicago Project Based on a Variety of Information from a Variety of Sources for a Variety of Reasons ............................... 6

    D.    The Forged 2015 Escrow Agreement ..................................................... 7

    E.    Plaintiffs Sue the Developer and TD ...................................................... 7

    F.    Plaintiffs Seek Class Certification ......................................................... 8

LEGAL STANDARD .................................................................................................. 9

ARGUMENT ............................................................................................................... 9

I.    PLAINTIFFS HAVE NOT ESTABLISHED THAT COMMON ISSUES PREDOMINATE ............................................................................................ 9

    A.    Individualized Issues Predominate Plaintiffs' Promissory Estoppel Claim.......... 10

        1.    The Clear and Definite Promise Element Requires Individualized Proof.................................................................................. 10

        2.    The Actual Reliance Element Requires Individualized Proof .................. 13

        3.    The Reasonableness Element Requires Individualized Proof .................. 16

    B.    Individualized Issues Predominate Plaintiffs' Breach of Contract Claim............. 18

    C.    The Circumstances of Each Investor's Transfers Require an Individualized Assessment.......................................................................... 19

II.    PLAINTIFFS HAVE NOT ESTABLISHED THAT THEIR CLAIMS ARE TYPICAL OF THE PUTATIVE CLASS ........................................................... 20

III.    PLAINTIFFS HAVE NOT ESTABLISHED THAT THEY WOULD BE ADEQUATE CLASS REPRESENTATIVES ................................................... 24

    A.    Plaintiffs Do Not Oversee or Control Their Own Claims...................... 24

    B.    Plaintiffs Lack a Basic Familiarity with the Claims, Pleadings, and Facts .......... 26

CONCLUSION.................................................................................................................... 28

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Andrews v. Sazerac Co.*,
   2025 WL 19312 (S.D.N.Y. Jan. 2, 2025) ................................................................ 22

*Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.*,
   2003 WL 23018888 (S.D.N.Y. Dec. 22, 2003) ........................................................ 18

*Baxter v. Palmigiano*,
   425 U.S. 308 (1976) ................................................................................................. 22

*Catzin v. Thank You & Good Luck Corp.*,
   2016 WL 11779675 (S.D.N.Y. Oct. 3, 2016) .......................................................... 24

*Chana Friedman-Katz v. Lindt & Sprungli*,
   270 F.R.D 150 (S.D.N.Y. 2010) .............................................................................. 22

*Cohen v. Lati*,
   98 F.R.D. 581 (E.D.N.Y. 1983) ............................................................................... 22

*Darvin v. Int'l Harvester*,
   610 F. Supp 255 (S.D.N.Y. 1985) ........................................................................... 23

*Ginsberg v. Bistricer*,
   2007 WL 987162 (N.J. Super. Ct. App. Div. Apr. 4, 2007) ...................... 13, 14, 16

*Haley v. Tchr.'s Ins. and Annuity Ass'n of Am.*,
   344 F.R.D. 284 (S.D.N.Y. 2023) .............................................................................. 9

*Haley v. Tchrs. Ins. & Annuity Ass'n of Am.*,
   54 F.4th 115 (2d Cir. 2022) ................................................................................. 9, 19

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014) ................................................................................................. 14

*Higgins v. MetLife Ins. Co.*,
   2008 WL 9421065 (D. Mass. Dec. 22, 2008) ......................................................... 17

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
   2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024) ........................................................... 9

*In re Term Commodities Cotton Futures Litig.*,
   2022 WL 485005 (S.D.N.Y. Feb. 17, 2022) ............................................................ 26

*Johnson v. Nextel Commc'ns Inc.*,
   780 F.3d 128 (2d Cir. 2015) ...................................................................................... 9

*Kline v. Wolf*,
    702 F.2d 400 (2d Cir. 1983) ................................................................................. 22

*Koenig v. Benson*,
    117 F.R.D. 330 (E.D.N.Y. 1987) ................................................................. 25, 26

*Koss v. Wackenhut Corp.*,
    2009 WL 928087 (S.D.N.Y. Mar. 30, 2009) ............................................. 23

*Luedke v. Pan Am. Corp.*,
    155 B.R. 327 (S.D.N.Y. 1993) ................................................................. 16

*Maywalt v. Parker & Parsley Petroleum Co.*,
    67 F.3d 1072 (2d Cir. 1995) ................................................................. 25

*Mendel v. Henry Phipps Plaza West, Inc.*,
    6 N.Y.3d 783 (2006) ................................................................................. 18

*Metz v. Unizan Bank*,
    2009 WL 10713772 (N.D. Ohio Mar. 24, 2009) ................................... 16

*Moore v. PaineWebber, Inc.*,
    306 F.3d 1247 (2d Cir. 2002) ................................................................. 14

*Moreno-Godoy v. Kartagener*,
    7 F.4th 78 (2d Cir. 2021) ....................................................................... 18

*Myers v. Hertz Corp.*,
    624 F.3d 537 (2d Cir. 2010) ............................................................. 9, 24

*Newton v. R.C. Bigelow, Inc.*,
    2025 WL 994721 (E.D.N.Y. Feb. 14, 2025) ....................................... 14

*Pagan v. Abbott Labs., Inc.*,
    287 F.R.D. 139 (E.D.N.Y. 2012) ......................................................... 23

*Rapcinsky v. Skinnygirl Cocktails, L.L.C.*
    2013 WL 93636 (S.D.N.Y. Jan. 9, 2013) ....................................... 14, 21

*Rotstain v. Trustmark National Bank*,
    2017 WL 11662671 (N.D. Tex. Nov. 7, 2017) ................................... 16

*Rowell v. Voortman Cookies, Ltd.*,
    2005 WL 1026715 (N.D. Ill. Apr. 27, 2005) ....................................... 17

*Russell v. Forster & Garbus, LLP*,
    2020 WL 1244804 (E.D.N.Y. Mar. 16, 2020) ................................... 25

*Scott v. New York City District Council of Carpenters Pension Plan*,
    224 F.R.D. 353 (S.D.N.Y. 2004) ........................................................ 27

*Stewart v. Hudson Hall LLC*,
    2021 WL 6285227 (S.D.N.Y. Nov. 29, 2021) ..................................... 22

*Toll Bros., Inc. v. Bd. of Chosen Freeholders of Burlington*,
    194 N.J. 223 (N.J. 2008) ..................................................................... 10

*Veleron Holding, B.V. v. BNP Paribas SA*,
    2014 WL 12699263 (S.D.N.Y. Apr. 16, 2014) ................................... 18

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011) .......................................................................... 9

*Weiner v. Snapple Beverage Corp.*,
    2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010) ....................................... 14

*Weisman v. Darneille*,
    78 F.R.D. 669 (S.D.N.Y. 1978) .......................................................... 27

*Wexler v. AT&T Corp.*,
    323 F.R.D. 128 (E.D.N.Y. 2018) ........................................................ 26

*Woodhams v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC*,
    2024 WL 1216595 (S.D.N.Y. Mar. 31, 2024) ..................................... 21

## Rules

Fed. R. Civ. P. 23(a)(3) ................................................................................... 21

Fed. R. Civ. P. 23(b)(3) .................................................................................... 9

## Other Authorities

Restatement (Second) of Contracts § 90 ....................................................... 16

v

Defendant TD Bank, N.A. ("TD") respectfully submits this memorandum of law in opposition to Plaintiffs' Motion for Class Certification (Dkt. 181) ("Pls.' Mot.").

## PRELIMINARY STATEMENT[1]

TD provided escrow services for a real estate development project planned for downtown Chicago. Plaintiffs are Chinese nationals that invested in that project. After the project failed and their settlement with its developer went unpaid, Plaintiffs sued TD, as the project's escrow agent, seeking to recoup their investments.

Plaintiffs' claims are premised on a purported May 19, 2015 escrow agreement between TD and the developer. That document is a forgery. TD's escrow accounts for the project were governed by a valid escrow agreement negotiated by TD and the developer and entered into on March 14, 2014. In August 2015, a principal of the developer asked a TD employee to sign a "revised" signature page for that 2014 escrow agreement on the pretext that it was "necessitated by a name change" for the project. Unbeknownst to TD, the developer then attached that signature page to a new, fabricated escrow agreement with substantially different terms that TD had not seen, negotiated, or accepted (the "Forged 2015 Escrow Agreement").

After its decision on TD's Motion to Dismiss, Plaintiffs have just two claims remaining, one for breach of contract and the other for promissory estoppel. They now seek to certify and represent a class of 85 investors in the project to pursue claims under those theories. The Court should deny class certification and their bid to represent that class.

Parties seeking class certification must prove that each requirement for certification is met. Courts then "rigorously" assess that proof to ensure that each requirement has, in fact, been satisfied. Plaintiffs' motion treats class certification in short strokes, as though it is guaranteed.

---

[1]    Capitalized terms are defined below.

For example, they assert a claim for promissory estoppel, which requires proof of reliance and that that reliance was reasonable. Reliance and reasonableness of reliance are quintessential questions of individualized fact that generally preclude class certification for common-law claims. Plaintiffs' entire explanation as to why these issues can nevertheless be resolved on a class-wide basis is as follows: "Whether Plaintiffs' reliance on that promise was reasonable and foreseeable is a common question of fact that predominates over any individual inquiry." Bare assertions do not satisfy the "rigorous" class certification analysis.

A considered analysis of the requirements shows that the proposed class cannot be certified. *First*, individualized issues of fact predominate with respect to the promissory estoppel and breach of contract claims and potential defenses, making a single trial infeasible.

Promissory Estoppel. Plaintiffs will need to prove, *inter alia*, actual and reasonable reliance on a clear and definite promise made by TD. Each of these elements require fact-intensive, individualized inquiries overwhelming common questions and precluding class certification.

Plaintiffs offer no evidence that any putative class member received the Forged 2015 Escrow Agreement before investing in the Chicago Project, let alone that every member did. Indeed, discovery has shown that no investor received the Forged 2015 Escrow Agreement before investing, and many invested before it was even created, so they necessarily could not have received it or relied upon it. Each putative class member will therefore need to prove that they received the Forged 2015 Escrow Agreement before investing in the Chicago Project.

Plaintiffs try to get around this problem by redefining their class to fit a new theory of promise capturing those who invested pursuant to the Forged 2015 Escrow Agreement *or* an unsigned "Form of Escrow Agreement." That unsigned "Form of Escrow Agreement" from the developer is not the "promise" that the Court has allowed to proceed past the pleading and

summary judgment stages or a viable theory of a "clear and definite promise" from TD. Moreover, not all members of the putative class received that unsigned "Form of Escrow Agreement" before investing, raising another individualized issue.

Cases that have a claim with a reliance element generally cannot be certified because people typically receive different information from different sources and assess that information in different ways when making decisions. This case is illustrative. Even among the proposed class representatives, the sources of information, information they received, and information actually relied upon in deciding to invest varied widely. Many investors, for example, did not review any documents before investing because the documents were in English, and they know only Chinese. Others relied solely on oral explanations of the investment from a variety of sources. Some invested on the mistaken belief that the project had "no risk" and "if the project had failed, [they] would be able to get [a] refund from the escrow account," while others believed that their funds would remain in escrow until the project started. Each individual putative class member's decision-making process will need to be explored.

The reasonableness of a particular investor's reliance will turn on a holistic assessment of a variety of factors—e.g., the investor's due diligence and sophistication and the mosaic of information possessed or available to that investor. These factors vary significantly from one putative class member to the next. Each of these promissory estoppel elements raises weighty, individualized issues of fact precluding class certification.

Breach of Contract. Plaintiffs must rely on the circumstances surrounding the purported agreement to show that they were each intended as third-party beneficiaries because the purported contract does not expressly identify them as beneficiaries (and in fact, expressly *disclaims* them as beneficiaries). This "surrounding circumstances" inquiry asks, *inter alia*, whether each putative

class member relied on the agreement and whether his or her reliance was reasonable and probable, raising the same fact-intensive, individualized issues of reliance and reasonableness of reliance that preclude certification of the promissory estoppel claim.

*Second*, Plaintiffs' claims are atypical of those of the broader class due to serious credibility issues and other unique defenses. One Plaintiff, for example, invoked her Fifth Amendment right against self-incrimination when questioned about the source of the funds she invested in the Chicago Project. Several others admitted outright to perjuring themselves in their I-526 immigration petitions submitted under oath to the U.S. Citizenship and Immigration Services ("USCIS") as part of their investment in the Chicago Project. Still others "lost" evidence or failed to produce any documents to support their claims. These unique issues will become a focal point at trial and undermine the assertion that the proposed representatives are typical of the class.

*Third*, Plaintiffs' ability to represent absent class members fairly and adequately is in serious doubt. Several do not control even their own claims, having handed full responsibility to their parents or spouses, so would not personally represent absent class members. Others have never reviewed the complaint, lack even a basic understanding of the suit, and have not monitored this litigation whatsoever. None have diligently litigated this case. And many have shown a willingness to flout laws to further their own interests.

## BACKGROUND[2]

### A.    The Chicago Project

This case results from a failed real estate development project in Chicago (the "Chicago Project"), initially called Intercontinental Tower/Chicago, L.P. ("Intercontinental") and

---

[2]    References to "Exhibits" refer to the exhibits to the Barry Declaration, submitted contemporaneously with this opposition.

subsequently renamed Carillon Tower/Chicago, L.P. ("Carillon").[3]  Ex. 2 at -3137–40; Ex. 3 at -3537; Ex. 5.  The Chicago Project was marketed under the EB-5 "Regional Center" program enacted by Congress, which provides certain foreign investors a pathway to U.S. citizenship.  Ex. 2 at -3139, -3161, -3170; Ex. 30 61:9-66:17.

In January 2014, TD was contacted by a principal of the developer about acting as escrow agent and setting up an escrow account to hold funds deposited by investors in the Chicago Project.  Ex. 1.  In February 2014, the developer shared an offering book with TD that described the proposed project and contained a form escrow agreement (the "2014 Offering Memorandum").  Ex. 2.  Working from the form escrow agreement in the 2014 Offering Memorandum, TD and the developer negotiated and entered into a valid escrow agreement on March 14, 2014 (the "2014 Escrow Agreement").  Ex. 4.

TD abided by the terms of the valid 2014 Escrow Agreement to release the escrowed funds to the developer.

### B.    Marketing the Chicago Project

The Chicago Project was marketed to prospective investors in China by a Chinese firm named Cansine (sometimes spelled "Kaisheng").  Ex. 30 61:9-70:10.

To market the Chicago Project, Carillon provided Cansine with a *different* offering book than the one it sent TD in February 2014.  The offering book that Carillon provided Cansine was dated January 15, 2015 (the "2015 Offering Memorandum") and contained a materially different unsigned "Form of Escrow Agreement" that was "[s]ubject to final approval from the Escrow Agent" and specified that "[t]he Partnership *intends* to enter into an Escrow Agreement[.]"  *Id.*; Ex. 18 at 27, 70 (emphasis added).

---

[3]    Intercontinental and Carillon are interchangeably referred to herein as "Carillon."

TD never received a copy of the 2015 Offering Memorandum or the "Form of Escrow Agreement" therein prior to the commencement of this litigation. Ex. 33 ¶ 28. TD did not have any role in preparing or marketing those materials. *Id.* TD never agreed to the Forged 2015 Escrow Agreement that the developer fabricated. *Id.*

### C.    Investors Invest in the Chicago Project Based on a Variety of Information from a Variety of Sources for a Variety of Reasons

In marketing the project, Cansine advertised the project online, Ex. 23 24:17-25:8; hosted a series of in-person presentations for prospective investors, Ex. 27 41:2-16; emailed, met, and had telephone calls with interested prospective investors, Ex. 19 70:24-71:19; Ex. 26 15:9-20; and provided some, but not all, prospective investors with the 2015 Offering Memorandum, *see infra* Section I.A.1.

Investors in the project decided to invest based on a variety of information from a variety of sources for a variety of reasons. Many did not review any documents before investing because the 2015 Offering Memorandum was in English, and they know only Chinese. *See, e.g.*, Ex. 20 79:8-16; Ex. 25 60:13-61:8. Some relied on Cansine's oral description of the project. *See, e.g.*, Ex. 27 46:23-48:4. Several knew nothing about the project and invested blindly, at the direction of their spouses or parents. *See, e.g.*, Ex. 20 67:19-22, 68:5-16; Ex. 21 42:17-43:12; Ex. 23 43:2-15, 86:18-21, 87:17-88:6. Some invested on the belief that the project had "no risk" and that "if the project had failed, [they] would be able to get [a] refund from the escrow account." Ex. 20 68:22-69:9. Others believed that the funds would remain in escrow until the project started. Ex. 23 54:9-14.

By August 26, 2015, more than a third of the putative class had made their investments in the Chicago Project. Ex. 32 at 10.

### D.      The Forged 2015 Escrow Agreement

On August 27, 2015, after more than a third of the putative class members had made their investments, a principal of the developer solicited TD employee Stephen Schaaf's signature on a "revised" signature page for the 2014 Escrow Agreement on the pretext that it was "necessitated by [a] name change" of the project from Intercontinental to Carillon.  Ex. 6.  Unbeknownst to TD, the developer then attached that signature page to a new, fabricated escrow agreement with substantially different terms that TD had not seen, negotiated, or agreed to accept.  Ex. 29 36:12-19; Ex. 33 ¶¶ 22–23.

Carillon did not provide Cansine with this Forged 2015 Escrow Agreement, so Cansine did not and could not have provided it to prospective investors.  *See* Ex. 30 69:2-17; Ex. 31 23:6-24:13.  The Forged 2015 Escrow Agreement only made its way to investors through the immigration lawyer the investors retained *after* investing to compile and submit their respective I-526 immigration petitions to the USCIS.  Ex. 30 64:16-65:23; Ex. 31 24:19-26:21.  Indeed, Plaintiffs did not produce the Forged 2015 Escrow Agreement outside of their I-526 petitions assembled by their immigration attorney.

### E.      Plaintiffs Sue the Developer and TD

The Chicago Project ultimately stalled.  Ex. 11 ¶¶ 25, 40–42.  In November 2018, the investors brought claims against various entities and managers affiliated with the Chicago Project as well as TD in the Northern District of Illinois.  Ex. 12.  In June 2019, the Illinois court dismissed TD from the case after TD and Plaintiffs stipulated to transfer the claims.  Exs. 13, 14.  Plaintiffs, however, took no action at that time to transfer their case against TD to this Court or to file a new action against TD.

Only after Plaintiffs were unable to collect on their settlement against the developer did they turn back to TD.  In December 2022, Plaintiffs tried to "resume proceedings against TD" in

Illinois and set aside the joint stipulation to transfer the claims against TD.  Ex. 15.  The Illinois court denied this request and instead transferred the claims against TD to this Court in May 2023.  Exs. 16, 17.

On September 20, 2024, the Court granted TD's motion to dismiss in part, dismissing all but Plaintiffs' third-party beneficiary breach of contract and promissory estoppel claims.  *See* MTD Order (Dkt. 94).  On July 9, 2025, the Court denied the parties' competing summary judgment motions.  SJ Order (Dkt. 179).  In its motion to dismiss and summary judgment decisions, the Court sustained Plaintiffs' promissory estoppel claim based on the investors' receipt, review, and understanding of the signed Forged 2015 Escrow Agreement attached to the Complaint, not the 2015 Offering Memorandum or its unsigned "Form of Escrow Agreement."  *See* MTD Order (Dkt. 94) at 19; SJ Order (Dkt. 179) at 3.

### F.    Plaintiffs Seek Class Certification

In the operative complaint, Plaintiffs defined their putative class as foreign investors who invested "pursuant to the Escrow agreement, the Offering Memorandum *and* Investment Documents."  SAC (Dkt. 25) ¶ 70 (emphasis added).  "Escrow Agreement," here, was defined as the "Escrow Agreement between Carillon and the defendant TD Bank" attached as Exhibit 2 to the SAC—i.e., the Forged 2015 Escrow Agreement.  *Id.* ¶¶ 29, 38.  So, the class definition in the operative complaint encompassed only those who invested pursuant to the Forged 2015 Escrow Agreement *and* other documents.

Plaintiffs now seek to certify a different class: foreign investors who invested "pursuant to the Carillon Tower/Chicago Escrow Agreement *and/or* the Carillon Tower Offering Memorandum on or after May 19, 2015."  Pls.' Mot. at 8 (emphasis added).  Plaintiffs, in other words, are trying to expand their class to include those who invested pursuant to the Forged 2015 Escrow Agreement *or* the unsigned "Form of Escrow Agreement" in the 2015 Offering Memorandum.  *Id.* ¶ 38.

## LEGAL STANDARD[4]

"Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). "The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met," *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010), and courts must perform a "rigorous analysis" for compliance with each of these requirements before certifying a class, *In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800, at *5 (S.D.N.Y. Mar. 29, 2024) (Oetken, J.).

## ARGUMENT

### I.    PLAINTIFFS HAVE NOT ESTABLISHED THAT COMMON ISSUES PREDOMINATE

Federal Rule of Civil Procedure 23(b)(3) requires courts to find that "the questions of law or fact common to class members predominate over any questions affecting only individual members." "Rule 23(b)(3)'s predominance requirement is more demanding than Rule 23(a)," *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 138 (2d Cir. 2015), and requires courts to "consider all factual or legal issues and classify them as subject either to common or individual proof," *Haley v. Tchrs. Ins. & Annuity Ass'n of Am.*, 54 F.4th 115, 121 (2d Cir. 2022). "Rather than take the plaintiff's word that no material differences exist in a class, district courts themselves must undertake a considered analysis[.]" *Haley v. Tchr.'s Ins. and Annuity Ass'n of Am.*, 344 F.R.D. 284, 290 (S.D.N.Y. 2023).

Plaintiffs fall far short of establishing that common questions predominate. They simply recite the predominance standard and represent that it has been met. *See* Pls.' Mot. at 11–13. A considered analysis of their claims and the potential defenses in the case, however, shows that individualized issues predominate.

---

[4]    Internal citations and quotation marks are omitted from case citations.

**A.    Individualized Issues Predominate Plaintiffs' Promissory Estoppel Claim**

To prevail on a promissory estoppel claim, a plaintiff must show actual and reasonable reliance on a clear and definite promise made by the defendant, a breach of that promise by the defendant, and damages from that breach.  *See Toll Bros., Inc. v. Bd. of Chosen Freeholders of Burlington*, 194 N.J. 223, 253 (N.J. 2008).[5]

Individualized questions of fact predominate as to three of these elements, namely:

(1)    Whether each putative class member received a clear and definite promise from TD;

(2)    Whether each putative class member actually relied on that promise from TD in deciding to invest in the Chicago Project; and

(3)    Whether each putative class members' reliance was reasonable in light of their particular circumstances.

Each of these individualized issues overwhelms common issues and independently bars class certification.

**1.    The Clear and Definite Promise Element Requires Individualized Proof**

Individualized issues predominate on the "clear and definite promise" element of the putative classes' promissory estoppel claims because Plaintiffs have not and cannot establish that all putative class members received the Forged 2015 Escrow Agreement before investing in the Chicago Project.

TD's purported "promise" with respect to the Forged 2015 Escrow Agreement was Schaaf's signing of the "revised" signature page on August 27, 2015 that was subsequently appended (without TD's knowledge or consent) to the Forged 2015 Escrow Agreement.  *See* MTD Order (Dkt. 94) at 19 (allowing promissory estoppel claim to proceed on theory that investors "were provided with a copy of the Escrow Agreement along with the Offering Memorandum" and

---

[5]    New Jersey law governs the promissory estoppel claim.  *See* MTD Order (Dkt. 94) at 16.

"there is a 'clear and definite promise' in the form of the Escrow Agreement"); SJ Order (Dkt. 179) at 3 (denying summary judgment because "[t]here exists a document containing the 2015 Agreement and the signature of a TD representative"); SAC ¶¶ 182, 185–87. The element of "clear and definite promise," then, will turn on proof that each putative class member received the Forged 2015 Escrow Agreement with the "revised" signature page signed by Schaaf on August 27, 2015 before investing in the Chicago Project.

Plaintiffs offer no evidence that any investor received the Forged 2015 Escrow Agreement with Schaaf's August 27 signature before investing, let alone that every member of the putative class received it. In fact, the evidence shows that none of the investors received it before investing and, for many, it was impossible to have received it prior to their investment. First, Carillon's Jason Ding testified that Carillon provided Cansine, the firm marketing the project to investors in China, with only an unsigned "form" escrow agreement that was still "[s]ubject to final approval from the Escrow Agent," Ex. 30 71:12-25, 72:25-73:14, and predated Schaaf signing the "revised signature page" on August 27, 2015, *see* Ex. 18 at Ex. D; Ex. 31 22:19-24:16, 27:3-7. Ding testified that Carillion did not give Cansine the Forged 2015 Escrow Agreement. *Id.* If Carillon did not provide Cansine with the Forged 2015 Escrow Agreement, investors necessarily could not have received it from Cansine before investing in the Chicago Project. Second, Schaaf did not sign the "revised signature page" that was appended to the Forged 2015 Escrow Agreement until August 27, 2015. More than a third of the putative class invested *before* August 27, 2015, Ex. 32 at 10, meaning that TD's supposed promise did not even exist when they invested in the Chicago Project. Third, several Plaintiffs expressly confirmed that they did not receive the Forged 2015 Escrow Agreement before making their investment. *See, e.g.*, Ex. 22 72:20-24; Ex. 27 45:7-10.

11

Because there is no evidence that every putative class member received the Forged 2015 Escrow Agreement before investing in the Chicago Project, each individual member of the putative class will need to establish that at trial. That investor-specific proof precludes class certification.

Plaintiffs claim that all investors received "the same offering document and escrow agreement" and therefore all received the same "promise" from TD. Pls.' Mot. at 12. That is inaccurate.

First, Plaintiffs use ambiguity (i.e., by asserting that investors received "the same offering document and escrow agreement" without specifying which documents those are) to imply that every investor received the Forged 2015 Escrow Agreement before investing in the Chicago Project. But as explained above, that is both false and impossible. The "escrow agreement" that *some* investors received was an unsigned "form" agreement that was still "[s]ubject to final approval from the Escrow Agent," Ex. 30 71:12-25, 72:25-73:14, and predated Schaaf signing the "revised signature page" on August 27, 2015, Ex. 18 at Ex. D; Ex. 31 22:19-24:16, 27:3-7. That is not the "promise" that the Court allowed to proceed past the pleading and summary judgment stages, which turned on the investors' receipt, review, and understanding of the signed Forged 2015 Escrow Agreement attached to the Complaint, *see* MTD Order (Dkt. 94) at 19; SJ Order (Dkt. 179) at 3, and cannot constitute a "clear and definite promise" from TD.

Second, not all putative class members received even the unsigned "form" escrow agreement before investing in the Chicago Project. Carillon did give Cansine an offering book that included the unsigned "form" escrow agreement. Ex. 30 69:2-17, 71:12-25. But it does not follow that Cansine then gave every prospective investor those documents, particularly when those documents are in English and many of the prospective investors do not speak English, *see, e.g.*, Ex. 23 36:13-21; Ex. 28 41:7-10.

Indeed, discovery has shown that not all investors were given those documents before investing. Plaintiff Wang, for example, testified unequivocally that she did not receive any escrow agreement—form or otherwise—before signing on as an investor:

> Q:    So you didn't have a copy of the escrow agreement before you signed the investment agreement; is that right?
>
> A:    Correct.

Ex. 27 45:7-10. Plaintiff Xiao did not remember receiving any escrow agreement before making his investment. Ex. 20 80:2-9. Plaintiff Xing testified that he did not receive offering materials during his meeting with Cansine and had to specifically ask for them later, Ex. 28 41:11-23, rebutting any notion that prospective investors were automatically given the same offering materials upfront. Plaintiff Yao initially testified that she received a copy of the escrow before investing, Ex. 26 87:7-18, 89:3-5, but subsequently testified that she asked TD's Schaff for a copy in 2019, *id.* 100:12-101:15. When asked why she needed a copy of the escrow agreement if she already had one, she struggled to respond, could no longer remember where she kept the agreement, and asked for a break. *Id.* 100:12-104:24. A jury could infer from her response that she did not receive an escrow agreement before investing.

The proposed class representatives' conflicting testimony around their receipt of the "form" escrow agreement further underscores the investor-specific nature of the "promise" element.

### 2. The Actual Reliance Element Requires Individualized Proof

Class certification must also be denied because individualized issues will predominate on the actual reliance element of the promissory estoppel claim.

To prevail on a promissory estoppel claim, a plaintiff must actually rely on the promise at issue in deciding to act. *See, e.g.*, *Ginsberg v. Bistricer*, 2007 WL 987162, at *14–16 (N.J. Super. Ct. App. Div. Apr. 4, 2007). Cases that have a reliance element generally cannot be certified

13

because people typically receive different information from different sources and assess that information in different ways when making decisions. As the U.S. Supreme Court explained, without a presumption of reliance (as in certain securities fraud cases), cases with a reliance element "cannot proceed as a class action," explaining that:

> Each plaintiff would have to prove reliance individually, so common issues would not "predominate" over individual ones, as required by Rule 23(b)(3).

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 281–82 (2014). The fundamental incompatibility of reliance-based claims and class certification is well-recognized in this circuit, including by this Court.[6] *Rapcinsky v. Skinnygirl Cocktails, L.L.C.* is illustrative. 2013 WL 93636 (S.D.N.Y. Jan. 9, 2013) (Oetken, J.). In *Rapcinsky*, a consumer sued the producers of "SkinnyGirl Margarita" under a promissory estoppel theory, alleging that "Defendants . . . promised the public that 'Skinnygirl Margarita' was 'All-natural' and contained only '100% Blue Agave tequila' when in fact impure *mixto* 'tequila' was used." *Id.* at *8. This Court denied class certification, pointing to reliance issues that "plague[d]" the claim. *See id.* at *9.

This case has the same problem. Even among the proposed class representatives, their sources of information, the information they received, and the information they actually relied upon in deciding to invest in the Chicago Project varied widely. For example:

- Plaintiff Shao admitted that he did not review any documents before investing and could not recall whether he was told about an escrow agreement. Ex. 21 42:17-43:12, 58:23-59:9, 65:9-11.

---

[6]    *See Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002) ("Where there are material variations in the nature of the misrepresentations made to each member of the proposed class, [] class certification is improper because plaintiffs will need to submit proof of the statements made to each plaintiff, the nature of the varying material misrepresentations, and the reliance of each plaintiff upon those misrepresentations in order to sustain their claims."); *Newton v. R.C. Bigelow, Inc.*, 2025 WL 994721, at *10 (E.D.N.Y. Feb. 14, 2025) ("reliance . . . is a fact intensive, individualized inquiry that is generally not appropriate for class certification"); *Weiner v. Snapple Beverage Corp.*, 2010 WL 3119452, at *11 (S.D.N.Y. Aug. 5, 2010) (denying class certification because reliance not subject to generalized proof).

- Plaintiff Wang explained that, because she does not know English, she relied on Cansine's oral explanation of what was in the offering documents. Ex. 27 46:23-48:4.

- Plaintiff Xiao did not review any documents before investing. Ex. 20 68:5-16. He invested purely at the direction of his wife, explaining that "other than signing the documents, I know nothing about it." *Id.* 63:15-16. He also believed that the project had "no risk" and that "if the project had failed, we would be able to get [a] refund from the escrow account." *Id.* 69:5-9.

- Plaintiff Dou could not recall what, if anything, she reviewed before investing and relied on her husband to review the marketing materials. Ex. 23 43:2-12, 86:18-21, 87:17-88:6. When asked what her husband reviewed, she refused to answer on spousal privilege grounds. *Id.* 87:22-88:6. She believed that the funds would remain in escrow until the project started. *Id.* 54:9-14.

- Plaintiff Go relied on oral representations by Cansine in making her investment decision. Ex. 19 101:17-102:6.

- Plaintiff Xing received documents in English—which he cannot read—and subsequently obtained Chinese-language documents, which have not been produced in discovery or compared to the Forged 2015 Escrow Agreement. Ex. 28 41:11-23.

- Plaintiffs Xing, Wang, Tao, and Shi all invested before Schaaf signed the "revised" signature page appended to the Forged 2015 Escrow Agreement, Ex. 32 at 9, tbl. 2, so they necessarily could not have relied on the Forged 2015 Escrow Agreement in deciding to invest in the Chicago Project.

- Plaintiffs have little to no English proficiency, so they could not have relied on the English-language offering documents. *See, e.g.*, Ex. 27 22:7-9; Ex. 19 41:6-13; Ex. 20 5:10-13; Ex. 23 36:13-21; Ex. 28 41:7-10.

The variety of the information received by the proposed class representatives, their sources of information, and the way in which that information impacted their decision to invest in the Chicago Project (if at all) shows how individualized the issue of actual reliance is in this case.

In their single sentence addressing class-wide reliance, Plaintiffs implicitly equate receipt of a document with actual reliance on a specific portion of that document. *See* Pls.' Mot. at 12. Receipt of a document (or promise) and reliance on a specific portion of that document (or promise) are different things, and that distinction is legally significant. The essence of promissory estoppel is that the defendant's promise induced the plaintiff to do something that they would not

have done otherwise.  *See* Restatement (Second) of Contracts § 90.  It is therefore not enough simply to receive a promise; to be actionable, one must receive a promise and actually rely on it in deciding to act.  *See Ginsberg*, 2007 WL 987162, at *16.  That means each investor must show that they decided to invest in the Chicago Project because of Section 4 of the Forged 2015 Escrow Agreement.  As explained above, Plaintiffs have not established that every member of the putative class both received the Forged 2015 Escrow Agreement and actually relied on Section 4 of the Forged 2015 Escrow Agreement in deciding to invest in the Chicago Project.  Each putative class member will therefore need to prove actual reliance at trial, precluding class certification.[7]

### 3.  The Reasonableness Element Requires Individualized Proof

Individual issues predominate as to the reasonableness element of the promissory estoppel claim as well because the factors relevant to deciding the reasonableness of a given class member's reliance vary significantly from one class member to the next.

Reasonableness is a quintessential question of individualized fact and generally precludes class certification.  *See, e.g.*, *Luedke v. Pan Am. Corp.*, 155 B.R. 327, 330 (S.D.N.Y. 1993) (denying class certification of promissory estoppel claim in part because "the task of evaluating the reasonableness of each claimants' belief . . . has the potential to embroil the Court in thousands of fact-finding inquiries"); *Metz v. Unizan Bank*, 2009 WL 10713772, at *3 (N.D. Ohio Mar. 24, 2009) (observing that "[c]ourts, in this and most other circuits, have held that individual issues predominate over common issues in cases where reasonable reliance is an element of the plaintiffs' claims, thereby justifying the denial of class certification," and collecting cases).

---

[7]      TD defeated class certification for similar reasons in *Rotstain v. Trustmark National Bank*, 2017 WL 11662671 (N.D. Tex. Nov. 7, 2017).  There, the court denied class certification because, where "potential class members received varying oral representations, common issues of fact did not predominate."  *Id.* at *2.  Indeed, even if all putative class members received the same representation, individualized issues would still predominate because the representation was made in a variety of contexts.  *Id.*

The question of whether a particular putative class members' reliance was reasonable is highly fact-intensive and turns on factors like the due diligence done by the investor, the mosaic of information possessed by the investor, the investor's experience dealing with similar types of promises, and other factors. *See, e.g.*, *Higgins v. MetLife Ins. Co.*, 2008 WL 9421065, at *4 (D. Mass. Dec. 22, 2008) (denying class certification of promissory estoppel claim because "an individual inquiry would be necessary in order to determine whether each class member reasonably relied" on alleged promise); *Rowell v. Voortman Cookies, Ltd.*, 2005 WL 1026715, at *2 (N.D. Ill. Apr. 27, 2005) ("Plaintiffs' promissory estoppel claim requires individualized inquiries into . . . whether the reliance was reasonable in numerous individual circumstances.").

The proposed class representatives vary widely in these respects relevant to reasonableness, as demonstrated by the proposed representatives' testimony. For example:

- Plaintiff Wang relied solely on Cansine's oral descriptions of the escrow arrangement. Ex. 27 47:16-48:4.

- Plaintiff Tao relied solely on information provided by Cansine, a non-party to the escrow agreement. Ex. 24 46:13-16.

- Plaintiffs Xing and Wang vetted Cansine, the entity marketing the project. Ex. 27 40:16-41:16; Ex. 28 38:25-40:7.

- Plaintiff Shi may have consulted lawyers or financial advisors about the escrow arrangement. Ex. 22 70:17-71:2.

- Plaintiff Xing relied solely on an English-language version of the escrow agreement despite not understanding English. Ex. 28 41:11-23.

These and other factors bear on the reasonableness of any reliance and vary from investor to investor, requiring an individualized inquiry into each. The multiplicity of factors and need for investor-by-investor analysis preclude class certification.

### B.    Individualized Issues Predominate Plaintiffs' Breach of Contract Claim

Plaintiffs' breach of contract claim also raises individualized issues of fact that preclude class certification.

Their breach of contract claim is based on an intended third-party beneficiary theory.  *See* MTD Order (Dkt. 94) at 8–13.  Plaintiffs asserting third-party beneficiary rights under a contract must establish, *inter alia*, that the contract was intended for their benefit.  *Mendel v. Henry Phipps Plaza West, Inc.*, 6 N.Y.3d 783, 786 (2006).[8]

There is no express language in the Forged 2015 Escrow Agreement identifying the putative class members as beneficiaries.  In fact, there is express language *disclaiming* them as beneficiaries.  *Compare* Forged 2015 Escrow Agreement (Dkt. 25, Ex. 2) § 12 (providing that the agreement "shall inure to the benefit of the parties hereto and their respective successors, heirs and assigns"), *with Veleron Holding, B.V. v. BNP Paribas SA*, 2014 WL 12699263, at *21 (S.D.N.Y. Apr. 16, 2014) (substantially identical language rendered plaintiff not a third-party beneficiary as a matter of law).  Consequently, Plaintiffs rely on the surrounding circumstances to show that the investors were intended third-party beneficiaries.  *See Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.*, 2003 WL 23018888, at *8 (S.D.N.Y. Dec. 22, 2003).

These surrounding circumstances going to their third-party beneficiary status include whether "reliance [on the contract] by the beneficiary [was] both reasonable and probable." *Moreno-Godoy v. Kartagener*, 7 F.4th 78, 86 n.3 (2d Cir. 2021).  As discussed above in connection with the promissory estoppel claim, reliance and the reasonableness of such reliance are highly individualized, fact-intensive inquiries.  The information animating each investor's decision to invest in the Chicago Project and the factors relevant to assessing whether that decision was

---

[8]    New York law governs the breach of contract claim.  *See* MTD Order (Dkt. 94) at 7.

reasonable vary significantly from one class member to the next, overwhelming common questions and precluding class certification.  *See supra* Section I.A.2.

### C.    The Circumstances of Each Investor's Transfers Require an Individualized Assessment

In deciding whether individual issues predominate that preclude class certification, courts must "consider *all* factual or legal issues and classify them as subject to common or individual proof," including defenses.  *Haley*, 54 F.4th at 121.  Key issues at trial will be what each investor learned about the Chicago Project, how he or she decided to invest in the Chicago Project, and how she or she marshalled the funds to invest in the Chicago Project.  Each of these issues will require individualized inquiries into each putative class member that will overwhelm common issues, precluding class certification.

Investors in the Chicago Project learned different information about the project, from different sources, through different mediums, at different times.  Cansine, the Chinese firm marketing the project in China, connected with prospective investors online, in person, by email, by telephone, through referrals, and through a series of group presentations.  *See supra* Section I.A.2.

Investors decided to invest in the Chicago Project for a litany of investor-specific reasons too.  Some had no knowledge of any escrow agreement before investing and simply signed the documents put before them.  *See id.*  Others invested at the direction of their parents or spouses. *See id.*

Investors marshalled the funds to invest in the Chicago Project in different ways as well. Each investor in the Chicago Project was required to invest $550,000.  Pls.' Mot. at 4.  However, China restricts the ability of its citizens to convert and to transfer and invest money outside of China.  Specifically, "domestic individuals" are prohibited from, among other things, (i)

purchasing or using more than $50,000 in purchased foreign exchange in a year, (ii) arranging with family, friends, or paid or cooperating helpers to assemble and use foreign exchange amounts in excess of $50,000, and (iii) using any amount of purchased foreign exchange to invest in securities (including any interest in a partnership) outside of Mainland China without a prior exemption from Chinese authorities. *See* Ex. 34 ¶¶ 4, 23, 24, 39–40.

The record indicates that there are issues with various Plaintiffs' compliance with these currency restrictions. For example, some investors, like Plaintiffs Go and Xing, divided the Chinese yuan equivalent of $550,000 into increments of $50,000 or less and distributed these funds across a number of supposed "family and friends" in China. Ex. 19 57:13-61:6; Ex. 28 35:19-37:6. Their "family and friends" then converted the yuan to U.S. dollars. Ex. 19 58:4-21; Ex. 28 35:19-36:17. Next, the "family and friends" deposited the converted funds into the investors' Hong Kong bank accounts. Ex. 19 58:14-21. These investors then transferred the converted funds into escrow in the U.S. to invest in the Chicago Project.[9] *Id.* 60:24-61:6. Other investors appear to have engaged in similar conduct.

The circumstances regarding each Plaintiffs' investment will need to be explored at trial to determine the merits of their claims against TD regarding the Chicago Project. That will create the need for 85 mini-trials and weighs strongly against class certification.

## II.    PLAINTIFFS HAVE NOT ESTABLISHED THAT THEIR CLAIMS ARE TYPICAL OF THE PUTATIVE CLASS

Plaintiffs Shi, Yao, Wang, Xing, Tao, and Go are not suitable class representatives because each has presented serious credibility issues and will face unique defenses that will become points of focus at trial.

---

[9]    TD's Global Anti-Money Laundering division collected information and conducted due diligence on each of the investors. *See, e.g.*, Ex. 10.

To serve as class representatives, a plaintiff's claims must be "typical of the claims [. . .] of the class." Fed. R. Civ. P. 23(a)(3).  This Court recognizes that for reasons of typicality, "class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Rapcinsky*, 2013 WL 93636, at *4.  In that vein, this Court rejects representatives who make "false or contradictory" statements because it would become the focus of the litigation and hamper the representative's ability to effectively represent the interests of the class. *Woodhams v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC*, 2024 WL 1216595, at *10 (S.D.N.Y. Mar. 31, 2024) (Oetken, J.).[10]

*Plaintiffs Admit to Perjury.*  Plaintiffs Wang, Xing, Tao, and Go admit to perjuring themselves in their I-526 petitions submitted to USCIS, making their claims atypical of those of the broader class and rendering them inadequate representatives as a result.  Each represented in their petition, made under penalty of perjury, that their family and friends converted the currency they invested in the Chicago Project from Chinese yuan to U.S. dollars.  *See* Ex. 7 at -3645; Ex. 8 at -3108; Ex. 9 at -2294–95; Ex. 19 57:13-19, 60:24-61:19.  But during their depositions, each admitted that some or all the people that converted their funds were in fact complete strangers.  Plaintiff Wang admitted the person who helped her was not a friend, and she could not even recall whether the person was a man or woman.  Ex. 27 36:9-37:5.  Plaintiff Xing testified that several of the people who helped her were strangers suggested by Cansine.  Ex. 28 36:8-23.  Plaintiff Tao admitted that the people who helped her were not friends, but strangers arranged for by Cansine.  Ex. 24 42:24-43:15.  Plaintiff Go could not remember any of her supposed family and friends and admitted that they were "not necessarily . . . people we personally knew."  Ex. 19 58:22-60:1.

---

[10]    When a proposed class representative's claims are subject to unique defenses, courts analyze the issue under both the typicality and adequacy prongs of Rule 23.  *See id.*

Plaintiffs Wang, Xing, Tao, and Go will be subject to serious attacks on their credibility for misrepresenting information to USCIS, making their claims atypical and causing them to be inadequate representatives of the class by extension. *See Stewart v. Hudson Hall LLC*, 2021 WL 6285227, at \*12–13 (S.D.N.Y. Nov. 29, 2021) (rejecting representative for committing perjury and misrepresenting themselves); *Kline v. Wolf*, 702 F.2d 400, 403 (2d Cir. 1983) (proposed representative inadequate where there was evidence of perjury); *Chana Friedman-Katz v. Lindt & Sprungli*, 270 F.R.D 150, 160 (S.D.N.Y. 2010) (same); *Andrews v. Sazerac Co.*, 2025 WL 19312, at \* 6 (S.D.N.Y. Jan. 2, 2025) (same).[11]

*Plaintiff Shi Invoked the Fifth Amendment.*  Plaintiff Shi is subject to unique credibility attacks because she invoked the Fifth Amendment and refused to testify during her deposition when asked about the source of the funds she invested in the Chicago Project. Ex. 22 57:7-15 ("So I—I plead the Fifth Amendment.").  Her invocation of the Fifth Amendment and refusal to testify will seriously and negatively impact her credibility in front of a jury. *See Baxter v. Palmigiano,* 425 U.S. 308, 318 (1976) ("the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify").

*Plaintiff Yao Testified Inconsistently and Incompletely on Critical Issues.*  Plaintiff Yao is subject to unique attacks because of critical inconsistencies and gaps in her testimony. *See Cohen v. Lati*, 98 F.R.D. 581, 583 (E.D.N.Y. 1983) ("[I]nconsistencies, standing alone, provide a sufficient basis for denial to the plaintiff of class representative status.").  Plaintiff Yao testified in the same deposition that (a) she had the escrow agreement before investing (which was impossible because the developer did not give the signed agreement to Cansine), Ex. 26 87:7-18, 89:3-5, and (b) she

---

[11]    Other Plaintiffs made similar representations in their I-526 petitions but would not admit to perjuring themselves. *See, e.g.*, Ex. 21 53:25-55:15.

did not have the escrow agreement and had to ask TD's Schaff for a copy in 2019—years after she

invested, *id.* 100:12-101:15.  When confronted with this inconsistency, she became flustered and

asked for a break from the questioning.  *Id.* 100:12-104:24.  Her inconsistent testimony and

palpable discomfort could lead a jury to conclude that she never received or read any escrow

agreement before investing.

Plaintiff Yao also testified that she communicated with only one other investor regarding

their investments in the project.  Ex. 26 18:6-21.  When later asked about her participation in

multiple group chats with other investors about the project, she testified that she did not remember

details about these chats or whether she was even a member of the group.  *Id.* 30:24-31:1, 32:12-

21.  After being pressed, though, she recanted and admitted to participating in group chats with

other investors.  *Id.* 31:16-22.  Plaintiff Yao also could not recall a single detail from an eighteen-

minute call she had with Carillon's Ding less than two years earlier.  *Id.* 25:1-26:22.  Her

contradictions and purportedly poor memory make her claims susceptible to unique credibility

defenses and prevent her from adequately representing the interests of the class.  *See Darvin v.*

*Int'l Harvester*, 610 F. Supp 255, 257 (S.D.N.Y. 1985) (rejecting proposed representative due to

inconsistencies and memory issues).

### *Plaintiff Yao "Lost" Evidence, and Plaintiffs Yao and Tao Did Not Produce Documents.*

Plaintiff Yao is also subject to unique credibility and evidentiary attacks because she claims to

have "lost" her cellphone that would have contained relevant evidence *after* filing this lawsuit and

did not produce *anything* in discovery, including her I-526 petition.  Ex. 26 22:22-23:16.  Plaintiff

Tao failed to produce documents as well.  These are sufficient grounds to reject them as class

representatives.  *See Koss v. Wackenhut Corp.*, 2009 WL 928087, at *8 (S.D.N.Y. Mar. 30, 2009)

(rejecting proposed representatives for failing to produce documents); *Pagan v. Abbott Labs., Inc.*,

287 F.R.D. 139, 150 (E.D.N.Y. 2012) (rejecting proposed representative who may have spoliated the drugs that caused her alleged injury).

## III. PLAINTIFFS HAVE NOT ESTABLISHED THAT THEY WOULD BE ADEQUATE CLASS REPRESENTATIVES

Rule 23(a)(4) requires proposed class representatives to prove that they are able to represent the interests of the putative class "fairly and adequately." Fed. R. Civ. P. 23(a)(4). The parties seeking class certification bears the burden of establishing by a preponderance of the evidence that each proposed representative will fairly and adequately represent the interests of the class. *Myers*, 624 F.3d at 547. Courts look to the totality of the circumstances when considering whether plaintiffs have carried their burden. *See Catzin v. Thank You & Good Luck Corp.*, 2016 WL 11779675, at *6 (S.D.N.Y. Oct. 3, 2016).

Plaintiffs makes no effort to prove, for each proposed class representative, the sort of diligence, integrity, familiarity, and engagement necessary to represent the putative class fairly and adequately. A considered analysis shows that the proposed class representatives' ability to represent absent class members fairly and adequately is seriously questionable. Several proposed class representatives do not control even their own claims (as explained below) and have not monitored the litigation whatsoever. Others have never reviewed the complaint and lack even a basic understanding of the suit, and none of the proposed class representatives have diligently litigated their own claims.

### A. Plaintiffs Do Not Oversee or Control Their Own Claims

Plaintiffs ask the Court to put them in charge of absent class members' claims, but many do not oversee or control even their own claims. A proposed class representative who does not oversee and control his or her own claims cannot be entrusted to oversee and control the claims of others.

*Plaintiffs Have Offloaded Oversight of Their Claims to Non-Parties.*  A proposed class representative's reliance on a non-party to control his or her claims disqualifies that proposed class representative from controlling litigation on behalf of absent class members.  *See Russell v. Forster & Garbus, LLP*, 2020 WL 1244804, at *4–6 (E.D.N.Y. Mar. 16, 2020) (denying class certification where proposed representative's "wife, who is not a party to the action, [would be] making decisions behind the scenes on behalf of the proposed class"); *Koenig v. Benson*, 117 F.R.D. 330, 337 (E.D.N.Y. 1987) (finding proposed representative who "relie[d] upon his son and attorney to guide him through this litigation" unsuitable).  Here, Plaintiffs Dou, Zhan, and Shao have shifted all responsibility for overseeing and prosecuting their claims to their husbands or parents.  *See* Ex. 21 24:13-17, 41:9-42:23; Ex. 23 56:9-13; Ex. 25 23:6-25:21.  And if Plaintiffs Dou, Zhan, and Shao were made representatives of the putative class, their husbands and parents would presumably be in charge of the absent class members' claims too.  But these family members are unknown and unaccountable:  They are foreign non-parties who have not participated in discovery or submitted to the jurisdiction of this Court.  Their diligence, interests, and capabilities—or lack thereof—are all unknown, and there is no recourse against them should they fail to uphold their responsibilities as class representatives.   Given their complete reliance on unknown and unaccountable non-parties, Plaintiffs have not carried their burden of showing that Plaintiffs Dou, Zhan, and Shao can adequately represent absent class members.

*Plaintiffs Are Not Monitoring the Litigation.*  Proposed class representatives who have signed on as passive, uninformed plaintiffs have not shown the diligence required to adequately represent the interests of the class and should be rejected.  *See Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1077–78 (2d Cir. 1995) ("class certification may properly be denied where the class representatives have so little knowledge of and involvement in the class action that

they would be unable or unwilling to protect the interests of the class"); *Wexler v. AT&T Corp.*, 323 F.R.D. 128, 130 (E.D.N.Y. 2018) (representatives have "significant" duty to monitor litigation). Plaintiffs Zhan, Xiao, and Wang have all demonstrated that they are not even minimally engaged with this litigation. Plaintiff Zhan was not aware that this case had been severed from the Illinois action. Ex. 25 38:25-39:2, 42:11-16. Plaintiff Xiao did not know when or where this lawsuit was filed. Ex. 20 40:8-41:9. Plaintiff Wang testified that she has not been following this litigation and "cannot pay attention" to it because she has too much going on at home. Ex. 27 30:6-21.

## B.    Plaintiffs Lack a Basic Familiarity with the Claims, Pleadings, and Facts

A class representative must understand the basic claims, filings, and facts to intelligently steer the litigation for the benefit of the class. Plaintiffs Dou, Xiao, Zhan, Shi, and Shao do not meet that minimal level of understanding and engagement. They never reviewed the complaint or do not have even a basic grasp of the core facts and evidence.

*Plaintiffs Have Never Reviewed the Complaint.* Class representatives are expected to review and understand foundational case filings, like the complaint. A proposed class representative who has not reviewed or does not understand the foundational case filings shows a profound lack of engagement and should be rejected as a class representative. *See In re Term Commodities Cotton Futures Litig.*, 2022 WL 485005, at *7 (S.D.N.Y. Feb. 17, 2022) (rejecting proposed representative who was "unsure whether he had reviewed the . . . complaint"); *Koenig*, 117 F.R.D. at 337 (rejecting proposed representative who "did not read his complaint before it was filed"). Here, Plaintiffs Dou, Xiao, and Zhan either could not recall reviewing the complaint at any point—before or after its filing—or admitted outright that they never have. *See* Ex. 20 56:8-13; Ex. 23 55:13-57:9; Ex. 25 40:4-41:12. Plaintiffs who have not even read the complaint, like Plaintiffs Dou, Xiao, and Zhan, should not be made class representatives.

26

_**Plaintiffs Are Not Familiar with Basic Aspects of the Case.**_   Class representatives are also expected to have a working familiarity with the basic facts and evidence in the case.   Proposed class representatives who have failed to familiarize themselves with those basic facts and evidence have not demonstrated the requisite engagement and diligence necessary to adequately advance the interests of absent class members.   _See Scott v. New York City District Council of Carpenters Pension Plan_, 224 F.R.D. 353, 355–56 (S.D.N.Y. 2004) (rejecting proposed representatives who demonstrated "alarming lack of familiarity with the suit").   Here, Plaintiffs Shi, Shao, and Xiao have shown an extreme unfamiliarity with the basic facts and evidence, down to their own records. Their unfamiliarity with their own I-526 petitions, which is the only document many produced, is emblematic.   Plaintiff Shi testified that she did not recognize her I-526, could not remember whether she had personally prepared and submitted the petition, or if she had even reviewed it before it was submitted to USCIS. Ex. 22 52:21-53:20, 54:13-16.   Plaintiff Shao did not recognize her own I-526 petition despite seeing her signature on the document certifying, under penalty of perjury, that its contents were true.   Ex. 21 50:8-52:12.   Plaintiff Xiao did not know what an I-526 petition was and did not recall submitting one.   Ex. 20 48:4-21, 63:4-25.   When he was shown his signature on the petition, he confirmed that it "was [his] signature," "[b]ut [he] didn't know what's [sic] the document's about when [he] signed on it."   Ex. 20 49:2-8.   Plaintiff Xiao also did nothing to prepare for his deposition other than arranging for its time and place and did not review any documents beforehand.   Ex. 20 24:5-22, 25:7-14.   This lack of preparation shows a grave lack of diligence and unsuitability to serve as class representative as well.   _See Weisman v. Darneille_, 78 F.R.D. 669, 671 (S.D.N.Y. 1978) (denying class certification and finding relevant to adequacy that proposed representative did not meet with counsel until day of deposition).

*          *          *

Various Plaintiffs have offloaded responsibility for overseeing their own claims to unknown and unaccountable non-parties, are not monitoring the litigation, have never reviewed the complaint, and lack even a basic understanding of the suit. They have not demonstrated the diligence, familiarity, and engagement necessary to represent absent class members fairly and adequately and should be rejected as representatives.

### CONCLUSION

TD respectfully requests that the Court deny Plaintiffs' motion for class certification.


Dated: August 19, 2025          Respectfully submitted,
      New York, New York

**SIMPSON THACHER & BARTLETT LLP**

*/s/ Lynn K. Neuner*
Lynn K. Neuner
Patrick K. Barry
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
lneuner@stblaw.com
patrick.barry@stblaw.com

*Attorneys for Defendant TD Bank, N.A.*

**WORD COUNT CERTIFICATION**

I, Patrick K. Barry, Esq., submit this certification pursuant to Your Honor's Individual Rule 4.C.:

I hereby certify that the word count of TD's Opposition to Plaintiffs' Motion for Class Certification complies with Your Honor's Individual Rule 4.C., allotting 8,750 words for opposition briefs.

According to the word-processing system used to prepare this filing, the total word count for all printed text exclusive of the material omitted under Rule 7.1 of the Local Civil Rules of the United States District Court for the Southern and Eastern Districts of New York is 8,533 words.

Dated: August 19, 2025
        New York, New York

        /s/ Patrick K. Barry
        Patrick K. Barry
        SIMPSON THACHER & BARTLETT LLP
        425 Lexington Avenue
        New York, New York 10017
        Telephone: (212) 455-2000
        patrick.barry@stblaw.com